No. 11-3750

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

### RYAN HART,

*Plaintiff-Appellant,*

v.

### ELECTRONIC ARTS, INC.,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

### APPELLANT'S OPENING BRIEF;
### APPENDIX TO THE BRIEFS, VOLUME I (APP0001-APP0074)

---

Timothy J. McIlwain
Attorney at Law, LLC
5 Marine View Plaza, Suite 300
Hoboken, NJ  07030
Ph:  (201) 420-1911
Fax: (201) 420-8054

*Attorney for Plaintiff-Appellant Ryan Hart*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RELATED CASES AND PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.    Hart's Claim Involves a Core Violation of his Common Law
        Right of Publicity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.    The Purpose of the Right of Publicity. . . . . . . . . . . . . . . . . . 16

        B.    EA's Commercial Exploitation of Hart's Likeness
                Constitutes a Core Violation of the Right of Publicity. . . . . . 20

    II.    The First Amendment Does Not Shield EA from Liability for
        its Infringement of Hart's Right of Publicity. . . . . . . . . . . . . . . . . . 23

        A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        B.    EA's First Amendment Rights Must Be Balanced
                Against Hart's Right of Publicity and the State
                Interests Served Thereby. . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

C.   EA's First Amendment Interests Do Not Outweigh
     Hart's Right of Publicity. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

     1.   EA's Predominant Purpose in Using Hart's
          Likeness in "NCAA Football" Was Commercial. . . . . 30

     2.   EA's Use of Hart's Identity Was Not
          "Transformative". . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

          a.   The "Transformative Use" Test. . . . . . . . . . . . . 35

          b.   EA Did Not "Transform" Hart's Likeness,
               but Simply Appropriated Its Economic
               Value. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

     3.   The Second Circuit's "Relatedness" Test Is
          Inapplicable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

     4.   Hart's Right of Publicity Claim Should Also Be
          Allowed To Proceed Under an Ad Hoc Balancing
          of the Relevant Interests.. . . . . . . . . . . . . . . . . . . . . . . 54

III.   The District Court Should Have Permitted Additional
       Discovery Before Granting Summary Judgment. . . . . . . . . . . . . . . 57

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

CERTIFICATE OF BAR MEMBERSHIP. . . . . . . . . . . . . . . . . . . . . . . . . 64

# TABLE OF AUTHORITIES

## CASES

*Allendale Leasing, Inc. v. Stone*,
  614 F.Supp. 1440 (D.R.I. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Brown v. Entertainment Merchants Ass'n*,
  131 S.Ct. 2729 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
  95 F.3d 959 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 29, 42, 54

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*City of Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Costlow v. United States*,
  552 F.2d 560 (3d. Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Doe v. Abington Friends School*,
  480 F.3d 252 (3d. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*ETW Corp. v. Jireh Publishing, Inc.*,
  332 F.3d 915 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 54

iii

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Facenda v. N.F.L. Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21, 53

*Golan v. Holder*,
  _ U.S. _, 2012 WL 125436 (Jan. 18, 2012). . . . . . . . . . . . . . . . . . . . . . . . . 27

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kaucher v. County of Bucks*,
  455 F.3d 418 (3d. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Keller v. Electronic Arts, Inc.*,
  No. C 09-1967 CW, 2010 WL 530108,
  38 Media L. Rep. 1353 (N.D. Cal. Feb. 8, 2010). . . . . . . . . . . . . . . . . 35, 48, 49

*Kois v. Wisconsin*,
  408 U.S. 229 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*McFarland v. Miller*,
  14 F.3d 912 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

*Estate of Presley v. Russen*,
  513 F.Supp. 1339 (D.N.J. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50, 51, 52

*Rose v. Bartle*,
  871 F.2d 331 (3d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 60

*Sames v. Gable*,
  732 F.2d 49 (3d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

iv

*San Francisco Arts & Athletics, Inc. v. U.S.O.C.*,
    483 U.S. 522 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*St. Surin v. Virgin Islands Daily News, Inc.*,
    21 F.3d 1309 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Tellado v. Time-Life Books, Inc.*,
    643 F.Supp. 904 (D.N.J. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Diebold, Inc.*,
    369 U.S. 654 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Zacchini v. Scripps-Howard Broadcasting Co.*,
    433 U.S. 562 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATE CASES

*Canessa v. J.I. Kislak, Inc.*,
    235 A.2d 62 (N.J. Super. Ct. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*Castro v. NYT Television*,
    851 A.2d 88 (N.J. Super. Ct. App. Div. 2004). . . . . . . . . . . . . . . . . . . . . . . . 19

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*,
    25 Cal.4th 387, 21 P.3d 797 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Doe v. TCI Cablevision*,
    110 S.W.3d 363 (Mo. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kirby v. Sega of America, Inc.*,
    50 Cal.Rptr.3d 607 (Cal. Ct. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . *passim*

*No Doubt v. Activision Publishing, Inc.*,
    122 Cal.Rptr.3d 397 (Cal. Ct. App. 2011) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Palmer v. Schonhorn Enterprises, Inc.*,
    232 A.2d 458 (N.J. Super. Ct. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

*Winter v. DC Comics*,
    30 Cal.4th 881, 69 P.3d 473 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## DOCKETED CASES

*Brown v. Electronic Arts, Inc.*,
    9th Cir. No. 09-56675. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Keller v. Electronic Arts, Inc.*,
    9th Cir. No. 10-15387. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## STATUTES AND REGULATIONS

28 U.S.C. §1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1332. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## RULES

Federal Rules of Civil Procedure
    Rule 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
    Rule 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    Rule 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## MISCELLANEOUS

*Restatement (Second) of Torts* §652C cmt. d (1977). . . . . . . . . . . . . . . . . . . . . 19

Joe Nocera, "Let's Start Paying College Athletes," *New York Times Magazine*, Dec. 30, 2011, at MM30, *available at* http://www.nytimes.com/ 2012/01/01/magazine/ lets-start-paying-college-athletes.html. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Taylor Branch, "The Shame of College Sports," *The Atlantic*, Oct. 2011, *available at* http://www.theatlantic.com/magazine/ archive/2011/10/ the-shame-of-college-sports/8643/. . . . . . . . . . . . . . . . . . . 57

Yongjae Kim, Patrick Walsh, & Stephen D. Ross, "An Examination
of the Psychological and Consumptive Behaviors of Sports Video
Gamers," 17 *Sports Marketing Quarterly* 44 (2008)...................... 21

## JURISDICTION

The district court had diversity jurisdiction under 28 U.S.C. §1332(a)(1)

because plaintiff-appellant Ryan Hart ("Hart") is a resident of New Jersey,

defendant-appellee Electronic Arts, Inc. ("EA") is incorporated in Delaware and

has its principal place of business in California, and the amount in controversy

exceeds $75,000.  APP0088-89.[1/]  The district court entered final judgment on

September 9, 2011.  APP0006-07.  Hart filed a timely notice of appeal on October

5, 2011.  APP0001.  This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED FOR REVIEW

1.  Did the trial court err in ruling on summary judgment that the First

Amendment provides a complete defense to a former college football player's

right-of-publicity claim, brought against a video game publisher who appropriated

the player's likeness, and the likenesses of similarly situated NCAA athletes, to

enhance the realism of its "NCAA Football" video games and thereby induce

consumers to purchase the games?  *See* APP0460-69 (raising issue); APP0700-09

(objecting); APP0052-62 (ruling).

2.  Did the district court err in granting summary judgment without

permitting plaintiff Hart to take any discovery, including into how EA markets and

---

[1/]  In this brief, the Appendix to the Briefs is cited as "APP####".

1

sells its "NCAA Football" games, the extent to which users play the games without modifying the realistic likenesses and abilities of the virtual athletes depicted, and the revenues and licensing arrangements for EA's "NCAA Football" and similar games, when that discovery could have demonstrated the commercial, non-transformative, non-expressive nature of EA's appropriation of Hart's likeness? *See* APP0680-81, APP0688, APP0698 n.4 (raising issue); APP0718-19 (objecting); APP0016-17 (ruling).

## RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court. Two appeals raising similar issues are pending before the U.S. Court of Appeals for the Ninth Circuit in *Keller v. Electronic Arts, Inc.*, No. 10-15387, and *Brown v. Electronic Arts, Inc.*, No. 09-56675, which are under submission.

## STATEMENT OF THE CASE

This is a class action lawsuit filed against Electronic Arts, Inc. by Ryan Hart, the quarterback of Rutgers University's NCAA Division I football team from 2002-05. Hart alleges that EA exploited his likeness and the likenesses of many similarly situated NCAA football players by using hyper-realistic virtual avatars of those athletes in its highly popular "NCAA Football" games, in violation of the athletes' state law right of publicity.

2

On September 9, 2011, the U.S. District Court for the District of New Jersey granted summary judgment to EA on the ground that the First Amendment precludes any state law interference with a video game manufacturer's use of realistic depictions of celebrities and other public figures.

## PROCEDURAL HISTORY

Hart filed this putative class action lawsuit on June 15, 2009 in the Superior Court for the State of New Jersey, Law Division, Somerset County, and he amended his complaint on October 26, 2009.  APP0093, APP0188.  On November 24, 2009, EA removed the lawsuit to the district court, where it was assigned to Judge Freda L. Wolfson.  APP0083.

On September 22, 2010, Judge Wolfson dismissed with prejudice several of the claims in Hart's first amended complaint (which are no longer at issue), and allowed him to re-plead his New Jersey common law right-of-publicity claim. APP0361.  The court found that Hart's original complaint did not sufficiently allege when or how EA appropriated his likeness for commercial purposes, but allowed amendment because Hart's opposition to EA's motion to dismiss and supporting declarations set forth facts sufficient to state a right-of-publicity claim. APP0350-56.

3

On October 12, 2010, Hart filed his second amended complaint, which alleged that EA had tortiously misappropriated his likeness and identity by modeling the Rutgers quarterback in "NCAA Football 2004," "NCAA Football 2005," and "NCAA Football 2006" on his own likeness and identity, and by using an actual photograph of him in "NCAA Football 2009."  APP0362, APP0369-71. Hart sought damages on behalf of himself and a class of the similarly situated college athletes depicted in "NCAA Football."  APP0374, APP0379-80.

EA filed a second motion to dismiss or in the alternative for summary judgment.  Conceding for purposes of its motion that "NCAA Football" infringed upon Hart's right of publicity under New Jersey law, EA argued that the First Amendment nonetheless provided a complete affirmative defense to any claims based on misappropriation of the digitized subjects' images.  *E.g.*, APP0432-34. In support of its motion, EA submitted copies of the actual "NCAA Football" games to the court (which it asked Judge Wolfson to "independent[ly] review"), accompanied by declarations explaining how the game operated.  APP0441-43, APP0476-0524, APP0527-78.

Hart opposed EA's alternative motion.  Hart contended that EA's First Amendment interests did not trump his own right of publicity.  APP0700-09.  Hart also submitted three declarations of his own and asked for leave to take discovery

4

before the court considered summary judgment.  APP0579-0674, APP0680-81,

APP0688.

The district court, without providing any advance notice that it would

decide EA's motion under Rule 56, granted summary judgment to EA on

September 9, 2011.  APP0008.  The court accepted EA's concession that Hart had

a valid right-of-publicity claim under New Jersey law.  APP0019-23.  The court

then balanced that right against EA's asserted First Amendment interests by using

the "transformative use" test established by the California Supreme Court in

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 21 P.3d 797

(2001).  APP0041-48.

The district court concluded, based on the games and their descriptions in

the record, that EA's use of Hart's likeness in "NCAA Football" was sufficiently

"transformative" to entitle EA to judgment as a matter of law because: 1) users

have the ability to modify certain default attributes of the virtual players during the

course of play; and 2) the games contain "creative elements" such as "virtual

stadiums, athletes, coaches, fans, sound effects, music, and commentary . . .

created or compiled by the games' designers."  APP0055-59 (citation omitted).  As

an alternative basis for its ruling, the court concluded that EA's First

Amendment's interests trumped Hart's right of publicity under the "relatedness"

test urged by EA (which the court nonetheless criticized, and properly so, *see infra* Part II.C.3).  APP0062-67.

Hart filed a timely notice of appeal on October 5, 2011.  APP0001.

## FACTS

The facts set forth below are drawn from the district court's opinion, the declarations submitted by the parties, and the games themselves, which are in the record.

As the district court noted, Hart included a statement of material facts in his opposition to EA's alternative motion for summary judgment, but did not submit a *separate* response to EA's Statement of Undisputed Facts.  APP0009 n.1.  The court penalized Hart for this oversight by treating every fact asserted by EA as admitted, even though it had not informed the parties of its intent to proceed under Rule 56.  *Id.*; *cf. Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989) (district court should "apprise[] the parties of the proposed conversion" of a motion to dismiss into a motion for summary judgment).

Despite Hart's failure to submit a Rule 56.1 response, this appeal should be governed by the usual standards applicable to summary judgment review, in which all facts in the record are construed in the light most favorable to Hart as the non-moving party, and all inferences are drawn in his favor.  *United States v. Diebold,*

6

*Inc.*, 369 U.S. 654, 655 (1962).  Unlike the typical appellate case involving a paper record and some demonstrative exhibits, this appeal requires the Court to analyze the actual content of a video game, and to assess how it is played and how it can be modified.  All four versions of "NCAA Football" at issue (2004, 2005, 2006, and 2009) have been submitted by EA for this Court's review, just as they were submitted to the district court.  APP0527.  To the extent the contents and attributes of these games support Hart's factual allegations, and to the further extent that EA has not disputed several allegations in Hart's second amended complaint, those facts should be accepted as true for purposes of this appeal.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) (moving party has the burden of demonstrating "the absence of a genuine issue of material fact" by identifying "factually unsupported claims or defenses"); *see also* APP0010 (citing EA's Statement of Undisputed Facts and the allegations in Hart's second amended complaint); APP0017, APP0056-59 (referring to court's independent review of the games' content).

*     *     *

Ryan Hart is a former starting quarterback for Rutgers University's Division I college football team.  He went to high school in Florida, then played football for Rutgers during the 2002-05 seasons.  APP0631.  When playing for Rutgers, Hart

7

was 6'2" tall, weighed 197 pounds, and wore the number 13, a helmet visor, and a wrist band on his left arm. APP0632. Hart never authorized EA to use his identity or to replicate his likeness in creating a digital version of the Rutgers University quarterback featured in "NCAA Football." APP0631.

Appellant Electronic Arts is a video game developer, publisher, and distributor. APP0529-30. EA's products include the "NCAA Football" video game series, "Madden NFL" (EA's officially licensed professional football video game), and several other professional sports games such as "FIFA Soccer," "Tiger Woods PGA Tour," and "NHL." *See, e.g.*, *id.*; APP0637.

EA sells versions of "NCAA Football" configured for different gaming platforms, including PlayStation 3, PlayStation 2, and XBox 360. APP0530. It has published a new edition of "NCAA Football" every year since 1993, with updated team rosters with revised player likenesses and abilities (*e.g.*, arm strength, passing accuracy, speed, and agility). APP0532. EA releases each new edition no later than mid-July of the year preceding the title year. *Id.*

The back covers of "NCAA Football 2004" and "NCAA Football 2009" proclaim that "NCAA Football" is the "#1 Selling NCAA Football Franchise." "NCAA Football" generates hundreds of millions of dollars in annual sales, and are sold using EA's "it's in the game" marketing slogan. APP0637; APP0377; *see*

8

http://www.ea.com/blog/sports.

EA designs its "NCAA Football" video games to recreate the college football game experience in highly realistic detail. The games, which EA markets as enabling consumers to "experience the excitement and challenge of college football," are "played" in virtual stadiums that are designed to mimic actual college campus venues, supplemented by sound effects such as crowd noise to enhance the overall you-are-there experience. APP0530-31.[2]

Users choose two college teams to compete against each other, and can play by themselves or with another user by calling plays and manipulating the virtual athletes by using a hand-held controller. *Id.* Pursuant to a licensing agreement with the Collegiate Licensing Company ("CLC," the NCAA's official licensing arm), "NCAA Football" incorporates actual NCAA college and team names, uniforms, logos, player numbers, stadiums, mascots, and fight songs. APP0532. EA encourages consumers to "[f]eel the true pride and passion of representing [their] school." APP0636.

The default players on each team included in "NCAA Football" are digitally created replicas of the actual players on that college team's roster for the

---

[2]   The trailer for EA's "NCAA Football 11" emphasizes, "We made it look just like it does on Saturday." *See* http://www.ea.com/sports-ncaa-football-11/ videos/a8d358edb9dc9210VgnVCM2000001165140aRCRD.

upcoming season.  For example, the Rutgers quarterback in "NCAA Football 2006," which was released shortly before Hart's final season, "bears resemblance to Hart and was designed with Hart's physical attributes, sports statistics, and biographical information in mind."  APP0056.  Like Hart, the Rutgers quarterback in "NCAA Football 2006" is a 6'2" tall, 197-pound athlete who hails from Florida and wears the number 13, a helmet visor, and a wrist band on his left arm.  APP0632-33.[3]  The virtual quarterback's speed and agility rating, his passing accuracy rating, and his arm strength – all of which determine how well the Rutgers team will perform against other teams – reflect Hart's actual skills and performance as the Rutgers quarterback.  APP0632-33.[4]  Although "NCAA Football" does not identify each depicted player by name, users can easily add the actual players' names by downloading computer files available on EA's computer servers.  APP0010 & n.3; "NCAA Football 2004" Instruction Manual at 32 (instructions for loading saved player roster).

---

[3]  Although EA contended below that the Rutgers quarterback in "NCAA Football 06" did not have a visor or a wrist band, APP0533, it did not dispute that the avatar replicated Hart in every other respect.

[4]  EA contended below that the Rutgers quarterback in "NCAA Football 04" and "NCAA Football 05" differed in minor respects from the Rutgers quarterback in "NCAA Football 06," APP0533, but there is no evidence (given the lack of discovery) concerning whether these purported differences reflect actual changes in Hart's weight and performance during the years depicted.

10

Certain default player characteristics in "NCAA Football" can be modified during the course of play.  APP0531.  However, users may not change the virtual players' home state, hometown, team, or school year.  APP0057 n.23. There is no indication in the record whether, or how often, consumers use this modification feature rather than playing the game in its more realistic default mode.  Common sense suggests, however, that because the principal attraction of the game is its realism, customers with strong loyalties to a particular college team are not likely to modify its players' attributes to make them less realistic.

In addition to "NCAA Football," EA creates and distributes annually updated versions of "Madden NFL," which depict professional NFL football with similar hyper-realism.  APP0637.  Under EA's exclusive licensing agreements with the NFL and the National Football League Players Association ("NFLPA"), "Madden NFL" not only includes realistic likeness of all professional football players, but also includes players' actual names.  APP0684.  EA reportedly pays the NFLPA millions of dollars to license the NFL athletes' publicity rights.  *Id.*; APP0372.

As a result of its exclusive licensing agreements, EA is the only company in the world that manufacturers and sells interactive football games featuring the realistic likenesses of actual NCAA and NFL teams and players – a fact that EA

11

emphasizes in marketing the games.  APP0682.  The cover of "NCAA Football 06," for example, notes EA's "exclusive NCAA license."

## SUMMARY OF ARGUMENT

Like nearly every other state, New Jersey protects the "right of an individual, especially a public figure or a celebrity, to control the commercial value and exploitation of his name and picture or likeness and to prevent others from unfairly appropriating this value for their commercial benefit."  *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1353 (D.N.J. 1981).  The rationale for this "right of publicity" "is the straightforward one of preventing unjust enrichment by the theft of good will."  *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576 (1977) (citation omitted).

The district court correctly recognized that EA's use of Hart's likeness in "NCAA Football" violated his right of publicity under New Jersey common law. New Jersey's courts recognized more than 40 years ago that the use of an athlete's likeness to "enhance the marketability of [a] game and public acceptance thereof" violates the athlete's right of publicity under New Jersey law.  *Palmer v. Schonhorn Enterprises, Inc.*, 232 A.2d 458, 459 (N.J. Super. Ct. 1967).  The market value that EA derives from its use of player likenesses is something "for which [EA] would normally pay,"  *Zacchini*, 433 U.S. at 576 (citation omitted);

12

indeed, it currently pays to use *professional* football players' likenesses in

"Madden NFL."

The district court nonetheless held that the First Amendment provides EA

with a complete defense to Hart's right-of-publicity claim. This Court should

reject that holding, which is contrary to both law and common sense. The First

Amendment does not grant EA the right to generate millions of dollars in revenue

through its commercial exploitation of college athletes' likenesses without seeking

authorization from, or providing compensation to, those athletes.

First, the predominant reason EA uses actual player likenesses in "NCAA

Football" is to generate commercial sales by recreating, in as much realistic detail

as modern technology permits, the athletic personas of actual college athletes. The

marketability of "NCAA Football" is enhanced by EA's use of those players'

likeness, and those realistic depictions increase EA's sales and profits by giving

consumers a reason to purchase a new, updated edition of "NCAA Football" every

year. *Cf. Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1012 (3d Cir. 2008)

(describing marketing for EA's "Madden NFL 06," which "extoll[s] the realism of

everything from the stadiums to the game play" and "underscore[s] the degree to

which the video game authentically recreates the NFL experience"). EA could

easily have created virtual football players of its own design, not modeled on

13

college teams' actual athletes, without affecting the expressive content of its

games.  Yet EA chose not to do so for purely commercial reasons – namely,

because realism enhances marketability and generates sales.

EA's use of Hart's likeness in "NCAA Football" was in no way

"transformative."  EA neither placed Hart in a setting different from that in which

he had achieved his fame, *cf. Winter v. DC Comics*, 30 Cal.4th 881, 69 P.3d 473

(2003); nor altered his physical likeness, biography, or abilities in a fantastical and

creative manner, *cf. id.*; *Kirby v. Sega of America, Inc.*, 50 Cal.Rptr.3d 607 (Cal.

Ct. App. 2006); nor used Hart's likeness in a manner, setting, or context designed

to criticize or satirize him or other college football athletes, *cf. Cardtoons, L.C. v.*

*Major League Baseball Players Ass'n*, 95 F.3d 959 (1996).  EA merely recreated

Hart's likeness in digital form to enhance the "realism" of its games, to permit

game users to "become" the particular college athletes they want to emulate or

"be," and to give consumers an incentive to purchase a new edition each year.  *Cf.*

*No Doubt v. Activision Publishing, Inc.*, 122 Cal.Rptr.3d 397 (Cal. Ct. App. 2011).

The mere fact that users have the opportunity to change some (but not all) aspects

of a player's likeness does not render the game's use of that likeness

"transformative," especially where the purpose of the game is not to create an

alternate sports universe, but to depict a particular college football team as

14

realistically as possible. *See id.* at 410. Likewise, that EA's digital game engineers exercise creativity and skill in building the digital "NCAA Football" world does not render EA's *use of Hart's likeness* transformative. *See Comedy III*, 21 P.3d at 810.

As in *Zacchini*, 433 U.S. at 576, no social purpose is served by denying Hart compensation for EA's infringement of his publicity rights. Because EA used Hart's likeness for a predominantly commercial purpose and in a non-transformative manner to generate millions of dollars in video game sales, this Court should hold that EA's First Amendment defense fails as a matter of law.

At a minimum, this Court should remand for further factual development. The district court entered judgment for EA without allowing any discovery. Through discovery, however, Hart could have established that consumers primarily play "NCAA Football" in its realistic default mode, without exercising their "opportunity" to modify certain player characteristics; that EA markets the games and targets particular audiences (including consumers who already own a prior edition) by focusing on their realistic portrayals of current college athletes; that the games generate millions of dollars in revenue; and that EA pays significant licensing fees to professional athletes and their representatives to use the professional athletes' equally protected identities and likenesses. That

15

discovery would establish even more clearly that EA's use of Hart's likeness was

commercial, non-transformative, and primarily designed to increase sales of the

"NCAA Football" franchise – and therefore not immunized by the First

Amendment.

## ARGUMENT

### I.    Hart's Claim Involves a Core Violation of his Common Law Right of Publicity

Defendant EA conceded for purposes of its dispositive motion that Hart had

established a prima facie violation of his New Jersey right of publicity.  APP0432.

Consequently, EA did not challenge the sufficiency of Hart's claim before the trial

court, and cannot challenge it on this appeal.  Nonetheless, before this Court

embarks on any First Amendment balancing, it bears emphasis that Hart's claim in

this case goes to the essence of his state law right.

### A.    The Purpose of the Right of Publicity

New Jersey recognizes and protects the right of publicity in order to protect

its citizens from unfair and unwanted commercial exploitation of their names,

identities, and likenesses.  Through the right of publicity, New Jersey protects an

individual's *privacy* interest in preventing unwanted uses of his name or likeness,

as well as his *property* right to control the commercial use of his name or likeness

16

Case: 11-3750    Document: 003110806271    Page: 25    Date Filed: 02/10/2012

and "enjoy the fruits of his own industry." *Palmer*, 232 A.2d at 462; *see also*

*Canessa v. J.I. Kislak, Inc.*, 235 A.2d 62, 66-76 (N.J. Super. Ct. 1967). The right

of publicity guarantees "'the right of an individual, especially a public figure or a

celebrity, to control the commercial value and exploitation of his name and picture

or likeness and to prevent others from unfairly appropriating this value for

commercial benefit.'" *McFarland v. Miller*, 14 F.3d 912, 918 (3d Cir. 1994)

(quoting *Presley*, 513 F.Supp. at 1353).

The unauthorized use of an individual's likeness "harms the person both by

diluting [its] value . . . and depriving that individual of compensation." *Id.* at 919.

In *Palmer*, for example, which involved a golf-theme board game that included the

names and profiles of famous golfers to "enhance the marketability of the game

and public acceptance thereof," the court concluded that the use of the golfers'

names "for the purpose of capitalizing upon the name by using it in connection

with a commercial project" violated their publicity rights under New Jersey law.

232 A.2d at 459, 462. In *McFarland*, this Court, applying New Jersey law, held

that George McFarland, who played "Spanky" in the "Our Gang" and "Little

Rascals" films and television shows, had a right-of-publicity claim against the

operators of the "Spanky McFarland" restaurant, because "[t]he right to exploit the

value of [the] notoriety or fame [associated with an individual's name or likeness]

17

belongs to the individual with whom it is associated."  14 F.3d at 923.  And in

*Estate of Presley*, the court concluded that Elvis Presley's estate could pursue a

right of publicity claim against the producer of "THE BIG EL SHOW," a "live

theatrical presentation or concert designed to imitate a performance of the late

Elvis Presley," because "the show serve[d] primarily to commercially exploit the

likeness of Elvis Presley."  513 F.Supp. at 1359.

Other jurisdictions have recognized right-of-publicity violations in similar

circumstances.  In *Zacchini*, for example, the U.S. Supreme Court considered an

Ohio right-of-publicity suit arising from an evening news broadcast of a 15-second

"human cannonball" act.  433 U.S. at 563-64.  The Supreme Court identified

several important state interests at stake, including "protecting the proprietary

interest of the individual in his act" and "preventing unjust enrichment by the theft

of good will," and concluded that the First Amendment posed no bar to the

plaintiff's right-of-publicity claim.  *Id*. at 573, 576-77.  In *No Doubt*, the

California Court of Appeal concluded that a video game publisher violated a

popular rock band's right of publicity by including realistic (yet user-manipulable)

digital avatars depicting the band's members in its "Band Hero" video game.  122

Cal.Rptr.3d at 409-12.  And in *Hilton v. Hallmark Cards*, 599 F.3d 894, 911 (9th

Cir. 2010), the Ninth Circuit determined that a humorous greeting card

18

lampooning Paris Hilton violated Hilton's right of publicity under California law. *Id.* at 909-12.

At the core of these decisions is the recognition that an individual has the right to control his or her own name and likeness, and that unauthorized appropriation of "the commercial or other values associated with the name or the likeness" is tortious. *Castro v. NYT Television*, 851 A.2d 88, 97 (N.J. Super. Ct. App. Div. 2004) (quoting *Restatement (Second) of Torts* §652C cmt. d (1977)); *see also McFarland*, 14 F.3d at 922 ("[W]e do not think New Jersey law would permit [defendant] to appropriate [plaintiff's likeness] for his own commercial advantage without [plaintiff's] consent . . . ."); *Presley*, 513 F.Supp. at 1360 (right of publicity applies to uses whose purpose "is to appropriate the commercial value of [plaintiff's] likeness"). "[H]owever little or much plaintiff's likeness and name may be worth, defendant, who has appropriated them for his commercial benefit, should be made to pay for what he has taken . . . ." *Canessa*, 235 A.2d at 75. Quite simply, "No social purpose is served by having the defendant get free some aspect of the plaintiff" – i.e., his name, identity, or likeness – "that would have market value and for which he would normally pay." *Zacchini*, 433 U.S. at 576 (citation omitted).

19

**B.    EA's Commercial Exploitation of Hart's Likeness Constitutes a Core Violation of the Right of Publicity**

These authorities require Hart's right-of-publicity claim to be given great weight in any First Amendment balancing.

The claim in this case is that EA "misappropriated and incorporated [Hart's] identity and likeness [in] NCAA Football 2004, NCAA Football 2005, NCAA Football 2006 and NCAA Football 2009."  APP0369.  EA did so by creating a virtual Rutgers quarterback that deliberately and explicitly replicated Hart's actual skills, appearance, and physical features, in order to appeal to potential consumers' interest in playing a virtual reality sports video game.  The digital Rutgers quarterback in "NCAA Football 06," for example, has the same height, weight, hometown, physical appearance, and football skills (including speed and agility, passing accuracy, and arm strength) as Hart.  *Id.*; *see also* APP0631-33; APP0635. As the district court found, this "virtual player bears resemblance to Hart and was designed with Hart's physical abilities, sports statistics, and biographical information in mind."  APP0056.  In addition, EA included a photograph of Hart throwing a pass during a Rutgers bowl game in "NCAA Football 09."  APP0534. EA used Hart's likeness in these instances without Hart's consent and without compensating him.  APP0371; APP0631.

20

EA included realistic player likenesses in "NCAA Football" "with the full intent of increasing the sales and profits" of the games. APP0374. By including Hart and other similarly situated college football athletes in its games, EA gives "NCAA Football" the "heightened realism" demanded by video game consumers who seek to "simulate actual college football matches in the most realistic manner possible." APP0374-76. Indeed, EA markets "NCAA Football" by declaring that the games permit consumers to "experience the most realistic authentic" football playing experience. APP0636. Including real college athletes in these games permits fans to "become" the athletes and teams they follow most closely, a feature that EA touts in its marketing. *Id.* (describing EA webpage declaring that "NCAA Football" permits consumers to "[f]eel the true pride and passion of representing [their] school"). Moreover, EA's use of actual college athletes' likenesses and abilities gives consumers a reason to purchase a new edition every year, with updated team rosters. *Cf. Facenda*, 542 F.3d at 1017 (infomercial for EA's similar "Madden NFL 06" portrayed prior editions as "antiquated").

Realism sells in the sports video game market. *See, e.g.*, Yongjae Kim, Patrick Walsh, & Stephen D. Ross, "An Examination of the Psychological and Consumptive Behaviors of Sports Video Gamers," 17 *Sports Marketing Quarterly* 44, 52 (2008) (concluding that sports gamers are motivated primarily by

identification with real teams and the opportunity to apply knowledge of the real sport). Consequently, as the district court recognized, it is "ludicrous to question whether video game consumers enjoy and, as a result, purchase more EA-produced video games as a result of the heightened realism associated with actual players." APP0053 (citation omitted).

EA greatly profited from its commercial exploitation of Hart and other similarly situated college athletes. EA's "NCAA Football" games are, by EA's own admission, the "#1 selling NCAA football franchise," and EA had $3.7 billion net revenue in 2010, APP0364, including hundreds of millions of dollars of revenue from its "NCAA Football" games, *id.*; APP0637.

As a well-known college athlete playing quarterback for a high-profile Division I football team, Hart's identity had substantial commercial value, which EA appropriated for its own benefit. *See* APP0350-52. Indeed, EA pays professional athletes significant licensing fees for its similar use of their likenesses in "Madden NFL." APP0684. Like the golf-themed game in *Palmer*, EA exploited the likenesses of Hart and other college football athletes in its "NCAA Football" games, without their consent and without compensating them, to increase the games' sales and marketability – a core violation of their state law right of publicity.

22

**II.    The First Amendment Does Not Shield EA from Liability for its Infringement of Hart's Right of Publicity**

The district court concluded, as a matter of law, that the First Amendment

provides EA with a complete affirmative defense to Hart's right-of-publicity

claim.  According to Judge Wolfson, the First Amendment gives game

manufacturers free rein to exploit the likenesses of athletes, celebrities, and other

public figures for the purely commercial purpose of marketing and selling their

games without having to compensate those individuals, as long as their games

contain expressive elements *other than* the realistic depiction of individuals whose

celebrity is critical to the games' marketability and success.  APP0055-57.

This Court should reject that reasoning.  As the Supreme Court made clear

in *Zacchini*, the right of publicity is not automatically trumped by a defendant's

First Amendment rights.  Instead, as in comparable areas like defamation, a

defendant's right to engage in protected expression must be carefully balanced

against a plaintiff's right-of-publicity interests, to ensure that neither right

impinges unnecessarily, or too greatly, upon the other.

The Supreme Court did not set forth in *Zacchini* a specific test to balance

those competing interests.[5]  Subsequent cases have proposed several alternative

_____

[5]    *See* 433 U.S. at 574-75 ("Wherever the line in particular situations is to
(continued...)

formulations.  As shown below, Hart should be entitled to a trial on his right-of-publicity claim under either of the two leading standards: the "predominant use" test adopted by the Missouri Supreme Court in *Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003), which is the most appropriate test for balancing the interests identified in *Zacchini*; or the "transformative use" test established by the California Supreme Court in *Comedy III*, which the district court applied.  EA advocated a third "relatedness" test in the district court, but that test should not apply here because plaintiff makes no claim under the federal Lanham Act and is not challenging the use of his identity in the *title* of EA's games.

## A.    Standard of Review

This Court reviews the grant of summary judgment *de novo*, construing all facts and drawing all inferences in the light most favorable to the non-moving party.  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d. Cir. 2006).  Summary judgment is only proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

---

[5/] (...continued)
be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent.").

**B.    EA's First Amendment Rights Must Be Balanced Against Hart's Right of Publicity and the State Interests Served Thereby**

In the district court, EA devoted much of its briefing to the proposition that its "NCAA Football" games are expressive works "fully protected by the First Amendment."  APP0445.  Hart does not dispute that EA's games contain expressive elements, or that interactive digital games as a genre can constitute expressive speech under First Amendment.  *See Brown v. Entertainment Merchants Ass'n*, 131 S.Ct. 2729, 2733, 2736-37 (2011).  However, finding that EA's First Amendment interests are implicated by its manufacture and sale of "NCAA Football" is only the first step in the required balancing analysis.  As *Zacchini* establishes, this Court must still engage in a careful balancing of EA's First Amendment rights against Hart's right of publicity to determine whether, or in what circumstances, Hart's state law rights must give way.[6]

_____

[6]    Although the Supreme Court concluded that the video games at issue in in *Brown* were constitutionally protected, the expressive content of the video games in *Brown* was far greater than those in this case.  *Brown* involved plot-driven "violent" video games with a substantial narrative component, similar for constitutional purposes to the violent books often read by children.  131 S.Ct. at 2736-37 (discussing *Grimm's Fairy Tales*, *The Odyssey*, *The Inferno*, and *Lord of the Flies*).  In finding those games protected by the First Amendment, the Supreme Court explained that, "[l]ike the protected books, plays, and movies that preceded them, video games communicate ideas – and even social messages – through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with

(continued...)

25

The speech at issue in *Zacchini* was a television newscast – core expressive speech under the First Amendment.  433 U.S. at 564.  Nonetheless, the Supreme Court held that the First Amendment did not immunize defendant news station from a right-of-publicity claim for having broadcast plaintiff's 15-second "human cannonball" act during the evening news.  *Id.* at 578.  The Court explained that "[t]he rationale for protecting the right of publicity is the straightforward one of preventing unjust enrichment by the theft of good will"; and, like the protections provided by patent and copyright law, the right also "encourage[s] . . individual effort by personal gain."  *Id.* at 576.  Comparing the interests served by the right of

---

6/ (...continued)
the virtual world)" – features that were "suffic[ient] to confer First Amendment protection."  131 S.Ct. at 2733.  By contrast, EA's "NCAA Football" games do not communicate any ideas or social messages; instead, they provide users with a platform for competition.  The basic game-play format features no plot, narrative, or character development, but simply permits two college teams chosen by users to square off against each other in a single game.  APP0530-31.  Like an actual playground football game or the golf-themed board game in *Palmer*, the purpose of "NCAA Football" is to permit users to compete against one another, or against the computer, not to convey ideas or messages.  Thus, like immensely popular video and arcade games of the past such as Pong, Pac-Man, and Asteroids, NCAA Football falls at the end of the expressiveness continuum farthest from games that most closely replicate protected media like books or films.  The competitive setting of "NCAA Football" is far more sophisticated than that of Pong or Pac-Man, given developments in video game technology over the past few decades, but that setting does not alter the inherently competitive, non-communicative nature of game play.  *Cf. Allendale Leasing, Inc. v. Stone*, 614 F.Supp. 1440, 1453-55 (D.R.I. 1985) (rejecting argument that bingo is "a form of entertainment" comparable "to protected expression such as films and dancing").

26

publicity to those served by other intellectual property protections like patent and

copyright law, the Court held that the First Amendment "does not prevent Ohio

from making a similar choice . . . to protect the entertainer's incentive in order to

encourage the production of [his] type of work." *Id.* at 577.[7]

    *Zacchini* establishes that a defendant's First Amendment rights do not

automatically trump a plaintiff's publicity rights. *See, e.g.*, *TCI Cablevision*, 110

---

[7]  The holding in *Zacchini* is fully consistent with other decisions involving
purported conflicts between the First Amendment and intellectual property rights.
In *San Francisco Arts & Athletics, Inc. v. U.S.O.C.*, 483 U.S. 522 (1987), for
example, the Supreme Court held that a statute limiting the use of the word
"Olympic" by entities other than the United States Olympic Committee did not
violate the First Amendment because "neither Congress nor the USOC has
prohibited the [plaintiff] from conveying its message . . . . [The statute] restricts
only the manner in which [plaintiff] may convey its message. The restrictions on
expressive speech properly are characterized as incidental to the primary
congressional purpose of encouraging and rewarding the USOC's activities." *Id.*
at 536. Likewise, in *Eldred v. Ashcroft*, 537 U.S. 186 (2003), the Court
recognized that copyright laws that merely "protect[] authors' original expression
from unrestricted exploitation" are not subject to heightened First Amendment
scrutiny of any kind, *id*. at 221, a conclusion the Court recently reiterated in *Golan
v. Holder*, _ U.S. _, 2012 WL 125436 (Jan. 18, 2012), in holding that a statute
restoring copyright protection to works previously in the public domain did not
violate the First Amendment. *Id.* at *16 (explaining that statute did not "impose a
blanket prohibition on public access" to newly protected works, but simply
required "would-be users [to] pay for their desired use of the author's expression,
or else limit their exploitation to 'fair use' of that work").

    By contrast, the law struck down in *Brown* was specifically targeted at and
designed to restrict the violent messages conveyed by certain video games. 131
S.Ct. at 2732-33.

S.W.3d at 372 (*Zacchini* "acknowledged, as had many lower courts previously, that the right of publicity is not always trumped by the right of free speech"); *Comedy III*, 21 P.3d at 806 (*Zacchini* establishes that "the state's interest in preventing the outright misappropriation of [the] intellectual property [protected by the right of publicity] by others is not automatically trumped by the interest in free expression or dissemination of information . . . ."). As in many other First Amendment contexts, this Court must carefully balance the competing interests, as reflected in the actual circumstances of this case. *Cf. Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994) (in determining whether particular use of copyrighted material constitutes "fair use," courts employ careful case-by-case analysis, weighing relevant factors "in light of the purposes of copyright").

## C. EA's First Amendment Interests Do Not Outweigh Hart's Right of Publicity

Courts that have considered the relationship between the right of publicity and the First Amendment after *Zacchini* have crafted several tests to balance the important competing interests. The Missouri Supreme Court, for example, established a "predominant use" test, *see infra* Part II.C.1, while the California Supreme Court adopted a "transformative use" test, *see infra* Part II.C.2. EA argued below that a third test, the "relatedness" test developed by the Second

Circuit in federal Lanham Act cases, should be used. *See infra* Part II.C.3.

Finally, some courts have applied an ad hoc, case-by-case balancing test. *See, e.g.*, *ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915, 937-38 (6th Cir. 2003); *Cardtoons*, 95 F.3d at 970-76.

This Court's goal should be to identify the test that best identifies those instances in which a traditionally protected interest must yield to overriding First Amendment concerns, while giving adequate protection to the important state interests served by the right of publicity.[8] To satisfy *Zacchini*, the test must strike a balance, and not cause the right of publicity to lose all viability where the First Amendment interests are tangential or collateral, or could be adequately protected without unduly encroaching on plaintiffs' state law rights, or do not encompass the infringing work as a whole. *See, e.g.*, *Comedy III*, 21 P.3d at 811 ("[W]ere we to decide that Saderup's depictions were protected by the First Amendment, we cannot perceive how the right of publicity would remain a viable right other than in cases of falsified celebrity endorsements.").

---

[8] *See, e.g.*, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 757 (1985) (Powell, J.) (in determining the extent to which the First Amendment limits state defamation lawsuits, the Court "balance[s] the State's interest in compensating private individuals for injury to their reputation against the First Amendment interest in protecting this type of expression").

As explained below, Missouri's "predominant use" test provides the best balance and is most consistent with *Zacchini*. However, the district court's summary judgment ruling could not stand even under the "transformative use" or "ad hoc" balancing tests. The only test under which EA's First Amendment defense might succeed is the "relatedness" test, but that test is inapplicable, as the district court recognized, because Hart's claim neither arises under the federal Lanham Act nor challenges the use of his name in the *title* of an artistic work.

### 1. EA's Predominant Purpose in Using Hart's Likeness in "NCAA Football" Was Commercial

The "predominant use" test permits right-of-publicity claims to proceed where defendant's use of a plaintiff's name or likeness "predominantly exploits the commercial value of an individual's identity," but not where that use predominantly involves "artistic or literary expression." *TCI Cablevision*, 110 S.W.3d at 374 (citation omitted). This is the test most similar to the Supreme Court's approach in *Zacchini* and is the most appropriate test for this case, as it protects the important state interests underlying the right of publicity by denying the First Amendment defense to uses that primarily amount to commercial exploitation, while prohibiting claims that are targeted at predominantly expressive uses.

30

*TCI Cablevision* was a right-of-publicity lawsuit against a comic book publisher that used a well-known former professional hockey player's name for a character, and then targeted the sales of its comic books (which featured other characters also named after professional hockey players) to hockey fans. *Id.* at 366-67, 71. After concluding that the plaintiff had proved a violation of his right of publicity, the Missouri Supreme Court considered whether the First Amendment trumped that state law right. *Id.* at 372.

The Court noted that two different tests had developed in the case law, the "relatedness" test and the "transformative use" test, *id.* at 372-74, but concluded that neither adequately balanced the interests identified in *Zacchini*:

> The weakness of the *Restatement*'s "relatedness" test and California's "transformative" test is that they give too little consideration to the fact that many uses of a person's name and identity have both expressive and commercial components. These tests operate to preclude a cause of action whenever the use of the name and identity is in any way expressive, regardless of its commercial exploitation. . . . Though these tests purport to balance the prospective interests involved, there is no balancing at all – once the use is determined to be expressive, it is protected.

*Id.* at 374.

The Court instead adopted "a more balanced balancing test" – one that actually weighs the competing interests, much as the Supreme Court did in *Zacchini* – that it labeled the "predominant use test":

31

> If a product is being sold that predominantly exploits the commercial value of an individual's identity, that product should be held to violate the right of publicity and not be protected by the First Amendment, even if there is some "expressive" content in it that might qualify as "speech" in other circumstances.  If, on the other hand, the predominant purpose of the product is to make an expressive comment on or about a celebrity, the expressive values could be given greater weight.

*Id.* (citation omitted).  Applying this test, the Court concluded that "the use and identity of [plaintiff's] name ha[d] become predominantly a ploy to sell comic books and related products rather than an artistic or literary expression," and that, "under these circumstances, free speech must give way to the right of publicity." *Id.*

This "predominant use" test properly balances the interests protected by the First Amendment and the right of publicity.  *Cf. City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (city's regulation of adult theaters was content-neutral where City Council's "'predominant' intent . . . was unrelated to the suppression of free expression").  The test gives full protection to predominantly expressive uses of an individual's name or identity, such as satire, criticism, biography, or reporting, while permitting right-of-publicity claims directed at uses that consist primarily of commercial exploitation and "ha[ve] very little [expressive] value compared to [their] commercial value." *TCI Cablevision*,

110 S.W.3d at 374.  The test prevents defendants from evading liability for their commercial use and exploitation of a plaintiff's likeness and preserves the core values enshrined in the First Amendment, while also protecting the fundamental property and privacy rights encompassed by the right of publicity.  It ensures that otherwise impermissible infringement is not elevated into constitutionally protected speech by the simple expedient of adding minor expressive elements to an otherwise exploitative and infringing work.  When the expressive component of a use is mere ornamentation, or clearly subordinated to the core purpose of depicting a celebrity for pure commercial gain, First Amendment interests do not predominate.[9]

Had the district court properly applied the "predominant use" test here, Hart's right of publicity claim surely would have survived summary judgment. EA appropriated Hart's likeness for use in "NCAA Football" to increase the games' sales and marketability by providing enhanced "realism" and giving

---

[9]  By incorporating "predominant use" analysis into the right of publicity itself, district courts in New Jersey have implicitly recognized that the "predominant use" test properly balances the First Amendment against the right of publicity. *See, e.g.*, *Tellado v. Time-Life Books, Inc.*, 643 F.Supp. 904, 909-10 (D.N.J. 1986) (misappropriation of likeness requires showing that use "was for a predominantly commercial purpose"); *Presley*, 513 F.Supp. at 1359 (permitting right of publicity claim because the work "serves primarily to commercially exploit the likeness of Elvis Presley").

consumers a reason to purchase a new edition of the game every year. Indeed, the district court recognized that "[p]lacing present and former college athletes, including Hart, into the fittingly-titled *NCAA Football* game setting strongly suggests that the goal of the game is to capitalize upon the fame of those players." APP0053. EA could have manufactured and sold the exact same interactive sport video game *without* using the likeness of Hart or the other easily identifiable NCAA athletes, but with the same user controls, the same functionality, the same crowd noise, and – because of its exclusive CLC license – the same team logos and other college identifiers. That game would be no less expressive, and it would not impose any burden on any athlete's right of publicity. Thus, as in *TCI Cablevision*, the use of Hart's likeness in the "NCAA Football" video games was "predominantly a ploy to sell [video games] and related products rather than an artistic or literary expression," 110 S.W.3d at 374, and it was error for the district court to bar Hart from proceeding with his right-of-publicity claim.

## 2.    EA's Use of Hart's Identity Was Not "Transformative"

Instead of applying the Missouri Supreme Court's "predominant use" test, the district court applied the "transformative use" test first developed in *Comedy III*, 21 P.3d at 808. The district court concluded that EA's use of Hart's likeness was "transformative" because, during the course of play, users have the

34

*opportunity* to alter the avatars' default features to make them less realistic (although EA never explained why a user might choose that option, in a game whose main marketing attraction is its hyper-realistic depictions of actual players on actual college football rosters), and because the game "includes several creative elements apart from Hart's image" such as equally realistic depictions of actual stadiums and the sounds of college football being played. APP0053-55. The court's analysis misapplied the "transformative use" test by giving undue weight to features that are either peripheral to the actual game experience or merely demonstrate how well modern digital engineers can recreate reality, and by permitting the purely commercial exploitation of an individual's name or likeness as long as that exploitation is included within a work containing creative elements – no matter how tenuously connected the exploitation of an individual's name or likeness is to those other elements.

a.    The "Transformative Use" Test

The California Supreme Court first described the "transformative use" test in *Comedy III*, 25 Cal.4th 387, 21 P.3d 797.[10/] *Comedy III* was a right-of-publicity

---

[10/]    That test has since been applied by many other courts faced with a First Amendment defense to a right-of-publicity claim. *See, e.g.*, *Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010); *Winter v. DC Comics*, 69 P.3d 473 (Cal. 2003); *Keller v. Electronic Arts, Inc.*, No. C 09-1967 CW, 2010 WL 530108, 38

(continued...)

lawsuit brought by the owner of The Three Stooges' intellectual property rights

against a portrait artist who made lithographs and T-shirts featuring the Three

Stooges. *Id.* at 800. Defendant's portraits, although made for financial gain, were

"expressive works" protected by the First Amendment. *Id.* at 802-04.

Nonetheless, the court recognized that "a celebrity's heirs and assigns have a

legitimate protectible interest in exploiting the value to be obtained from

merchandising the celebrity's image, whether that interest be conceived as a kind

of natural property right or as an incentive for encouraging creative work." *Id.* at

805.

Although the California Supreme Court could have resolved the case in a

more straightforward fashion had it anticipated the Missouri Supreme Court's

"predominant use" test, it instead adopted a "transformative use" test derived from

copyright law's "fair use" doctrine. *Id.* at 807-808. The court explained:

> Th[e] inquiry into whether a work is "transformative" appears to us to
> be necessarily at the heart of any judicial attempt to square the right
> of publicity with the First Amendment. . . . When artistic expression
> takes the form of a literal depiction or imitation of a celebrity for
> commercial gain, directly trespassing on the right of publicity without
> adding significant expression beyond that trespass, the state law

---

[10/] (...continued)
Media L. Rep. 1353 (N.D. Cal. Feb. 8, 2010); *No Doubt v. Activision Publishing, Inc.*, 122 Cal.Rptr.3d 397 (2011); *Kirby v. Sega of America, Inc.*, 50 Cal.Rptr.3d 607 (2006).

interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist.

On the other hand, when a work contains significant transformative elements, it is not only especially worthy of First Amendment protection, but it is also less likely to interfere with the economic interest protected by the right of publicity. . . .  Accordingly, First Amendment protection of such works outweighs whatever interest the state may have in enforcing the right of publicity. The right-of-publicity holder continues to enforce the right to monopolize the production of conventional, more or less fungible, images of the celebrity.

*Id.* at 808 (citations and footnote omitted).

Applying this test, the court concluded that defendant's portraits of The Three Stooges were unprotected.  The portraits' "marketability and economic value . . . derive[d] primarily from the fame of the celebrities depicted," and the court could "discern no significant transformative or creative contribution."  *Id.* at 811.  Instead, the artist's "undeniable skill [wa]s manifestly subordinated to the overall goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame."  *Id.*

The California Supreme Court next applied its "transformative use" test in *Winter v. DC Comics*, a case that demonstrates when an appropriation is actually "transformative."  Two well-known rock musicians, Johnny and Edgar Winter, sued a comic book publisher who created characters named "Johnny and Edgar

37

Autumn." The characters had "long white hair and albino features similar to [the Winters]"; "the Johnny Autumn character was depicted as wearing a tall black top hot similar to the one Johnny Winter often wore"; and the title of the volume that introduced the characters – "Autumns of Our Discontent" – included a pun based upon the brothers' last name. 69 P.3d at 476. Unlike the Winters, though, Johnny and Edgar Autumn were "villainous half-worm, half-human offspring born from the rape of their mother by a supernatural worm creature that had escaped from a hole in the ground." *Id.*

The California Supreme Court concluded that the comic book characters were "transformative" because they "contain[ed] significant expressive content other than plaintiffs' mere likenesses." *Id.* at 479. Although the characters were "less-than-subtle evocations of Johnny and Edgar Winter, the books d[id] not depict plaintiffs literally." *Id.* Instead, they were "distorted for purposes of lampoon, parody, or caricature," and were "but cartoon characters – half-human and half-worm – in a larger story, which is itself quite expressive." *Id.* The court determined that the First Amendment precluded the Winters' right of publicity action because the comics "depict[ed] fanciful, creative characters, not pictures of the Winter brothers." *Id.* at 480.

38

> **b.**    *EA Did Not "Transform" Hart's Likeness, but Simply Appropriated Its Economic Value*

When applied to a work whose expressive elements are unrelated to the celebrity depiction itself, as here, the "transformative use" test has the potential to prohibit right-of-publicity actions even where defendant's sole purpose in appropriating the individual's likeness is commercial exploitation.  In this regard, the test affords too little weight to plaintiff's state law rights even though infringing that right was neither necessary nor central to the work's expressive components.  *See, e.g.*, *TCI Cablevision*, 110 S.W.3d at 374.  Nonetheless, when properly applied with a focus on the plaintiff's role or function in relation to the expressive aspects of the work, the "transformative use" test, like the "predominant use" test, requires that Judge Wolfson's decision be reversed.

As noted, "NCAA Football" depicts well-known, easily identified college athletes using virtual avatars that recreate the athletes' likenesses and physical attributes – an essential element of a game targeted at consumers who want to stage a game between, say, the Rutgers and Vanderbilt football teams.  The games attribute the real athletes' physical characteristics, biographies, and abilities to their virtual counterparts, and place the athletes in the very setting in which they became well known – college football games.  That EA exercises engineering skill

39

and creativity in designing the virtual avatars does not make the athletes'

likenesses transformative, any more than a life-like bobblehead doll or a coffee

cup with a holographic 3-D portrait of a player would be transformative.  As

explained in *Comedy III*, "a literal depiction of a celebrity, even if accomplished

with great skill, may still be subject to a right of publicity challenge."  21 P.3d at

809; *see also id.* at 810 (rejecting argument that the "creative decisions" made by

artist in producing portrait rendered portrait transformative).

The virtual avatars in "NCAA Football" are indistinguishable from the

digital avatars of a popular rock band's members that were found *not*

constitutionally protected in *No Doubt*.  In that case, the video game's publisher

asserted that its use of the band's likenesses was transformative "because the

videogame shows [the band's] avatars surrounded by unique, creative elements,

including in fanciful venues such as outer space . . . and performing songs that [the

band] avowedly would never perform in real life."  122 Cal.Rptr.3d at 410-11.

The appellate court rejected that argument.  While recognizing "[t]hat the avatars

can be manipulated to perform at fanciful venues including outer space or to sing

songs the real band would object to singing [and] that the avatars appear in the

context of a videogame that contains many other creative elements," it found the

use of the band's likenesses non-transformative, because the band's avatars

40

"perform[ed] rock songs, the same activity by which the band achieved and

maintains its fame," and did so "as literal recreations of the band members." *Id.* at

410-11. The game did not "transform the avatars into anything other than exact

depictions of [the band's] members doing exactly what they do as celebrities." *Id.*

The court also emphasized the game's predominantly commercial use of the

band's identities:

> Activision's use of life-like depictions of No Doubt performing songs
> is motivated by the commercial interest in using the band's fame to
> market *Band Hero*, because it encourages the band's sizable fan base
> to purchase the game so as to perform as, or alongside, the members
> of No Doubt. Thus, insofar as the depiction of No Doubt is
> concerned, the graphics and other background content of the game are
> secondary, and the expressive elements of the game remain
> 'manifestly subordinated to the overall goal of creating a
> conventional portrait of [No Doubt] so as to commercially exploit
> [its] fame.'"

*Id.* at 411 (citing *Comedy III*, 25 Cal.4th at 408) (alterations in original).

EA's use of the likenesses of actual college athletes in its games also cannot

be meaningfully distinguished from the non-transformative use of celebrity Paris

Hilton's likeness in *Hilton*.[11/] The greeting card at issue there "depict[ed] a

---

[11/]    The district court concluded that *Hilton*'s application of the
"transformative use" test was distinguishable because that case arose in the
context of an "anti-SLAPP" (Strategic Litigation Against Public Participation)
motion. APP0050 n.19. However, as *Hilton* emphasized, the standard that
governs anti-SLAPP motions is similar to the summary judgment standard. 599

(continued...)

41

cartoon waitress" with "[a]n oversized photograph of [Paris] Hilton's head . . . super-imposed on the cartoon waitress's body" "serving a plate of food to a restaurant patron" 599 F.3d at 899. Hilton alleged that the card violated her right of publicity. Hallmark countered that the card was "transformative" because it had cartoon-like elements and used Hilton's signature phrase in a humorous manner. *Id.* at 911. The Ninth Circuit rejected Hallmark's argument, explaining that the card fell "short of the level of new expression" required to establish the transformative use defense as a matter of law, because the card's "basic setting" was no different from that in which Hilton had become famous. *Id.*

EA's use of Hart's likeness in "NCAA Football," a realistic depiction of a well known athlete in the very setting from which his fame derived, does not differ in any meaningful respect from the band avatars at issue in *No Doubt*, and exhibits even less transformation than the greeting card at issue in *Hilton*. Unlike the cartoon characters in *Winter*, EA placed Hart in the same setting that made him well-known, and neither he nor his virtual teammates and opponents are "fanciful, creative characters" "distorted for purposes of lampoon, parody, or caricature."

---

[11]/ (...continued)
F.3d at 902. The minor differences relate solely to the parties' relative burdens in producing factual evidence, *see id.*, and did not impact the Ninth Circuit's application of the transformative use test.

42

*Winter*, 69 P.3d at 479-80; *see also Cardtoons*, 95 F.3d 959 (First Amendment precluded right-of-publicity action against maker of trading cards parodying baseball players); *Kirby*, 50 Cal.Rptr.3d at 609, 616-18 (video game's use of singer's identity was "transformative" where the character was "more than a mere likeness or literal depiction of [plaintiff]," because the character and the singer looked and danced differently and the character was portrayed as "a space-age reporter in the 25th century"). As in *No Doubt*, EA's use of Hart's likeness "is motivated by the commercial interest in using [college athletes'] fame to market ["NCAA Football"], because it encourages [the athletes'] sizable fan base to purchase the game so as to perform as, or alongside, the [athletes]." *No Doubt*, 122 Cal.Rptr.3d at 411. The games' expressive content is "manifestly subordinated to the overall goal of creating a conventional portrait of [the athletes] . . . to commercially exploit [their] fame." *Comedy III*, 21 P.3d at 810.

In concluding that EA's use of Hart's likeness was "transformative" because game *users* can modify some default characteristics of the players depicted, the district court gave insufficient consideration to how defendant EA *itself* used and appropriated Hart's likeness – and ignored that the record contains *no* evidence showing how often that feature is used or why any users would choose to make their game-playing experience less realistic.

43

EA created an electronic game whose default mode of play depicts highly realistic likenesses and attributes of real NCAA football players. While the game allow users to alter some of those characters' features, it does not require such alterations; indeed, it prohibits users from changing the character's basic biographical data. APP0057 n.23. If EA's purpose were to permit game players to create virtual athletes of their own design, as the district court apparently concluded, there would be no reason to create replicas of almost 200 separate college teams each year, or to go to great lengths to ensure that each team's roster accurately depicts the teams' actual players. EA could manufacture and sell the very same game, with the very same expressive attributes, without trenching on *any* player's right of publicity, simply by using stock players whose likenesses and abilities do not mimic those of the teams' actual players. Such a game would not require the creation of several hundred separate – and separately identifiable – rosters. A more generic game would be far less marketable than one whose major selling point is fan identification with a particular college program or player, but from the First Amendment perspective it would be just as expressive as "NCAA Football" – without depriving any athlete of the right to control the commercial exploitation of his hard-earned identity and likeness.

44

By providing blanket immunity from civil liability for game manufacturers if they simply provide users with the *option* to modify the likenesses of realistically depicted celebrities, the district court ignored the critical recognition in *Comedy III* and *No Doubt* that the commercial exploitation of "conventional, more or less fungible, images" is actionable under the right of publicity. *Comedy III*, 21 P.3d at 808; *No Doubt*, 122 Cal.Rptr.3d at 407.

The district court's focus on the opportunity to modify the virtual players' default characteristics also ignores that almost any depiction in any medium can be altered by the ultimate user. The district court concluded, apparently as a matter of law, that "a user's interaction with a video game is one of the means by which video games communicate ideas and social messages," and that the users' ability to modify the default characteristics of the virtual players constitutes an "expressive aspect" of "NCAA Football." APP0058. However, users are not required to alter any of the default characteristics that EA assigns to the virtual players, and there is no evidence in the record regarding whether, or to what extent, any users actually modify any of the virtual players' characteristics. EA itself admits that users value the game's *realism* – i.e., their ability to "experience the excitement and challenge of college football." APP0530. For that reason, few if any users are likely to change the default players' likenesses (although in this

45

case decided without any discovery it is impossible to know).  Tellingly, the

instruction manual included with "NCAA Football 2004" buries the instructions

for modifying the virtual players' default characteristics near the very end (on

page 27 out of 36).  Thus, while the district court treated "NCAA Football" as if

its primary function was to enable users to alter images of famous college athletes,

in fact the packaging, marketing, and format of those games suggests that its

actual purpose is to provide a platform for virtual competitions between actual

teams.

The district court's emphasis on the games' "creative elements apart from

Hart's image" is similarly misplaced.  "[A]lthough context may create protected

expression in the use of a celebrity's literal likeness," *No Doubt*, 122 Cal.Rptr.3d

at 410, that context must transform the celebrity depictions at issue.  If, in context,

the appropriated celebrity images remain nothing but "exact depictions of [the

celebrities] doing exactly what they do as celebrities," the use of the depictions

cannot be "transformative." *Id.* at 411.  That is why the court in *No Doubt* found

no "transformation" of the band members' likenesses, even though the game

"show[ed] the No Doubt avatars surrounded by unique, creative elements,

including in fanciful venues such as outer space and performing songs that No

Doubt avowedly would never perform in real life." *Id.* at 410.  That is also why

46

the Ninth Circuit in *Hilton* found no "transformative use" of Paris Hilton's image, even though Hallmark's greeting card featured creative elements besides Hilton's image, including a joke and birthday wish creatively built upon Hilton's signature phrase, and even though anyone who purchased or received that card could have modified Hilton's image (with a pen or crayon or collage materials) to personalize the card's message.  599 F.3d at 899; *see also Comedy III*, 21 P.3d at 810 (rejecting argument that portraits are *per se* "transformative" because they result from "creative decisions" and never "portray[] a mere literal likeness").  Surely the Ninth Circuit's decision would not have come out differently if, instead of being a paper card, the greeting card in *Hilton* were an e-card bearing the identical likeness and message but permitting digital alterations by its sender.

The cases cited above properly recognize that the ultimate question when applying the "transformative use" test should be whether *the celebrity depiction* itself has been "so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness." *Id.* at 809.[12]  Although context may be relevant in determining whether a celebrity depiction has been transformed, the mere presence of creative aspects in a work cannot make it

---

[12]  *Comedy III* itself did not distinguish between defendant's depictions of The Three Stooges and the work as a whole, because the depiction and the work were one and the same.

"transformative " if those aspects do not render the depiction something other than a conventional image of the celebrity.  The transformative use test is designed to balance the First Amendment against the right of publicity, not to permit the commercial misappropriation of a celebrity's identity through depictions in works containing other creative aspects that do not change the commercially exploitative nature of the celebrity's image.  *Comedy III*, 21 P.3d at 808; *cf. Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 68 (1983) (advertisers cannot render their speech "noncommercial" for First Amendment purposes "simply by including references to public issues"); *Kois v. Wisconsin*, 408 U.S. 229, 231 (1972) ("A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication . . . .").

Because EA included a "conventional, more or less fungible" likeness of Hart in "NCAA Football" and did not use that likeness either for purposes of satire, parody, criticism, or reporting, or to create a "fanciful, creative character" as in *Winter*, 69 P.3d at 480, EA's use of Hart's likeness was not "transformative." EA therefore should not have prevailed on summary judgment, even under the "transformative use" test.[13]

---

[13]    This was the precise conclusion reached by Judge Claudia Wilken in *Keller v. Electronic Arts, Inc.*, No. C 09-1967 CW, 2010 WL 530108, 38 Media L.

(continued...)

### 3.    The Second Circuit's "Relatedness" Test Is Inapplicable

EA urged the district court to apply the "relatedness" test established by the

Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), rather than any

of the tests described above.  As the district court properly recognized, however,

that test applies only to violations of the federal Lanham Act, and is not

appropriate in circumstances that require First Amendment interests to be balanced

against the interests served by the right of publicity.

In *Rogers*, Ginger Rogers sued the producers and distributors of "Ginger

and Fred," a Federico Fellini-directed film, alleging that the film's *title* violated

---

[13]/  (...continued)
Rep. 1353 (N.D. Cal. Feb. 8, 2010), *appeal pndg*. No. 10-15387, currently under submission before the Ninth Circuit.  *Keller* involved a similar right-of-publicity class action against EA, based on its appropriation of the image of college football players in several versions of "NCAA Football."  The district court rejected EA's argument that the First Amendment precluded such claims as a matter of law, concluding that "EA's depiction of Plaintiff [was] not sufficiently transformative to bar his California right of publicity claims as a matter of law." *Id.* at *5.  The game "does not depict [the lead plaintiff] in a different form" but represents him "as what he was: the starting quarterback for Arizona State University"; and "the game's setting [was] identical to where the public found Plaintiff during his collegiate career: on the football field." *Id.*  The court also rejected EA's argument that its use of the college athletes' likenesses was transformative because "the video game, taken as a whole, contains transformative elements," recognizing that when applying the "transformative use" test, "th[e] Court's focus must be on the depiction of Plaintiff in 'NCAA Football,' not the game's other elements." *Id.*  The parties to the present appeal will undoubtedly address *Keller* in more depth after the Ninth Circuit issues its decision.

her federal Lanham Act rights and her Oregon state law right of publicity.  875

F.2d at 996-97.  She did not contend that the content of the film was actionable,

only the title.  *Id.*  The Second Circuit affirmed the dismissal of her lawsuit,

concluding that, in order to prevent the "overextension of Lanham Act restrictions

in the area of titles" in a manner that "might intrude on First Amendment values,"

the Lanham Act should be construed to apply "only where the public interest in

avoiding consumer confusion outweighs the public interest in free expression."

*Id.* at 998-99.  The Second Circuit then explained that, "[i]n the context of

allegedly misleading titles using a celebrity's name, that balance will normally not

support application of the Act unless *the title has no artistic relevance* to the

underlying work whatsoever, or, if it has some artistic relevance, unless *the title*

*explicitly misleads as to the source or the content of the work*."  *Id.* at 999

(emphases added).  Applying this "relatedness" test, the court rejected Rogers'

Lanham Act claim because the film's title was "artistically relevant though

ambiguous."  *Id.* at 1001.

The Second Circuit also rejected Rogers' right-of-publicity claim, but as a

matter of Oregon state law, not the First Amendment.  The Court explained that

Oregon common law "permit[s] the right of publicity to bar the use of a celebrity's

name in a movie title [only if] the title was 'wholly unrelated' to the movie or was

50

simply a disguised commercial advertisement for the sale of goods or services."
*Id.* at 1004. Because neither of those circumstances existed, the court had no need, and expressly declined, to consider whether the First Amendment independently barred Rogers' claim. *Id.* at 1005 n.13 ("As in our ruling on the Lanham Act claim, we need not, and do not, reach the issue of whether the First Amendment would preclude a state from giving broader application to the right of publicity.").

By its own terms, *Rogers*' "relatedness" test is limited to its federal Lanham Act and Oregon common law context. Despite this, and even though the Second Circuit expressly declined to reach the First Amendment issues, EA urged the district court to use the "relatedness" test to balance Hart's right of publicity against EA's First Amendment rights. The district court properly rejected that suggestion.[14]

The Lanham Act addresses "the danger of consumer deception" when a work is depicted as something it is not. As the district court recognized, the

_____

[14] EA contended in part that the "relatedness" test should be applied because it is recommended by the *Restatement (Third) of Unfair Competition*. *See* APP0068-69 (describing EA's "convoluted" argument). However, New Jersey has never adopted that Restatement. Besides, EA's suggested approach improperly conflates a defendant's federal constitutional defense with the elements of a plaintiff's state law right-of-publicity claim – an approach particularly inappropriate here, because EA *conceded* for purposes of the underlying motion that Hart had stated a prima facie violation of his New Jersey right of publicity. *See supra* at 4.

51

"relatedness" test was designed to address "likelihood of confusion" concerns

arising in cases that have nothing to do with the issues presented here. *Rogers*,

875 F.2d at 997; *see also id.* ("The purchaser of a book . . . has a right not to be

misled as to the source of the product."). The Second Circuit's "relatedness" test

addresses that possibility-of-confusion problem by requiring that the titles of

works be related to their content and "not explicitly misleading as to the content of

the work." *Id.* at 1000. The court applied that same requirement as a matter of

Oregon common law to plaintiffs' allegation that the film's title was intended to

appropriate her name misleadingly. *Id.* at 1004 (holding that Oregon common law

would not "permit the right of publicity to bar the use of a celebrity's name *in a*

*movie title* unless the title was 'wholly unrelated' to the movie or was 'simply a

disguised commercial advertisement for the sale of goods or services'") (emphasis

added).

As the Supreme Court made clear in *Zacchini*, the interests underlying the

right of publicity – "preventing unjust enrichment by the theft of good will" and

ensuring that defendants not "get free some aspect of the plaintiff that would have

market value and for which he would normally pay," 433 U.S. at 576 – are largely

unrelated to the "false advertising" concerns that gave rise to the Lanham Act and

*Rogers*' "relatedness" test. The right of publicity "provides an economic

52

incentive" for the "production of works of benefit to the public." *Id.* at 576-77.

Yet nothing in the "relatedness" test permits any consideration of those interests,

as that test focuses exclusively on concerns about potential consumer deception.

The "relatedness" test thus cannot be used to "balance" a defendant's First

Amendment rights against a plaintiff's rights of publicity.

The "relatedness" test is also inapplicable because this case involves the

misappropriation Hart's likeness *within* a work, not, as in *Rogers*, the use of Hart's

name in a work's *title*. Even in cases brought under the Lanham Act, this Court

has already recognized the narrow applicability of *Rogers*' "relatedness" test, and

has expressed skepticism about its application to cases not involving the titles of

artistic works. *Facenda*, 542 F.3d at 1018. That limitation makes logical sense,

because the risk to a celebrity's rights, property, or economic interests posed by a

title that is relevant to the work and does not mislead consumers is insignificant.

By contrast, the commercial exploitation of a celebrity's likeness in the work itself

– whether in a portrait, as in *Comedy III*, or in a video game, as in *No Doubt* –

poses a significant threat to the celebrity's rights, property, and economic interests,

because the right to benefit from commercial uses of one's identity often provides

the primary "economic return" for years of "creative labor." *Comedy III*, 21 P.3d

at 804-05. A test that is satisfied merely by showing that the use of a celebrity's

likeness *within* a work is "relevant" to the work as a whole is entirely inadequate to balance the interests at stake.[15/]

In short, because the "relatedness" test does not address the interests underlying the right of publicity and is applicable only to Lanham Act challenges involving the *titles* of expressive works, it is inapplicable here.

### 4.    Hart's Right of Publicity Claim Should Also Be Allowed To Proceed Under an Ad Hoc Balancing of the Relevant Interests

Even if this Court conducts an ad hoc balancing of EA's First Amendment interests against Hart's right of publicity, rather than applying one of the other tests discussed above, it should still reverse the trial court's summary judgment ruling.[16/]

---

[15/]    If EA were correct that, under the "relatedness" test, the First Amendment overcomes every challenge to the contents of an expressive work *even under the Lanham Act itself* as long as the use in question is "related" to the contents of the work, Lanham Act protections for trademarks used in expressive works would disappear. Not only would EA be entitled to exploit for its own commercial purposes the likenesses of every athlete, celebrity, and public figure, but it would not need to pay the NCAA to license team names or logos, or to pay the NFL or NFLPA to use their trademarks. Nor could EA preclude any of its competitors from exercising their own "First Amendment" right to use such trademarks, notwithstanding EA's exclusive license for those trademarks.

[16/]    The "predominant use" and "transformative use" tests are preferable to the ad hoc balancing approach taken in cases like *ETW Corp.*, 332 F.3d 915 (6th Cir. 2003), and *Cardtoons*, 95 F.3d 959 (10th Cir. 1996), for at least two reasons.

(continued...)

EA's First Amendment interest in appropriating the commercially valuable likeness of Ryan Hart and other NCAA athletes is minimal. "NCAA Football" contains little expressive content that will be suppressed if EA is required to compensate Hart for the use of his likeness (or even to refrain from using that likeness, although plaintiff is not seeking injunctive relief in this lawsuit). That is because the game does not communicate any ideas or social messages, but merely seeks to recreate the experience of competing in an actual NCAA football game. *See supra* note 6. Moreover, the expressive content of those games – to the extent they are expressive – would be almost exactly the same if EA omitted the likenesses of actual college athletes and instead created virtual players of its own design. Using truly fictional players would no doubt negatively impact the sales and marketability of "NCAA Football" by reducing its hyper-realism and limiting the ability of consumers to "become" their favorite college football stars, but it would not significantly impact the manner in which the games are played, the

---

16/    (...continued)
First, the tests are more predictable and provide greater guidance to content producers and celebrities about the scope of their rights. Second, and more important, the ad hoc approach is far more subjective than either test. *Compare Zacchini*, 433 U.S. at 573-76 (describing important state interests underlying the right of publicity and comparable interests served by patent and copyright law); *with Cardtoons*, 95 F.3d at 973-76 (disagreeing with the justifications for the right of publicity and arguing that "the inducements generated by publicity rights are not nearly as important as those created by copyright and patent law").

expressive content of the games, or any purported "ideas" or "messages" the games convey.

Conversely, plaintiff's right-of-publicity claim must be accorded great weight in any balancing of the relevant interests.  EA has generated millions of dollars in sales as a result of its commercial appropriation of NCAA football players' likenesses, and it uses the hyper-realism of those likenesses as its principal marketing device.  Those likenesses indisputably have value, as shown by the millions of dollars EA pays to licence professional football players' publicity rights for use in "Madden NFL."  "No social purpose is served by having [EA] get free some aspect of the plaintiff that would have market value and for which [it] would normally pay." *Zacchini*, 433 U.S. at 576 (citation omitted).

Moreover, for college football athletes like Ryan Hart, publicity rights are often one of the most important returns available for years of work developing their athletic skills.  The NCAA's amateurism rules, as currently written, significantly limit the extent to which college football players can receive financial compensation for their efforts while still in school.  Although many receive annual college scholarships, those scholarships generally do not cover the true cost of attending college, and the amount of time that college football players must devote to the sport makes it difficult for them to benefit fully from the educational

56

opportunities other students enjoy.[17]  Some college football players also suffer

medical injuries as a result of their athletic endeavors, and often must pay for the

required medical care themselves without any assistance from the colleges that

they represented on the playing field.[18]  Although NCAA college football is a

billion-dollar business and EA generates millions of dollars in revenue from

"NCAA Football," the athletes themselves receive almost none of those funds.

College football athletes' publicity rights are one of the primary returns

available for the time and effort they invest in their athletic career.  Those

important rights outweigh EA's minimal First Amendment interests under any

proper balancing of the parties' rights.

//

//

//

//

---

[17]  *See* Joe Nocera, "Let's Start Paying College Athletes," *New York Times Magazine*, Dec. 30, 2011, at MM30, *available at* http://www.nytimes.com/ 2012/01/01/magazine/lets-start-paying-college-athletes.html.

[18]  *See* Taylor Branch, "The Shame of College Sports," *The Atlantic*, Oct. 2011, *available at* http://www.theatlantic.com/magazine/archive/2011/10/ the-shame-of-college-sports/8643/.

## III.    The District Court Should Have Permitted Additional Discovery Before Granting Summary Judgment

At a minimum, the Court should remand to permit additional discovery and the development of a more complete record.

"[T]he summary judgment process presupposes the existence of an adequate record." *Doe v. Abington Friends School*, 480 F.3d 252, 257 (3d. Cir. 2007). For that reason, "a court is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery." *Id.* (citation omitted). Nonetheless, the district court granted EA's motion for summary judgment before *any* discovery had occurred. Indeed, because the court deferred the Rule 16 scheduling conference pending its resolution of EA's motions to dismiss, Hart was never permitted even to propound initial discovery requests. *See* Fed. R. Civ. P. 26(d), (f).

In opposing EA's summary judgment motion, Hart specifically asked the district court to allow him to take discovery, and he described some of the evidentiary materials that he sought. APP0688; APP0698 n.4. Through discovery, Hart could have established, for example, that EA markets "NCAA Football" by emphasizing its realism, and that it exploits the players' likenesses to increase sales. He could have shown that very few users modify the default

58

characteristics of their favorite teams' players, and that most users activate only a handful of the hundreds of available Division I teams, focusing on a few favorites. So, too, could he have shown that EA reaps enormous annual revenues from these games, which bears on both damages and the market value of the likenesses that EA has appropriated. *See id.* (explaining that, "[t]hrough discovery, [Hart] intend[ed] to show [EA's] sales records and anticipate[d] that the sales of each year's *NCAA Football* release remain relatively steady"). That evidence could have demonstrated that EA's use of actual college athletes in its games primarily provides users an incentive to purchase a new edition with updated team rosters every year. And evidence regarding the amount EA pays *professional* athletes for comparable uses of their likenesses would have demonstrated that, by refusing to compensate the college athletes included in "NCAA Football," EA is merely attempting to "get free some aspect of the plaintiff that [has] market value and for which [EA] would normally pay." *Zacchini*, 433 U.S. at 576.[19]

---

[19]    Most of this evidence is in EA's sole possession. *See* APP0696 n.3 (noting that EA keeps the terms of its licensing agreements confidential); *cf. Costlow v. United States*, 552 F.2d 560, 563-64 (3d. Cir. 1977) (where the party opposing summary judgment seeks discovery regarding facts "in possession of the moving party[,] a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course").

While Hart did not submit a formal affidavit under Rule 56(d), such a failure "is not automatically fatal" to a party's request to delay consideration of summary judgment pending discovery. *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994). To the contrary, a premature grant of summary judgment should be reversed, notwithstanding less-than-perfect compliance with Rule 56(d), if that discovery is likely to be relevant and the party opposing summary judgment informed the district court that necessary discovery had not yet been completed, as Hart did here. *Compare* APP0688, APP0698 (requesting opportunity to conduct discovery and describing evidence sought); *with Sames v. Gable*, 732 F.2d 49, 51-52 & n.3 (3d Cir. 1984) (reversing summary judgment where plaintiffs "alerted the court in their opposing memorandum that discovery was still underway" but "failed to request a continuance of defendants' motion specifically and failed to identify specific outstanding discovery requests that were vital to the prosecution of their claims").[20]

---

[20] It is particularly appropriate to excuse Hart's failure to prepare a separate Rule 56(d) declaration in this case because the district court failed to notify the parties of its intent to treat EA's motion as a motion for summary judgment. *See Rose*, 871 F.2d at 342 (before treating a motion to dismiss as a motion for summary judgment, a court should issue an order that "fairly apprises the parties of the proposed conversion"). Moreover, EA repeatedly asserted in its briefing that the Court could resolve its motion on the pleadings, as a matter of law. APP0439; APP0719.

60

In this case, Hart's purported procedural failings are not "sufficiently egregious to warrant a non-merits resolution of [his] claim[]." *Id.* at 52 n.3. Consequently, this Court should at a minimum reverse and remand for additional factual development, rather than deciding the important First Amendment questions posed by EA's motion on an inadequate factual record generated without any discovery.

## CONCLUSION

For the foregoing reasons, the decision below should be REVERSED.

Respectfully submitted,

Dated: February 10, 2012

s/Timothy J. McIlwain
Timothy J. McIlwain
Attorney at Law, LLC
N.J. Bar No. 010471996
5 Marine View Plaza, Suite 300
Hoboken, NJ 07030
Ph: (201) 420-1911
Fax: (201) 420-8054

*Attorney for Plaintiff-Appellant Ryan Hart*

61

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 28(a)(11), I hereby certify that this brief

complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B),

because this brief contains 13,929 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I also certify that the text of the

electronic brief is identical to the text in the paper copies of the brief, and that the

electronic brief was scanned using McAfee Virus Scan, and no virus was detected.

Dated: February 10, 2012                     s/Timothy J. McIlwain
                                              Timothy J. McIlwain

                                              *Attorney for Plaintiff-Appellant*
                                              *Ryan Hart*

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2012, I filed and served the foregoing Appellant's Opening Brief, as well as the Appendix to the Briefs, by causing copies to be electronically filed and served via the appellate CM/ECF system to the following counsel of record:

> Elizabeth A. McNamara
> Davis Wright Tremaine LLP
> 1633 Broadway
> New York, NY 10019

I also hereby certify that I have caused ten copies to be delivered to the Court, and one copy to the above-listed counsel of record, by United Parcel Service.

Dated: February 10, 2012                s/Timothy J. McIlwain
                                         Timothy J. McIlwain

                                         *Attorney for Plaintiff-Appellant*
                                         *Ryan Hart*

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the attorney whose name appears on the foregoing Appellant's Opening Brief was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit on February 9, 2012, and is presently a member in good standing at the Bar of said court.

Dated: February 10, 2012                    s/Timothy J. McIlwain
                                            Timothy J. McIlwain

                                            *Attorney for Plaintiff-Appellant*
                                            *Ryan Hart*