No. 11-3750

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### RYAN HART,

*Plaintiff-Appellant,*

v.

### ELECTRONIC ARTS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**AMICUS CURIAE BRIEF OF THE NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, THE MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, THE NATIONAL HOCKEY LEAGUE PLAYERS' ASSOCIATION, THE NATIONAL BASKETBALL PLAYERS ASSOCIATION, AND THE MAJOR LEAGUE SOCCER PLAYERS UNION**

Michael Rubin
P. Casey Pitts
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Ph:  (415) 421-7151
Fax: (415) 362-8064
mrubin@altber.com
*Attorneys for Amici Curiae*

(Additional Counsel on Inside Cover)

## ADDITIONAL COUNSEL FOR AMICI

DeMaurice Smith
Executive Director
National Football League Players Association
1133 20th Street
Washington, DC 20036
Ph:   (202) 756-9100

Michael S. Weiner
Executive Director and General Counsel
Major League Baseball Players Association
12 East 49th Street, 24th Floor
New York, NY 10017
Ph:   (212) 826.0808

Donald Fehr
Executive Director
National Hockey League Players' Association
20 Bay Street Suite 1700
Toronto, ON
M5J 2N8
Ph:   (416) 313-2300

G. William Hunter
Executive Director
National Basketball Players Association
310 Lenox Avenue
New York, NY 10027
Ph:   (212) 655-0880

Robert Foose
Executive Director
Major League Soccer Players Union
7605 Arlington Road, Suite 250
Bethesda, MD 20814
Ph:   (301) 657-3535

## CORPORATE DISCLOSURE STATEMENT

The National Football Players Association and the National Basketball Players Association are corporations that do not issue stock and have no parent corporations.  The Major League Baseball Players Association, the National Hockey League Players' Association, and the Major League Soccer Players Union are unincorporated associations.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iv-

INTERESTS OF THE AMICI CURIAE.. . . . . . . . . . . . . . . . . . . . . . . . . . . -viii-

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      EA Depicts Real Athletes in its Hyper-Realistic Sports
        Video Games Because Consumer Demand Is Driven by
        Team and Player Identification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      The Right of Publicity Protects the Identities of
                Athletes and Other Public Figures from Unauthorized
                Commercial Exploitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      The Realistic Depictions of Real Athletes in Sports
                Video Games Are at the Core of the Right of Publicity. . . . . . 8

                1.      Sports Video Games Include Realistic Depictions
                        of College and Professional Athletes. . . . . . . . . . . . . . . 8

                2.      The Realistic Depictions of Famous Athletes
                        in Sports Video Games Increase Game Sales. . . . . . . . 11

                3.      Sports Video Games Generate Billions of
                        Dollars in Annual Sales. . . . . . . . . . . . . . . . . . . . . . . . 14

II.    The First Amendment Does Not Prohibit Right-of-Publicity
       Claims Targeting Predominantly Commercial Uses of an
       Individual's Likeness or Identity, Such as EA's Use of Hart's
       Likeness in "NCAA Football". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       A.    EA's First Amendment Interests Must Be Balanced
             Against Hart's Right of Publicity. . . . . . . . . . . . . . . . . . . . . . . 19

       B.    EA's Predominantly Commercial Use of Hart's
             Likeness Is Not Shielded from a Right-of-Publicity
             Claim by the First Amendment. . . . . . . . . . . . . . . . . . . . . . . . 23

       C.    The "Transformative Use" Test, Properly Applied,
             Also Establishes that EA's Use of Hart's Likeness Is
             Not Protected. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF BAR MEMBERSHIP. . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*City of Erie v. Pap's A.M.*,
    529 U.S. 277 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Facenda v. N.F.L. Films, Inc.*,
    542 F.3d 1007 (3d. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Golan v. Holder*,
    _ U.S. _, 2012 WL 125436 (Jan. 18, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Halean Laboratories, Inc. v. Topps Chewing Gum, Inc.*,
    202 F.2d 866 (2d Cir. 1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Lloyd Corp. v. Tanner*,
    407 U.S. 551 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*McFarland v. Miller*,
    14 F.3d 912 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 17, 25

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Parks v. LaFace Records*,
    329 F.3d 437 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Estate of Presley v. Russen*,
    513 F.Supp. 1339 (D.N.J. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Zacchini v. Scripps-Howard Broadcasting Co.*,
    433 U.S. 562 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATE CASES

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*,
    21 P.3d 797 (Cal. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Doe v. TCI Cablevision*,
    110 S.W.3d 363 (Mo. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 23, 24, 28

*No Doubt v. Activision Publishing, Inc.*,
    122 Cal.Rptr.3d 397 (Cal. Ct. App.),
    *review denied*, No. S191787 (Cal. Sup. Ct. June 8, 2011). . . . . . . . . . . . *passim*

*Palmer v. Schonhorn Enterprises, Inc.*,
    96 N.J. Super. 72 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## DOCKETED CASES

*Keller v. Electronic Arts, Inc.*,
    No. 10-15387 (9th Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Parish v. NFLPA*,
    No. 3:07-cv-00943-WHA (N.D. Cal. Aug. 22, 2008). . . . . . . . . . . . . . . . 16, 17

## PRESS RELEASES

Press Release, Electronic Arts, EA Announces 2005 Electronic
    Entertainment Expo Line-Up (May 11, 2005). . . . . . . . . . . . . . . . . . . . . . . . 17

Press Release, Electronic Arts, EA Changes the Game, Announces
    NBA ELITE 11 (June 2, 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Press Release, Electronic Arts, EA Extends Interactive Videogame
    Agreements With NFL and NFL PLAYERS (Feb. 12, 2008). . . . . . . . . . . . . 17

Press Release, Electronic Arts, Electronic Arts Reports Q2 FY12
    Financial Results (Oct. 27, 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Press Release, Electronic Arts, Electronic Arts Reports Q3 FY12
    Financial Results (Feb. 1, 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Press Release, Electronic Arts, NCAA Football 12 Kicks Off to Record
    Start at Retail (July 26, 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Press Release, Electronic Arts, Touchdown! EA's Madden NFL 12
    Kicks Off with a Big Opening Week (Sept. 7, 2011). . . . . . . . . . . . . . . . . . . 15

## MISCELLANEOUS

Cianfrone & Baker, "The Use of Student Athlete Likenesses in Sport
    Video Games: An Application of the Right of Publicity," 20
    *J. Legal Aspects Sport* 35 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Cianfrone, Zhang & Ko, "Dimensions of Motivation Associated with
    Playing Sport Video Games: Modification and Extension of the
    Sport Video Game Motivation Scale," 1 *Sports, Business and
    Management: An International Journal* 172 (2011). . . . . . . . . . . . . 11, 12, 13

Entertainment Software Association, "2011 Sales, Demographic
    and Usage Data: Essential Facts About the Computer and Video
    Game Industry," at 8, 10 (2011), *available at*
    http://www.theesa.com/facts/pdfs/ESA_EF_2011.pdf. . . . . . . . . . . . . . . . . 14

Kaplan, Daniel, "NFL Gives EA a Break," *Street & Smith's Sports
    Business Journal*, Feb. 14-20, 2011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Kim, Walsh & Ross, "An Examination of the Psychological and
   Consumptive Behaviors of Sports Video Gamers," 17 *Sports
   Marketing Quarterly* 44 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Lee, Mark S., "Agents of Chaos: Judicial Confusion in Defining the
   Right of Publicity-Free Speech Interface," 23 *Loyola L.A. Enter.
   L. Rev.* 471, 498 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Joe Nocera, "Let's Start Paying College Athletes," *New York Times
   Magazine*, Dec. 30, 2011, at MM30, *available at*
   http://www.nytimes.com/2012/01/01/magazine/
   lets-start-paying-college-athletes.html. . . . . . . . . . . . . . . . . . . . . . . . . . 7

Jim Parcels, Chances of Making It in Pro Hockey (April 2002),
   *available at* http://www.omha.net/flash.asp?page_id=242 . . . . . . . . . . . . . . 7

"Tide Wins a Title for Gamers," *Birmingham News*, Dec. 20, 2011. . . . . . . . . . . 14

http://2ksports.com/games/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

http://us.playstation.com/
   games-and-media/games/mlb-11-the-show-ps3.html. . . . . . . . . . . . . . . . . . 11

http://aboutus.ea.com/companylabels.action. . . . . . . . . . . . . . . . . . . . . . . . . . 10

http://www.ea.com/nba-live. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

http://www.easports.com/blogs/fromdowntown/post/slug/
   nba-live-10-roster-update-for-the-2010-2011-nba-season. . . . . . . . . . . . . . . 13

http://www.ncaa.org/wps/wcm/connect/public/ncaa/pdfs/2011/
   2011+probability+of+going+pro. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## INTERESTS OF THE AMICI CURIAE

The National Football League Players Association ("NFLPA"), the Major League Baseball Players Association ("MLBPA"), the National Hockey League Players' Association ("NHLPA"), the National Basketball Players Association ("NBPA"), and the Major League Soccer Players Union ("MLSPU") (collectively, the "Player Associations" or "Amici") represent professional athletes in collective bargaining and for other purposes in, respectively, the National Football League, Major League Baseball, the National Hockey League, the National Basketball Association, and Major League Soccer (collectively, the "Leagues").

The Player Associations have a strong interest in this case because, on behalf of the professional athletes they represent, they have entered into group licensing agreements authorizing companies throughout the world to use their represented athletes' identities, names, and likenesses in particular commercial products and services, under specifically negotiated terms and conditions. Each of the Player Associations, directly or indirectly, has group licensing agreements with defendant-appellee Electronic Arts, Inc. ("EA") and/or other competing video game manufacturers, which authorize and limit the use of their members' names, identities, and likenesses in sports video games such as "Madden NFL," "NHL

Hockey," "FIFA Soccer," "NBA 2K12," and "MLB 2K12."[1/]

Through the carefully negotiated terms of those licensing agreements, the Player Associations and the athletes they represent are able to ensure that: 1) the athletes are not associated with or perceived to promote products they and the Player Associations would not choose to support, 2) the commercial value of the athletes' identities is not diluted through misuse or overuse, and 3) the athletes whose images enhance the consumer appeal of a product receive fair consideration for their contributions.  EA and other video game manufacturers have long recognized their obligation to obtain licenses from *professional* athletes and/or the Player Associations who represent them before manufacturing and selling sports video games that profit from those athletes' valuable personas.  Those licensing agreements enable the game manufacturers to increase the hyper-realism of their games, which greatly adds to the games' consumer appeal.

In this case, EA asserts a First Amendment right to exploit the likenesses of non-professional NCAA college football players for commercial gain without their authorization and without providing them any compensation, in violation of their New Jersey right of publicity.  Although several professional sports video games

---

[1/]  NBPA and MLSPU license their members' publicity rights to the NBA and MLS, respectively, and the NBA and MLS in turn license those rights to video game manufacturers and others.

like "Madden NFL" depict professional athletes in an even more realistic manner than "NCAA Football," Amici's licensing agreements with EA and with other game manufacturers rest in considerable part upon the very same state law rights of publicity that the district court erroneously held were trumped by EA's First Amendment rights. The district court's decision, if affirmed, would provide a massive commercial windfall to EA, and could disrupt the long-established expectations and rights underlying the athletes' and the Player Associations' group licensing agreements with EA and others, including companies involved in other forms of "new media."

This brief is submitted with the parties' consent. No counsel for a party authored this brief in whole or in part, and no person other than amici or their counsel made a monetary contribution to the preparation or submission of this brief.

**INTRODUCTION**

Plaintiff-appellant Ryan Hart ("Hart") alleges that defendant-appellee Electronic Arts, Inc. ("EA") violated his New Jersey common law right of publicity by including his likeness, and the likenesses of other non-professional college football players, in its "NCAA Football" video games. EA concedes for purposes of this appeal that its actions violated Hart's right of publicity, but contends that the First Amendment permits it to exploit the likenesses of college athletes like Hart for commercial gain, without authorization and without compensation, because video games are "expressive works" within the scope of the First Amendment. As explained below, the district court, by granting summary judgment to EA, undermined the important rights protected by the New Jersey right of publicity and threatened settled rights and expectations in a billion-dollar industry that has successfully grown under the existing regime of strong, predictable, and enforceable publicity rights.

This brief focuses on two key issues that are particularly relevant to Amici's interests as the collective bargaining and group licensing representatives of professional athletes in the sports of football, baseball, basketball, hockey, and soccer.

First, this brief provides context by describing what is at stake in this case

1

for EA and for the accomplished athletes whose likenesses are featured in its video games.  Understanding the commercial context is important, because the very purpose of the right of publicity is to enable individuals "to control the commercial value and exploitation of [their] name[s] and picture[s] or likeness[es] and to prevent others from unfairly appropriating this value for their commercial benefit."  *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1353 (D.N.J. 1981).  This Court cannot properly weigh the rights at issue here without understanding the manner in which modern sports video games are designed to exploit the commercial value of athletes' names and likenesses.

The publicity rights that Hart invokes here have tremendous commercial value.  Sports video games generate billions of dollars in sales.  EA's best selling sports games, including "NCAA Football" and "Madden NFL," are highly successful because they depict actual college and professional athletes in realistic game settings.  Those realistic depictions exploit the athletes' hard-earned reputations for the company's economic gain, and it is only fair – and required by the right of publicity – that some of the massive revenue generated by those depictions be returned to the athletes.

After establishing the broader commercial context in which this case arises, Amici demonstrate why the First Amendment does not allow EA to strip college

2

athletes of their rights of publicity without consent or compensation. As the

Supreme Court held in *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S.

562, 577 (1977), First Amendment rights do not automatically trump rights of

publicity. Instead, courts must carefully balance the competing First Amendment

and right-of-publicity interests, in a manner that protects the core purposes served

by both.

The best approach to balancing those rights where a celebrity's likeness is

appropriated for use in a medium that has expressive elements is the "predominant

use" test established by the Missouri Supreme Court in *Doe v. TCI Cablevision*,

110 S.W.3d 363 (Mo. 2003). That test permits right-of-publicity claims when a

defendant has appropriated an individual's valuable name or likeness for a

predominantly commercial purpose, rather than a predominantly expressive

purpose. *Id.* at 374. This approach preserves the right of publicity in cases

involving core infringements – *i.e.*, where the commercial value of a celebrity's

identity is exploited for economic gain; the use of that identity is collateral to the

expressiveness of defendant's speech; and the defendant could have expressed the

same message or idea without infringing upon plaintiff's publicity rights. At the

same time, this approach fully protects core First Amendment activities, such as

reporting about and criticizing public figures, by precluding claims directed at

3

"predominantly expressive" uses of a celebrity's identity.

Instead of using Missouri's "predominant use" test, the district court applied the "transformative use" test established by *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 21 P.3d 797 (Cal. 2001). That test does not actually *balance* First Amendment interests against the right of publicity; it focuses only on the expressive aspects of how a celebrity's identity has been used, ignoring the extent to which that use is commercially exploitative. Nonetheless, when properly applied with a focus on whether *the use of the celebrity's identity* has been "so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness," the test is sufficiently similar to the "predominant use" test to satisfy First Amendment balancing requirements. *Id.* at 809; *see No Doubt v. Activision Publishing, Inc.*, 122 Cal.Rptr.3d 397, 409-12 (Cal. Ct. App.), *review denied*, No. S191787 (Cal. Sup. Ct. June 8, 2011) (video game's similar depiction of famous musicians not "transformative").

## ARGUMENT

## I.    EA Depicts Real Athletes in its Hyper-Realistic Sports Video Games Because Consumer Demand Is Driven by Team and Player Identification

The district court granted summary judgment to EA without allowing any discovery. Consequently, the record does not fully establish the commercial

4

context in which EA manufactures and sells its sports video games such as

"NCAA Football."  To provide this Court with a more complete understanding of

that context, Part I describes how the important public interests served by the right

of publicity are implicated in "NCAA Football" and other realistic sports video

games.

**A.    The Right of Publicity Protects the Identities of Athletes and Other Public Figures from Unauthorized Commercial Exploitation**

State and federal courts have long recognized the right of athletes and other

celebrities to control the use of their names, images, and likenesses for commercial

gain.  As the Supreme Court has emphasized, this "right of publicity" serves the

"straightforward" purpose "of preventing unjust enrichment by the theft of good

will."  *Zacchini*, 433 U.S. at 576.  Like other intellectual property rights such as

those protected by copyright law, the right of publicity "provides an economic

incentive for [celebrities] to make the investment required to produce a [work] of

interest to the public."  *Id.*  "A famous individual's name, likeness, and

endorsement carry value and an unauthorized use harms the person both by

diluting the value of the name and depriving that individual of compensation.

Unauthorized use of an individual's name is nothing short of an appropriation of

the attributes of one's identity."  *McFarland v. Miller*, 14 F.3d 912, 919 (3d Cir.

5

1994) (citation omitted).

Courts have recognized the right of publicity in a range of commercial settings, from trading cards depicting professional baseball players, *Halean Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1963); and board games featuring professional golfers, *Palmer v. Schonhorn Enterprises, Inc.*, 96 N.J. Super. 72 (1967); to works of art representing famous comedians, *Comedy III*, 21 P.3d 797; and video games depicting popular musicians, *No Doubt*, 122 Cal.Rptr.3d 397. No matter what the medium, the right to control the commercial exploitation of an individual's "notoriety or fame belongs to the individual with whom it is associated." *McFarland*, 14 F.3d at 923.

The right of publicity also permits individuals to avoid becoming associated with particular commercial products or works against their will. In *Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003), for example, civil rights icon Rosa Parks brought a right-of-publicity suit against a rap group whose song "Rose Parks" contained "lyrics . . . laced with profanity" and "a 'hook' or chorus that [was] pure egomania," but no content relating to Parks herself. *Id.* at 453-55, 459-461. Similarly, in *No Doubt*, the plaintiff musicians objected to a video game publisher's decision to depict them performing songs they "never would have performed," and performing songs as soloists or as members of other bands. 122

6

Cal.Rptr.3d at 402. The right of publicity thus protects the right to choose how one's identity is commercially exploited as well as the right to compensation for such exploitation.

It goes without saying that, for college and professional athletes, the commercial value of their identities is the result of a tremendous amount of work over many years. Very few athletes develop the extraordinary skills necessary to compete at the Division I college or professional level.[2] Just over 6% of high school football players play in college, and fewer than 2% of those college athletes are drafted into the NFL.[3] Accordingly, NCAA Division I athletes have already devoted an enormous effort to developing and honing their athletic skills, and this commitment of time and effort only increases as they reach the elite college level. Typical college football players, for example, commonly spend 50 or more hours per week practicing, conditioning, and playing in actual games.[4] In making that

---

[2] *See, e.g.*, Jim Parcels, Chances of Making It in Pro Hockey (April 2002), *available at* http://www.omha.net/flash.asp?page_id=242 (of 22,000 individuals playing junior hockey in Ontario in 1991, only 32 played in NHL).

[3] http://www.ncaa.org/wps/wcm/connect/public/ncaa/pdfs/2011/ 2011+probability+of+going+pro.

[4] *See, e.g.*, Joe Nocera, "Let's Start Paying College Athletes," *New York Times Magazine*, Dec. 30, 2011, at MM30, *available at* http://www.nytimes.com/ 2012/01/01/magazine/lets-start-paying-college-athletes.html.

7

commitment, athletes necessarily sacrifice other opportunities, while recognizing that, even if they remain injury-free, the chances of playing professionally are slim.  And of course, the ultimate commercial value of any athlete's identity is largely determined by the quality of that athlete's game performance.

### B.    The Realistic Depictions of Real Athletes in Sports Video Games Are at the Core of the Right of Publicity

The realistic depictions of actual college and professional athletes in sports video games like "NCAA Football" are at the core of the right of publicity, because that realism is key to attracting potential purchasers with strong team and player loyalties.

### 1.    Sports Video Games Include Realistic Depictions of College and Professional Athletes

EA's "NCAA Football" games allow users "to experience the excitement and challenge of college football."  APP0530.  The games depict actual college football teams, athletes, and games in realistic detail.  The avatars representing each team's players, while omitting the players' names, "bear[] resemblance to" the actual athletes on that team and are "designed with [the real athletes'] physical attributes, sports statistics, and biographical information in mind."  APP0056.  Virtual football competitions take place in stadiums that replicate actual college football venues; and, because of EA's exclusive, multi-million-dollar licensing

8

agreement with Collegiate Licensing Company ("CLC," the NCAA's official licensing arm), the games include school names, team names, uniforms, logos, and fight songs. APP0532. As in a real college football television broadcast, audio commentators provide a running commentary during the virtual competition. *See* Cianfrone & Baker, "The Use of Student Athlete Likenesses in Sport Video Games: An Application of the Right of Publicity," 20 *J. Legal Aspects Sport* 35, 43 (2010). To further heighten users' sense of the "reality" of college football, EA includes photo montages featuring photographs of actual college athletes, including plaintiff Ryan Hart within "NCAA Football 2009," and the cover of each edition of "NCAA Football" features an athlete who was notably successful during the preceding college football season. APP0534; *see* NCAA Football 04 (University of Southern California quarterback and Heisman Trophy winner Carson Palmer); NCAA Football 05 (University of Pittsburgh wide receiver Larry Fitzgerald); NCAA Football 09 (University of California Berkeley wide receiver DeSean Jackson).

EA also has the exclusive license to manufacture and sell sports video games featuring *professional* football players. EA's "Madden NFL" franchise "authentically recreates the NFL experience" by depicting NFL players, teams, stadiums, and game play. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1012

9

(3d. Cir. 2008); *see also* APP0055 (noting similarities beween "NCAA Football"

and "Madden NFL").  The virtual player avatars in "Madden NFL" are, if

anything, even more realistic than those in "NCAA Football," because "Madden

NFL" includes players' names by default, while users of "NCAA Football" have to

add player names using files available on EA's website.[5/]  Moreover, because of

EA's licensing agreements with the NFLPA and the NFL, EA is entitled to meet in

person with each of the athletes in "Madden NFL" in order to recreate their virtual

image more precisely.

EA's sports video game franchises include many popular sports besides

football.  "FIFA Soccer," for example, portrays the "reality" of professional

soccer, "NHL Hockey" recreates professional hockey, "Tiger Woods PGA TOUR"

depicts professional golf, and "NBA Live" portrays professional basketball.[6/]

Other companies, which compete with EA for exclusive professional sports

licensing agreements, manufacturer games featuring professional athletes in other

sports.  2K Sports' games, for example, replicate the "reality" of major league

baseball ("MLB2K") and NBA basketball ("NBA2K"), while Sony produces

---

[5/]  EA nonetheless pre-records the names of certain college athletes so their
names will be pronounced correctly by in-game audio commentators after they are
added.  *See* Cianfrone & Baker, *supra*, at 43.

[6/]  *See* http://aboutus.ea.com/companylabels.action.

10

"MLB The Show," a major league baseball video game.[7] These games, too, depict

real professional athletes with tremendous verisimilitude.

### 2.    The Realistic Depictions of Famous Athletes in Sports Video Games Increase Game Sales

The manufacturers of these sports video games recognize that depicting the

images and abilities of real athletes and real teams has a direct commercial benefit

by increasing game sales. Users are motivated to play sports video games because

of their strong identification with a favorite athlete or team, coupled with an

interest in applying their knowledge of the sport in "real" game conditions. *See,*

*e.g.*, Cianfrone, Zhang & Ko, "Dimensions of Motivation Associated with Playing

Sport Video Games: Modification and Extension of the Sport Video Game

Motivation Scale," 1 *Sports, Business and Management: An International Journal*

172, 186 (2011); Kim, Walsh & Ross, "An Examination of the Psychological and

Consumptive Behaviors of Sports Video Gamers," 17 *Sports Marketing Quarterly*

44, 52 (2008). In simple terms, consumers purchase sports video games to

"become" a favorite player like Eli Manning, Sidney Crosby, or Deron Williams,

and to lead their favorite team, be it the New York Knicks, the Philadelphia Flyers,

or the Pittsburgh Steelers, onto the field of play. Consumers are far more likely to

---

[7]    *See, e.g.*, http://2ksports.com/games/; http://us.playstation.com/
games-and-media/games/mlb-11-the-show-ps3.html.

buy hyper-realistic sports video games depicting real college and professional athletes than games featuring imaginary or do-it-yourself players, teams, and settings for which no licensing or compensation is required.

By including real athletes in their video games, manufacturers like EA take advantage of the consumer desire for realism and "capitalize[s] upon the fame of those players." APP0053. As the district court recognized, no one can dispute that "video game consumers enjoy and, as a result, purchase more EA-produced video games as a result of the heightened realism associated with actual players." *Id.* (citation omitted); *see also* Cianfrone, Zhang & Ko, *supra*, at 186.

Depicting real athletes promotes the business interests of sports video game manufacturers like EA in another important way – namely, by building planned obsolescence into each release and thus generating a reliable annual revenue stream. EA, for example, releases new editions of "Madden NFL," "NCAA Football," and "FIFA Soccer" every year, while 2K Sports annually releases new editions of "MLB2K" and "NBA2K." The new editions feature updated team rosters with updated player descriptions and ability ratings. *See, e.g.*, APP0532. Because prior editions of the game no longer depict current teams and athletes accurately, consumers must purchase those new editions if they wish to maintain the game's realism – which, as noted above, is the primary factor motivating the

typical customer's purchasing decisions.  Accordingly, it is not surprising that most users of "Madden NFL" and "NCAA Football" play the most up-to-date version.  Cianfrone, Zhang & Ko, *supra*, at 180.[8]

Because consumers are drawn to the realism of sports video games, and in particular to their depictions of real athletes, EA emphasizes that realism in its commercial marketing.  The longstanding motto of its sports video game division was, "If it's in the game, it's in the game" – now shortened to "it's in the game." Consistent with this theme, the advertising for "Madden NFL 06" "included several sequences comparing the video game's virtual environment with the actual NFL environment, extolling the realism of everything from the stadiums to the game play."  542 F.3d at 1012.  Likewise, in marketing "NBA Live 10," EA proclaimed that, "[w]ith over 500 shoes in the game that update throughout the course of the season and authentic tattoos on 75 of the top players in the league, NBA LIVE 10 is as real as videogame basketball gets."[9]  And every year EA conducts a well-publicized "NCAA Football" match between the two Division I

---

[8]    When EA could not release a new edition of its professional basketball game before the 2010-11 NBA season, it offered a free "roster update" revising the prior edition's virtual teams to reflect the actual team rosters for the upcoming season.  *See* http://www.easports.com/blogs/fromdowntown/post/slug/ nba-live-10-roster-update-for-the-2010-2011-nba-season.

[9]    http://www.ea.com/nba-live.

13

college football teams playing in the FCS championship game to emphasize the

video game's hyper-realistic replication of actual college football. *See* "Tide Wins

a Title for Gamers," *Birmingham News*, Dec. 20, 2011, at D2.

### 3. Sports Video Games Generate Billions of Dollars in Annual Sales

The commercial strategy described above, in which game manufacturers

depict real athletes to generate increased consumer interest, has been highly

lucrative. Sports video games constitute 16.3% of the nearly $10 *billion* market

for video games. Entertainment Software Association, "2011 Sales, Demographic

and Usage Data: Essential Facts About the Computer and Video Game Industry,"

at 8, 10 (2011), *available at* http://www.theesa.com/facts/pdfs/ESA_EF_2011.pdf.

In 2011, EA's "Madden NFL 11" was the second-best selling video game in the

United States across *all* genres, while "NBA2K11" was the tenth best-selling

game. *Id.* at 9.

EA's total net revenue in FY2011 was $3.6 billion, Press Release,

Electronic Arts, NCAA Football 12 Kicks Off to Record Start at Retail (July 26,

2011), with a significant portion of that revenue generated by its sports video

games. In the quarter ending September 30, 2011, for example, EA had non-

GAAP net revenue of more than $1 billion "due to the strong performance of FIFA

14

12, NCAA Football 12, NHL 12, and Madden NFL 12," which were all (along

with "FIFA 11") among the 20 top-selling video games in western markets.  Press

Release, Electronic Arts, Electronic Arts Reports Q2 FY12 Financial Results (Oct.

27, 2011).  In 2011 as a whole, EA sold more than 10 million copies of "FIFA 12"

and more than five million copies of "Madden NFL 12," including more than 1.4

million copies of the latter game in its first week of availability.  Press Release,

Electronic Arts, Electronic Arts Reports Q3 FY12 Financial Results (Feb. 1,

2012); Press Release, Electronic Arts, Touchdown! EA's Madden NFL 12 Kicks

Off with a Big Opening Week (Sept. 7, 2011).  "NCAA Football" is almost as

successful as "Madden NFL."  For example, "NCAA Football 12" sold more than

700,000 copies in its first two weeks on sale.  Press Release, Electronic Arts,

NCAA Football 12 Kicks Off to Record Start at Retail (July 26, 2011).  Likewise,

EA has sold more than 25 million NBA-themed video games.  Press Release,

Electronic Arts, EA Changes the Game, Announces NBA ELITE 11 (June 2,

2010).[10]

    With the notable exception of "NCAA Football," for which EA licenses

team names, logos, and other similar identifiers from the NCAA (through CLC)

---

[10]  EA's sports video games retail for as much as $59.99, depending on the
user's gaming platform.  Press Release, Electronic Arts, Touchdown! EA's
Madden NFL 12 Kicks Off with a Big Opening Week (Sept. 7, 2011).

but does not obtain player licenses, APP0743, EA and its competitors obtain licenses from the Leagues *and* the athletes or their authorized representatives, including Amici, for every other sports video game featuring real teams and real players.  For example, EA uses the names and likenesses of professional football players in "Madden NFL" pursuant to a group licensing agreement with the NFLPA.  APP0737.  Likewise, EA licenses the publicity rights of professional hockey, basketball, and soccer players from the NHLPA, the NBPA (through the NBA), and the MLSPU (through MLS).  Although the terms of these licensing agreements are generally confidential, the amounts paid by EA to the NCAA, the Leagues, and the Player Associations are substantial.  *See, e.g.*, Daniel Kaplan, "NFL Gives EA a Break," *Street & Smith's Sports Business Journal*, Feb. 14-20, 2011, at 1 (noting that EA's licensing agreement with the NFL "is believed to be worth well into nine figures in guarantees and royalties over its original five-year term" and "stands as one of the most, if not the most lucrative non-TV contract the NFL enjoys"); *see also* Declaration of Ryan Hilbert Exh. XX (Dkt. No. 377-57) at Pl140594, *in Parish v. NFLPA*, No. 3:07-cv-00943-WHA (N.D. Cal. Aug. 22, 2008) (noting substantial FY2006 payment by EA to NFLPA pursuant to

exclusive licensing agreement).[11]

These licensing agreements ensure that the video game manufacturers use the licensed properties in a manner consistent with the wishes of the athletes, their representatives, and the Leagues, and that a portion of the significant revenue generated through their commercialization of the licensed properties returns to the source of the properties' value.  Like the right of publicity itself, the agreements allow professional athletes and the Player Associations that represent them "to control the commercial value and exploitation of [their] name[s] and picture[s] or likeness[es] and to prevent [the game developers] from unfairly appropriating this value for commercial benefit." *McFarland*, 14 F.3d at 918 (citation omitted). Indeed, EA has expressly acknowledged in its agreements that the rights licensed from the athletes therein belong to the players and the Player Associations and have great value.  Hilbert Decl. Exh. C (Dkt. No. 377-3) at EA000116, *in Parish*, *supra*.

---

[11]  EA's licensing agreements often prohibit the licensors from entering into similar agreements with other video game developers. *See, e.g.*, Press Release, Electronic Arts, EA Extends Interactive Videogame Agreements With NFL and NFL PLAYERS (Feb. 12, 2008).  That is why EA is the only developer authorized to manufacture video games including real NCAA and NFL football teams. *See, e.g.*, *id*; Press Release, Electronic Arts, EA Announces 2005 Electronic Entertainment Expo Line-Up (May 11, 2005).  EA's exclusive agreements provide it with a significant competitive advantage over manufacturers of competing football-themed games.

**II.    The First Amendment Does Not Prohibit Right-of-Publicity Claims Targeting Predominantly Commercial Uses of an Individual's Likeness or Identity, Such as EA's Use of Hart's Likeness in "NCAA Football"**

The district court held that the college athletes whom EA depicts in "NCAA Football" have no right to *any* compensation from EA, despite its highly profitable appropriation of their likenesses.  The decision, if allowed to stand, would provide EA a huge commercial windfall, permitting EA to keep for itself *all* of the significant commercial value it derives from marketing the college athletes' likenesses, rather than sharing some portion of that revenue with the athletes whose hard work, skills, and commitment to their sport generated that value in the first place.  Nothing in the First Amendment requires such an outcome.

As the Supreme Court made clear in *Zacchini*, courts considering a First Amendment defense to a right-of-publicity claim must balance those competing interests based on the particular facts of the case at hand.  Whether this court chooses to accomplish that balancing through the Missouri Supreme Court's "predominant use" test – which is most consistent with *Zacchini* – or the "transformative use" test adopted by the district court, it should conclude that Hart's core publicity rights outweigh EA's minimal First Amendment interest in exploiting his likeness for commercial profit.

18

### A.    EA's First Amendment Interests Must Be Balanced Against Hart's Right of Publicity

EA acknowledged below that the district court must balance its First Amendment interests against Hart's right of publicity in determining whether Hart's suit can proceed to discovery, class certification, and trial. *See, e.g.*, APP0725-26. Several of EA's supporting amici in the parallel Ninth Circuit case, however, took the more extreme position that expressive works are *categorically* excluded from right-of-publicity claims, and that right-of-publicity suits like Hart's must be subjected to the heightened scrutiny applicable to content-based speech restrictions. *See, e.g.*, Amicus Curiae Brief of the Motion Picture Association of America at 13-21, *in Keller v. Electronic Arts, Inc.*, No. 10-15387 (9th Cir. Sept. 7, 2010). This Court should reject those arguments, if they are made by EA or its amici here, because they are inconsistent with the Supreme Court's guidance regarding the intersection between the First Amendment and intellectual property rights like the right of publicity.

*Zacchini* refutes any contention that expressive works are categorically immune from right-of-publicity claims. *Zacchini* involved a right-of-publicity lawsuit triggered by a broadcast during the evening news of a performer's 15-second human cannonball act. 433 U.S. at 564. Such reporting indisputably sits

19

at the core of the First Amendment's protections for speech, expression, and the press. *See, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971). Nonetheless, *Zacchini* held that the First Amendment did *not* bar the plaintiff's right-of-publicity suit. 433 U.S. at 578-79.[12]

*Zacchini* also refutes the argument of some of the *Keller* amici that state right-of-publicity laws are subject to strict scrutiny review under the First Amendment and thus must be justified by a compelling government interest and narrowly drawn to serve that interest. The Supreme Court did not apply strict scrutiny analysis in *Zacchini*. Instead, it balanced the relevant interests, concluded that the performer's substantial right-of-publicity interest could be protected without significantly undermining the broadcaster's First Amendment rights, and allowed the performer's lawsuit to go forward. 433 U.S. at 573-78. That could

---

[12]    Although some courts have limited *Zacchini*'s reach to cases involving a performer's "entire act," *see, e.g.*, APP0038, that fact was only relevant to the Court's determination of the particular weight to which plaintiff's publicity rights were entitled, not to the existence of those rights or the need to balance them against First Amendment interests. *See Zacchini*, 433 U.S. at 574-75 ("Wherever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent."). If all works constituting protected expression under the First Amendment were categorically immune from right-of-publicity liability, *Zacchini* would have affirmed the decision below without ever considering plaintiff's publicity rights.

not have been the result under traditional strict scrutiny review.

The Supreme Court's decisions in comparable cases involving other forms of intellectual property reinforce the appropriateness of balancing. The Supreme Court has repeatedly held, for example, that copyright laws are not subject to heightened constitutional scrutiny under the First Amendment because they "incorporate[] [their] own speech-protective purposes and safeguards." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *see also Golan v. Holder*, _ U.S. _, 2012 WL 125436, at *14-*17 (Jan. 18, 2012) (same). The right of publicity is no different. Like copyright law, the right of publicity "spur[s] the creation . . . of new expression." *Eldred*, 537 U.S. at 219; *cf. Zacchini*, 433 U.S. at 577 (right of publicity "protect[s] the entertainer's incentive in order to encourage the production of [his] type of work"). And the balancing of interests required under *Zacchini* accommodates First Amendment concerns much as copyright law's "fair use" doctrine does. *See Eldred*, 537 U.S. at 219-20.

The Supreme Court has never subjected state defamation and libel laws to heightened constitutional scrutiny either. Instead, the Court carefully balances the interests served by those laws against countervailing First Amendment interests to determine what, if any, restrictions on state defamation and libel lawsuits the First Amendment requires. *See, e.g.*, *Dun & Bradstreet, Inc. v. Greenmoss Builders,*

21

*Inc.*, 472 U.S. 749, 757 (1985) (plurality opinion); *Gertz v. Robert Welch, Inc.*,
418 U.S. 323, 343 (1974).

These decisions demonstrate that state right-of-publicity laws are not
"content-based."[13/]   Instead, as the Supreme Court has explained, laws are content-
neutral for First Amendment purposes if they are "justified without reference to
the content of the regulated speech."  *Bartnicki v. Vopper*, 532 U.S. 514, 526
(2001) (citation and emphasis omitted).  State right-of-publicity laws clearly
satisfy this standard.  They protect a form of intellectual property – the commercial
value of one's name, likeness, and identity – from unauthorized commercial
exploitation and misappropriation to "prevent[] unjust enrichment by the theft of
goodwill" and "to afford greater encouragement to the production of works of
benefit to the public."  *Zacchini*, 433 U.S. at 576-77.  That protection is available
whether the misappropriation takes an expressive or non-expressive form.  *Cf. City
of Erie v. Pap's A.M.*, 529 U.S. 277, 289-90 (2000) (ordinance banning public
nudity was "content-neutral" even though it prohibited expressive nude dancing).
Because the right of publicity's justifications are content-neutral, state laws that
protect that right, like other intellectual property laws, are content-neutral for First

---

[13/]   Suits for defamation and copyright infringement require an examination
of the "content" of challenged speech, but heightened scrutiny is nonetheless
never applied in such cases.  *See, e.g., Eldred*, 537 U.S. at 221.

Amendment purposes. To determine whether Hart's lawsuit can proceed this Court, like *Zacchini*, must balance Hart's publicity rights against EA's First Amendment rights.

### B. EA's Predominantly Commercial Use of Hart's Likeness Is Not Shielded from a Right-of-Publicity Claim by the First Amendment

Hart's opening brief describes four tests that have been used to balance publicity rights against First Amendment interests. *See* Appellant's Opening Brief at 28-29. Amici agree with Hart that the test that most effectively balances those rights is the "predominant use" test adopted by the Missouri Supreme Court in *TCI Cablevision*. That test permits right-of-publicity lawsuits directed at the uses of an individual's likeness that most threaten the interests protected by the right of publicity, while prohibiting suits posing a genuine threat to First Amendment rights of expression. *See TCI Cablevision*, 110 S.W.3d at 374.

The "predominant use" test is preferable because it is the only test that genuinely considers and *balances* the countervailing interests. As the Missouri Supreme Court recognized in rejecting the alternative tests applied by the district court here, the "transformative use" test and the "relatedness" test focus exclusively on the expressive aspects of a challenged work, ignoring that "many uses of a person's name and identity have both expressive and commercial

23

components." *TCI Cablevision*, 110 S.W.3d at 374. Such a one-sided focus is

inappropriate because "[t]he right of publicity-free speech interface involves not

merely the constitutional right to 'speak,' but also the right to control one's

property." Mark S. Lee, "Agents of Chaos: Judicial Confusion in Defining the

Right of Publicity-Free Speech Interface," 23 *Loyola L.A. Enter. L. Rev.* 471, 498

(2003). To properly *balance* First Amendment and right-of-publicity interests, a

court must consider *both* elements: the expressive aspects of defendant's use of

plaintiff's identity *and* the commercially exploitative aspects of that use. As in

*Zacchini*, a proper balancing test must focus on defendant's use of an individual's

identity and weigh its expressive aspects against its commercially exploitative

aspects. *See, e.g.*, *TCI Cablevision*, 110 S.W.3d at 374 (permitting right-of-

publicity claim where "metaphorical reference to [plaintiff], though a literary

device, ha[d] very little literary value compared to its commercial value" and "the

use and identity of [plaintiff's] name ha[d] become predominantly a ploy to sell

comic books and related products rather than an artistic or literary expression").

    In addition to providing the only *genuine* balancing of relevant interests, the

Missouri Supreme Court's "predominant use" test establishes the *proper* balancing

of those interests, permitting liability for predominantly commercial uses while

barring liability for predominantly expressive uses. That approach "protects

intellectual property that is being exploited by others, but permits and encourages creative expression that makes meaningful comment on, about, or with the intellectual property." Lee, *supra*, at 500.

By permitting claims directed at "predominantly commercial" uses of a celebrity's identity, the "predominant use" test prevents defendants from avoiding liability for their raw exploitation of an individual's commercially valuable likeness by adding minor or collateral expressive elements. The names, identities, and likenesses of high-profile athletes have considerable commercial value, and merchants like EA have a strong incentive to exploit that value in order to increase sales of their goods or services. The "predominant use" test ensures that publicity rights are enforceable where they are most important and most likely to be infringed – i.e., when defendant's principal purpose is to exploit the hard-earned commercial value of a public figure's identity for their own exclusive commercial benefit. These are the uses most likely to dilute the value of the identity, and public figures deserve compensation for any damage resulting from such uses. *McFarland*, 14 F.3d at 919; *cf. Zacchini*, 433 U.S. at 575 n.12 (noting that plaintiff must still prove at trial that defendant's appropriation of his likeness caused compensable damages, rather than constituting free advertising).

Because the "predominant use" test only permits right-of-publicity suits

where plaintiff's name or likeness is used for a predominantly commercial purpose, the test fully protects a defendant's competing First Amendment rights of expression. A movie such as *Forrest Gump*, for example, which invokes reality and features real individuals in order to heighten its dramatic narrative, would be protected because its use of celebrity likenesses is predominantly expressive. Indeed, the "predominant use" test permits greater intrusions on a plaintiff's intellectual property rights than is permitted in other contexts involving comparable conflicts between the First Amendment and private property. *See, e.g.*, *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972) ("where adequate alternative avenues of communication exist," a property owner's right to exclude trespassers is not trumped by "the [trespassers'] exercise of [their] First Amendment right[]").

Conversely, in cases involving uses of a person's identity that are *not* predominantly expressive, the "predominant use" test poses little threat to First Amendment rights, because a defendant like EA could easily omit the likenesses of specific athletes from its work without changing its expressive content to any significant degree. The expressive content of "NCAA Football" and "Madden NFL," for example, would not be materially different if the games omitted the likenesses of real college and professional athletes – EA would simply sell fewer

26

units.

The longstanding willingness of EA and other game manufacturers to license intellectual property rights from the Player Associations and the Leagues (and from the NCAA) demonstrates there is little risk that expressive activity will be chilled by right-of-publicity suits challenging predominantly commercial uses of a plaintiff's identity. To the contrary, permitting such suits to proceed would simply require those companies to extend their existing licensing practices to college athletes, from whose hard-earned celebrity they have long been earning windfall profits.

Applying the Missouri Supreme Court's "predominant use" test, then, requires reversal of the district court's summary judgment decision. As explained above, EA includes the likenesses of college football players in its "NCAA Football" games in order to appeal to consumer desire to experience the "reality" of college football and to identity with and "become" particular college football athletes and teams. Indeed, the district court found that "the goal of the game is to capitalize upon the fame of [actual college athletes]." APP0053. Because EA's predominant purpose in using real college athletes' likenesses in "NCAA Football" is to "exploit[] the commercial value of [the athletes'] identit[ies]," and not "to make an expressive comment on or about" college football players, Hart

27

should be entitled to take discovery and prove his right-of-publicity claim at trial.

*TCI Cablevision*, 110 S.W.3d at 374 (citation omitted).

### C.     The "Transformative Use" Test, Properly Applied, Also Establishes that EA's Use of Hart's Likeness Is Not Protected

The district court applied the California Supreme Court's "transformative use" test, which asks whether the challenged work "takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass," or whether, conversely, the work "contains significant transformative elements" making it "especially worthy of First Amendment protection." *Comedy III*, 21 P.3d at 808; *see* APP0048.

However, the district court misapplied that test, asking whether EA's "NCAA Football" *as a whole* was "transformative," rather than whether *Hart's likeness* was transformed by EA into something other than a "a literal depiction or imitation of a celebrity for commercial gain." *Id.*; *see, e.g.*, APP0055 ("Viewed as a whole, there are sufficient elements of EA's own expression found in the game that justify the conclusion that its use of Hart's image is transformative and, therefore, entitled to First Amendment protection."). The question mistakenly asked by the district court was not whether EA "transformed" Hart's likeness into

its own protected expression, but whether the "NCAA Football" games were themselves expressive.

As applied in this manner, the "transformative use" test does not *balance* anything. Instead, it simply provides that a minimum amount of expressive content will render any use protected under the First Amendment, no matter how insignificant the expressive content is in comparison to the celebrity's publicity rights, if the use is presented in an expressive medium or manner. Because that formulation of the "transformative use" test does not balance the parties' countervailing interests – and, indeed, ignores the plaintiff's publicity rights altogether – it is inconsistent with *Zacchini* and must be rejected.

However, when that test is properly applied with a focus on whether the *use of the plaintiff's identity* has been "so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness," *Comedy III*, 21 P.3d at 809, the "transformative use" test becomes comparable to the "predominant use" test (because a "transformative use" is predominantly expressive) and thus provides a reasonable balancing of the parties' interests. Had the district court applied *this* test, it would have ruled differently.

The proper application of the "transformative use" test to circumstances virtually indistinguishable from this case is demonstrated by *No Doubt*, 122

29

Cal.Rptr.3d 397.  Like the digital reproductions of college athletes in "NCAA

Football," the video game in *No Doubt* included "computer-generated recreations

of the [plaintiffs], painstakingly designed to mimic their likenesses."  *Id.* at 409.

The game's manufacturer, like EA, asserted that its use of the plaintiffs' likenesses

was "transformative" and shielded from liability by the First Amendment.  *Id.* at

406.

     The California Court of Appeal rejected that defense, and the California

Supreme Court denied review.  The court of appeal explained that the game's

manufacturer was "motivated by the commercial interest in using the band's fame

to market Band Hero" and had "intentionally used the[] literal reproductions so

that players could choose to 'be' the No Doubt rock stars."  *Id.* at 409-11.

Although the game "show[ed] the No Doubt avatars surrounded by unique,

creative elements, including in fanciful venues such as outer space and performing

songs that No Doubt avowedly would never perform in real life," those aspects of

the game did not "transform[] the literal depictions of No Doubt's members into

expression that [was] more [defendant's] than pure mimicry" because the avatars

remained "exact depictions of No Doubt's members doing exactly what they do as

celebrities."  *Id.* at 410-11.  While the court acknowledged that "context may

create protected expression in the use of a celebrity's literal likeness," it

30

recognized that realistic depictions are protected only if that context transforms the celebrity's likeness into something other than "pure mimicry" designed to exploit commercial value of that likeness. *Id.* If "nothing in the creative elements of [a video game] elevates [its] depictions of [a celebrity] to something more than 'conventional, more or less fungible, images' of [the celebrity]," the First Amendment does not trump the celebrity's "right to control and exploit" that use of his or her identity. *Id.* (citing *Comedy III*, 21 P.3d at 808).

When properly applied, as in *No Doubt*, the "transformative use" test requires reversal of the decision below. The only difference between Activision's depiction of No Doubt and EA's depiction of college football players in "NCAA Football" is that EA permits users to modify some (but not all) of the players' default features, such as their "personal characteristics" and "accessories." APP0053.[14/] That immaterial purported difference cannot render EA's depictions of the college players "transformative," because it does nothing to transform them into anything other than "literal depiction[s] . . . for commercial gain." *Comedy III*, 21 P.3d at 808. Were it otherwise, game manufacturers could evade valid

---

[14/] In fact, contrary to the district court's understanding, the avatars in *No Doubt could* be "unlocked" and then modified by any user, allowing male band members to sing in female voices and vice versa, and allowing solo performances and performances with other bands. 122 Cal.Rptr.3d at 402.

31

right-of-publicity suits by making minor changes to their games that do not affect the commercial misappropriation of a well-known individual's identity, and that will never be used by consumers who are attracted to the games *because* of their realistic portrayals. Indeed, the district court's approach would allow Activision to re-release a game featuring identical hyper-realistic depictions of No Doubt, as long as it permitted users at some stage of play to modify the band members' "personal characteristics" and "accessories" in additional ways. APP0053.

By suggesting that the viability of a right-of-publicity lawsuit turns on whether a video game permits users to choose whether a digital avatar wears a visor or an arm band, the district court's application of the "transformative use" test ignores the real question – whether the use has become "primarily the defendant's own expression rather than the celebrity's likeness," *Comedy III*, 21 P.3d at 809 – while trivializing the important interests protected by the right of publicity. EA depicts actual college players to "us[e] the [players'] fame to market [the game]" and to "encourage[] the [players'] sizeable fan base to purchase the game so as to perform as, or alongside, the [players]." *No Doubt*, 122 Cal.Rptr.3d at 411. Nothing in "NCAA Football" transforms those depictions into anything other than "literal depiction[s] or imitation[s] . . . for commercial gain." *Comedy III*, 21 P.3d at 808. For that reason, EA's use of the players' likenesses was not

32

"transformative," and this Court should reject EA's First Amendment defense even under the "transformative use" test.

## CONCLUSION

For the foregoing reasons, the district court's summary judgment ruling should be REVERSED.

Dated: February 17, 2012    Respectfully submitted,

s/Michael Rubin
Michael Rubin, CA Bar No. 80618
P. Casey Pitts, CA Bar No. 262463
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Ph: (415) 421-7151
Fax: (415) 362-8064
*Attorneys for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 28(a)(11), I hereby certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B), because this brief contains 6,971 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 3d Cir. R. 29.1(b). I also certify that the text of the electronic brief is identical to the text in the paper copies of the brief, and that the electronic brief was scanned using McAfee Virus Scan, and no virus was detected.

Dated: February 17, 2012              s/Michael Rubin
                                      Michael Rubin

                                      *Attorney for Amici Curiae*

34

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2012, I filed and served the foregoing

Amicus Curiae Brief of the National Football League Players Association, the

Major League Baseball Players Association, the National Hockey League Players'

Association, the National Basketball Players Association, and the Major League

Soccer Players Union by causing copies to be electronically filed and served via

the appellate CM/ECF system to the following counsel of record:

Timothy McIlwain
Attorney at Law, LLC
5 Marine View Plaza, Suite 300
Hoboken, NJ  07030
*Attorney for Plaintiff-Appellant Ryan Hart*

Elizabeth A. McNamara
Davis Wright Tremaine LLP
1633 Broadway
New York, NY 10019
*Attorney for Defendant-Appellee Electronic Arts, Inc.*

I also hereby certify that I have caused ten copies to be delivered to the

Court, and one copy to the above-listed counsel of record, by United Parcel

Service.

Dated: February 17, 2012                    s/Michael Rubin_____
                                            Michael Rubin

                                            *Attorney for Amici Curiae*

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the attorney whose name appears on the foregoing Amicus Curiae Brief of the National Football League Players Association, the Major League Baseball Players Association, the National Hockey League Players' Association, the National Basketball Players Association, and the Major League Soccer Players Union was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit on November 23, 2011, and is presently a member in good standing at the Bar of said court.

Dated: February 17, 2012                    s/Michael Rubin_____
                                            Michael Rubin

                                            *Attorney for Amici Curiae*