**11-3750**

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆◆◆

RYAN HART, individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

—v.—

ELECTRONIC ARTS, INC., a Delaware Corporation; DOES 1-50,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

## BRIEF FOR DEFENDANT-APPELLEE ELECTRONIC ARTS INC.

ELIZABETH A. MCNAMARA
SAMUEL M. BAYARD
DAVIS, WRIGHT & TREMAINE LLP
1633 Broadway, 27th Floor
New York, New York 10019
Telephone: (212) 489-8230
Facsimile:  (212) 489-8340

BRUCE S. ROSEN, ESQ.
MCCUSKER, ANSELMI, ROSEN
  & CARVELLI, P.C.
210 Park Avenue, Suite 301
Florham Park, New Jersey 07932
Telephone: (973) 635-6300
Facsimile:  (973) 635-6363

*Attorneys for Defendant-Appellee
  Electronic Arts Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellee Electronic Arts Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

COUNTERSTATEMENT OF THE ISSUES ........................................1

COUNTERSTATEMENT OF CASE .......................................................1

COUNTERSTATEMENT OF FACTS ....................................................3

    A.    EA's Works ............................................................................3

    B.    Procedural Background .........................................................6

        1.    First Amended Complaint ...........................................6

        2.    The District Court's September 22, 2010 Opinion ........................6

        3.    Second Amended Complaint ..........................................7

        4.    EA's Motion to Dismiss or, in the Alternative, for Summary Judgment ........................................................8

COUNTERSTATEMENT OF THE STANDARD OF REVIEW ...........10

SUMMARY OF THE ARGUMENT .....................................................10

ARGUMENT .........................................................................................17

    I.    THE DISTRICT COURT PROPERLY HELD THAT EA'S *NCAA FOOTBALL* GAMES ARE EXPRESSIVE WORKS FULLY PROTECTED BY THE FIRST AMENDMENT .....................................17

        A.    EA's Games Are Expressive Works ...............................17

        B.    The First Amendment Fully Protects Works Sold for Profit..........21

        C.    The First Amendment Fully Protects Realistic Works of Entertainment ...................................................................25

    II.    EA'S FIRST AMENDMENT RIGHTS TRUMP HART'S RIGHT OF PUBLICITY UNDER ANY OF THE APPROPRIATE FIRST AMENDMENT TESTS .........................................................29

DWT 19263322v3 0058278-000010

A.    The First Amendment Bars Hart's Right-of-Publicity Claim
      Under The Transformative-Use Test.............................................32

      1.    The Interactivity of EA's Games Underscores Their
            Transformativeness.................................................................34

      2.    There is No Support for Hart's Argument that a
            Celebrity's Depiction Must Be Viewed in Isolation,
            Transmogrified or Placed in a Counter-Factual Setting......36

B.    Hart's Reliance on *No Doubt*, *Hilton*, and *Keller* Is Misplaced....41

C.    The First Amendment Trumps Hart's Right-of-Publicity
      Claim Under the *Rogers/Restatement* Test .....................................46

D.    *Doe v. TCI Cablevision*'s "Predominant Use" Test Is
      Incompatible with the First Amendment.........................................52

E.    NCAA Football is Entitled to First Amendment Protection
      Under An *Ad Hoc* Balancing Test..................................................56

III.   THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT
       WAS PROCEDURALLY APPROPRIATE.............................................59

CONCLUSION.......................................................................................................65

DWT 19263322v3 0058278-000010

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdul-Jabbar v. Gen. Mtrs. Corp.*,
    85 F.3d 407 (9th 1996) ................................................................45

*American Amusement Machine Ass'n v. Kendrick*,
    244 F.3d 572 (7th Cir. 2001) .................................................17, 18

*Anderson v. City of Hermosa Beach*,
    621 F.3d 1051 (9th Cir. 2010) ......................................................20

*Ball v. Union Carbide Corp.*,
    385 F.3d 713 (6th Cir. 2004) ........................................................61

*Bleinstein v. Donaldson Lithographing Co.*,
    188 U.S. 239 (1903) (Holmes, J.) .................................................55

*Brown v. Electronic Arts*,
    No. 2:09-cv-1598 FMC (RZx) (C.D. Cal. Sept. 23, 2009) ..........passim

*Brown v. Entertainment Merchants Association*,
    131 S.Ct. 2729 (2011) .............................................................passim

*C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced Media*,
    443 F. Supp. 2d 1077 (E.D. Mo. 2006), *aff'd*, 505 F.3d 818 (8th Cir. 2007) ...........................................................................24, 31, 55

*C.B.C. Distribution v. Major League Baseball Advanced Media*,
    505 F.3d 818 (8th Cir. 2007) ...................................................passim

*Campbell v. Acuff-Rose Music*,
    510 U.S. 569 (1994)..........................................................25, 39, 40

*Canessa v. J.I. Kislak, Inc.*,
    235 A.2d 62 (N.J. Super Ct. 1967) ...............................................21

*Cardtoons, L.C. v. MLBPA*,
    95 F.3d 959 (10th Cir. 1996) ..................................................passim

DWT 19263322v3 0058278-000010

*Carson v. Here's Johnny Portable Toilets, Inc.*,
　698 F.2d 831 (6th 1983) .................................................................45

*CBS Interactive Inc. v. National Football League Players Ass'n, Inc.*,
　259 F.R.D. 398, 2009 WL 1151982 (D. Minn. Apr. 28, 2009).........................27

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
　25 Cal. 4th 387 (2001) ..............................................................passim

*Davis v. Electronic Arts Inc.*,
　No. 10-03328 RS (N.D. Cal. Mar. 29, 2012) ...............................................44, 45

*Dillinger v. Electronic Arts Inc.*,
　No. 1:09-cv-1236, 2011 WL 2457678 (S.D. Ind. June 16, 2011) ..........49, 50, 60

*Doe v. TCI Cablevision*,
　110 S.W.3d 363 (Mo. 2003) ......................................................passim

*Dowling v. City of Philadelphia*,
　855 F.2d 136 (3d Cir. 1988) ...........................................................62

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
　444 F. Supp. 2d 1012 (C.D. Cal. 2006), *aff'd*, 547 F.3d 1095 (9th Cir.
　2008) .................................................................................17

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
　547 F.3d 1095 (9th Cir. 2008) ............................................15, 49, 50

*Estate of Presley v. Russen*,
　513 F. Supp. 1339 (D.N.J. 1981) ......................................................32

*ETW Corp. v. Jireh Publ'g, Inc.*,
　332 F.3d 915 (6th Cir. 2003) ....................................................passim

*Facenda v. N.F.L. Films, Inc.*,
　542 F.3d 1007 (3d Cir. 2008) ...................................................passim

*Falcone v. Columbia Pictures Industries, Inc.*,
　805 F.2d 115 (3d Cir. 1986) ...........................................................63

*Frosch v. Grosset & Dunlap, Inc.*,
　75 A.D.2d 768 (N.Y. App. Div., 1st Dep't 1980) ...............................47

iv

*Galgay v. Gil-Pre Corp.*,
864 F.2d 1018 (3d Cir. 1988) ............................................................................62

*Gionfriddo v. Major League Baseball*,
94 Cal. App. 4th 400 (2001) .....................................................................passim

*Guglielmi v. Spelling-Goldberg Prods.*,
25 Cal.3d 860 (1979) ................................................................................passim

*Harris v. City of Phila.*,
35 F.3d 840 (3d Cir. 1994) ................................................................................64

*Hart-Hanks Communications v. Connaughton*,
491 U.S. 657 (1989).........................................................................................22

*Hicks v. Casablanca Records*,
464 F. Supp. 426 (S.D.N.Y. 1978) ...................................................................26

*Hilfirty v. Shipman*,
91 F.3d 573 (3d Cir. 1996) ...............................................................................61

*Hilton v. Hallmark Cards*,
599 F.3d 894 (9th Cir. 2010) ...........................................................................41

*Hoepker v. Kruger*,
200 F. Supp. 2d 340 (S.D.N.Y. 2002) ..............................................................26

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
515 U.S. 557 (1995).........................................................................................20

*Interactive Digital Software Ass'n v. St. Louis County, Mo.*,
329 F.3d 954 (8th Cir. 2003) ............................................................................17

*Jenkins v. Dell Publ'g Co.*,
251 F.2d 447 (3d Cir. 1958) .............................................................................54

*Keller v. Electronic Arts, Inc.*
No. C 09-1967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010) .................41, 43, 44

*Keybank Nat'l Assoc. v. Rico, LLC*,
Civ. Action No. 08-6421, 2010 WL 2232719 (D.N.J. June 1, 2010)...................9

v

*Kirby v. Sega of America*,
144 Cal. App. 4th 47 (2006) ..........................................................passim

*L.L. Bean v. Drake Publishers*,
811 F.2d 26 (1st Cir. 1987) ................................................................29

*Matthews v. Wozencraft*,
15 F.3d 432 (5th Cir. 1994) ...................................................15, 26, 49

*McFarland v. Miller*,
14 F.3d 912 (3d Cir. 1994) ...........................................................21, 45

*Merkle v. Upper Dublin Sch. Dist.*,
211 F.3d 782 (3d Cir. 2000) ..............................................................61

*Montgomery v. Montgomery*,
60 S.W.3d 524 (Ky. 2001) ......................................................15, 48, 49

*Nichols v. Moore*,
334 F. Supp. 2d 944 (E.D. Mich. 2004) ...........................................48

*No Doubt v. Activism Publishing, Inc.*,
122 Cal. Rptr. 3d 397 (Cal. Ct. App. 2011)...........................41, 42, 43

*Norfolk Southern Ry. Co. v. Basell USA Inc.*,
512 F.3d 86 (3d Cir. 2008) ...............................................................10

*Palmer v. Schonhorn Enters.*,
96 N.J. Super. 72 (Ch. Div. 1967) .....................................................24

*Parks v. LaFace Records*,
329 F.3d 437 (6th Cir. 2003) ......................................................passim

*Pastore v. Bell Tel. Co. of Penn.*,
24 F.3d 508 (3d Cir. 1994) ................................................................63

*Polydoros v. Twentieth Century Fox Film Corp.*,
67 Cal. App. 4th 318 (1997) .............................................................25

*Radich v. Goode*,
886 F.2d 1391 (3d Cir. 1989) ......................................................10, 63

vi

*Razzoli v. Director, Bureau of Prisons*,
  293 Fed. Appx. 852 (3d Cir. 2008) ...................................................61

*Rode v. Dellarciprete*,
  892 F. 2d 1177 (3d Cir. 1990) ..........................................................65

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) .......................................................passim

*Romantics v. Activision Publishing, Inc.*,
  574 F. Supp. 2d 758 (E.D. Mich. 2008) ......................................passim

*Rose v. Bartle*,
  871 F.2d 331 (3d Cir. 1989) .............................................................61

*Ruffin-Steinback v. dePasse*,
  82 F. Supp. 2d 723 (E.D. Mich. 2000), *aff'd*, 267 F.3d 457
  (6th Cir. 2001) .............................................................15, 26, 48, 49

*Sames v. Gable*,
  732 F.2d 49 (3d Cir. 1984) ...............................................................63

*Seale v. Gramercy Pictures*,
  949 F. Supp. 331 (E.D. Pa. 1996) .............................................passim

*St. Surin v. Virgin Islands Daily News, Inc.*,
  21 F.3d 1309 (3d Cir. 1994) .............................................................63

*Stephano v. News Group Publs.*,
  64 N.Y.2d 174 (1984) ......................................................................47

*Tacynec v. City of Philadelphia*,
  687 F.2d 793 (3d Cir. 1982) .............................................................20

*Taylor v. NBC*,
  No. BC110922, 1994 WL 780690 (Cal. Super. Ct. Sept. 12, 1994) ....................26

*Tellado v. Time-Life Books, Inc.*,
  642 F. Supp. 2d 904 (D.N.J. 1986) .............................................21, 22

*Time Inc. v. Hill*,
  385 U.S. 374 (1967) .........................................................................22

DWT 19263322v3 0058278-000010

*Tri-Gen Inc. v. Int'l Union of Operating Eng'rs*,
    433 F.3d 1024 (7th Cir. 2006) ........................................................61

*Tyne v. Time Warner Entm't*,
    901 So.2d 802 (Fla. 2005) ..............................................................48

*Valentine v. CBS*,
    698 F.2d 430 (11th Cir. 1983).........................................................26

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)........................................................................22

*Warren Publ'g Co. v. Spurlock*,
    645 F. Supp. 2d 402 (E.D. Pa. 2009)..............................................25

*Westchester Media v. PRL Holding*,
    214 F.3d 658 (5th Cir. 2000) ..........................................................29

*Winter v. DC Comics*,
    30 Cal. 4th 881 (2003) .............................................................passim

*Wisniewski v. Johns-Manville Corp.*,
    812 F.2d 81 (3d Cir. 1987) .............................................................62

*Zacchini v. Scripps-Howard Broad.*,
    433 U.S. 562 (1977)..........................................................30, 31, 32

## STATUTES

D.N.J. L.Civ.R. 56.1(a) .......................................................................9

Fed. R. Civ. P. 56(c)(1)(A) ................................................................58

Fed. R. Civ. P. 56(d) .........................................................................61

## OTHER AUTHORITIES

2 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 8:71 (2d ed. 2011).......50

2 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 8:72 (2d ed. 2011).......46

2 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 8:82 (2d ed. 2011).46, 55

2 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 8:65 (2d ed. 2011).......26

DWT 19263322v3 0058278-000010

David S. Welkowitz & Tyler T. Ochoa, *The Terminator as Eraser: How Arnold Schwarzenegger Used the Right of Publicity to Terminate Non-Defamatory Political Speech*, 45 Santa Clara L. Rev. 651 (2005)....................53

Diane L. Zimmerman, *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503 (2009)53, 54, 55

Eugene Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903 (2003) ...................................................................................31, 32, 46

Michael Madow, *Private Ownership of Public Image: Popular Culture and Publicity Rights*, 81 Cal. L. Rev. 125 (1993) ......................................................57

*Restatement (Third) of Unfair Competition § 47*........................................11, 30, 47

DWT 19263322v3 0058278-000010

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the district court properly granted summary judgment to Electronic Arts Inc. ("EA"), holding that EA's First Amendment rights bar plaintiff Ryan Hart's right-of-publicity claim that challenged the alleged use of his likeness in EA's *NCAA Football* video games, which are expressive works that contain myriad audio, visual, storyline, software and engineering elements to create an interactive virtual environment in which users control virtual college football teams to create their own story of a team's development and performance?

2.      Whether the district court abused its discretion in treating EA's motion as one for summary judgment when the district court could determine EA's entitlement to First Amendment protection from reviewing the *NCAA Football* video games themselves and Hart failed to identify – either below or on appeal – any potential discovery that would affect the district court's consideration of EA's First Amendment defense?

## COUNTERSTATEMENT OF CASE

On September 12, 2010, Ryan Hart filed a second amended complaint in the District of New Jersey alleging a right-of-publicity claim under New Jersey law against EA for allegedly including his likeness (physical, biographical, and

1

statistical "attributes") in EA's *NCAA Football* video games.  On November 12, 2010, EA filed a motion to dismiss or, in the alternative, for summary judgment.

The district court granted EA summary judgment on September 9, 2011, observing that EA's *NCAA Football* works are expressive works entitled to the same First Amendment protection as books, movies, and other creative works. Applying both the transformative-use test and the *Rogers/Restatement* test for balancing EA's First Amendment rights against Hart's right of publicity, the court concluded that EA prevailed under either standard.  Specifically, the court found that EA's games were transformative because, viewed as a whole, they contain numerous independently creative elements and interactive features that enable users to customize and control a virtual world that realistically depicts college football. The district court also concluded that EA's games were entitled to First Amendment protection under the *Rogers/Restatement* test because EA's alleged use of Hart's likeness is clearly related to video games about college football and not simply a disguised advertisement for an unrelated product.

Under either test, the district court's ruling placed video games on the same constitutional footing as books, movies, and other expressive works that have long enjoyed First Amendment protection for depicting real-life individuals in real-life settings.

## COUNTERSTATEMENT OF FACTS

### A.    EA's Works

EA is a leading developer and publisher of video games, including *NCAA Football*, which EA publishes annually.[1]  Each *NCAA Football* game includes over 100 virtual teams and thousands of virtual players.[2]  Combining technically advanced computer and software engineering and creative audiovisual elements, the games allow users to experience the excitement and challenge of college football.  Users may compete against an opponent controlled by the game itself, against a person connected to the same game system, or against a person connected over the Internet.[3]

The virtual world of *NCAA Football* is constructed from an array of video graphics, audio features, storylines and data.[4]  After a user chooses two college teams to compete against each another, the game assigns a stadium for the match-up and populates it with virtual players, coaches, referees, mascots, cheerleaders, and fans – all designed and rendered by EA's graphic artists.[5]  The virtual players appear as members of college football teams, clothed in their teams' uniforms and

---

[1]  App.472; App.532.

[2]  App.473.

[3]  App.472.

[4]  App.472-74.

[5]  App.472.

using team logos – all elements (uniforms, logos, trademarks) licensed by EA from

the NCAA and its licensing agent, the Collegiate Licensing Company.[6]

The games are interactive.[7] Although the virtual players' personal

characteristics (such as height, weight, athletic ability, and experience) and other

variables (including crowd noise and weather) affect the virtual teams'

performances, the individual users most directly influence the game's outcome

through their play-calling and their ability to use hand-held controllers to

manipulate the virtual players' actions on the field.[8] In other words, it is the user

who selects each play of the virtual football game (*e.g.*, whether to pass, run or

punt) and, combined with the user's skill at manipulating the controller, it is the

user who predominantly determines the outcome of the selected play and the game.

Because of these numerous variables and the creative input of the user, the course

of the game changes each time it is played – no two game experiences are alike.[9]

The user's control over the action and how the story of each game develops

is further enhanced by the user's ability to make changes to the virtual players

themselves or other elements of the game.[10] Users easily alter the abilities of the

---

[6]  App.474.

[7]  App.10.

[8]  App.473.

[9]  *Id.*

[10]  *Id.*

4

virtual athletes (speed and agility, throwing arm, passing accuracy), appearances (height, weight, hairstyle), or biographical information in a multitude of ways. Users also may create custom virtual players from scratch for their teams.[11]

In addition to playing the basic single-game format, users may choose from a variety of multi-game options. In "Dynasty" mode, a user controls a college program for up to thirty seasons, creating his own story of the program's development and undertaking the year-round responsibilities of a college coach.[12] In "Campus Legend" mode, users control a single virtual player from high school through his collegiate career, making his or her own choices regarding practices, academics and social activities – all of which potentially impact the virtual player's performance in a game. In the Dynasty and Campus Legend modes, the interactive environment extends beyond a single game to create an original narrative of a college program's history over many years.[13]

The user experiences the game audio-visually through real-time, television-like animation and action-specific, play-by-play commentary. The game also includes realistic original sounds, such as the crunch of players' pads as contact is made, the audible of a quarterback changing a play at the line of scrimmage, and

---

[11] *Id.*

[12] App.474.

[13] *Id.*

the roar of the crowd.[14]  *NCAA Football* does not recreate, recount or imitate actual

historical games.  The action of the game and the results achieved are virtual, user-

generated, and driven by the user's creativity and skill.[15]

## B.    Procedural Background

### 1.    First Amended Complaint

Hart played quarterback for the Rutgers University football team during the

2002-2005 seasons.  Appellant's Opening Brief ("Br.") at 7.  Hart's First Amended

Complaint, filed in New Jersey Superior Court on behalf of himself and similarly

situated athletes, alleged that his "likeness" was used in EA's *NCAA Football '04,

'05* and *'09* games.[16]  Hart asserted right-of-publicity claims, as well as claims for

unjust enrichment, conspiracy and violation of New Jersey's Consumer Fraud Act.

On November 24, 2009, EA removed the action to the District Court and thereafter

moved to dismiss the complaint.[17]

### 2.    The District Court's September 22, 2010 Opinion

On September 22, 2010, the Court granted EA's motion to dismiss the First

Amended Complaint.  Finding that the First Amended Complaint "faile[ed] to put

forth sufficient facts detailing the attributes Plaintiffs believe are appropriated in

---

[14]  *Id.*

[15]  App.473.

[16]  App.192.

[17]  App.76, Docket Entry # 8.

the *NCAA Football* game," the district court dismissed Hart's right-of-publicity claims, but granted him leave to further amend his complaint.[18]  His remaining claims were dismissed with prejudice and are not at issue in this appeal.  Br. at 3.

### 3.    Second Amended Complaint

Hart filed his Second Amended Complaint on October 12, 2010, alleging two duplicative common law right-of-publicity claims.[19]  The Second Amended Complaint alleges that EA "misappropriated and incorporated" Hart's likeness into *NCAA Football 04, '05, '06, and '09*.  By "likeness," Hart refers primarily to certain default "attributes" ascribed to one of the Rutgers quarterbacks that he contends identifies him in the *NCAA Football 06* game.  These attributes, which Hart alleges are "referenced in the Rutgers University Football Media Guide,"[20] include his home state, his height, weight, jersey number, equipment choices, and statistics like speed, agility and passing accuracy.[21]  Hart also alleges that his image

---

[18]  App.349-355.

[19]  App.371, 374.

[20]  App.369, Sec. Am. Cplt. ¶ 34.

[21]  App.369-70, Sec. Am. Cplt. ¶'s 32, 34-44.  The district court correctly observed that Hart did not make specific allegations with respect to the use of his "attributes" in *NCAA Football 04* and *05*, but charitably concluded that "it appears that Hart intends for the allegations related to *NCAA Football 2006* to be imputed to *NCAA Football 2004* and *NCAA Football 2005*."  App.14.

DWT 19263322v3 0058278-000010

"was used in promotion" for EA's *NCAA Football* game, but no facts were pled to support that conclusion (or presented in opposition to EA's motion).[22]

### 4.    EA's Motion to Dismiss or, in the Alternative, for Summary Judgment

EA filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, and argued that "[e]ven if one assumes that Plaintiff could state a *prima facie* right-of-publicity claim under New Jersey law – which EA disputes but will assume only for purposes of this motion – his claim is barred by the First Amendment."[23]    In support of its motion, EA submitted copies of *NCAA Football 2004, 2005, 2006,* and *2009* games for the district court to review,[24] as well as a declaration that summarized the content of the games.[25]    EA also submitted a Rule 56.1 Statement of Material Facts Not in Dispute under Local Rule 56.1, which set forth the

---

[22]    App.370, Sec. Am. Compl. ¶ 45.  It appears that this allegation refers to the undisputed fact that a photo of Hart throwing a pass appears *inside* the *NCAA Football 2009* game as part of a photo montage that can only be seen when a user selects Rutgers as his or her favorite team.  *See* App.534.

[23]    App.432.

[24]    App.434; App.527.  EA filed a motion in this Court on November 18, 2011 requesting leave to submit video-game consoles, controllers, and copies of *NCAA Football 2004, 2005, 2006,* and *2009*.  Docket Entry # 13 and 50.  (On May 14, 2012, EA filed a corrected version of this motion to remove extraneous documents that were attached to Exhibit B to the motion.)  This motion was referred to the merits panel on November 23, 2011, Docket Entry # 16, and the Clerk's Office advised counsel for EA to submit the consoles and games along with this brief, in advance of a formal ruling on the motion.

[25]    App.529-78.

8

material facts necessary for the Court to decide the motion by describing the content of the games.[26]

In response to EA's motion, Hart submitted an opposition brief that characterized EA's motion as a "motion for summary judgment"[27] and included a "Statement of Material Facts" and supported those facts with two affidavits and a certification with numerous exhibits.[28] Hart did not file a Rule 56(d) affidavit identifying any discovery needed to respond to the motion, although he noted in a footnote to his brief that he would have requested discovery only "to show Defendant's sales records and anticipate [sic] that sales of each year's *NCAA Football* release remain relatively steady."[29]

Drawing on the affidavits and supporting evidence submitted by both parties, the district court treated EA's motion as one for summary judgment.[30] The

---

[26] App.471-475.

[27] App.686.

[28] App.682-86; 579 - 674. Hart's "Statement of Material Facts" failed to comply with Local Rule 56.1, which requires a party opposing summary judgment to file a response addressing each paragraph of the moving party's statement of material facts not in dispute. D.N.J. L.Civ.R. 56.1(a). As a result, the district court appropriately deemed the facts submitted by EA admitted and undisputed for purposes of the motion. App.9. *See also Keybank Nat'l Assoc. v. Rico, LLC*, Civ. Action No. 08-6421, 2010 WL 2232719, at *3 (D.N.J. June 1, 2010).

[29] App.698, Br. at 19 n.4.

[30] At several points in its opinion, the district court referenced the evidence submitted by Hart, but found it irrelevant to the issues in question. *See, e.g.*, App.54-55, 58-60.

court held that the *NCAA Football* games were core expressive works that were entitled to First Amendment protection under either the transformative-use test or the *Rogers/Restatement* test.[31]   It therefore found that "EA is entitled to the First Amendment defense and its motion for summary judgment must . . . be granted."[32]

## COUNTERSTATEMENT OF THE STANDARD OF REVIEW

This Court's review of the district court's grant of summary judgment on the merits is *de novo*. *Norfolk Southern Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91 (3d Cir. 2008).   Whether the district court granted summary judgment prematurely is reviewed for abuse of discretion.   *Radich v. Goode*, 886 F.2d 1391, 1393 (3d Cir. 1989).

## SUMMARY OF THE ARGUMENT

In this action, former collegiate quarterback Ryan Hart alleges his common law rights of publicity were violated by allegedly using his likeness as one of the thousands of virtual athletes in three editions of EA's *NCAA Football* video games. While drawing on the reality of college football, EA's video games offer an interactive, highly creative experience that enables users to manipulate dozens of variables to create their own football world.   The district court properly concluded that even if one assumes that Hart could state a *prima facie* right-of-publicity claim

---

[31]   *See* App.24-30, 55-62, 73-74.

[32]   App.74.

DWT 19263322v3 0058278-000010

under New Jersey law – which EA disputed below but assumed for purposes of the motion only – Hart's claim is barred by the First Amendment.

"[T]he categorization of speech is a question of law" that the Court may resolve through independent review of the video games. *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1016 (3d Cir. 2008). Here, adhering to the Supreme Court's recent decision in *Brown v. Entertainment Merchants Association*, 131 S.Ct. 2729 (2011) – which held that interactive video games, "like the protected books, plays and movies that preceded them," are core expressive works and "as much entitled to the protection of free speech as the best of literature," *id.* at 2733, 2737 n.4 – the district court had no trouble finding that EA's *NCAA Football* works are fully protected expressive speech.

Because his claim targets an expressive work, Hart's right-of-publicity claim must be balanced against EA's fundamental First Amendment rights. Courts across the country have adopted various balancing tests that attempt to weigh the First Amendment rights of creators, like EA, against individual publicity rights. Two commonly applied tests have emerged: the transformative-use test derived from *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001), and the "*Rogers*" test derived from *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), which mirrors the test adopted by the *Restatement (Third) of Unfair Competition § 47*. While the Third Circuit has not adopted a particular test, it has instructed that

11

"courts must circumscribe the right of publicity so that [individuals] *do not get a right that extends beyond* **commercial advertisements** *to other works of artistic expression.*" *Facenda*, 542 F.3d at 1032 (emphasis added). This appeal offers the Court an opportunity to apply a test that addresses that concern and recognizes that, like a filmmaker who used Hart's photograph in a documentary about college football, or a screenwriter who depicted Hart as a character in a fictional movie, the use of Hart's likeness in an interactive video game is protected by the First Amendment.

Under either of the two leading tests, Hart's right-of-publicity claim fails. First, the transformative-use test looks at whether the use of Hart's alleged likeness in EA's works is just the "raw material[] from which an original work is synthesized," and not the "very sum and substance of the work in question." *Comedy III*, 25 Cal. 4th at 406. "[I]n other words," the court must evaluate whether "a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness." *Winter v. DC Comics*, 30 Cal. 4th 881, 888 (2003). The dispositive question is not whether the *plaintiff's name or image* has been transformed, but whether the *defendant's work* contains enough other creative elements so that the work, *as a whole,* is something more than simply a depiction of the plaintiff. *Winter*, 30 Cal. 4th at 888; *Comedy III*, 25 Cal. 4th at 406.

12

Here, Hart's alleged likeness is only one among thousands of virtual players in *NCAA Football*, and the game contains a plethora of independently creative elements designed by EA – "virtual stadiums, athletes, coaches, fans sound effects, music and commentary"[33] – that together allow users to create their own interactive virtual environment.  *NCAA Football* draws on real-life components to enrich this interactive virtual world, but the ultimate control is in the hands of the users, so that they can create and experience their own story of NCAA football, including through crafting original narratives about a college football program's history over multiple seasons and the arc of a player's entire college career.  As the district court found, because of the game's interactivity, a virtual player in *NCAA Football* serves as an "art-imitating-life starting point for the game playing experience," and in the end it is but one of the "raw materials from which an original work is synthesized [and] the depiction or imitation of the celebrity is not the very sum and substance of the work in question."[34]

On appeal, Hart argues that because he appears in the same setting "in which he achieved his fame," *i.e.*, the football field, and his likeness is not altered in a "fantastical and creative manner," *NCAA Football* is not transformative.  Br. at 14.

---

[33] *Brown v. Electronic Arts,* No. 2:09-cv-1598 FMC (RZx), Slip Op. at 7 (C.D. Cal. Sept. 23, 2009) [hereinafter *Brown* Slip Op.]. A copy of the *Brown v. Electronic Arts* decision is located at App.478-87.

[34] App.61 (quoting *Comedy III*, 25 Cal. 4th at 406).

The district court properly rejected Hart's cramped view of the transformative-use test that would shield only highly fanciful or surreal works from right-of-publicity challenges. Indeed, Hart's approach would lead to perverse results; it would not protect *any* expressive works that use a person's actual name or realistic likeness, including films like this year's Oscar nominee *Moneyball* and last year's winner for Best Film, *The King's Speech*, novels like *L.A. Confidential* and songs like Elton John's *Candle in the Wind*. Because Hart's position is irreconcilable with well-established law protecting the vast array of expressive works that routinely include the names or likeness of real people, at bottom, Hart asks for some kind of video game exception to First Amendment principles. But the Supreme Court categorically rejected that position in *Brown*, 131 S.Ct. at 2733, 2737 n.4, 2740.

This Court need not rely only on the transformative-use test to find in favor of EA. We urge the Court to move away from the subjectivity of the transformative-use test and instead to apply the *Rogers* test. The *Rogers* test tracks the *Restatement* standard and has been followed within this Circuit. *See Seale v. Gramercy Pictures*, 949 F. Supp. 331, 336-37 (E.D. Pa. 1996) (finding Bobby Seale did not have a right-of-publicity claim arising out of docudrama and book about the Black Panthers that used his name and likeness). The *Rogers/Restatement* test is a straightforward and more predictable test for determining whether the First Amendment defeats right-of-publicity claims that

14

target expressive works.  Under the test, the First Amendment bars right-of-publicity claims arising from the use of a plaintiff's name or likeness in an expressive work, unless the use is "wholly unrelated" to the work or is "simply a disguised commercial advertisement for the sale of goods or services."  875 F.2d at 1004.[35]  Because, as a former college football player, Hart's likeness is not "wholly unrelated" to *NCAA Football* and the game is not a commercial advertisement for some unrelated product, Hart understandably does not try to meet the *Rogers/Restatement* test.  Instead, he erroneously claims the test only applies to Lanham Act claims involving titles of expressive works.  But Hart's position is flatly contradicted by cases across the country that have applied the *Rogers/Restatement* test in analogous cases.[36]

While never argued below, Hart presses this Court to adopt the "predominant use" test from *Doe v. TCI Cablevision*, 110 S.W.3d 363, 374 (Mo. 2003).

---

[35] This is consistent with *Facenda*.  *See Facenda*, 542 F.3d at 1032 ("[C]ourts must circumscribe the right of publicity so that [individuals] do not get a right that extends beyond commercial advertisements to other works of artistic expression.").

[36] *See, e.g., Rogers*, 875 F.2d at 1004 (applied to right of publicity); *Parks v. LaFace Records*, 329 F.3d 437, 461 (6th Cir. 2003) (same); *Matthews v. Wozencraft*, 15 F.3d 432, 440 (5th Cir. 1994) (applied to right of publicity and content of work); *Romantics v. Activision Publishing, Inc.*, 574 F. Supp. 2d 758, 766 (E.D. Mich. 2008) (same); *Seale*, 949 F. Supp. at 336-38 (same); *Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723, 730 (E.D. Mich. 2000) (same), *aff'd*, 267 F.3d 457 (6th Cir. 2001); *Montgomery v. Montgomery*, 60 S.W.3d 524, 530 (Ky. 2001) (same).  *See also E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (applied to content of work); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 927 (6th Cir. 2003) (same); *Brown* Slip Op. at *7 (same).

DWT 19263322v3 0058278-000010

However, the "predominant use" test is wholly incompatible with the First Amendment because it hinges on the content creator's profit-motivation rather than the nature of the work, contravening Supreme Court precedent and threatening to give celebrities and athletes a veto over all expressive works whenever the use of a name or likeness somehow crosses an indecipherable line and becomes "predominantly" commercial. For good reason, no court outside of Missouri has ever adopted this flawed and highly subjective test that has been the subject of widespread criticism.

Finally, Hart has no viable basis to challenge the district court's procedural decisions. He submitted evidence in opposition to EA's motion and had ample notice and opportunity to identify for the district court what discovery he believed he needed to oppose summary judgment, and he chose not to do so. The district court only needed to review the *NCAA Football* works to determine their entitlement to First Amendment protection, and the discovery Hart now suggests he needs for the first time on appeal is irrelevant to that determination. Therefore, the district court did not abuse its discretion in granting summary judgment.

For all the foregoing reasons, this Court should affirm the district court's decision granting summary judgment in favor of EA and dismissing Hart's claims with prejudice.

16

# ARGUMENT

## I.

## THE DISTRICT COURT PROPERLY HELD THAT EA'S *NCAA FOOTBALL* GAMES ARE EXPRESSIVE WORKS FULLY PROTECTED BY THE FIRST AMENDMENT

The district court properly held that *NCAA Football* is expressive speech that enjoys full First Amendment protection.[37]  This conclusion is dictated by the Supreme Court's *Brown* decision and is consistent with a long line of cases finding video games are expressive works.[38]  Hart does not seriously dispute the district court's determination.  Instead, he suggests that because the use of his alleged likeness is "realistic" and is motivated by "profit," EA has some kind of diminished ("tangential or collateral") First Amendment interest.  Br. at 29.  Hart is wrong on all counts.

### A.    EA's Games Are Expressive Works

In *Brown*, the Supreme Court unequivocally held that video games are "expressive activity," "as much entitled to the protection of free speech as the best of literature":

---

[37]  "[T]he categorization of speech is a question of law" that the Court may resolve through independent review of the video games.  *Facenda*, 542 F.3d at 1016.

[38]  *See, e.g.*, *Interactive Digital Software Ass'n v. St. Louis County, Mo.*, 329 F.3d 954, 957 (8th Cir. 2003); *American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572, 577-78 (7th Cir. 2001); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 444 F. Supp. 2d 1012, 1039 (C.D. Cal. 2006), *aff'd*, 547 F.3d 1095, 1100 (9th Cir. 2008); *Romantics*, 574 F. Supp. 2d at 766.

17

> Like the protected books, plays, and movies that preceded them, video games communicate ideas – and even social messages – through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (*such as the player's interaction with the virtual world*).   That suffices to confer First Amendment protection.

*Brown*, 131 S.Ct. at 2733, 2737 n.4 (emphasis added).  Notably, the Supreme Court stressed that the interactivity of video games contributes to their expressive quality. Quoting Judge Posner, the Court explained that "all literature is interactive": "[T]he better it is, the more interactive.  Literature when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own."  *Id.* at 2738 (quoting *American Amusement*, 244 F.3d at 577).

Even before the Supreme Court's clear instruction, lower courts had reached the same conclusion with respect to video games that are similar to *NCAA Football*.  For instance, in *Brown v. Electronic Arts, Inc.*, No. 2:09-cv-1598 (C.D. Cal. Sept. 23, 2009), a federal district court granted EA's motion to dismiss Jim Brown's Lanham Act claims based on the alleged use of his likeness in its *Madden NFL* games, ruling that the First Amendment provided a complete defense.  *Brown* Slip Op. at 9.  The court held that EA's *Madden NFL* football games, which are similar in many respects to the *NCAA Football* games, are expressive works

DWT 19263322v3 0058278-000010

because they "contain numerous creative elements" even though the games strive

to realistically evoke NFL football:

> Although the games seek to realistically replicate NFL
> football, they use creative means to achieve that goal.
> The games contain virtual stadiums, athletes, coaches,
> fans, sound effects, music, and commentary, all of which
> are created or compiled by the games' designers. By
> manipulating virtual athletes and franchises as they wish,
> video game players interact with the designers' creative
> interpretation of real-world NFL game play. The football
> season can itself become a storyline in *Madden NFL*, as
> game players navigate their chosen athletes and
> franchises towards victory.

*Brown* Slip Op. at 7.[39]  *See also Romantics*, 574 F. Supp. 2d at 766 (holding that

the video game "Guitar Hero" is "an expressive artistic work that is entitled to First

Amendment protection" because it "allows players to customize their game play

experience, contains large amounts of original artwork, and requires complex

synchronization so that the audio and visual elements of the Game line up with a

player's manipulation of the controller").

Here, *NCAA Football* is rife with original graphics, videos, sound effects,

and game scenarios, and interactive features that enable users to become

storytellers by directing strategic decisions and crafting original narratives about a

---

[39] This conclusion is consistent with dicta from *Facenda* that *Madden NFL* is an
expressive work. *See Facenda*, 542 F.3d at 1018 (concluding "infomercial" about
*Madden NFL* is commercial speech because it "aims to promote" another product,
but distinguishing it from the underlying "creative work, the video game" that was
being promoted by the infomercial).

19

college football program's history over multiple seasons and the arc of a player's entire college career.[40]    Indisputably, EA's *NCAA Football* video games are expressive works.

Hart responds by suggesting that there should be a sliding scale for expressive works and that *NCAA Football* should be distinguished from the video games at issue in *Brown v. Entertainment Merchants* because those games were "plot-driven" and EA's games do not "communicate any ideas or social messages." Br. at 26, n.6.  Not so.  The Supreme Court expressly has rejected that argument: "[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verses of Lewis Carroll."  *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569 (1995).[41]  There is no basis for treating EA's expressive works different from others in this context.

---

[40]  App.472-74.

[41]  *See also Tacynec v. City of Philadelphia*, 687 F.2d 793, 796 (3d Cir. 1982) (First Amendment protects string band performance in Mummers Parade); *C.B.C. Distribution v. Major League Baseball Advanced Media*, 505 F.3d 818, 823 (8th Cir. 2007) (holding that "fantasy baseball" games constituted "speech entitled to first amendment protection," even though the games had no story line or script); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010) (holding

20

**B.    The First Amendment Fully Protects Works Sold for Profit**

On appeal, Hart does not argue that *NCAA Football* is commercial speech, as he did below.[42]  Indeed, applying the three-factor test from *Facenda*, the district court readily found that Hart could not "reasonably contend" that EA's works constitute commercial speech.[43]  In contrast to the speech at issue in *Facenda*, which was essentially an "infomercial" aimed "to promote another creative work, the video game," the district court concluded: "[H]ere . . . the speech *is* the video game that is being sold.  It is not a separate instance of speech that promotes the purchase of another work."  *Id.*  The district court also properly held that EA's use of Hart's photograph in a video montage inside *NCAA Football 09* was not commercial speech because "the photograph is part of the video game itself, the commercial transaction has already taken place" and "because Plaintiff's photo does not advertise another product or service."[44]

---

that the "the tattooing process" and "the business of tattooing" are "purely expressive activity fully protected by the First Amendment").

[42]  *See, e.g.*, App.695-98, 700, 702-03.

[43]  App.27-28.

[44]  App.30.  Hart cites *McFarland v. Miller*, 14 F.3d 912 (3d Cir. 1994), in which the plaintiff's character-name was used as the restaurant's name, *Canessa v. J.I. Kislak, Inc.*, 235 A.2d 62 (N.J. Super Ct. 1967), which involved use of a plaintiff's story in advertising leaflets, and *Tellado v. Time-Life Books, Inc.*, 642 F. Supp. 2d 904 (D.N.J. 1986), which involved the use of a photograph in an *advertisement* for a book series for the expansive proposition that an individual has the right to control his/her name and likeness and that unauthorized use without payment is unlawful.  *See* Br. at 17, 19, 33 n.9.  But those cases are inapposite and do not

21

Instead, Hart now suggests that EA's games should be entitled to diminished protection on the grounds that EA has a profit motivation and that it has a "commercial purpose" in allegedly including players' likenesses in the game. *See, e.g.*, Br. at 13, 21, 22, 39, 43, 44. Indeed, the whole premise of Hart's proposed "predominant use" test is that commercial motivation should strip EA of First Amendment protection. *Id.* at 30-34. Hart's argument has been rejected repeatedly by the Supreme Court, which has recognized that it is "beyond serious dispute" that the sale of speech alone does not render it "commercial" for purposes of the First Amendment. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976); *Time Inc. v. Hill*, 385 U.S. 374, 397 (1967) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."); *Hart-Hanks Communications v. Connaughton*, 491 U.S. 657, 667 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases

---

support Hart's broad pronouncement, because they involved the use of someone's name and likeness in commercial speech. Indeed, *Tellado* distinguished between the use of plaintiff's photo in an ad and a hypothetical photograph used *inside* a book itself, which "clearly would have been protected by the First Amendment, regardless of the type of profit defendant expected to make with its book series." 642 F. Supp. at 914.

from *New York Times* to *Hustler Magazine* would be little more than empty vessels.").

The fact that filmmakers, authors and other creators, like EA, strive for commercial and artistic success does not diminish First Amendment protection. Nor does this conclusion change because, as Hart suggests, EA allegedly included player likenesses in the games "with the full intent of increasing the sales and profits" of the game. Br. at 21. Indeed, federal and state courts consistently have rejected that argument, dismissing right-of-publicity claims that challenge expressive works, even where the inclusion of plaintiff's name or likeness would "enhance the sale" of the expressive work in question. *See*, *e.g.*, *C.B.C.*, 505 F.3d at 823 (8th Cir. 2007) (rejecting publicity claims even though it was "clear that CBC uses baseball players' identities in its fantasy baseball products for purposes of profit"); *Winter,* 30 Cal. 4th at 891 (2003) (holding it irrelevant to the constitutional analysis that "defendants were trading on plaintiffs' likenesses and reputations to generate interest in the comic book series and increase sales"); *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal.3d 860, 869 (1979) (Bird, C.J., concurring) (rejecting publicity claim despite argument that Rudolph Valentino's identity was "incorporated in the film solely to increase the film's value"); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 411 (2001) (rejecting argument that athletes could state publicity claims because the challenged uses

"help baseball owners make a profit" and their "achievements are being exploited to promote the product of baseball").[45]

Alternatively, Hart and *amici* press that because EA has licensed the publicity rights of certain professional athletes in *other* EA games, it must do so here and forego its First Amendment rights. Br. at 12-13, 15; Amicus Curiae Brief of the National Football Players Association et al. ("Players Br.") at 9-10, 15-17. In doing so, they confuse business decisions with legal obligations. As a business matter, EA derives significant benefits – including deep promotional cooperation, advertising opportunities with players, and invaluable access to players – from its partnership with professional players' associations. These are unique and valuable benefits that EA would not enjoy if it did not have an agreement with these associations. More to the point, however, these are relationships involving agreements for different rights in different games, and for different reasons. They do not affect EA's First Amendment rights here. Again, *C.B.C.* is instructive.

---

[45] Hart cites *Palmer v. Schonhorn Enters*., 96 N.J. Super. 72 (Ch. Div. 1967), in an effort to depart from this settled rule. Br. at 12. Forty-three years ago, the *Palmer* court interpreted what it described as the "comparatively recent" right-of-publicity as barring the unauthorized use of names of famous golf players within a board game. But *Palmer* never even mentioned the First Amendment and treated the static, non-interactive board game in question as a simple piece of commercial merchandise akin to a coffee mug bearing a celebrity's image, not as an expressive work protected by the First Amendment. For good reason *Palmer* has been criticized as being out of step with modern analysis. *See C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced Media*, 443 F. Supp. 2d 1077, 1087 (E.D. Mo. 2006), *aff'd*, 505 F.3d 818 (8th Cir. 2007).

There, a fantasy-baseball operator entered into a license with the players association to use players' names, likenesses, and biographical information in its games. 505 F.3d at 821. After the players association refused to extend the license, the company won a declaratory judgment that it had a First Amendment right to use the same information without a license. *Id.* at 823. *See also Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 326 (1997) ("[T]he industry custom of obtaining 'clearance' establishes nothing, other than the unfortunate reality that many filmmakers may deem it wise to pay a small sum up front for a written consent to avoid later having to spend a small fortune to defend unmeritorious lawsuits").[46]

## C. The First Amendment Fully Protects Realistic Works of Entertainment

Throughout his brief, Hart argues that the realism of *NCAA Football* diminishes the work's First Amendment protection. *See, e.g.*, Br. at 21-22, 33-34, 35, 39-43, 46-48. Yet, nothing in First Amendment law suggests that using an individual's actual name or likeness to inject realism into an expressive work removes the work from the protections of the First Amendment. If injecting verisimilitude into a highly creative video game causes the game to lose First Amendment protection, then it also would strip protection from countless other

---

[46] *See also Campbell v. Acuff-Rose Music*, 510 U.S. 569, 585 n.18 (1994) (prior licensing efforts have no bearing on whether a defendant is entitled to fair-use protections); *Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 2d 402, 417, 422 (E.D. Pa. 2009) (same).

25

creative works, including films like *The Social Network*, *Forrest Gump*, and *All the President's Men*, novels like E.L. Doctorow's *Ragtime* and Thomas Pynchon's *Gravity's Rainbow*, songs like Simon and Garfunkel's *Mrs. Robinson*, and plays like Steve Martin's *Picasso at the Lapin Agile*, all of which feature the names or likenesses of real-life individuals. This result would contravene a long line of cases recognizing that the First Amendment protects the use of real-life figures in an array of creative works.[47]

Nor are athletes and games associated with athletes treated differently. Courts have extended full constitutional protection to games and other works that use athletes' actual names and biographical information. In *Gionfriddo v. Major League Baseball*, for example, the defendant Major League Baseball used a wide array of identifying material in printed programs, videos and on its website without permission from the plaintiff baseball players, including "video clips taken of plaintiffs when they were playing the game themselves." 94 Cal. App. 4th 400, 410

---

[47] *See, e.g., ETW*, 332 F.3d at 937-938 (painting); *Matthews v. Wozencraft*, 15 F.3d 432, 439-440 (5th Cir. 1994) (biographical novel); *Valentine v. CBS*, 698 F.2d 430, 433 (11th Cir. 1983) (song); *Hoepker v. Kruger*, 200 F. Supp. 2d 340, 349 (S.D.N.Y. 2002) (visual art); *Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723, 730-731 (E.D. Mich. 2000) (television miniseries), *aff'd*, 267 F.3d 457, 461-462 (6th Cir. 2001); *Seale*, 949 F. Supp. at 337 (docudrama and book); *Hicks v. Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978) (docudrama and novel); *Guglielmi*, 25 Cal. 3d at 866-868 (docudrama); *Taylor v. NBC*, No. BC110922, 1994 WL 780690, at *2 (Cal. Super. Ct. Sept. 12, 1994) (television fictional biography). *See generally,* 2 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 8:65 (2d ed. 2011) [hereinafter McCarthy, *Rights of Publicity*] (collecting cases).

(Cal. Ct. App. 2001).  The court rejected plaintiff's right-of-publicity claims, finding that the use of the plaintiffs likenesses "within game programs" and "in videos" are not "advertisements" or speech where the "primary message is 'buy.'" *Id.* at 412-13.  The court concluded that "the public interest favoring the free dissemination of information regarding baseball's history far outweighs any proprietary interests at stake," and that the plaintiffs' right-of-publicity claim thus failed as a matter of law.  *Id.* at 415.

More recently, in *C.B.C.*, the Eighth Circuit affirmed that the First Amendment protected the plaintiff's right to use major league baseball players' names and biographical information in connection with its fantasy baseball game. Equally true here, the court observed that "fantasy baseball games depend on the inclusion of all players and thus cannot create a false impression that some particular player with 'star power' is endorsing [the plaintiff's] products," and held that the First Amendment "trump[ed]" the players' right-of-publicity claim.   505 F.3d at 822-24.  *Accord CBS Interactive Inc. v. National Football League Players Ass'n, Inc.*, 259 F.R.D. 398, 2009 WL 1151982, at *19 (D. Minn. Apr. 28, 2009) ("[L]ike in *C.B.C. Distribution*, the package of information used here [names, player profiles, up-to-date statistics, injury reports, participant blogs, pictures, images and biographical information] comes within the ambit of the First Amendment.").  *See also ETW*, 332 F.3d at 937-38 (holding First Amendment

27

defeated right-of-publicity claim based on realistic painting of Tiger Woods and other golfers).

As a final attack, Hart suggests that EA should not receive First Amendment protection on the theory that EA could have created an alternative, less realistic game that would be "just as expressive" as *NCAA Football* without allegedly using his likeness. *See, e.g.*, Br. at 44, 55. That "alternative means" argument has been consistently rejected by courts, which have refused to engage in the creative second-guessing inherent in this approach to expressive speech. The Second Circuit in *Rogers* rejected the alternative avenues test because it "does not sufficiently accommodate the public's interest in free expression." 875 F.2d at 999. The Sixth Circuit in *Parks v. LaFace Records* likewise "reject[ed] the alternative avenues test" because it does not "accord[] adequate weight to the First Amendment[.]" 329 F.3d at 449-450. The court explained that the test was "derived from real property law[,]" and "is premised on the notion that, just as a real property owner may exclude a speaker from a shopping mall so long as other locations exist for the speaker to deliver his message, a celebrity may prohibit use of his or her name so long as alternative ways exist for the artist to communicate his or her idea." *Id.* at 449-50. The court made clear that "[t]o suggest that other

words can be used as well to express an author's or composer's message is not a proper test for weighing First Amendment rights." *Id.* at 450.[48]

In the end, Hart and his amici cannot seriously contend that the First Amendment protection afforded to movies, novels, biographies, documentaries, docudramas, and other expressive works depends on whether the characters are depicted realistically or whether real names are used. Instead, they ask this Court to create a video-game specific test that provides less protection to video games than all other expressive works. But without equivocation, the Supreme Court's *Brown* decision forecloses just such a distinction. *See* 131 S.Ct. at 2740 ("Here, California has singled out the purveyors of video games for disfavored treatment – at least when compared to booksellers, cartoonists, and movie producers – and has given no persuasive reason why."). This Court should reject Hart's argument that video games should be singled out for disfavored treatment.

## II.
## EA'S FIRST AMENDMENT RIGHTS TRUMP HART'S RIGHT OF PUBLICITY UNDER ANY OF THE APPROPRIATE FIRST AMENDMENT TESTS

A right-of-publicity claim targeting expressive speech is "fundamentally constrained by the public and constitutional interest in freedom of expression."

---

[48] *See also Cardtoons, L.C. v. MLBPA*, 95 F.3d 959, 971 (10th Cir. 1996) (finding that the "'no adequate alternative avenues' test does not sufficiently accommodate the public's interest in free expression"; declining to apply it to right-of-publicity claim); *ETW*, 332 F.3d at 927; *Westchester Media v. PRL Holding*, 214 F.3d 658, 672 (5th Cir. 2000); *L.L. Bean v. Drake Publishers*, 811 F.2d 26, 29 (1st Cir. 1987).

*Restatement (Third) of Unfair Competition* § 47 cmt. c [hereinafter *Restatement (Third)*].  Because countless expressive works incorporate the names or likenesses of real-life individuals, courts long have cautioned that "[t]he right of publicity has a potential for frustrating" constitutionally protected speech.  *Comedy III*, 25 Cal. 4th at 397.  This Court recognized that concern when it "emphasize[d] that courts must circumscribe the right of publicity" so that individuals do not get a right that "extends beyond commercial advertisements to other works of artistic expression." *Facenda*, 542 F.3d at 1032.

Despite the evident tension between the First Amendment and the right of publicity, the United States Supreme Court has provided very little guidance on this issue.  In its only right-of-publicity decision, *Zacchini v. Scripps-Howard Broad.*, 433 U.S. 562 (1977), the Supreme Court considered whether the First Amendment categorically defeated a right-of-publicity claim based on a television station's broadcast of the plaintiff's entire human-cannonball act.[49]  In allowing the claim to survive, the Court declined to promulgate any specific balancing test; it merely held that "[w]herever the line in particular situations is to be drawn between media reports that are protected [against right-of-publicity claims] and

---

[49]  Hart and amici rely on *Zacchini* for the unremarkable proposition that EA's "First Amendment rights do not automatically trump a plaintiff's publicity rights," Br. at 27; Players Br. at 3, something that neither EA nor the district court ever disputed.

DWT 19263322v3 0058278-000010

those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast *a performer's entire act* without his consent." *Zacchini*, 433 U.S. at 574-75 (emphasis added). The Supreme Court underscored that broadcasting *Zacchini*'s entire act posed a "substantial threat to the economic value of that performance" and contrasted that use with the use of someone's name or picture by the press. *Id*. at 575-76.

Subsequent right-of-publicity decisions have recognized this distinction and pointed out the limited nature of *Zacchini*'s holding. App.38-40. As the Tenth Circuit observed, *Zacchini* "complained of the appropriation of the economic value of his *performance*, not the economic value of his *identity*." *Cardtoons*, 95 F.3d at 973 (emphasis in original); *accord ETW*, 332 F.3d at 956 ("one must look beyond *Zacchini* inasmuch as *Zacchini* has been criticized as being very 'narrowly drawn' in that it involved the wholesale reproduction of a live 'entire act'"); *C.B.C.*, 443 F. Supp. 2d at 1098 ("right of publicity cases involving the value of one's performance, such as *Zacchini*, must be distinguished from right of publicity cases involving the economic value of one's identity").

Professor Volokh has observed that "*Zacchini* focused only on the unusual right of publicity scenario where a defendant broadcasts the plaintiff's entire act, a claim that the Court pointed out is much like a copyright claim, though applicable under state law to unfixed works." Eugene Volokh, *Freedom of Speech and the*

31

*Right of Publicity*, 40 Hous. L. Rev. 903, 906 (2003) [hereinafter Volokh, *Freedom of Speech*]. "The Court twice stressed that it was not deciding the broader question of when a plaintiff may sue the defendant for using plaintiff's name, likeness, or other attributes of identity – the standard right of publicity claim." *Id.* (citing *Zacchini*, 433 U.S. at 573 n.10, 576). Because of the narrowness of its holding, *Zacchini* cannot provide a rule of decision for this case.[50]

In the absence of direction from the United States Supreme Court, various tests have arisen to ensure that right-of-publicity claims do not chill speech, including the transformative-use test and the *Rogers/Restatement* test, which the district court applied below, as well as others. Under any test that comports with the First Amendment, EA is entitled to dismissal of Hart's right-of-publicity claim.

## A.    The First Amendment Bars Hart's Right-of-Publicity Claim Under The Transformative-Use Test

The California Supreme Court articulated the transformative-use test in *Comedy III Productions v. Gary Saderup, Inc.* In that case, the court formulated "what is essentially a balancing test between the First Amendment and the right of

---

[50]    The same is true for *Estate of Presley v. Russen*, 513 F. Supp. 1339 (D.N.J. 1981), on which Hart relies. Br. at 18, 19, 33. Critical to *Presley* was the court's determination that the performance at issue was a complete "copy or imitation" of Elvis's actual performances, akin to the species of copyright violation at issue in *Zacchini. Presley*, 513 F. Supp. at 1359. Accordingly, *Presley* has been equated with *Zacchini. See Comedy III*, 25 Cal. 4th at 402. Here, the undisputed evidence shows that *NCAA Football* does not imitate or recreate any actual NCAA games or Hart's actual "performances." App.473.

publicity based on whether *the work in question* adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." 25 Cal. 4th at 391 (emphasis added). The court explained that "the inquiry is whether the celebrity likeness is *one of* the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very *sum and substance of the work* in question." *Id.* at 406 (emphasis added). There, the court found that since the defendant's T-shirts contained only a literal representation of The Three Stooges – no other creative elements or expression – the First Amendment did not foreclose liability. *Id.* at 410.

Applying the transformative-use test here, *NCAA Football* works are transformative because they contain myriad independently creative elements beyond Hart's alleged likeness and statistics, and because the games contain rich interactive elements that enable users to create and experience their own story of college football.[51] The games feature an array of original graphics, videos, sound effects, and game scenarios, all keyed to the users' strategic decisions and manipulation of the game controls. With these creative elements as the foundation, the user becomes the storyteller by directing strategy decisions and controlling individual athlete's movements in real time. Users can select and operate a virtual college team as initially configured in EA's games, or can customize the team

---

[51] *See* App.55-58.

based on their own preferences, altering the characteristics of individual players or even creating custom virtual players from scratch for their teams.[52]    Further, the interactive environment extends beyond single games, allowing users in "Dynasty Mode" to control a collegiate football program for up to thirty years and, in effect, to create an original narrative of that program's history.[53]    Likewise, in "Campus Legend" mode, users may dictate not only a virtual athlete's performance in a single game, but the arc of his entire college career, making decisions regarding practices, academics and social activities.[54]

Therefore, even assuming that a virtual player in *NCAA Football* resembles Hart, that virtual likeness is only a single virtual player among thousands and is surrounded by innumerable other creative and interactive elements – in other words, it is only one of the countless "raw materials" from which EA creates its own expressive work.  The *NCAA Football* games plainly meet the transformative-use test and are entitled to First Amendment protection.

### 1.    The Interactivity of EA's Games Underscores Their Transformativeness

In *Brown*, the Supreme Court emphasized that interactivity is one of the features unique to video games that contribute to their expressive quality.  *Brown*,

---

[52]  App.472-73.

[53]  App.474.

[54]  *Id*.

131 S.Ct at 2733, 2738.  The district court drew on the Supreme Court's reasoning and recognized that a "user's interaction with a video game is one of the means by which video games communicate ideas and social messages."  App.58.

Hart tries to belittle the interactivity of *NCAA Football* and specifically questions whether users are likely to alter the virtual players' default physical characteristics.  *See, e.g.*, Br. at 43, 45-46.[55]  In focusing only on whether and how often a user may change a virtual player, Hart misses the point.   Interactivity extends to the entire play of the game; modifying a virtual player's statistics or characteristics so as to possibly enhance the virtual player's skill set is just part of EA's larger endeavor to create an entire interactive virtual world that is both customized by and controlled by the game user.  *NCAA Football* draws on real-life components to enrich this interactive virtual world and create a sense of verisimilitude, but that is just an "art-imitating-life starting point" and the ultimate control is in the hands of the users, so that they can create and experience the play of each individual game, as well as the broader story of NCAA football.[56]  To that end, it is not surprising that Hart wholly ignores the more advanced interactive features

---

[55]   While downplaying the importance of game users' ability to make physical alterations to virtual players' likenesses, Hart inconsistently trumpets users' ability to add actual players' names in the game.  *See* Br. at 10.

[56]  App.61, 472-74.

of the *NCAA Football* games, such as the "Dynasty" and "Campus Legend" modes that allow users to generate their own narratives that can span years.

**2.      There is No Support for Hart's Argument that a Celebrity's Depiction Must Be Viewed in Isolation, Transmogrified or Placed in a Counter-Factual Setting**

At bottom, Hart's argument rests on the erroneous contention that the transformative-use should focus on *his depiction*, rather than *NCAA Football's* entire creative football world.  Br. at 47.  Working from this erroneous premise, he argues that the transformative-use test protects only those works that physically distort the plaintiff's likeness or place the plaintiff in a counter-factual setting.  *See, e.g.*, Br. at 40-43, 46-48 & n.13.  That argument is inconsistent with cases establishing and applying the transformative-use test and the copyright fair use doctrine from which the transformative-use test derives, and would lead to illogical results inconsistent with the First Amendment.

First, Hart's argument is inconsistent with how the California Supreme Court and other courts have applied the transformative-use test.  In *Comedy III* and *Winter*, the court instructed that the transformative-use test does *not* turn on whether the plaintiff's likeness, viewed in isolation from the rest of the work, is physically transformed.  The court made clear that the transformative-use "inquiry is in a sense more quantitative than qualitative, asking whether the literal and imitative or the creative elements predominate *in the work*."  *Comedy III*, 25 Cal.

4th at 407 (emphasis added).  In *Winter*, the court did not look exclusively at the transmogrification of the characters, as Hart suggests, but instead found the comic books to be transformative after considering the work as a whole, finding that the Winter Brothers were characters "in a larger story, which is *itself quite expressive*". 30 Cal. 4th at 890 (emphasis added).  The transformative-use test shielded the works because the plaintiffs' likenesses were "merely part of the raw materials from which the comic books were synthesized."  *Id.*

Furthermore, in both *Comedy III and Winter*, the California Supreme Court explained that "the transformative elements or creative contributions that require First Amendment protection *are not confined to parody and can take many forms*," from "factual reporting," to "fictionalized portrayal," to "subtle social criticism." *Comedy III*, 25 Cal. 4th at 406 (emphasis added); *Winter*, 30 Cal. 4th at 888. Because those forms of expression often do not involve *any* physical transformation of an individual's name or likeness, Hart errs by making such transformation an essential element of the defense.  Hart's interpretation cannot be reconciled with the California Supreme Court's seminal decision in *Guglielmi*, cited in *Comedy III,* 25 Cal. 4th at 406.  In rejecting a right-of-publicity claim arising out of the realistic depiction of Rudolph Valentino in a docudrama, the court observed that "[n]o author should be forced into creating mythological

worlds or characters wholly divorced from reality." *Guglielmi*, 25 Cal. 3d at 869

(Bird, C.J., concurring).

Hart's argument likewise is not supported by other cases that have applied

the transformative-use test. In *Kirby v. Sega of America*, 144 Cal. App. 4th 47

(2006), for example, the video game character at issue was not considered in

isolation; rather, the character was deemed to be a "fanciful, creative character who

*exists in the context* of a unique and expressive video game." 144 Cal. App. 4th at 61

(emphasis added.). Even more instructive is the realistic artistic rendering of Tiger

Woods found to be transformative in *ETW*. Under Hart's view of the

transformative-use test, the fact that Woods was depicted literally (same facial

features, hitting the ball right-handed, and wearing his familiar black pants, red

shirt, and cap) and in a setting where he appeared in real life (The Masters) would

dictate that the use was not protected. *Compare* 332 F.3d at 918, 936, *with* Br. at

46-47. Yet, the Sixth Circuit found "that [the defendant's] work does contain

significant transformative elements which make it especially worthy of First

Amendment protection." 332 F.3d at 938.[57] Even though the foreground of the

painting was dominated by Woods' realistic image, the court held that the work

"consist[ed] of much more than a mere literal likeness of Woods." *Id.* at 936

---

[57] In *ETW*, the Court applied a hybrid test that mixed ad hoc balancing and
transformative-use, and also drew on the *Restatement*. *See* 332 F.3d at 937-38.

"Unlike the unadorned, nearly photographic reproduction of the faces of The Three Stooges in *Comedy III*," the court explained that the "work does not capitalize solely on a literal depiction of Woods. Rather, [the] work consists of a collage of images in addition to Woods' image which are combined to describe, in artistic form, a historic event in sports history[.]" *Id.* at 938 Notably, the "collage of images" consisted of realistic portraits of other professional golfers. *Id.*

Second, Hart's interpretation of the transformative-use test overlooks its origins in copyright's fair-use defense. *See Comedy III*, 25 Cal. 4th at 404-405. In determining whether a defendant's use of a plaintiff's copyrighted work is transformative under the fair-use doctrine, the court does not consider simply whether the plaintiff's work was physically altered or a portion of it was literally copied; the focus instead is on the *defendant's work*. In its seminal fair-use decision, the United States Supreme Court announced that the "central purpose" of this analysis "is to see … whether the [defendant's] work merely 'supersede[s] the objects' of the original creation … or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message[.]" *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994) (citation omitted). Indeed, fair use commonly involves the use of the plaintiff's unaltered work, such as "a book review quoting the copyrighted material criticized," or 2

Live Crew's use in its own song of the opening line of Roy Orbison's *Pretty Woman*. *Id.* at 581, 588.

Third, Hart's restrictive interpretation of the transformative-use test would lead to entirely illogical results; the use of someone's actual name or realistic image within an expressive work would always be actionable. For example, under this interpretation, a Cubist painting that included a real-life individual's image might be protected, but a Realist painting that included the same person's image might not. Or a distorted caricature of that individual might be protected, while a realistically-rendered political cartoon might not. Constitutional protections for free speech cannot turn on such stylistic (and legally immaterial) distinctions.

Documentarians, biographers, filmmakers, novelists, photographers, songwriters, and many others do exactly what Hart claims is not protected: they create expressive works that realistically depict individuals and/or refer to them by their actual names. Under Hart's reasoning the transformative-use test would not protect the film *The Social Network* where Mark Zuckerberg is depicted as what he is – the founder of the social-networking website Facebook, who allegedly cut friends out of the company en route to becoming the youngest billionaire in America. Nor, as explained in Part I.C above, would it protect countless other films, novels, songs and plays that feature the names or likenesses of real-life individuals. This result would be plainly inconsistent with recognized First

40

Amendment protection for the use of real-life figures as characters in docudrama, historical fiction and other realistic expressive works.  *See supra* note 47.

## B.    Hart's Reliance on *No Doubt, Hilton*, and *Keller* Is Misplaced

Hart's view of the transformative-use test is cobbled together from undue reliance on *No Doubt v. Activism Publishing, Inc.*, 122 Cal. Rptr. 3d 397 (Cal. Ct. App. 2011), *Hilton v. Hallmark Cards,* 599 F.3d 894 (9th Cir. 2010), and *Keller v. Electronic Arts, Inc.* No. C 09-1967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010). *See* Br. at 40-48.

First, Hart's reliance on *Hilton*, which focused on a single individual's celebrity value, misses the mark.  *NCAA Football* is not a game about Ryan Hart, but about college football as a whole.  EA's games create an interactive virtual world based on historical events (football seasons), and Hart's alleged likeness and statistics are included to complete the historical picture.  The real analogy should be to *C.B.C.*, where the Eighth Circuit recognized that the games "depend on the inclusion of all players and thus cannot create a false impression that some particular player with 'star power' is endorsing [the plaintiff's] products."  505 F.3d at 822-24.

Next, Hart and amici both rely heavily on the *No Doubt* decision.  Yet, the *No Doubt* court significantly misstates the law, by mis-citing *Comedy III* for the proposition that a work "is insulated by First Amendment only where 'added

creative elements significantly transform *the celebrity depiction.*" *No Doubt*, 122 Cal. Rptr. 3d at 410 (emphasis in original). But critically, the word "only" does not appear in *Comedy III*, nor did the California Supreme Court emphasize the words "the celebrity depiction." With these additions, the *No Doubt* majority mistakenly suggests that the person's image itself *must* be transformed.[58] That conclusion is belied by express language in *Comedy III*, which emphasized that "factual reporting," "fictionalized portrayal," and "subtle social criticism" like Andy Warhol's celebrity portraits are fully protected – all of which use literal likenesses and/or names of individuals, and portray them in the same contexts or settings in which they would ordinarily appear. *Comedy III*, 25 Cal. 4th at 406. *Accord Winter v. D.C. Comics*, 30 Cal. 4th at 886. Nor could that standard be reconciled with countless expressive works that use actual depictions of people.

Indeed, for this and other reasons, *No Doubt* is readily distinguishable and, respectfully, incorrectly decided. *No Doubt* was a contract case, which could have been decided without reaching the constitutional issues. The parties in *No Doubt*

---

[58] Hart follows *No Doubt*'s lead misquoting from *Comedy III* to suggest that "the ultimate question when applying the 'transformative use' test should be whether *the celebrity depiction* itself has been 'so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness.'" Br. at 47 (emphasis in original) (quoting *Comedy III*). This misstates *Comedy III*, which states that the test asks whether the "*product containing a celebrity's likeness is so transformed* that it has become primarily the defendant's own expression rather than the celebrity's likeness." *Comedy III*, 25 Cal. 4th at 406 (emphasis added).

42

entered into a detailed written licensing agreement, under which the rock band gave defendant the right to use certain songs and their names and likeness in a video game. *No Doubt,* 192 Cal. App. 4th at 1023. The band participated in a full day photograph session so that their in-game images would look, move, and sound like them. *Id.* at 1024. In exchange, defendant gave plaintiffs the explicit right to approve the manner in which their names and likenesses were used. *Id.* When their in-game images were used in ways never approved by the band, the defendant not only refused to change the game, but hired actors to impersonate the band, and the band sued for breach of contract and fraud, among other claims. *Id.* at 1024-25. Nothing of the kind is alleged here. There is no relationship, let alone agreement, between Hart and EA; EA made no promises to Hart; and Hart have no approval rights over EA's games. Thus, the equitable arguments that influenced the *No Doubt* court are absent here.

No Doubt draws on the *Keller* decision's misplaced "approach of focusing solely on the challenged image, as opposed to the work as a whole."[59] Tellingly, Hart does not rely heavily on *Keller,* which is on appeal before the Ninth Circuit,[60] perhaps because the district court here so persuasively rebutted the reasoning of

---

[59] App.61.

[60] App.488-89.

that decision.[61] On the heels of the Supreme Court's decision in *Brown,* the district court aptly pointed out that the *Keller* decision failed to consider the interactivity of EA's works, where player images "serve[] as an art-imitating-life starting point for the game playing experience."[62] As the district court pointed out, not only does *Keller* misread *Kirby* and *Winter*, but it is "logically inconsistent to consider the setting in which the character sits, which *Keller* does in its analysis, yet ignore the remainder of the game." [63]

Another court in the Northern District of California has followed *Keller*. *Davis v. Electronic Arts Inc.*, No. 10-03328 RS (N.D. Cal. Mar. 29, 2012). (slip opinion attached as Exhibit A to this brief).[64] *Davis* follows and repeats the same errors as *Keller*. Dismissing *Madden NFL* as "the digital equivalent of transferring the Three Stooges' images onto a t-shirt," *Davis* says that EA's work is not transformative because athletes are "represented realistically." Slip Op. at 7, 9. That rationale disregards (a) *Comedy III*, which emphasized that transformative works "are not confined to parody and can take many forms," including "factual reporting" and "fictionalized portrayals" of real people (25 Cal. 4th at 406); (b) the

---

[61] *See* App.60-62.

[62] App.61.

[63] App.62.

[64] While *Davis* understandably followed its fellow district court, it conspicuously fails to mention – let alone respond to – the district court's well-reasoned decision below.

transformative-use test's origins in copyright's fair-use defense, which focuses on whether the defendant's work *as a whole*; (c) the interactivity and creative elements of *Madden NFL* video games; and (d) well-settled First Amendment protections for *all* expressive works that include the names and likenesses of real people, including documentaries, biographies, and docudramas. *See* Parts I.C, II.A, *supra*. *Davis* goes even further astray when it attempts to distinguish the constitutionally protected, realistic depiction of Rudolph Valentino in *Guglielmi*, by suggesting that the use of an athlete's likeness in *Madden NFL* is "conventional merchandising." Slip Op. at 8. There is no way to reconcile this conclusion with the Supreme Court's decision in *Brown* and the district court's cogent analysis below, finding that EA's games are not commercial speech but expressive works entitled to full First Amendment protection.[65]

In the end, under the transformative-use test as actually articulated by *Comedy III* and as applied so as to be consistent with the First Amendment, EA's

---

[65] App.27-30. *Davis* also grossly exaggerated the state of the law when it opined that "if, as EA urges, any expressive elements within the larger work were somehow to 'transform' an otherwise conventional use of a celebrity's likeness, the right of publicity would effectively be eviscerated." *Davis*, Slip Op. at 8. EA has never urged absolute First Amendment protection for all uses of a celebrity's name or likeness, and protecting EA's interactive, expressive works would have no effect on garden variety right-of-publicity cases involving commercial-speech uses of a celebrity's name or likeness. *See, e.g.*, *McFarland v. Miller*, 14 F.3d 912 (3d Cir. 1994); *Abdul-Jabbar v. Gen. Mtrs. Corp.*, 85 F.3d 407 (9th 1996); *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th 1983).

DWT 19263322v3 0058278-000010

alleged use of Hart's likeness and statistics as one among thousands of players in a highly creative and interactive videogame is transformative and the district court's ruling should be affirmed.

## C.   The First Amendment Trumps Hart's Right-of-Publicity Claim Under the *Rogers/Restatement* Test

The district court also correctly ruled that EA's First Amendment rights trumped Hart's right of publicity under the *Rogers/Restatement* test.  Because the test is clear and more predictable, the *Rogers/Restatement* test has been adopted by a number of courts[66] and endorsed by leading commentators.  *See, e.g.*, 2 McCarthy, *Rights of Publicity* § 8:82 (suggesting that "courts should use the 'Ginger Rogers Test'" in cases where a person is identified by name or other characteristics as part of literary or artistic work); Volokh, *Freedom of Speech*, at 908 (noting that "courts have consistently held – correctly, in my view – that the right of publicity may not restrict … movies, novels, plays, or songs that use people's names or likeness"; citing *Rogers* with approval).[67]  EA urges this Court to adopt the *Rogers/Restatement* test for the Third Circuit.

---

[66] See *supra* note 36.

[67]   At the same time, commentators have criticized the transformative-use test because it rests on a subjective, aesthetic review of a work and understandably causes unpredictable results.  McCarthy, for example, observed that the test is "extremely difficult to predict and apply because it requires a court to make an aesthetic judgment" about "the degree of the artistic transformation" required for a work to qualify for First Amendment protection.  2 McCarthy, *Rights of Publicity* § 8:72.  *See also* Volokh, *Freedom of Speech*, at 915-16.

In *Rogers v. Grimaldi*, the Second Circuit held that use of a celebrity's name in a motion picture title is protected from a right-of-publicity action unless that use is either (1) "wholly unrelated" to the content of the work or (2) "simply a disguised commercial advertisement for the sale of goods or services." 875 F.2d at 1004. The *Restatement (Third) of Unfair Competition* has effectively adopted and tracks the *Rogers* test, stating that a "use in entertainment and other creative works is permitted," unless "the name or likeness is used solely to attract attention to a work that is not related to the identified person." *Restatement (Third)* § 47, cmt. c. *See also Parks*, 329 F.3d at 461 (adopting the *Rogers* test for right-of-publicity claims and noting that "[t]his test is supported in the context of other expressive works by comment c of § 47 of the *Restatement (Third) of Unfair Competition*").[68]

At least one other district court in this Circuit has adopted the *Rogers/Restatement* test, *Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996). In that case, the district court applied the test to a right-of-publicity claim

---

[68] New York courts follow this test when evaluating right-of-publicity claims that challenge expressive works, including works of entertainment. *See, e.g., Stephano v. News Group Publs.*, 64 N.Y.2d 174, 185 (1984) ("It is settled that a picture illustrating an article on a matter of public interest is not considered used for the purposes of trade or advertising within the prohibition of the statute unless it has no real relationship to the article or unless the article is an advertisement in disguise") (internal quotation marks omitted); *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768, 769 (N.Y. App. Div., 1st Dep't 1980) (biography of Marilyn Monroe written by Norman Mailer and published years after her death was protected because it was a "literary work" and "not simply a disguised commercial advertisement for the sale of goods or services").

arising from use of the name and likeness of Bobby Seale, a co-founder of the Blank Panther Party, in a docudrama and related book about its history. *Id.* at 337. The court concluded that the plaintiff's name and likeness used on and in the movie and book were "clearly related to the content of the book and the film, the subject matter of which deals with the Black Panther Party and the [p]laintiff's role as co-founder of the Party." *Id.* at 337. Thus, the court dismissed Seale's right-of-publicity claims as a matter of law with regard to the film and the book. *Id.*[69] *Seale* has been cited with approval in several other cases involving expressive depictions of real-life individuals. *See ETW*, 332 F.3d at 937 n.18; *Ruffin-Steinback*, 82 F. Supp. 2d at 730; *Nichols v. Moore*, 334 F. Supp. 2d 944, 956 (E.D. Mich. 2004); *Montgomery*, 60 S.W. 3d at 530 n.23; *Tyne v. Time Warner Entm't*, 901 So.2d 802, 809 (Fla. 2005).

As he did below, Hart does not contest that EA prevails under the *Rogers/Restatement* test. Br. at 49-54. Nor could he. EA's use of his alleged likeness clearly relates to the content of video games about college football. And the alleged use of his attributes (and in one edition, a photograph) *within* the game itself – alongside thousands of virtual players and thousands of other creative

---

[69] The court did not dismiss claims based on use of plaintiff's name and likeness on the cover of the soundtrack CD, finding that this use "does not relate to the content in the CD/cassette" which "is merely a collection of different songs performed by different musicians, which songs have no direct connection to the [p]laintiff or the history of the Black Panther Party." 949 F. Supp. at 337.

elements – is not "a disguised advertisement" for the sale of the game or a different product. Therefore, the district court's ruling under the *Rogers/Relatedness* test should be upheld. *See* App.73.

Instead, Hart attempts to dismiss the *Rogers/Restatement* test as only applicable to Lanham Act claims involving the titles of expressive works. *See* Br. at 49, 53-54. That position has no merit. The Second, Fifth, and Sixth Circuits, and many federal district courts have applied this test to right-of-publicity claims targeting expressive works, not just Lanham Act claims. *See Rogers*, 875 F.2d at 1004; *Parks*, 329 F.3d at 461; *Matthews*, 15 F.3d at 440; *Romantics*, 574 F. Supp. 2d at 766; *Seale*, 949 F. Supp. at 336-38; *Ruffin-Steinback*, 82 F. Supp. 2d at 730-31. *See also Montgomery*, 60 S.W.3d at 530.

It is equally clear that the *Rogers/Restatement* test applies to the content of expressive works, not just titles. *See, e.g.*, *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008); *ETW*, 332 F.3d at 927; *Brown* Slip Op. at *7; *Romantics*, 574 F. Supp. 2d at 765-66; *Seale*, 949 F. Supp. at 336-37; *Dillinger v. Electronic Arts Inc.*, No. 1:09-cv-1236, 2011 WL 2457678, at *4-8 (S.D. Ind. June 16, 2011); *Montgomery*, 60 S.W.3d at 530. As Professor McCarthy puts it: "While the *Rogers* case was decided in the context of a challenge to the title of an expressive work, courts have expanded the *Rogers*

balancing test to encompass all 'works of artistic expression.'" 2 McCarthy, *Rights of Publicity* § 8:71.[70]

Consider for example, *Romantics*, where the court applied this test in evaluating a band's publicity rights claim against the creator of a video game that incorporated the band's name and a song associated with it. *See Romantics*, 574 F. Supp. 2d at 765-66. The court rejected plaintiffs' misappropriation claim: First, the song was not wholly unrelated to the content of the work "[g]iven that the purpose of the [g]ame is to allow players to pretend they are in a rock band." *Id.* at 766. Second, because "neither the song nor [p]laintiffs are referenced in the [g]ame's advertising, and it is possible to play the [g]ame and never encounter the [s]ong…, the [s]ong cannot be 'a disguised commercial advertisement.'" *Id.*

Similarly, the district court in *Brown v. Electronic Arts* applied the test to dismiss former NFL star Jim Brown's Lanham Act claim arising from EA's alleged use of his likeness in it *Madden NFL* video game – a claim that is functionally indistinguishable from Hart's right-of-publicity claim. *Brown* Slip Op. at 8-9. The district court in *Brown* found that even assuming that EA had used Brown's

---

[70] This Court in *Facenda* expressed skepticism about applying *Rogers* beyond titles. 542 F.3d at 1015-16. Since *Facenda* was argued, however, the *Rogers* test has been more widely adopted, with general acceptance that it should apply to the contents of expressive works. *See E.S.S. Entm't 2000*, 547 F.3d at 1099; *Romantics*, 574 F. Supp. 2d at 765-66; *Dillinger*, 2011 WL 2457678, at *4-8; Brown Slip. Op. at 8-9.

likeness as a virtual player on one of the teams in the game, the use had artistic relevance to the game, and that "the mere use of [Brown's] likeness in the game, without more, is insufficient to make the use explicitly misleading." *Id.* at 8.

Although *Brown* involved a Lanham Act claim rather than a right-of-publicity claim, it would be an exercise in formalism to treat these nearly factually indistinguishable cases differently simply because of the formal categories the claims fall into. Indeed, the practical similarity between right-of-publicity and Lanham Act false endorsement claims (and that they are often brought together on the same set of facts) is why "some courts have described the Lanham Act as the federal equivalent of a state right of publicity." App.67 (citing *Kirby*, 144 Cal. 4th at 57, and *ETW*, 332 F.3d at 924).

Hart nonetheless seeks to distinguish this test because it supposedly evolves from the Lanham Act, which addresses consumer confusion while right-of-publicity claims do not. Br. at 51-52. The fact that right-of-publicity claims do not have a consumer confusion requirement does not help Hart. Rather, it shows that right-of-publicity claims can cover a broader range of expression and therefore constitute an even greater threat to First Amendment values. *Rogers*, 875 F.2d at 1004 (citing the consumer confusion distinction as the "reason [that] courts delineating the right of publicity, more frequently than in applying the Lanham Act, have recognized the need to limit the right to accommodate First Amendment

concerns"); *see ETW*, 332 F.3d at 930 ("[t]he rationales underlying recognition of a right of publicity are generally *less compelling* than those that justify rights in trademarks") (citation omitted; emphasis added).

The *Rogers/Restatement* is consistent with long-standing First Amendment's protection for works of biography, docudrama, and non-fiction, and extends that protection to video games on an equal basis, as the Supreme Court instructs courts to do. *Brown*, 131 S.Ct. at 2733. EA respectfully submits that the Court should adopt the *Rogers/Restatement* test for right-of-publicity claims and affirm the district court's decision on that basis.

## D. *Doe v. TCI Cablevision*'s "Predominant Use" Test Is Incompatible with the First Amendment

This Court should reject Hart's and amici's push to adopt the "predominant use" test offered by a single state court for balancing EA's First Amendment rights against Hart's right of publicity. Br. at 30-34; Players Br. at 23-27. The "predominant use" test articulated by the Missouri Supreme Court in *Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003), is incompatible with the First Amendment, highly subjective, and, for good reason, has been rejected by every other court that has considered it. *Doe* stands alone; Hart and his amici cite no case other than *Doe* itself that has adopted the "predominant use" test, and it is therefore highly misleading for Hart to characterize it as one of the "two leading standards." Br. at 24.

In *Doe*, former professional hockey player Anthony "Tony" Twist successfully sued the publisher and creator of a comic book that used "Tony Twist" as the nickname for a fictional mafia boss inspired by Twist's real-life persona as an "enforcer" in the NHL.  110 S.W.3d at 366.  *Doe*'s "predominant use" test posits that "[i]f a product is being sold that predominantly exploits the commercial value of an individual's identity, that product should be held to violate the right of publicity and not be protected by the First Amendment, even if there is some 'expressive' content in it that might qualify as 'speech' in other circumstances." *Id.* at 374.

This test, which focuses on the content creator's profit-motivation rather than the nature of the work, violates longstanding First Amendment precedent that protection is not diminished because of a creator's profit motivation.  *See* Part I.B *supra*.  As one law review article succinctly put it in criticizing *Doe*: "The U.S. Supreme Court has held that whether speech is sold for profit is legally irrelevant to whether it receives protection under the First Amendment, yet *Doe* holds that a profit motive can disqualify speech from First Amendment protection."[71]  The *Doe*

---

[71]  David S. Welkowitz & Tyler T. Ochoa, *The Terminator as Eraser: How Arnold Schwarzenegger Used the Right of Publicity to Terminate Non-Defamatory Political Speech*, 45 Santa Clara L. Rev. 651, 670 (2005).  Another commentator aptly describes the *Doe* test as "so . . . tilted against situations where expressive and commercial motivations coexist, that it is hard to see why magazines and newspapers would not also be routinely liable for the common practice of using stories and pictures of celebrities to boost their circulation."  Diane L. Zimmerman,

court and Hart both make liberal use of the term "commercial" rather than "profit-motivation" in their discussions, but that word choice is meaningless unless the speech at issue is actually "commercial speech," which is not the case here. *See Jenkins v. Dell Publ'g Co.*, 251 F.2d 447, 450-51 (3d Cir. 1958) ("True, such publication is 'commercial' in the sense that Front Page Detective is a magazine published for profit. But this in no way distinguishes it from almost all other newspapers and magazines.").

The "predominant use" test also asks courts (or jurors) to make the highly subjective determination as to the "predominant" reason that a person's name or likeness was included in an expressive work. It is no secret that judgments as to which book project to acquire or which celebrity might be featured on a magazine's cover are in part driven by popularity and who will sell the most books or magazines. How would a court or jury determine whether the work's predominant purpose was legitimate news coverage or exploitation of the subject's popularity? How does a court or jury determine whether the predominant purpose of an unauthorized biography of a famous celebrity was to entertain and inform the public or to exploit the celebrity for financial gain?

---

*Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503, 1510 (2009) [hereinafter, Zimmerman, *Money*].

DWT 19263322v3 0058278-000010

The predominant use test leaves that determination to the aesthetic tastes of the judge or jury, something courts have long rejected. *See Bleinstein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) (Holmes, J.) ("[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits"); 2 McCarthy, *Rights of Publicity* § 8:82 (indicating that the *Doe* test is "wrong" because the court "second-guessed the literary and artistic decision made by the comic book author to name a character," adding that "[t]he right of publicity should have no place in the analysis when the accused work is this kind of expressive, artistic use of a person's name").[72]

It is for these independent reasons, therefore, that no court has adopted the Missouri *Doe* test. Tellingly, the Eighth Circuit ignored the test in *C.B.C.*, which dealt with Missouri law and presented facts similar to this case. *See C.B.C.*, 443 F. Supp. 2d at 1096 n.26 (declining to adopt *Doe* in fashioning a First Amendment balancing test for right-of-publicity claims) (not applying *Doe*'s test). Likewise, the court in *Kirby* refused the plaintiff's invitation to "refine" the transformative-

---

[72] *See also* Zimmerman, *Money*, at 1510 (criticizing test as "open-ended" and "extreme"). In fact, *Doe* is wrong when it states that under the *Rogers/Restatement* or "transformative-use" tests, "once the use is determined to be expressive, it is protected." *Doe*, 110 S.W.3d at 374. *Comedy III*, *Seale*, and *Parks* are but three examples where works were found to be expressive, but the plaintiffs' claims were *not* dismissed. *Comedy III*, 25 Cal. 4th at 410; *Parks*, 329 F.3d at 458-59; *Seale*, 949 F. Supp. at 337.

55

use test by drawing on *Doe*. *Kirby*, 144 Cal. App. 4th at 58. This Court should reject Hart and amici's invitation to reverse the district court based on Missouri's flawed "predominant use" test.

**E.    NCAA Football is Entitled to First Amendment Protection Under An *Ad Hoc* Balancing Test**

Finally, while he questions the subjectivity of the test and never argued for its application below, Hart nonetheless now argues that this Court should reverse the district court under an ill-defined *ad hoc* balancing test. Br. at 54, n. 16. Under *ad hoc* balancing, courts balance the societal and personal interests embodied in the First Amendment against the right of publicity, often looking to "the interests that states typically intend to vindicate by providing rights of publicity to individuals." *ETW*, 332 F.3d at 938; *C.B.C.*, 505 F.3d at 824; *Cardtoons,* 95 F.3d at 972. Here, the First Amendment interests in promoting independently creative, realistic expressive works like EA's games significantly outweigh the wholly speculative benefits of protecting college athletes' ability to license their publicity rights for use in expressive works. Therefore, EA prevails under this test as well.

The First Amendment interests at stake here are compelling. Courts and commentators have long recognized that celebrities, including athletes, are an important component of our cultural vocabulary, and that creators of expressive works have a strong interest in making use of their names and likenesses in creating new works. *See ETW*, 332 F.3d at 937-38; *Comedy III*, 25 Cal. 4th at 397;

DWT 19263322v3 0058278-000010

*Guglielmi*, 25 Cal. 3d at 869-70; *Cardtoons*, 95 F.3d at 972; Michael Madow,

*Private Ownership of Public Image:  Popular Culture and Publicity Rights*, 81 Cal.

L. Rev. 125, 128 (1993).  EA's interest in drawing on the names and likenesses of

athletes as an "important element of the shared communicative resources of our

cultural domain" is therefore strong.  *Cardtoons*, 95 F.3d at 972.  This factor, along

with the transformative character of the painting, led the Sixth Circuit in *ETW* to

hold that "the effect of limiting Woods's right of publicity in this case is negligible

and  significantly  outweighed  by  society's  interest  in  freedom  of  artistic

expression."  *ETW*, 332 F.3d at 938.

This conclusion is buttressed by the undeniable fact that EA's alleged use of

Hart's likeness is drawn from publicly available statistics and biographical data

about Hart and his game performance, as the district court recognized.  App.56; *see*

App.369-70, Sec. Am. Cplt. ¶ 32, 34-44.  Cases with highly similar facts, discussed

*supra* Part I.C, have consistently recognized that expressive speakers have a strong

First  Amendment  interest  in  drawing  on  athletes'  names,  statistics,  and

biographical data in creating new works and have held that those interests trump

the  proprietary  rights  of  the  players  in  question.   *C.B.C.*, 505 F.3d at 822-24;

*Gionfriddo*, 94 Cal. App. 4th at 410-11, 415.  As the district court noted, "it would

be  strange  law  that  a  person  would  not  have  a  first  amendment  right  to  use

information that is available to everyone." App.56 (*quoting* C.B.C., 505 F.3d at 823).

On the opposite side of the scale, Hart argues that "[c]ollege football athletes' publicity rights are one of the primary returns available for the time and effort they invest in their athletic career," Br. at 57, suggesting that failure to compensate college players for use of their likenesses in creative works negatively impacts their incentive to play college football. But this argument makes no sense.[73] Hart himself points out that college football players are bound by the NCAA's amateurism rules, App.630, Hart Decl. ¶ 4, meaning that they do not get paid to play college football. It stretches credulity to suggest that athletes who are *willing to play college football for free* might lose their incentive to play if expressive works – be they books, movies or videogames – may include their likenesses and statistics without compensation. College players have a host of incentives to play college football, including love of the game, respect at their university and among their teammates, scholarships, and the prospect of landing a lucrative career in the National Football League. Like Tiger Woods in *ETW* and the professional athletes in *Gionfriddo*, *C.B.C.*, and *Cardtoons*, college football

---

[73] Hart's argument here also relies on a host of facts that were not in the record before the district court, Br. 56-57, and should be rejected for that independent reason. *See* Fed. R. Civ. P. 56(c)(1)(A) (a party's factual assertions on summary judgment must be supported by "citing to particular parts of materials in the record").

DWT 19263322v3 0058278-000010

players have more than sufficient incentives to continue playing the game without the hope of receiving royalties down the road for the use of their likenesses in an expressive work.

In sum, the First Amendment interest in permitting EA to incorporate real-world likenesses and statistics into its independently creative works far outweighs the proprietary interests of college players, and EA is entitled to judgment as a matter of law under Hart's proposed *ad hoc* balancing test.

## III.
## THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT WAS PROCEDURALLY APPROPRIATE

The district court properly granted summary judgment without the need for additional evidence. While Hart now claims that his own procedural failings should be excused and the case should be remanded, his belated arguments should be rejected for a number of reasons.

First, the district court decision turned on examination of the games themselves, which was all that was needed to resolve the motion. As this Court recognized in *Facenda*, "the categorization of speech is a question of law" that may be resolved through independent review of the work in question. 542 F.3d at 1016. Both the transformative-use and the *Rogers/Restatement* tests examine the work in question. This explains why courts across the county routinely review the

work to determine whether it is protected by the First Amendment.[74] Here, the

district court needed to look no further than the games themselves to conclude that

EA's First Amendment defense prevailed and Hart's proposed need for additional

facts would not change that outcome.

Second, Hart knew that the district court could consider the motion as one

for summary judgment and had every opportunity to (and did) introduce his own

evidence.   EA's notice of motion, memorandum, Rule 56.1 Statement, and

accompanying papers all made clear that EA was seeking summary judgment as an

alternative to a motion to dismiss.[75] Hart's brief recognized that it was a "motion

for summary judgment"[76] and included a (defective) "Statement of Material

Facts,"[77] and he added his own evidence to the record by submitting two affidavits

---

[74] *See, e.g., Winter*, 30 Cal. 4th at 891(instructing that right-of-publicity claims against publishers of expressive works "can often [be] resolve[d] . . . *as a matter of law simply by viewing the [defendant's] work in question*" and applying the transformative-use test) (emphases added); *Rogers*, 875 F.2d at 1004-1005; *Seale*, 949 F. Supp. at 337-38 (examining the contents of the docudrama, book, and CD to determine whether they were entitled to protection under the *Rogers/Restatement* test); *Brown* Slip Op. at 7-9 (relying on contents of EA's *Madden NFL* games and granting motion to dismiss).  *See also Romantics*, 574 F. Supp. 2d at 762, 766 (relying on contents of game and evidence of lack of advertising use – also presented here (App.474-75) – in determining that video game was entitled to protection); *Dillinger*, 2011 WL 245768, at *4-8 (relying primarily on contents of the game and dismissing argument based on evidence not requested in Rule 56(d) affidavit).

[75] *See, e.g.*, App.420-21, 423, 440-441, 471-75, 476-77, 736-51.

[76] App.686.

[77] App.682-86.

DWT 19263322v3 0058278-000010

and a certification with numerous exhibits.[78]  He now disingenuously argues that this Court should excuse his procedural defaults "because the district court failed to notify the parties of its intent to treat EA's motion as a motion for summary judgment."  Br. at 60 (citing *Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989)).  Yet, the district court has no obligation to provide notice of conversion to summary judgment when, as here, the motion papers provide adequate notice to the non-moving party.  *See Hilfirty v. Shipman*, 91 F.3d 573, 578-79 (3d Cir. 1996) (plaintiffs had adequate notice where two of the five motions "were framed in the alternative as motions for summary judgment," plaintiffs never objected to defendants' submission of affidavits with their motions, never made a motion for discovery before the court, and submitted their own affidavit with their brief), *disapproved of on other grounds by Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782 (3d Cir. 2000); *Razzoli v. Director, Bureau of Prisons*, 293 Fed. Appx. 852, 855 (3d Cir. 2008) (following *Hilfirty*).[79]  *Compare Rose,* 871 F.2d at 341 (plaintiff "unaware that the court was even considering summary judgment").

Third, despite ample notice and opportunity, Hart failed to identify specific discovery that would affect the motion.  Rule 56(d) of the Federal Rules of Civil

---

[78]  App.579 – 674.

[79]  Other Circuits are in accord.  *See, e.g., Tri-Gen Inc. v. Int'l Union of Operating Eng'rs*, 433 F.3d 1024, 1029 (7th Cir. 2006); *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004.

Procedure gives the district court discretion to defer ruling on a summary judgment motion when a party opposing summary judgment files an affidavit or declaration indicating that "it cannot present facts *essential* to justify its opposition."  Fed. R. Civ. P. 56(d) (emphasis added).  Hart did not do so; he simply included a single vague footnote in his memorandum of law stating that he would like discovery "to show Defendant's sales records and anticipate [sic] that sales of each year's *NCAA Football* release remain relatively steady."[80]  Even if properly framed in a Rule 56(d) affidavit – which it was not – the district court correctly found that this discovery was far from "essential" and "would have no bearing on this Court's analysis of EA's First Amendment defense."[81]  This conclusion is undeniably correct because First Amendment protection may not permissibly turn on whether an expressive work is created and sold for profit (or the amount of that profit).  *See supra* Parts I.B, II.C.

Hart's failure to submit a formal 56(d) affidavit or declaration is itself dispositive of this issue on appeal.  In all but the most exceptional cases, failure to comply with Rule 56(d) (formerly Rule 56(f)) is fatal to a claim of insufficient discovery on appeal.  *Galgay v. Gil-Pre Corp.*, 864 F.2d 1018 (3d Cir. 1988); *Dowling v. City of Philadelphia*, 855 F.2d 136 (3d Cir. 1988); *Wisniewski v. Johns-*

---

[80]  App.698, Br. at 19 n.4.

[81]  App.16-17.

*Manville Corp.*, 812 F.2d 81 (3d Cir. 1987); *Falcone v. Columbia Pictures*

*Industries, Inc.*, 805 F.2d 115 (3d Cir. 1986); *Pastore v. Bell Tel. Co. of Penn.*, 24

F.3d 508, 511 (3d Cir. 1994).  Thus, in *Radich v. Goode*, this Court rejected

unsworn attorney statements in a memorandum, explaining that such unsworn

statements are "lacking both in substance, and in any indicia of evidentiary

reliability contemplated by the requirements of Rule 56."  886 F.2d at 1395.

Indeed, in the rare circumstances when technical compliance with Rule

56(d) is excused, it is only when a party opposing summary judgment identifies

"*with specificity what particular information is sought*; *how, if uncovered, it would*

*preclude summary judgment*; and why it has not previously been obtained."  *St.*

*Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994)

(quotations omitted) (emphasis added).  Here, Hart failed to identify *any* material

evidence he required or explain how such evidence would preclude summary

judgment.  Accordingly, Hart failed even to begin to satisfy this relaxed standard.

*See Pastore*, 24 F.3d at 511 (declining to "reverse the district court's decision to

consider the summary judgment motion, when plaintiffs failed to move beyond

mere generalities in their attempt to delay that consideration").[82]

---

[82]  Hart cites *Sames v. Gable*, 732 F.2d 49 (3d Cir. 1984), in support of his position that compliance with Rule 56(d) should be waived, but in that case, unlike here, the court was already aware of the specific discovery the plaintiffs sought and had determined that they were entitled to it.  *Id.* at 51-52.

<u>Finally</u>, on this appeal, Hart identifies *different* discovery he would have liked to have sought. *See* Br. at 58-60. His belated demands should be rejected as this Circuit "has consistently held that it will not consider issues that are raised for the first time on appeal." *Harris v. City of Phila.*, 35 F.3d 840, 845 (3d Cir. 1994). Regardless, they carry no substantive weight. The discovery he seeks – evidence into whether "users modify the default characteristics of their favorite teams' players" and "evidence regarding the amount EA pays professional athletes for comparable uses of their likenesses" (Br. at 58-59 ) – is irrelevant and does not affect the district court's determination. Evidence of how often users choose to modify the default virtual players in *NCAA Football* would not alter the district court's correct legal determination that the interactivity of *NCAA Football*'s virtual world and its independent creative elements make the games "transformative" and therefore entitled to First Amendment protection.[83] Like novels, films, works of visual art and other expressive works, First Amendment protection for video games depends upon the character of the work itself (including the interactivity it permits), not the bean-counting Hart proposes. Hart's argument here is akin to asking a court to determine how many readers found a novel's plotline engaging before extending protection to it.

Similarly, evidence regarding whether and how much EA pays professional

---

[83]  App.55-62.

athletes for licensing their likenesses (along with a host of other benefits) in other games, as the district court correctly noted, has no bearing on "whether or not EA's use of Hart's image is protected by the First Amendment."[84]

The district court was fully justified in granting summary judgment, and its decision was not an abuse its discretion. *See Rode v. Dellarciprete*, 892 F. 2d 1177, 1182-83 (3d Cir. 1990) (an abuse of discretion occurs "when no reasonable person would adopt the district court's view," when the district court applied incorrect "standards or procedures," or made "clearly erroneous" factual findings).

## CONCLUSION

For the foregoing reasons, EA respectfully submits that the district court's decision should be affirmed.

---

[84]  App.55.

DWT 19263322v3 0058278-000010

Dated:   New York, New York
         May 16, 2012

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

 /s/ Elizabeth A. McNamara 

1633 Broadway 27th floor
New York, New York 10019
Tel:  (212) 489-8230
Fax:  (212) 489-8340
New York State Bar No. 1930643
*Attorneys for Defendant-Appellee*
*Electronic Arts Inc.*

*Of Counsel:*
  Bruce Rosen
  Samuel M. Bayard

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Appellate Rule 46.1(e), the undersigned hereby certifies that she is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit

    /s/ Elizabeth A. McNamara    

DAVIS WRIGHT TREMAINE LLP
1633 Broadway 27th floor
New York, New York 10019
Tel:  (212) 489-8230
Fax:  (212) 489-8340

*Attorneys for Defendant-Appellee*
*Electronic Arts Inc.*

May 16, 2012

## CERTIFICATE OF WORD COUNT

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's order dated May 3, 2012 granting Electronic Arts Inc. permission to file an over-length brief of up to 16,000 words, because this brief contains 15,907 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type styles requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011 in 14-point Times New Roman font.

_____/s/ Elizabeth A. McNamara_____

DAVIS WRIGHT TREMAINE LLP
1633 Broadway 27th floor
New York, New York 10019
Tel:  (212) 489-8230
Fax:  (212) 489-8340

*Attorneys for Defendant-Appellee*
*Electronic Arts Inc.*

May 16, 2012

# CERTIFICATE OF SERVICE UPON COUNSEL

I hereby certify that I caused the foregoing Brief for Defendant-Appellee

Electronic Arts Inc. to be served on counsel for Plaintiff-Appellant, Amici

Appellants and Proposed Amici Appellants via the Notice of Docket Activity

generated by the Court's electronic filing system (i.e., CM/ECF) and via electronic

mail pursuant to Local Appellate Rules 31.1(d) and 113.4(a):

> Timoth J. McIlwain
> Atttorney at Law, LLC
> 5 Marine View Plaza, Suite 300
> Hoboken, New Jersey 07030
> (201) 420-1911
> timothymcilwain@yahoo.com
> *Attorney for Plaintiff-Appellant Ryan Hart*
>
>
> P. Casey Pitts, Esq.
> Michael Rubin, Esq.
> Altshuler, Berzon, Nussbaum,
>   Berzon & Rubin
> 177 Post Street, Suite 300
> San Francisco, CA 94108-0000
> 415-421-7151
> *Attorneys for Amici Appellants Major League Baseball Players*
> *Association, NFL Players Assn, NHL Players Assn and National Basketball*
> *Players Association*
>
> Duncan W. Crabtree-Ireland, Esq.
> Screen Actors Guild
> 5757 Wilshire Boulevard, 7th Floor
> Los Angeles, CA 90036
> 323-549-6043
> *Attorneys for Proposed Amici Appellants Screen Actors Guild Inc.,*
> *American Federation of Television & Radio Artists*
> *AFL-CIO and  Luminary Group LLC*

Also on this day, I caused to be sent 10 hard copies of the foregoing to the Office of the Clerk of the Court and one copy via overnight mail to counsel for Appellant.

    /s/ Elizabeth A. McNamara

DAVIS WRIGHT TREMAINE LLP
1633 Broadway 27th floor
New York, New York 10019
Tel:  (212) 489-8230
Fax:  (212) 489-8340

*Attorneys for Defendant-Appellee*
*Electronic Arts Inc.*

May 16, 2012

# CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS

I certify that the electronically filed brief and the hard copies of the brief are identical.


    /s/ Elizabeth A. McNamara

DAVIS WRIGHT TREMAINE LLP
1633 Broadway 27th floor
New York, New York 10019
Tel:  (212) 489-8230
Fax:  (212) 489-8340

*Attorneys for Defendant-Appellee
Electronic Arts Inc.*

May 16, 2012

## CERTIFICATE OF VIRUS CHECK

I hereby certify that a virus check was performed on the E-Brief using

Sophos Endpoint Security, version 10.0.4 and that no viruses were found.

      /s/ Elizabeth A. McNamara

DAVIS WRIGHT TREMAINE LLP
1633 Broadway 27th floor
New York, New York 10019
Tel:  (212) 489-8230
Fax:  (212) 489-8340

*Attorneys for Defendant-Appellee
Electronic Arts Inc.*

May 16, 2012

# EXHIBIT A

**\*\*E-filed 3/29/12\*\***

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL E. DAVIS, aka TONY DAVIS, VINCE FERGAMMO, and BILLY JOE DUPREE, on behalf of themselves and all other similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>ELECTRONIC ARTS INC.,<br><br>        Defendant.<br>_____/ | No. 10-03328 RS<br><br>**ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS AND TO STRIKE UNDER CCP § 425.16** |

## I. INTRODUCTION

Former National Football League ("NFL") players Michael Davis, Vince Ferragamo, and Billy Joe Dupree bring this putative class action against videogame developer Electronic Arts Inc. ("EA"), alleging their likenesses were used without authorization in the EA video game, *Madden NFL*. Defendants move to dismiss the first amended complaint ("FAC") under Federal Rule of Civil Procedure 12(b)(6) and, separately, move to strike the complaint pursuant to California's Anti-SLAPP law. Upon consideration of the briefs, oral argument, and for the reasons explained below, both of defendant's motions must be denied.

## II. FACTUAL & PROCEDURAL BACKGROUND

**United States District Court**
For the Northern District of California

1    EA is a leading developer and publisher of video games. Plaintiffs, three retired NFL

2  players, contend EA used their likenesses in its video game *Madden NFL*. According to plaintiffs,

3  EA's *Madden NFL* franchise is the best-selling sports video game of all time, with sales of more

4  than 85 million copies and revenues in excess of $4 billion. The company has released a new

5  version of *Madden NFL* each year for approximately twenty years, including editions tailored to

6  different gaming systems. The FAC alleges that at least five editions of *Madden NFL*, designed for

7  distinct gaming consoles, and released over a number of years, use plaintiffs' likenesses without

8  authorization.[1] FAC ¶ 75.

9    *Madden NFL* permits users to simulate an NFL football game. The game is elaborate and

10  entails many creative and expressive features, including extensive audiovisual effects. EA itself

11  represents *Madden NFL* as highly realistic. It features depictions of actual stadiums, as well as

12  current teams, with accurate rosters, colors, logos, and uniforms. FAC ¶ 25-27. According to the

13  FAC, many of these game elements are covered by licensing deals. For example, EA has licensed

14  the rights to use active players' likenesses and biographical information, and holds similar licenses

15  covering coaches, announcers, and select retired players. According to the FAC, it was publicly

16  reported that EA paid the licensing division of the NFL Players Association approximately $35

17  million for the use of active players' likenesses.

18    Significantly, for purposes of this action, those playing *Madden NFL* may select specific

19  teams to compete against each other. Plaintiffs allege that some recent versions of the game even

20  permit gamers to choose famous "historical" teams, with rosters populated by players closely

21  resembling NFL retirees, including plaintiffs Davis, Ferragammo, and Dupree. At least in the most

22  recent versions of the game, the avatars allegedly representing former players are not identified by

23  name or jersey number.[2] According to the FAC, however, the representative avatars are

24  

25  [1] According to EA, only the editions designed for the Sony Playstation 2 and the Microsoft Xbox
gaming consoles feature the "historic" players at issue in this action. For purposes of defendant's

26  motion to dismiss, however, the Court must accept plaintiffs' allegations as true. *See also infra* note
4 (addressing cross-motions for judicial notice).

27  [2] According to plaintiffs, in older versions of *Madden NFL*, EA accurately listed most retired
players' jersey numbers. It stopped that practice in 2004, listed different numbers, and added

28  functionality permitting gamers to change the historic players' numbers themselves. Players' names
may now also be edited. *See* Henri Decl. in Supp. of Pls.' Opp'n, Ex. 7 (*Madden NFL* official guide

United States District Court

For the Northern District of California

1  preprogrammed by EA to reflect accurately a variety of individual, physical and biographical

2  characteristics that precisely correspond to the plaintiffs' own profiles as active players – including

3  height, weight, skin tone, position, team, years in the league, and athletic ability (speed, agility,

4  etc.).  Notably, for purposes of its present motions, EA accepts plaintiffs' allegations that it used

5  some protectable element of plaintiffs' likenesses in *Madden NFL*.

6        Plaintiffs filed this putative class action on behalf of themselves and approximately 6,000

7  other former NFL players whose likenesses, they claim, appear in certain editions of *Madden NFL*.

8  The FAC advances five claims for relief: (1) violations of California's statutory right of publicity,

9  California Civil Code § 3344, (2) violations of California's common law right of publicity, (3)

10  conversion, (4) trespass to chattels, and (5) unjust enrichment.  Discovery is ongoing.  Defendants

11  now move to dismiss with prejudice, and separately, to strike under California's Anti-SLAPP law[3]

12  which plaintiffs oppose.[4]

13

14  for the 2007 to 2008 versions noted, with respect to historical players, "[t]he players do not have
their actual names but you can edit them if you want optimum realism.").

15  [3] In support of its motions, EA requests judicial notice of: (1) the content of the Playstation 2 and
Xbox editions of *Madden NFL*, (2) ¶¶ 7-13 of the Frazier Declaration, (3) and district court orders

16  disposing of motions to dismiss in *Kent v. Universal Studios, Inc., et al.*, No. C08-2704, *Brown v.
Elec. Arts Inc.*, No. C09-1598, and *Stewart Surfboards, Inc. v. Disney Book group*, No. C10-2982.

17  Although the Court is ordinarily limited to considering the pleadings and any attached exhibits upon
a motion to dismiss, here, taking judicial notice of *Madden NFL*'s content is appropriate because the

18  authenticity of the material submitted by EA is not subject to dispute.  *Keller v. Electronic Arts,
Inc.*, 2010 WL 530108, at *5 n.2.  The Court may also take judicial notice of the district court

19  opinions, since they are matters of public record.  *See* Fed. R. Evid. 201(b), *and Lee v. City of Los
Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).  The Frazier Declaration simply describes *Madden*

20  *NFL* in terms favorable to EA.  Plaintiffs oppose judicial notice of the Frazier Declaration because it
also contains statements that the FAC specifically contradicts.  Having reviewed *Madden NFL*, there

21  is no reason to take judicial notice of the contents of the Frazier Declaration, and EA's request is
denied to that extent.

22  [4] Plaintiffs have also filed a motion requesting judicial notice of: (1) briefs, declarations, and expert
reports and testimony offered by EA in a number of other cases, (2) two licensing agreements

23  between EA and NFL-related entities, (3) official media guides from several NFL teams, (4)
numerous screen shots from *Madden NFL*, (5) various printouts from EA's website, and (6) the

24  official EA user guides for *Madden NFL* from 2001 to 2009.  EA opposes notice of all but the
screen shots, which are hereby noticed by the Court because their authenticity is not disputed.  The

25  court filings plaintiffs submit are all matters of public record and are therefore also amenable to
judicial notice.  Fed. R. Evid. 201(b).  The FAC alleges, and the Court accepts for purposes of the

26  instant motions, that EA has entered into various licensing agreements with the NFL Players
Association and other NFL entities.  It is not necessary to take judicial notice of their contents.  The same is

27  true for the NFL team media guides; plaintiffs have alleged, and it is undisputed for purposes of this
motion, that *Madden NFL* misappropriated plaintiffs' likenesses.  While accepting statements by EA

28  alleged in the complaint, the Court need not take judicial notice of other statements made on EA's
website or in the game user guides to resolve the instant motions because how the *Madden NFL* was

No. C 10-03328 RS
ORDER DENYING MOTIONS TO DISMISS AND TO STRIKE

3

### III. LEGAL STANDARD

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555) ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory statements," are not taken as true). In dismissing a complaint, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

### IV. DISCUSSION

A. Motion to Dismiss

    1. California Rights of Publicity

The FAC's first and second claims for relief articulate violations of plaintiffs' California statutory and common law rights of publicity. To state a right of publicity claim under California common law, plaintiffs must allege: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Hilton v. Hallmark Cards*, 580 F.3d 874, 889 (9th Cir. 2009) (quoting *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001)). The statutory right is created by Civil Code § 3344(a), which provides, in relevant part:

---

marketed is legally irrelevant. *See Winter v. DC Comics*, 30 Cal. 4th 881, 891 (2003). As for these materials, the motion is denied.

United States District Court
For the Northern District of California

> Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent ... shall be liable for any damages sustained by the person or persons injured as a result thereof.

To establish the statutory right, plaintiff must show, in addition to the common law elements, a knowing use of the plaintiff's name or likeness. *Kirby*, 144 Cal. App. 4th at 55. For purposes of these motions, however, neither party argues that there is any material distinction between plaintiffs' statutory and common law claims, and as a result, they rise or fall together. Rather than challenge the sufficiency of the pleadings, EA contends that plaintiffs' claims must fail as a matter of law because they are barred by the First Amendment.[5] Alternatively, EA contends plaintiff's claims are barred by California's public interest exception or by the public affairs exception to California's statutory right of publicity.

### a. Transformative Use Test

Faced with a right of publicity claim based on an expressive work, EA raises the "affirmative defense that the work is protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of the work does not derive primarily from the celebrity's fame." *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 407 (2001). The California Supreme Court first articulated the "transformative" use test in *Comedy III*. As the Court explained, under applicable California law, this "transformative" use test "is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." *Id.* at 391.

In *Comedy III*, the Court recognized that because "celebrities take on personal meanings to many individuals in the society, the creative appropriation of celebrity images can be an important avenue of individual expression." *Id.* at 397. For example, a fictional film based on the life of a celebrity is afforded First Amendment protection, as against the subject's right of publicity claim. *See Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 868 (1979) (barring publicity claims

---

[5] Although reaching a constitutional issue or argument is generally disfavored, it is appropriate to consider the question where, as here, defendant contends that merely proceeding with this litigation would chill its speech rights. *Winter v. D.C. Comics*, 30 Cal. 4th 881, 891 (2003).

United States District Court
For the Northern District of California

1  brought by putative heirs of Rudolph Valentino based on fictionalized film portraying Valentino's

2  life). Nonetheless, the Court in *Comedy III* went on to hold, "depictions of celebrities amounting to

3  little more than the appropriation of the celebrity's economic value are not protected expression

4  under the First Amendment." *Id.* at 400. It further explained, "when an artist's skill and talent is

5  manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to

6  commercially exploit his or her fame, then the artist's right of free expression is outweighed by the

7  right of publicity." *Id.* at 408. In such cases, "[t]he right-of-publicity holder [may still] enforce the

8  right to monopolize the production of conventional, more or less fungible, images of the celebrity."

9  *Id.* at 405; *see also id.* at 402 ("[The] strongest case for a 'right of publicity'" claim arises where

10 plaintiff's work constitutes "the appropriation of the very activity by which the entertainer acquired

11 his reputation in the first place" (citation omitted)).

12      The essence of the "transformative" use test is: "An artist depicting a celebrity must

13 contribute something more than a merely trivial variation, but create something recognizably his

14 own, in order to qualify for legal protection." *Id.* at 408. Although courts consistently require some

15 transformation to confer First Amendment protection, the case law makes clear the analysis does not

16 turn on the quality of the accused work, or the message conveyed. *Id.* at 407 ("[I]n determining

17 whether the work is transformative, courts are not to be concerned with the quality of the artistic

18 contribution – vulgar forms of expression fully qualify for First Amendment protection."").

19 Protected transformations of celebrity likenesses "are not confined to parody and can take many

20 forms, from factual reporting to fictionalized portrayal, from heavy-handed lampooning to subtle

21 social criticism." *Id.* at 406 (citations omitted).

22      Consistent with this rubric, in *Comedy III*, the Court permitted the Three Stooges to proceed

23 with claims against defendant for selling lithographs and t-shirts which bore "literal, conventional

24 depictions" of the famous comedians, drawn in charcoal. Although defendant maintained that his

25 portraiture necessarily involved some creative decisions, and thus could not be considered a literal

26 reproduction of plaintiffs' likenesses, the Court rejected that categorical position. *Id.* at 408-409.

27 Purportedly without judging the quality of the work, it found that defendant was engaged in merely

28 merchandising plaintiffs' images, and distinguished the works from more expressive reproductions

1    of celebrity portraits, such as Andy Warhol's silkscreen portraits of celebrities.  *Id.*  Noting that the

2    value of the accused works in *Comedy III* derived primarily from plaintiffs' fame, and appeared to

3    be merely "conventional celebrity images," the Court perceived no other transformative element,

4    and as a result, permitted plaintiffs to proceed on their claims.  *Id.* at 409-410.

5         On the other hand, in *Winter*, the Supreme Court barred claims brought by country

6    musicians Johnny and Edgar Winter against DC Comics for sale of a comic book featuring "brothers

7    Johnny and Edgar Autumn, depicted as villainous half-worm, half-human offspring born from the

8    rape of their mother by a supernatural worm creature that had escaped from a hole in the ground."

9    *Winter v. DC Comics*, 30 Cal. 4th 881, 886 (2003).  According to plaintiffs, they were represented

10   as "vile, depraved, stupid, cowardly, subhuman individuals who engage in wanton acts of violence,

11   murder and bestiality for pleasure and who should be killed."  *Id.*  The Court easily found that these

12   depictions, though "less than subtle evocations" of the plaintiffs, did not depict them literally and

13   instead were "distorted" caricatures appearing "in a larger story, which is itself quite expressive."

14   *Id.* at 890.  While noting that the comic would not impair plaintiffs' ability to market their

15   likenesses, the Court also held it irrelevant that "defendants were trading on plaintiffs' likenesses

16   and reputations to generate interest in the comic book series and increase sales."  *Id.* at 891.

17        While the facts in the instant action present a closer case than does either *Comedy III* or

18   *Winter*, a growing number of authorities have now addressed the issue in the context of video

19   games, in circumstances that are materially indistinguishable from the case at bar.  In a recent case

20   also before the Northern District of California, the quarterback of Arizona State University sued EA

21   for using his likeness in its *NCAA Football* videogame.  *Keller v. Elec. Arts, Inc.*, No. 09-1967, 2010

22   WL 530108, at *5 (N.D. Cal. Feb. 8, 2010).  There, as here, plaintiff was represented realistically by

23   EA in both physical and biographical respects.  *Id.*  As the court noted, "EA does not depict Plaintiff

24   in a different form; he is represented as what he was: the starting quarterback for Arizona State

25   University."  *Id.*  In addition, "the game's setting is identical to where the public found Plaintiff

26

27

28

United States District Court
For the Northern District of California

1    during his collegiate career: on the football field." EA has not attempted to explain how that case

2    differs from this one, and instead merely notes that the *Keller* decision is on appeal.[6]

3        EA argues here, as it did in *Keller*, that the videogame, taken as a whole, contains

4    transformative elements. Relying heavily on *Comedy III*, EA characterizes plaintiffs' likenesses

5    merely as the "raw materials" from which *Madden NFL* is fashioned. While there is no question

6    that video games qualify for First Amendment protection, *Video Software Dealers Ass'n v.*

7    *Schwarzenegger*, 556 F.3d 950, 958 (9th Cir. 2009), and *Madden NFL* certainly encompasses

8    significant expressive elements, this basic proposition does not end the inquiry. *Id.* at 408-09. A

9    review of the applicable authority indicates that the "transformative" use test focuses on the

10   reproduction of plaintiff's likenesses, rather than on a canvassing of the larger work. *See Winter*, 30

11   Cal. 4th at 886, *and Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 59 (2006) (plaintiff's likeness

12   was adequately transformed by dissimilar physique, different costumes, and portrayal as a space-age

13   news reporter in the 25th century). It would make little sense for the rule to be otherwise: if, as EA

14   urges, any expressive elements within the larger work were somehow to "transform" an otherwise

15   conventional use of a celebrity's likeness, the right of publicity would effectively be eviscerated.

16   This conclusion is not inconsistent with judicial decisions protecting fictionalized portrayals of

17   celebrities' life stories in film or other media. *See, e.g., Guglielmi*, 25 Cal. 3d at 868. In *Guglielmi*,

18   for example, Rudolph Valentino's likeness was not used within the film for conventional

19   merchandising purposes, but only for the transformative purpose of representing a fictionalized

20   version of Valentino's storied life.

21       It follows that the weight of authority rests with plaintiffs. As in *Keller*, plaintiffs here

22   appear in *Madden NFL* in their conventional role as football players, playing football. If there is

23   any expressive significance inhering in EA's depiction of plaintiffs, defendant has failed to

24   articulate it. Although EA appears to claim that its mere projection of plaintiffs' likenesses into

25   avatar figures, capable of manipulation by gamers, is sufficient to confer constitutional protection,

26

27   _____
[6] EA's appeal was argued and submitted to the Ninth Circuit in February of 2011. A decision by the
28   governing Circuit Court in that case will no doubt provide important guidance for the pending action
     and, indeed, perhaps for this motion in particular. That said, it would not be fair to the litigants in
     this case to defer a determination on the pending motions indefinitely.

United States District Court
For the Northern District of California

1  another way to see this supposed transformation is as a relatively literal, if skilled, translation of

2  plaintiffs' conventional images into the medium of the video game.  In this sense, EA's use of

3  plaintiffs' likenesses, though highly sophisticated, is the digital equivalent of transferring the Three

4  Stooges' images onto a t-shirt.  *See generally Comedy III*, 25 Cal. 4th at 408-10.  *Guglielmi* does not

5  compel a different result.  25 Cal. 3d at 868.  There, the accused work was a fictionalized film

6  account of Valentino's life story.  Although the opinion does not expressly state as much, had the

7  film at issue instead been an "appropriation of the very activity by which the entertainer acquired his

8  reputation in the first place," such as an uninflected reproduction of some of Valentino's famous

9  performances on screen, there likely would have been a stronger case for plaintiff's publicity claims.

10  *Cf. Comedy III*, 25 Cal. 4th at 402 (quoting *Estate of Presley v. Russen* 513 F. Supp. 1339, 1361 (D.

11  N.J. 1981)).  Here, as noted, plaintiffs' likenesses are shown engaged in the activity—playing

12  football—which earned them fame.  Although it is true that plaintiffs' likenesses, as they appear in

13  *Madden NFL*, may be controlled by gamers playing the video game, this fact, without more, does

14  not change the analysis.

15        Prior cases agree.  As the California Court of Appeal recently explained, addressing the use

16  of celebrity likenesses in the popular video game *Band Hero*:

17      That the avatars can be manipulated to perform at fanciful venues including outer
18      space or to sing songs the real band would object to singing, or that the avatars appear
    in the context of a videogame that contains many other creative elements, does not
19      transform the avatars into anything other than exact depictions of [band] members
    doing exactly what they do as celebrities.

20  *No Doubt v. Activision Pub., Inc.*, 192 Cal. App. 4th 1018, 1034 (2011).  The holding in *No Doubt*

21  thus went well beyond what is required here.  There, the court deemed even fairly significant

22  "distortions" to plaintiffs' likenesses to be non-transformative.  In *Madden NFL*, the depiction of

23  plaintiffs is not altered to nearly the same degree, and in fact, the realistic depiction of plaintiffs

24  achieved by EA appears to be restricted chiefly by the inherent limitations of the medium.  The logic

25  of *No Doubt* applies easily and squarely to the facts at bar.  EA's claim that its alleged use of

26  plaintiffs' likeness is transformative, and thus protected, fails.

27        b. *Rogers* Test

28

United States District Court
For the Northern District of California

1    Alternatively, EA invites adoption of the Second Circuit's *Rogers* test.[7] *Rogers v. Grimaldi*,

2    875 F.2d 994, 996-97 (2d Cir. 1989). Under *Rogers*, the first step is to determine whether the use of

3    plaintiffs' image is minimally relevant to the underlying work. *Id.* at 1100. If so, the use is

4    permitted so long as it poses no risk of confusion to consumers. *Id.* As the substance of the *Rogers*

5    test makes clear, it was primarily formulated in the context of evaluating a Lanham Act claim, and

6    only secondarily, for application to the right of publicity. Although EA invokes several California

7    federal district court cases that have applied *Rogers'* analysis to the use of trademarks, *see, e.g.,*

8    *Brown v. Elec. Arts, Inc.*, No. 09-1598 (E.D. Cal. Sept. 23, 2009) (slip op.), no California federal

9    courts have extended its application to California's statutory right of publicity. It would be fairly

10    extraordinary to do so here. EA's invitation must be declined.

11        c. Public Interest Test

12    Unable to meet the transformative use or *Rogers* tests, defendant argues that its use of

13    plaintiffs' likenesses in *Madden NFL* is protected because it concerns a matter of public interest.

14    "Under California law, 'no cause of action will lie for the publication of matters in the public

15    interest, which rests on the right of the public to know and the freedom of the press to tell it.'"

16    *Hilton,* 580 F.3d at 892 (quoting *Montana v. San Jose Mercury News, Inc.,* 34 Cal. App. 4th 790,

17    793 (1995)).

18    It is true that the reporting and discussion of factual information about professional sports

19    implicates the public interest. In *Gionfriddo v. Major League Baseball*, a declaratory action

20    brought by four former professional baseball players against the league itself, the court considered

21    plaintiff's right of publicity claims, as applied to the league's website, which "provides historical

22    information about major league baseball including rosters, box scores, game summaries, lists of

23    award winners, and video clips of historic moments from past games." 94 Cal. App. 4th 400, 405

24    (2001). The *Gionfriddo* court held that "[t]he recitation and discussion of factual data concerning

25    the athletic performance of these plaintiffs commands a substantial public interest, and therefore

26    [are] a form of expression due substantial constitutional protection." *Id.* at 411 (citation omitted).

27    _____

28    [7] EA notes that the Ninth Circuit has expressly reserved the question of whether First Amendment
protection may be broader than the California Supreme Court recognized in *Comedy III*. *Hilton,*
599 F.3d at 909 n.11.

1    *See also Montana*, 34 Cal. App. 4th at 796 (discussing a poster of the front page of a newspaper

2    which featured the Superbowl-winning quarterback).

3        Here, *Madden NFL* indeed includes some historical facts concerning plaintiffs' biographical

4    information and performance statistics.  The alleged use of plaintiffs' likenesses in the game,

5    however, goes well beyond simply reporting or republishing "statements of historical fact,

6    descriptions of these facts or video depictions of them," and there is very little in the game that

7    resembles any kind of traditional reporting.  *Gionfriddio*, 94 Cal. App. 4th at 415.  Notably, this is

8    not necessarily fatal, even though some courts have assumed the public interest doctrine applies

9    only to reporting.  *See, e.g., Hilton*, 599 F.3d at 912 (public interest defense is limited to

10   "publication of newsworthy items"); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 543

11   (applying exemption to surf documentary).  Defendant accurately states that *Gionfriddio* and other

12   courts have recognized "[e]ntertainment features receive the same constitutional protection as

13   factual news reports."  94 Cal. App. 4th at 410.  *See also Zacchini v. Scropps-Howard Broad. Co.*,

14   433 U.S. 562, 578 (1977) (applying public interest analysis to circus performer).  It is not difficult to

15   conclude that the free speech protections encompass entertainment, and EA argues, persuasively,

16   that videogames are interactive "entertainment."  Yet, "these protections are not absolute" and

17   *Madden NFL* simply does not appear to fulfill the traditional informative role recognized as

18   deserving protection by the court. *Keller*, 2010 WL 530108, at *6; *see generally Dora*, 15 Cal. App.

19   4th at 543, ("[M]atters in the public interest are not 'restricted to current events; magazines and

20   books, radio and television may legitimately inform and entertain the public with the reproduction

21   of past events, travelogues and biographies.'").

22       While EA's publication of plaintiffs' biographical facts and performance statistics might

23   warrant protection under the reporting criterion, the game play of *Madden NFL*, for all its realism,

24   does not "report," or even recreate, recent or historical games.  Rather, as EA itself emphasizes,

25   each game in *Madden NFL* lies within the gamers' control, and is unique and new.  When a gamer

26   selects one of *Madden NFL*'s "historic teams," the only historical aspect of the game that ensues are

27   plaintiffs' likenesses.  Everything else is simply play.

28

United States District Court
For the Northern District of California

1    In an attempt to address this reality, EA invokes *C.B.C. Distributing & Marketing, Inc. v.*

2    *Major League Baseball Advanced Media L.P.*, in which the Eighth Circuit held that defendants'

3    "fantasy" league products were protected under Missouri law.  In fantasy leagues, sports enthusiasts,

4    acting as owners, assemble rosters of professional players and then compete statistically "on paper,"

5    based on their players' actual performances.  The accused fantasy system employed the real names,

6    statistics, and other biographical information, of professional baseball players to facilitate

7    competition.  505 F.3d 818, 823-24 (8th Cir. 2007).

8    Although there are some compelling similarities between fantasy league products and

9    *Madden NFL*, unlike the latter, competition in fantasy leagues actually turns on the players' reported

10   performance, and for this reason much more easily fits as a kind of discourse concerning statistical

11   facts.  In addition, as the *C.B.C.* court held:

> … the facts in this case barely, if at all, implicate the interests that states typically
> intend to vindicate by providing rights of publicity to individuals. Economic interests
> that states seek to promote include the right of an individual to reap the rewards of his
> or her endeavors and an individual's right to earn a living. … major league baseball
> players are rewarded, and handsomely, too, for their participation in games and can
> earn additional large sums from endorsements and sponsorship arrangements.

15   505 F.3d at 824.  Here, by contrast, EA's decision to use plaintiffs' likenesses in *Madden NFL*

16   clearly implicates recognized economic interests, as evidenced by the case law discussing the use of

17   celebrities in video games, and EA's other licensing agreements that cover the game.  *Keller*, which

18   is again directly on point, comes to the same conclusion: *Madden NFL* does not pass the public

19   interest test under California courts' jurisprudence.  *Keller*, 2010 WL 530108, at *5-6

20   (distinguishing *C.B.C.* because the video game did not "depend on updated report of the real-life

21   players' progress during the college football season").

22   d. Section 3344(d)

23   Finally, EA contends that its use of plaintiffs' likenesses is exempt from liability under

24   California Civil Code § 3344(d).  That section provides immunity for the "use of a name … or

25   likeness in connection with any news, public affairs, or sports broadcast or account…."  Cal. Civ.

26   Code § 3344(d).  The Ninth Circuit has suggested that § 3344(d) immunity is intended to sweep

27   more broadly than the First Amendment.  *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d

1   302, 310 n. 10 (9th Cir. 1992) (citing *Eastwood v. Superior Court,* 149 Cal. App. 3d 409, 421

2   (1983)) ("[The provision] is designed to avoid First Amendment questions in the area of

3   misappropriation by providing extra breathing space for the use of a person's name in connection

4   with matters of public interest"). Again, there is little room for debate as to whether the use of

5   photographs and videos of professional athletes, as well as statistics summarizing their performance,

6   concern "public affairs" within the meaning of § 3344(d). *See Gionfriddo,* 94 Cal. App. 4th at 319;

7   *Dora,* 15 Cal. App. 4th at 545 ("'public affairs' was intended to mean something less important than

8   news"); *accord Keller,* 2010 WL 530108, at *7 (college athletics, including NCAA football, qualify

9   as "public affairs"). Plaintiffs, however, contend § 3344(d) immunizes only reporting on, or

10  informative uses of, celebrity likenesses, as under the First Amendment's public interest test.[8]

11       In *Dora,* the California Court of Appeal held that although the term "public affairs" reaches

12  matters less significant than the news, nonetheless, "[p]ublic affairs must be related to real-life

13  occurrences. As has been established in the cases involving common law privacy and appropriation,

14  the public is interested in and constitutionally entitled to know about things, people, and events that

15  affect it." Cal. App. 4th at 545-46. Although EA argues *Madden NFL* relates to "public affairs,"

16  broadly understood, under *Dora*'s logic it is difficult to see how EA can prevail under § 3344(d).

17  Other than a minimal amount of preprogrammed statistical information concerning each player,

18  game play does not report or relate "real-life occurrences." It is, rather, entirely fictional. In *Keller,*

19  this Court reached the same conclusion: "Although NCAA Football is based on subject matter

20  considered 'public affairs,' EA is not entitled to the statutory defense because its use of Plaintiff's

21  image and likeness extends beyond reporting information about him." 2010 WL 530108, at *7. As

22  a result, EA's motion to dismiss must be denied on this reasoning as well.

23       2. Conversion & Trespass to Chattels

24       Given that plaintiffs' first two claims survive, EA's only remaining challenge to the third

25  and fourth claims, for conversion and trespass to chattels, respectively, is that plaintiffs have failed

26  to plead that EA dispossessed them of an interest in tangible personal property. Such an allegation

---

[8] Section 3344(d) remains distinct from the public interest doctrine because the former specifically enumerates certain immunized activities for particular contexts. *New Kids on the Block,* 971 F.2d at 310 n.10.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   is required, EA claims, to satisfy the merger requirement, which mandates that the intermeddled

2   interest be merged with some tangible property. *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559,

3   1565 (1996) ("Courts have traditionally refused to recognize as conversion the unauthorized taking

4   of intangible interests that are not merged with, or reflected in, something tangible"). As plaintiffs

5   properly point out, however, California courts no longer apply the merger requirement, and have

6   instead indicated a willingness to entertain conversion and trespass to chattels claims, even where

7   the alleged interference is to an intangible interest. For example, in *Kremen v. Cohen*, plaintiff

8   asserted a conversion claim with respect to his intangible interest in a domain name. 337 F.3d 1024,

9   1034 (9th Cir. 2003). Reversing the district court's dismissal based on the absence of a showing of

10  merger, the Ninth Circuit held: "We conclude that California does not follow the *Restatement*'s

11  strict merger requirement. Indeed, the leading California Supreme Court case rejects the tangibility

12  requirement altogether." *Id.* (citing *Payne v. Elliot*, 54 Cal. 339 (1880)); *see also A&M Records,*

13  *Inc. v. Heilman*, 75 Cal. App. 3d 554, 570 (1977) (holding, without applying merger rule, that

14  "misappropriation and sale of the intangible property of another without authority from the owner is

15  conversion"). Accordingly, the merger requirement does not provide a basis to dismiss plaintiffs'

16  ancillary claims.

17       3. Unjust Enrichment

18       Finally, EA contends that plaintiffs' fifth claim for relief for unjust enrichment is not

19  recognized under California law absent independent grounds for imposing a constructive trust.

20  Importantly, plaintiffs' FAC does allege that "EA is an involuntary trustee holding all such sums in

21  its possession under a constructive trust for the benefit of Plaintiffs and the Class ...." FAC ¶ 82.

22  Thus, EA's contention that plaintiffs have not alleged the propriety of a constructive trust is simply

23  incorrect. EA further argues the unjust enrichment claim must be dismissed because California

24  courts do not recognize a standalone cause of action for unjust enrichment without an independent

25  basis for relief. Here, however, plaintiffs have adequately pled an independent basis in stating that

26  EA was unjustly enriched by virtue of its unauthorized use of their likenesses. *See generally Monet*

27  *v. Chase Home Fin., LLC*, No. C 10-0135 RS, 2010 WL 2486376, at *3 (N.D. Cal. June 16, 2010)

28  (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) and justifying a

1    standalone unjust enrichment claim where property "identified as belonging in good conscience to

2    the plaintiff could clearly be traced to particular funds or property in the defendants' possession");

3    *Keller*, 2010 WL 530108, at *7.  Accordingly, EA's motion to dismiss the fifth claim for relief must

4    be denied.

5    B. Anti-SLAPP

6          EA's Anti-SLAPP motion employs exactly the same analytical framework and arguments to

7    attack plaintiffs' various claims, albeit under a different legal standard.  California's Anti-SLAPP

8    statute provides for early dismissal of any claims for relief that are primarily based on defendants'

9    activities taken in furtherance of their right to free speech or petition relating to an issue of public

10   concern.  *Vess v. CIBA-GEIGY Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003).  Specifically, the

11   law provides that a party may file a motion to strike a cause of action under § 425.16 if the

12   complaint "aris[es] from any act of that person in furtherance of the person's right of petition or free

13   speech under the United States Constitution or the California Constitution in connection with a

14   public issue."  Cal. Code Civ. Proc. § 425.16(b)(1).  The first step in evaluating an anti-SLAPP

15   motion is to determine whether the defendant has carried its burden in demonstrating that the

16   challenged cause of action is "arising from" activity taken "in furtherance" of the right to petition or

17   free speech.  *Mindys*, 611 F.3d at 595-96.  "In the anti-SLAPP context, the critical consideration is

18   whether the cause of action is *based on* the defendant's protected free speech or petitioning activity."

19   *Id.* at 597 (quoting *Navellier v. Sletten*, 29 Cal. 4th 82, 89 (2002)) (emphasis in original).  The

20   statute expressly recognizes four categories of protected speech and petitioning activity, including,

21   in relevant part, any "conduct in furtherance of the exercise of the constitutional right of petition or

22   the constitutional right of free speech in connection with a public issue or an issue of public

23   interest."  Cal. Code Civ. Proc. § 425.16(e).

24          If a defendant succeeds in making a *prima facie* showing, the burden then shifts to plaintiff

25   to demonstrate "a 'reasonable probability' of prevailing on the challenged claims."  *Mindys*, 611

26   F.3d at 595.  This "minimal merit" standard requires only that plaintiff "state and substantiate a

27   legally sufficient claim."  *Id.* at 598-99, (quoting *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th

28   728 (2003)).  This entails a "sufficient prima facie showing of facts to sustain a favorable judgment

United States District Court
For the Northern District of California

if the evidence submitted by the plaintiff is credited." *Id.* at 599 (quoting *Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811, 821 (2002)). In evaluating the parties' positions, the court is to consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." Cal. Code. Civ. Proc. § 425.16(b)(2).

As applied here, there is no question that "[v]ideo games are expressive works entitled to as much First Amendment as the most profound literature," *Kirby*, 144 Cal. App. 4th at 58, and although, as the foregoing discussion clearly indicates, there remain serious doubts as to whether EA's use of plaintiffs' likenesses is affirmatively immunized by the First Amendment, it may be assumed for purposes of this motion that the challenged conduct "aris[es] from" activity taken "in furtherance" of the right to petition or free speech," within the meaning of the statute. Cal. Code Civ. Proc. § 425.16(b)(1). Nonetheless, given that EA has conceded for purposes of these motions that *Madden NFL* uses plaintiffs' likenesses without authorization, and has not otherwise attacked the adequacy of the FAC's allegations, for the reasons explained above, plaintiffs have satisfied their burden under step two of the relevant analysis. The FAC, in conjunction with the evidence presented in the form of the game itself, is sufficient to "state and substantiate a legally sufficient claim." *Mindys*, 611 F.3d at 599-99. Accordingly, EA's motion to strike must be denied.

### V. CONCLUSION

For the reasons stated above, defendant's motion to dismiss and motion to strike under § 425.16 are denied.

IT IS SO ORDERED.

Dated: 3/29/12

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE