No. 11-3750

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

RYAN HART

*Plaintiff-Appellant*

v.

ELECTRONIC ARTS, INC.,

*Defendant-Appellee*

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BRIEF *AMICUS CURIAE* IN SUPPORT OF APPELLEE BY
ADVANCE PUBLICATIONS, A&E TELEVISION NETWORKS,
ASSOCIATION OF AMERICAN PUBLISHERS, ACTIVISION, BLOOMBERG NEWS,
CAPCOM U.S.A., COMIC BOOK LEGAL DEFENSE FUND, DAILY NEWS, DOW
JONES LOCAL MEDIA GROUP, ESPN, FIRST AMENDMENT COALITION, FORBES,
FREEDOM COMMUNICATIONS, THE GANNETT COMPANY, GAWKER MEDIA,
HYBRID FILMS, THE MCCLATCHY COMPANY, NATIONAL PUBLIC RADIO, THE
NEW YORK TIMES, NORTH JERSEY MEDIA GROUP, THE PENNSYLVANIA
NEWSPAPER ASSOCIATION, THE PRESS-ENTERPRISE COMPANY, RADIO
TELEVISION DIGITAL NEWS ASSOCIATION, THE REPORTER'S COMMITTEE FOR
FREEDOM OF THE PRESS, SQUARE ENIX, TAKE-TWO INTERACTIVE SOFTWARE,
THQ, THE WASHINGTON POST, AND WENNER MEDIA

*Counsel for Amici*:
Nathan E. Siegel
Lee Levine
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC 20036
Telephone: (202) 508-1100
(*list of additional counsel continued inside*)

*Of Counsel:*

Neil M. Rosenhouse
Sabin, Bermant & Gould LLP
Four Times Square, 23rd Floor
New York, New York 10036
*Counsel for Advance
   Publications, Inc.*

Darci J. Bailey
A&E Television Networks
235 East 45th Street
New York, New York 10017
*Counsel for A&E
   Television Networks, LLC*

George Rose
Activision Blizzard, Inc.
3100 Ocean Park Boulevard
Santa Monica, CA 90405
*Counsel for Activision
   Blizzard, Inc.*

Charles Glasser
Bloomberg L.P.
731 Lexington Ave.
New York, NY 10022
*Counsel for Bloomberg L.P.*

Hiro Tachibana
Capcom U.S.A., Inc.
800 Concar Drive, Suite 300
San Mateo, California 94402
*Counsel for Capcom U.S.A., Inc.*

Anne Carroll
Daily News L.P.
4 New York Plaza, 6th Fl.
New York, NY 10004
*Counsel for Daily News, L.P.*

Gail C. Gove
Dow Jones & Co., Inc.
1211 Avenue of the Americas
7th Floor
New York, NY 10036
*Counsel for Dow Jones Local Media
   Group*

David Pahl
Eleanor Devane
ESPN, Inc.
ESPN Plaza
Bristol, CT 06011
*Counsel for ESPN, Inc.*

Peter Scheer
First Amendment Coalition
534 4th Street, Suite B
San Rafael, CA 9490
*Counsel for First
   Amendment Coalition*

Kai Falkenberg
Forbes Inc.
60 Fifth Avenue
New York, NY 10011
*Counsel for Forbes, Inc.*

Albert Nicholson
Freedom Communications, Inc.
17666 Fitch
Irvine, CA 92614-6022
*Counsel for Freedom
   Communications, Inc.*

Barbara W. Wall
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
*Counsel for Gannett Co., Inc.*

Gaby Darbyshire
Gawker Media
210 Elizabeth Street, 4th Fl.
New York, NY 10012
*Counsel for Gawker Media*

Cameron Stracher
One Park Avenue, 3rd Fl.
New York, NY 10016
*Counsel for Hybrid Films, Inc.*

Stephen J. Burns
The McClatchy Company
2100 Q Street
Sacramento, California 95816
*Counsel for The McClatchy
   Company*

Denise Leary
Ashley Messenger
National Public Radio, Inc.
635 Massachusetts Ave., NW
Washington, DC 20001
*Counsel for National Public Radio,
   Inc.*

George Freeman
The New York Times Company
620 8th Ave., 18th Fl.
New York, NY 10018
*Counsel for the New York Times Co.*

Jennifer Borg
North Jersey Media Group Inc.
Legal Department, 6th Fl.
1 Garret Mountain Plaza
Woodland Park, New Jersey 07424
*Counsel for North Jersey Media
   Group Inc.*

Melissa Melewsky
Pennsylvania Newspaper Association
3899 North Front Street
Harrisburg, PA 17110
*Media Law Counsel for the
   Pennsylvania Newspaper Association*

Kathleen Kirby
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
*Counsel for The Radio Television
   Digital News Assn.*

Lucy A. Dalglish
Gregg P. Leslie
The Reporter's Committee for
Freedom of the Press
1101 Wilson Blvd, Suite 1100
Arlington, VA 22209
*Counsel for Reporters Committee
for Freedom of the Press*

Steve Ross
Square Enix, Inc.
999 N. Sepulveda Blvd., 3rd Fl.
El Segundo, CA 90245
*Counsel for Square Enix, Inc.*

Seth Krauss
Peter Welch
Take-Two Interactive Software, Inc.
622 Broadway
New York, NY 10012
*Counsel for Take-Two Interactive
   Software, Inc.*

Edward L.  Kaufman
David Anderson
THQ Inc.
29903 Agoura Road
Agoura Hills, CA 91301
*Counsel for THQ Inc.*

Eric N. Lieberman
James A. McLaughlin
Kalea Seitz Clark
The Washington Post
1150 15th Street, N.W.
Washington, D.C. 20071
*Counsel for The Washington Post
      Co.*

Dana J. Rosen
Wenner Media
1290 Avenue of the Americas
New York, New York  10104
*Counsel for Wenner Media*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

CORPORATE DISCLOSURE STATEMENT ................................ vii

STATEMENT OF THE INTERESTS OF *AMICI* ........................... 1

SUMMARY OF ARGUMENT ........................................................ 1

ARGUMENT ................................................................................... 3

I.    THE DISTRICT COURT CORRECTLY HELD THAT THE FIRST
      AMENDMENT PROTESTS THESE VIDEO GAMES ................ 3

      A.    The District Court Correctly Applied the *Rogers* and the
            "Transformative Use" Tests ................................................. 3

      B.    The "Predominant Use" Test is a Constitutional Anathema ................ 6

II.   THE LAW GOVERNING THE RELATIONSHIP BETWEEN THE FIRST
      AMENDMENT AND THE RIGHT OF PUBLICITY IS UNCLEAR ........... 7

III.  THE RIGHT OF PUBLICITY IS NOT LIKE A COPYRIGHT ................. 10

      A.    Looking to Copyright Law Results From Misconstruing *Zacchini* .... 11

      B.    Any Right to Publicize One's Name and Likeness Does Not
            Resemble the Right to Copyright Expression ...................... 14

      C.    "Realism" Is Not a Negative Word in the Lexicon of the First
            Amendment ................................................................... 18

IV.   THE *ROGERS/RESTATEMENT* TEST IS THE MOST APPROPRIATE
      PROPOSED TEST TO APPLY HERE .......................................... 21

      A.    The *Rogers/Restatement* Test More Accurately Reflects the
            Relationship Between the Right of Publicity and the
            First Amendment ............................................................. 21

      B.    The Rogers Test Recognizes that the Right of Publicity Is
            a Content-Based Restriction On Speech and Provides
            Better Clarity ................................................................. 24

V.     FIRST AMENDMENT CONSIDERATIONS GENERALLY WEIGH IN
       FAVOR OF AFFIRMING THE DISTRICT COURT ..................................25

       A.     The Existence of Other Specific Licensing Agreements is Not
              a Basis to Apply a Right of Publicity Generally .................................25

       B.     Works Involving Mass Participants in Historical Events Merit
              Constitutional Protection....................................................................27

CONCLUSION .......................................................................................................29

# TABLE OF AUTHORITIES

## CASES

*20th Century Music Corp. v. Aiken*,
    422 U.S. 151 (1975)..................................................................14

*Beverley v. Choices Women's Medical Center*,
    587 N.E.2d 275 (N.Y. 1991)....................................................23

*Brown v. Electronic Arts, Inc.*,
    722 F. Supp. 2d 1148 (C.D. Cal. 2010) ...................................8

*Brown v. Entertainment Merchants Association*,
    131 S. Ct. 2729 (2010).............................................................19

*C.B.C. Distribution & Marketing v. Major League Baseball Advanced Media, L.P.*,
    505 F.3d 818 (8th Cir. 2007) ............................................*passim*

*Cardtoons, L.C. v. MLBPA*,
    95 F.3d 959 (10th Cir. 1996) ............................................*passim*

*Castro v. NYT Television*,
    851 A.2d 88 (N.J. Super. 2004) ...............................................16

*CBS Interactive Inc. v. National Football League Players Association*,
    259 F.R.D. 398 (D. Minn. 2009) ...............................................9

*Clark v. Community for Creative Non-Violence*,
    468 U.S. 288 (1984)..................................................................24

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*,
    25 Cal. 4th 387 (2001) ......................................................*passim*

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*,
    600 F.2d 1184 (5th Cir. 1979) .................................................14

*Doe v. TCI Cablevision*,
    110 S.W.3d 363 (Mo. 2003) ...............................................6, 9

*Estate of Presley v. Russen*,
  513 F. Supp. 1339 (D.N.J. 1981) ...................................................... 7-8

*ETW Corp. v. Jireh Publishing, Inc.*,
  332 F.3d 915 (6th Cir. 2003) ......................................................9, 15, 23

*Facenda v. N.F.L. Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008) .............................................................27

*Finger v. Omni Publications*,
  566 N.E.2d 141 (N.Y. 1990)..............................................................22

*Fisher v. Dees*,
  794 F.2d 432 (9th Cir. 1986) .............................................................14

*Gionfriddo v. Major League Baseball*,
  94 Cal. App. 4th 400 (2001) .............................................................15

*Goldstein v. California*,
  412 U.S. 546 (1973)...........................................................................13

*Guglielmi v. Spelling-Goldberg Productions*,
  25 Cal. 3d 860 (1979) .................................................................4, 5, 19

*Haelan Labs, Inc. v. Topps Chewing Gum, Inc.*,
  202 F.2d 866 (2d Cir. 1953) .............................................................15

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985)....................................................................14, 16

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010) .....................................................8, 9, 27

*Hoffman v. Capital Cities/ABC, Inc.*,
  255 F.3d 1180 (9th Cir. 2001) .............................................................8

*International News Service v. Associated Press*,
  248 U.S. 215 (1918)...........................................................................13

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952)..............................................................................6

*Keller v. Electronic Arts Inc.*,
    No. C 09-1967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010) ............................4, 8

*Murphy v. Millennium Radio Group LLC*,
    650 F.3d 295 (3d Cir. 2011) ................................................................16

*Palmer v. Schonhorn Enterprises*,
    232 A.2d 458 (N.J. Super. 1967) ........................................................10

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) .....................................................*passim*

*Ruffin-Steinback v. dePasse*,
    267 F.3d 457 (6th Cir. 2001) ...............................................................19

*Seale v. Gramercy Pictures*,
    949 F. Supp. 331 (E.D. Pa. 1996) ...........................................*passim*

*Tyne v. Time Warner Entertainment Co. L.P.*,
    901 So. 2d 802 (Fla. 2005) ..............................................................8, 19

*Uhlaender v. Henricksen*,
    316 F. Supp. 1277 (D. Minn. 1970) ................................................. 9-10

*Valentine v. C.B.S, Inc.*,
    698 F.2d 430 (11th Cir. 1983) .............................................................19

*Winter v. DC Comics*,
    30 Cal. 4th 881 (2003) .........................................................................9

*Zacchini v. Scripps-Howard Broadcasting Co.*,
    351 N.E.2d 454 (Ohio 1976) ..............................................................12

*Zacchini v. Scripps-Howard Broadcasting Co.*,
    433 U.S. 562 (1977).................................................................*passim*

**STATUTES**

Cal. Civ. Code 3344.1 .................................................................17, 18

## OTHER AUTHORITIES

Thomas F. Cotter & I. Dmitrieva, *Integrating the Right of Publicity with First Amendment and Copyright Preemption Analysis*, 33 Colum. J. L. & Arts 165 (Winter 2010) .................................................................................13, 24

Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn from Trademark Law*, 58 Stan. L. Rev. 1161 (Feb. 2006) ...............10, 13, 15, 23

Hilton Kramer, *Art: Warhol Show at Jewish Museum*, N.Y. Times, Sept. 19, 1980 (1980 WLNR 181285) .................................................................................8

J. Thomas McCarthy, *The Rights of Publicity & Privacy*, §§ 8:34, 8:38 (2010) .................................................................................................................11

*Restatement (Third) of the Law of Unfair Competition* §§ 46, 47 ...................*passim*

Diane L. Zimmerman, *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503 (Nov. 2009) .....................................................................................................6, 12, 15

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29(c) and 26.1 of the Federal Rules of Appellate Procedure, *amici* provide the following disclosures of corporate identity:

**Advance Publications, Inc.**, directly and through its subsidiaries, publishes over 18 magazines with nationwide circulation, daily newspapers in over 20 cities, including *The Star-Ledger* in Newark, New Jersey, and *The Patriot-News* in Harrisburg, Pennsylvania, and weekly business journals in over 40 cities throughout the United States.  It also owns, directly and through its subsidiaries, many internet sites and has interests in cable systems serving over 2.3 million subscribers. Advance Publications, Inc. has no parent corporations, and no publicly held corporation owns 10% or more of its stock.

**A&E Television Networks, LLC ("AETN")** is an award-winning, international media company offering consumers a diverse communications environment ranging from television programming, to home videos/DVDs and music CDs, to Web sites, as well as supporting nationwide educational initiatives. AETN's properties include A&E Network, HISTORY, Crime & Investigation Network, BIO: The Biography Channel, Lifetime, Lifetime Movie Network, A&E IndieFilms, and AETN Consumer Products, among others.  AETN is a Delaware LLC and is owned by Hearst Communications, Inc., Disney/ABC International Television, Inc., and NBC A&E Holding, Inc.

**The Association of American Publishers, Inc.** ("AAP") is the national trade association of the U.S. book publishing industry. AAP's members include most of the major commercial book publishers in the United States, as well as smaller and non-profit publishers, university presses, and scholarly societies. AAP members publish hardcover and paperback books in every field, educational materials for the elementary, secondary, postsecondary, and professional markets, scholarly journals, computer software, and electronic products and services. AAP represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment. AAP is a nonprofit organization that has no parent and issues no stock.

**Activision Blizzard, Inc.** ("Activision") is a worldwide pure-play online and console game publisher whose portfolio includes best-selling video games such as Call of Duty, Guitar Hero, Tony Hawk, Spider-Man, and James Bond, as well as leading on-line franchises such as Worlds of Warcraft and Starcraft. Activision is a publicly-traded company which is majority owned and controlled by Vivendi S.A., a publicly held company based in Paris, France.

**Bloomberg L.P. d/b/a Bloomberg News** is one of the world's largest newsgathering organizations, comprised of more than 2,500 journalists around the world in more than 120 bureaus. Bloomberg provides business, legal and financial

news through the Bloomberg Professional Service, Bloomberg's website and
Bloomberg Television.  Bloomberg is a privately-held company.

**Capcom U.S.A., Inc.** ("Capcom USA") is a leading developer, publisher
and distributor of interactive entertainment for game consoles, PCs, handheld and
wireless devices for the North American, European and Latin American markets.
Capcom USA is a wholly owned subsidiary of Capcom Co. Ltd., a publicly traded
company in Japan.

**The Comic Book Legal Defense Fund** ("CBLDF") is a non-profit
organization dedicated to the protection of the First Amendment rights of the
comics art form and its community of retailers, creators, publishers, librarians and
readers.  With a membership that includes comic book creators, publishers,
retailers, and aficionados, the CBLDF has defended dozens of First Amendment
cases in courts across the United States, and led important education initiatives
promoting comics literacy and free expression.

**Daily News, L.P.** publishes the New York *Daily News*, a daily newspaper
that serves primarily the New York metropolitan area and is the fourth-largest
paper in the country by circulation.  The Daily News' web site, nydailynews.com,
receives more than 160 million page views each month.  Daily News, L.P., is
privately held.

**Dow Jones Local Media Group ("DJLMG")** publishes community newspapers throughout the United States, including *The Pocono Record*. DJLMG is a wholly owned subsidiary of Dow Jones & Company, Inc. News Corporation, a publicly held company, is the indirect parent corporation of Dow Jones, and Ruby Newco LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. No publicly held company owns 10% or more of Dow Jones's stock.

**ESPN, Inc.** ("ESPN") is the largest sports media company in the world. In the United States, it owns and operates multiple cable television networks, a radio network, multiple sports internet sites, a broadband network, multiple magazines, and a program syndication business. ESPN produces news, documentaries, and fantasy sports games among many other forms of content. The Walt Disney Company is one of two ultimate parent companies of ESPN, and it issues shares of stock to the public. ESPN's second ultimate parent company, The Hearst Corporation, is privately held.

**The First Amendment Coalition** is a non-profit public interest organization dedicated to advancing free speech and open-government rights. A membership organization, the Coalition's activities include educational and informational programs, strategic litigation to enhance First Amendment and access rights for the largest number of citizens, legal information and consultation services, and

legislative oversight of bills affecting free speech.  The Coalition's members are

newspapers and other news organizations, bloggers, libraries, civic organizations,

academics, freelance journalists, community activists—and ordinary individuals

seeking help in asserting rights of citizenship.  The Coalition's offices are in San

Rafael, California.

**Forbes, Inc.** is the publisher of *Forbes*, its international edition, *Forbes*

*Asia*, and Forbes.com.  Forbes, Inc. has no parents, subsidiaries or affiliates that

have any outstanding securities in the hands of the public, has no publicly held

stock and no publicly held company owns 10% or more of its stock.

**Freedom Communications**, headquartered in Irvine, California, is a

national privately owned information and entertainment company of print

publications, broadcast television stations and interactive businesses.  The

company's print portfolio includes more than 100 publications and 27 daily

newspapers, weekly newspapers, magazines and other specialty publications.  The

broadcast stations – five CBS, two ABC network affiliates and one CW affiliate –

reach more than 3 million households across the country.

**Gannett Company, Inc.** ("Gannett") is an international news and

information company that publishes 82 daily newspapers in the United States,

including *USA TODAY*, *The News Journal* in Wilmington, DE, and in New Jersey,

the *Asbury Park Press*, the *Courier News*, the *Courier-Post*, the *Home News*

*Tribune*, the *Daily Record* and the *Daily Journal*, as well as hundreds of non-daily

publications across the country.  In broadcasting, the company operates 23

television stations in the United States.  Each of Gannett's daily newspapers and

TV stations operate Internet sites offering news and advertising that is customized

for the market served and integrated with its publishing or broadcasting operations.

Gannett is a publicly traded company and has no affiliates or subsidiaries that are

publicly owned.  No publicly owned company owns 10% or more of Gannett

stock.

**Gawker Media** is the publisher of some of the web's best loved titles,

including *Gawker* (for news and entertainment), *Deadspin* (for sports), and *Kotaku*

(a gamer's guide), among others. With a readership in excess of 20 million

monthly uniques, Gawker Media marries a traditional publishing model and an all-

star editorial masthead with the audience engagement borne out of the candor,

frequency and hyper-linking of the blog format. Gawker Media is a privately-held

company.

**Hybrid Films, Inc.** is a New York-based independent production company

that, since 1995, has produced award-winning reality, character-driven

documentary, and factual, entertainment programming.  Its recent programs

include *Dog the Bounty Hunter* (currently in its sixth season), which portrays the

life of legendary bounty hunter Duane "Dog" Chapman as he hunts down fugitives

with the help of his wife and family, and *Parking Wars* (currently in its third

season), which follows the Philadelphia and Detroit Parking Authorities as they

come face to face with the citizens they ticket, boot and tow.  Hybrid Films, Inc. is

a privately-held company.

**The McClatchy Company**  owns 30 daily newspapers in 29 U.S. markets,

including *Centre Daily Times* in State College, Pennsylvania, *The Sacramento Bee*,

*The Fresno Bee*, and *The Merced Sun-Star*, as well as *The Miami Herald*, *The Star-

Telegram* of Fort Worth, *The Charlotte Observer*, and 45 non-daily papers.  In

each of its daily newspaper markets, McClatchy operates the leading local website,

offering readers information, comprehensive news, advertising, e-commerce and

other services.  More than 10% of the stock in the McClatchy Company is owned

by Bestinver Gestion, a Spanish company.

**National Public Radio, Inc. ("NPR")** is a District of Columbia non-profit

membership corporation with no parent company.  It produces and distributes its

radio programming through, and provides trade association services to, nearly 800

public radio member stations located throughout the United States and in many

U.S. territories.  NPR's award-winning programs include Morning Edition, All

Things Considered, and Talk of the Nation and serve a growing broadcast audience

of over 23 million Americans weekly.  NPR also distributes its broadcast

programming online, in foreign countries, through satellite, and to U.S. Military installations via the American Forces Radio and Television Service.

**The New York Times Company** is the owner of *The New York Times*, *The Boston Globe*, *The International Herald Tribune*, and many websites, including NYTimes.com, About.com, and Boston.com.  The New York Times Co. is a publicly held company that has no parent company, and no publicly held corporation owns 10% or more of its stock.

**North Jersey Media Group Inc. ("NJMG")** is an independent, family-owned printing and publishing company, parent of two daily newspapers serving the residents of northern New Jersey:  *The Record* the state's second-largest newspaper, and *The Herald News*.  NJMG also publishes more than 40 community newspapers serving towns across five counties, including some of the best weeklies in the state, as well as several magazines.  NJMG is a privately held company owned solely by Macromedia Incorporated, also a privately held company.

**The Pennsylvania Newspaper Association** is a Pennsylvania non-profit member corporation with its headquarters located in Harrisburg, Pennsylvania. The Association represents the interests of over three hundred (300) daily and weekly newspapers and other media organizations across the Commonwealth of Pennsylvania in ensuring that the press can gather information and report to the

public.  A significant part of the Association's mission is to defend the media's

Constitutional right to freely gather and report newsworthy information.  The

Association issues no stock and has no parent company.

**The Press-Enterprise Company** publishes *The Press-Enterprise*, a daily

newspaper published in Riverside, California that has won a Pulitzer Prize, as well

as two U.S. Supreme Court cases recognizing the public's right of access to court

proceedings.  It has the largest circulation of any newspaper in Southern

California's Inland Empire.  The Press-Enterprise Company also publishes

www.pe.com, an online source of news and information.  The Press-Enterprise

Company is wholly owned by A.H. Belo Corporation, which is a publicly-traded

company.  Belo Corporation owns ten percent or more of the shares of A.H. Belo

Corporation.

**The Radio Television Digital News Association** ("RTDNA"), based in

Washington, D.C., is the world's largest professional organization devoted

exclusively to electronic journalism.  RTDNA represents local and network news

directors and executives, news associates, educators and students in broadcasting,

cable and other electronic media in over 30 countries.  RTDNA is committed to

encouraging excellence in electronic journalism, and upholding First Amendment

freedoms.  RTDNA does not issue stock.

**Reporters Committee for Freedom of the Press** is an unincorporated association of reporters and editors which works to defend First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance and research in First Amendment litigation since 1970.

**Square Enix, Inc. ("Square Enix")** is a privately held Washington state corporation. Square Enix Holdings Co., Ltd., a Japanese corporation that is publicly traded on the Tokyo Stock Exchange, is the ultimate corporate parent of Square Enix. No publicly held corporation owns 10% or more of Square Enix or Square Enix Holdings Co., Ltd. Square Enix is a creator, developer and publisher of video games and related media.

**Take-Two Interactive Software, Inc. ("Take-Two")** is a leading developer, marketer and publisher of interactive entertainment for consumers around the globe. Take-Two develops and publishes products through its two wholly-owned labels Rockstar Games and 2K, which publishes its titles under the 2K Games, 2K Sports and 2K Play brands. Take-Two's products are designed for console gaming systems such as Sony's PlayStation®3 ("PS3") and PlayStation®2 ("PS2"), Microsoft's Xbox 360® ("Xbox 360") and Nintendo's Wii™ ("Wii"); handheld gaming systems such as Nintendo's DS ("DS"), Nintendo's 3DS ("3DS") and Sony's PlayStation Portable ("PSP"); and personal computers including

smartphones and tablets.  Take-Two delivers its products through physical retail, digital download, online platforms and cloud streaming services. Take-Two is a publicly-held company.  BlackRock funds hold in excess of 10% of Take-Two's stock.

**THQ Inc.** is a leading worldwide developer and publisher of interactive entertainment software.  The company develops its products for all popular game systems, personal computers and wireless devices.  Headquartered in Los Angeles County, California, THQ sells products through its global network of offices located throughout North America, Europe and Asia Pacific.  THQ Inc. is a publicly-held corporation and no public corporation owns 10% or more of its stock.

**The Washington Post** is one of the nation's most prominent news organizations.  It publishes a daily newspaper with print circulation primarily in the Washington, D.C. metropolitan area, as well as a website, www.washingtonpost.com, that attracts an average of over 17 million unique visitors per month.  The Washington Post (WP Company LLC) is a wholly-owned subsidiary of The Washington Post Company, a publicly held corporation.  Berkshire Hathaway, Inc., a publicly held company, has a 10 percent or greater ownership interest in The Washington Post Company.

**Wenner Media** publishes *Rolling Stone*, which has been honored with 15 National Magazine awards and is one of the country's premiere sources for music information and pop culture trends. Wenner Media also publishes *Us Weekly* and *Men's Journal*, and together the company's three titles reach more than 29 million readers. Wenner Media is privately held.

## STATEMENT OF THE INTERESTS OF *AMICI*

*Amici* are organizations that create and disseminate expressive speech, including news, documentaries, films, television programs, fantasy sports games, video games, and other content. This brief is submitted with the consent of the parties. Electronic Arts contributed funds intended for the preparation of this brief. No counsel for any party authored any part of this brief.

## SUMMARY OF ARGUMENT

The district court correctly held that the First Amendment protects the video games at issue, and it correctly applied both the "transformative use" and *Rogers/Restatement* tests. Football players are indisputably related to games about football and the court correctly considered the games as a whole, rather than only the physical characteristics or factual information related to its avatars. By contrast, the "predominant use" test that Hart urges this Court to apply would itself violate the First Amendment and for good reason has not been applied by any federal court.

But this appeal can also present an opportunity for this Court to help resolve the growing confusion engendered by conflicting decisions involving the right of publicity. The inconsistent decisions district courts around the country have reached concerning EA's video games are a prime illustration of the fractured state of the law concerning the relationship between the right of publicity and the First

Amendment.  This lack of clarity directly affects the diverse content many of these *amici* routinely create.

To balance the interests presented in right of publicity cases appropriately, *amici* believe that it is important to begin by recognizing that a right of publicity is not analogous to a copyright.  That erroneous view, premised in large part on a misconstruction of the Supreme Court's *Zacchini* decision, informs many of the arguments made by Hart and his *amici* here, which contend that the use of realism in expressive works is constitutionally disfavored and that individual likenesses must therefore literally be physically altered.  These arguments seriously undervalue First Amendment interests and, if adopted, could call into question much of the content these *amici* produce.

Of all the tests proposed by the parties, the one that most appropriately balances the interests presented here is the "relatedness" test embraced in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), the *Restatement (Third) of the Law of Unfair Competition* ("Restatement"), New York state courts, and others.  The *Rogers/Restatement* test best reflects the proper relationship here between the right of publicity, intellectual property law and the First Amendment, and would bring much-needed clarity to this area of the law.  Finally, setting formal tests aside, the broader balance of interests presented by this case strongly favors the protection of the works at issue.  Recognizing a right of publicity for every participant in

historical events involving mass numbers of people to control whether or how they may be personally depicted in expressive works related to those events – be it a college football season, annual election campaigns, periodic legislative bodies, or numerous other possibilities—would impose extraordinary constraints upon both the creation of such works and their ability to accurately depict history.

**ARGUMENT**

## I.    THE DISTRICT COURT CORRECTLY HELD THAT THE FIRST AMENDMENT PROTECTS THESE VIDEO GAMES

The district court addressed two First Amendment tests, the "transformative use" and *Rogers/Restatement* tests, while Hart urges that a third, the "predominant use" test, be applied here.  The district court correctly applied the first two, while the third should be soundly rejected.

### A.    The District Court Correctly Applied the *Rogers* and the "Transformative Use" Tests

There can be no question that if the *Rogers/Restatement* test is applied here, as these *amici* believe it should be, then the district court's decision must be affirmed.  The use of any football player's likeness is related to video games about college football and is not a commercial advertisement for an unrelated product.  Similarly, if the "transformative use" test is applied, then for all the reasons set forth in EA's Brief the district court correctly applied it as well.  Most importantly, the court recognized that any constitutionally-defensible formulation of that test

3

requires courts to assess the larger context in which an individual's name and

likeness appears, not merely the physical appearance of that likeness in isolation,

and that these games contain numerous independently creative elements.

The district court also correctly distinguished its approach from the narrow

construction of the test adopted by the district court in *Keller v. Electronic Arts*

*Inc.*, No. C 09-1967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010), and more recently

by *Davis v. Electronic Arts, Inc.*, No. 10-03328 (N.D. Cal. March 29, 2012).

Those courts' reasoning cannot be reconciled with any meaningful constitutional

protection for expressive works, and indeed is internally inconsistent as a result.

For example, *Davis* maintained that its construction of the test would not put at risk

a fictionalized docudrama such as the one about Rudolph Valentino at issue in

*Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 3d 860 (1979), because

Valentino's likeness was used "for the transformative purpose of representing a

fictionalized version of Valentino's life." EA Br. Add. at 8. But that point relates

entirely to the broader content of the film as a whole, not the physical

characteristics of Valentino's specific likeness, and merely underscores why it was

error for *Davis* and *Keller* to refuse likewise to consider the totality of EA's video

games.

Even more troubling, *Davis* suggested that, if the same docudrama had been

less fictionalized and included scenes such as "an uninflected reproduction of

[Valentino's] famous performances onscreen", it would present a "stronger case" for a violation of the publicity right. *Id.* at 9. If so, then numerous documentaries, news reports, and films that routinely realistically portray performances would now be at risk, like Jamie Foxx's Academy Award-winning portrayal of Ray Charles in the movie *Ray*, Joaquin Phoenix's nomination for his highly realistic portrayal of Johnny Cash' s performances in *Walk the Line*, and countless other examples.

Indeed, Hart's construction of the test would only encourage pointless gamesmanship to alter celebrities' appearances in expressive works. For example, his logic suggests that, if the virtual avatar that is allegedly Mr. Hart had been sufficiently "transformed" to be 175 pounds (instead of 197), 5'9" (instead of 6'2"), and wore number 14 (instead of 13) with a wrist band on his right arm (instead of his left), *see* Second Amended Compl. at ¶¶ 36-39 (listing Mr. Hart's physical characteristics), a closer constitutional question might be presented. In fact, in *Keller*, the entire claim was based on that premise, because the putative class there only included athletes whose alleged virtual equivalents were "within one inch of the players' roster height and . . . . within 10% of the player's roster weight." There is no plausible construction of the First Amendment or the interests it protects that should turn on such trivialities. *See, e.g.*, *Guglielmi*, 25 Cal. 3d at 869 (Bird, C.J., concurring) ("No author should be forced into creating mythological worlds or characters wholly divorced from reality.").

**B.    The "Predominant Use" Test is a Constitutional Anathema**

Hart also urges this Court to apply the "predominant use" test, which seeks to discern whether the primary purpose of using particular content is "commercial" or "artistic." *Doe v. TCI Cablevision*, 110 S.W.3d 363, 374 (Mo. 2003).  On its face, that test is so entirely subjective and vague that it would render this area of the law even more chaotic than it already is.  More importantly, the test violates long-established First Amendment doctrine which protects speech regardless of the degree to which a profit motive that may have influenced its creation.  *See, e.g., Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952).  Notably, the Missouri decision that adopted this test resulted in a $15 million jury verdict in favor of a hockey player of modest fame and achievement that drove a publisher of popular comic books into bankruptcy, a stark example of the real impact on free expression such jurisprudence can create.  See Diane L. Zimmerman, *Money as a Thumb on the Constitutional Scale:  Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503, 1507 (Nov. 2009).

Equally flawed is Hart's application of that test to these facts.  According to Hart, the use of athletes' likenesses here is primarily "commercial" because EA could have made a single game using mythical avatars that would have been just as "expressive", but instead it used real likenesses to give it an excuse to update its games every year to sell more of them.  Hart Br. at 33-34.  Using this logic,

6

chroniclers of recent history that periodically publish new, updated editions of their books to take into account more recent events could equally be charged with a predominantly "commercial" use of their subjects, since they could instead have written single works of historical fiction incapable of being updated. Such logic represents a wholesale departure from the most basic First Amendment principles.

## II.    THE LAW GOVERNING THE RELATIONSHIP BETWEEN THE FIRST AMENDMENT AND THE RIGHT OF PUBLICITY IS UNCLEAR

Though this Court could simply affirm the district court on any of the grounds discussed above, it is no accident that the parties here urge this Court to apply three different First Amendment "tests" (or none at all), and further disagree over how each test should be calibrated. This reflects the reality that the state of the law governing the relationship between rights of publicity and free expression is highly fractured and unpredictable, perhaps more so than in any other area of contemporary First Amendment jurisprudence. *Amici* hope that this Court will also take the opportunity to bring greater coherence to this important subject and ensure that First Amendment interests are appropriately valued.

To illustrate the problem, in this jurisdiction alone, one court addressed right-of-publicity claims by applying essentially the *Rogers/Restatement* test, *see Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996), while others have eschewed any test and engaged in ad hoc balancing. *See, e.g., Estate of Presley v.*

*Russen*, 513 F. Supp. 1339 (D.N.J. 1981). Courts in other jurisdictions have

employed even more approaches than the tests discussed by the parties here,

ranging from the "public interest" test, *Hilton v. Hallmark Cards*, 599 F.3d 894,

912 (9th Cir. 2010); the "actual malice" test, *Hoffman v. Capital Cities/ABC, Inc.*,

255 F.3d 1180 (9th Cir. 2001); ad hoc balancing, *Cardtoons, L.C. v. MLBPA*, 95

F.3d 959 (10th Cir. 1996); and the view that expressive speech enjoys absolute

First Amendment protection. *Tyne v. Time Warner Entm't Co. L.P.*, 901 So. 2d

802 (Fla. 2005).

 This lack of coherent doctrine produces results that are impossible to

reconcile, thus providing little guidance to creators of expressive works. The

conflicting results on the same facts reached by the district court here and those in

*Keller, Davis* and *Brown v. Electronic Arts, Inc.*, 722 F. Supp. 2d 1148 (C.D. Cal.

2010) is a particularly stark example, but there are many others. For example, with

respect to pictorial works, *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25

Cal. 4th 387 (2001) held that images of the Three Stooges were not transformative,

but that similar images created by Andy Warhol would be, *id.* at 408-09, a

conclusion that would have been vigorously disputed by many art critics who once

viewed Warhol as the quintessential knock-off artist. *See, e.g.*, Hilton Kramer,

*Art: Warhol Show at Jewish Museum*, N.Y. Times, Sept. 19, 1980 (1980 WLNR

181285). Similarly, although the Ninth Circuit held that a greeting card might not

be transformative because its "basic setting [was] the same" as a scene in Paris

Hilton's television show, *Hilton*, 599 F.3d at 911, the Sixth Circuit found that a

painting of Tiger Woods surrounded by other golfers was constitutionally

protected, even though the dissent argued that the image of Woods was "nearly

identical" to a famous Nike poster.  *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915,

959 (6th Cir. 2003) (Clay, J., dissenting).

In the same vein, the California Supreme Court's application of the

transformative use test to dismiss a claim concerning two comic book characters

whose names ("Johnny and Edgar Autumn") evoked the plaintiff musicians

("Johnny and Edgar Winter"), *see Winter v. DC Comics*, 30 Cal. 4th 881 (2003),

contrasted markedly with the application of the "predominant use" test in favor of

a hockey player ("Tony Twist") whose name resembled that of another comic book

character ("Tony Twistelli"), *see TCI Cablevision*, 110 S.W.3d at 374.  And, the

Eighth Circuit recently invoked the First Amendment to dismiss right of publicity

claims asserted by athletes challenging computer-based fantasy sports games, *see*

*C.B.C. Distribution & Marketing v. Major League Baseball Advanced Media, L.P.*,

505 F.3d 818 (8th Cir. 2007); *CBS Interactive Inc. v. National Football League*

*Players Association*, 259 F.R.D. 398 (D. Minn. 2009), though several decades ago

a number of fantasy sports games in the pre-computer age were deemed actionable,

with little discussion of the First Amendment.  *See Uhlaender v. Henricksen*, 316

F. Supp. 1277 (D. Minn. 1970); *Palmer v. Schonhorn Enters.*, 232 A.2d 458 (N.J. Super. 1967).

The current fractured state of the law has a substantial impact on expressive speech related to popular figures. Legal uncertainty inevitably incentivizes litigation regardless of its merit, a phenomenon *amici* have collectively experienced. And while the lack of significant Supreme Court guidance has undoubtedly contributed to the confusion in this area of the law, fundamentally it results from the frequent misconstruction of basic principles that often leads to overstating the interests served by the right of publicity, and undervaluing the First Amendment interests at stake. The most common example undergirds most of the arguments advanced by Hart and his *amici*: that the right of publicity is analogous to copyrights, which in turn produces the claim that the more literal a "copy" of names or likenesses an expressive work makes, the more actionable it becomes. These propositions are fundamentally flawed.

## III.    THE RIGHT OF PUBLICITY IS NOT LIKE A COPYRIGHT

Analysis of the right of publicity often begins with the premise that names and likenesses are analogous to copyrighted expression, a proposition that undergirds the "transformative use" test. *See Comedy III*, 25 Cal. 4th at 404. However, this assumption is not well-founded. *See, e.g., C.B.C. Distrib. & Mktg., Inc.*, 505 F.3d at 818; *Cardtoons*, 95 F.3d at 976 ("The justifications for the right of publicity are not

nearly as compelling as those offered for other forms of intellectual property"); Stacey

L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn from Trademark*

*Law*, 58 Stan. L. Rev. 1161, 1163-64 (Feb. 2006).  As a result, borrowing legal

standards from copyright law necessarily undervalues the First Amendment interests

at stake in the typical right of publicity case, and also shares the practical difficulties

that have always plagued the fair use doctrine in copyright law.  *See Cardtoons*, 95

F.3d at 973; J. Thomas McCarthy, *The Rights of Publicity & Privacy*, §§ 8:34, 8:38

(2010) (fair use is one of the most "nebulous" doctrines know to the law).

### A.    Looking to Copyright Law Results From Misconstruing *Zacchini*

The analogy to copyright often begins with the Supreme Court's analysis in

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977), which posited

a strong relationship between the ends of copyright law and the "right to the

publicity value of his performance" claim asserted in that particular case.  *Id.* at

562.  For example, *Zacchini* was the starting point for the analysis in *Comedy III*

that produced the "transformative use" test.  However, as the Court in *Zacchini*

expressly recognized, it was an unusual case quite unlike most right of publicity

cases, and nothing at all like this one.  *See id.* at 574 n.10 ("the case before us is

more limited than the broad category of lawsuits that may arise under the heading

of 'appropriation'").

In most right of publicity cases, including this one, the plaintiff challenges the defendant's alleged use of a persona to enhance the value of the defendant's expressive work. The plaintiff in *Zacchini*, however, was not complaining about the use of his likeness in the defendant's news broadcast; as the Court put it, he "[did] not merely assert that some general use, such as advertising, was made of his name or likeness." *Id.* Rather, he "relie[d] on the much narrower claim that respondent televised an entire act that he ordinarily gets paid to perform," thus threatening his livelihood. *Id.*

Those facts presented a claim that was much like any claim for copyright infringement involving the literal reproduction of an entire copyrighted work or performance. Acts of copyright infringement may also include the attendant disclosure or use of a copyright holder's name or likeness, but that is not an "injury" that copyright law recognizes or deems significant. Indeed, as *Zacchini* made its way through the Ohio judiciary, the state courts there disagreed about whether the claim should even be denominated one for "right of publicity" or, instead, a claim for conversion and common-law copyright infringement. *Zacchini v. Scripps-Howard Broad. Co.*, 351 N.E.2d 454, 457 (Ohio 1976). As some commentators have pointed out, *see* Zimmerman, 50 B.C. L. Rev. at 1520, the case therefore does not really belong in the "right of publicity" category at all. Rather, it is one of a small genre in which the Court has permitted state laws to fill gaps in

copyright law to protect expressive activities that are very close to what copyright law is designed to incentivize. *See, e.g.*, *Int'l News Service v. Associated Press*, 248 U.S. 215 (1918) (sustaining a common-law claim for the taking of "hot news"); *Goldstein v. California*, 412 U.S. 546 (1973) (sustaining a state law criminalizing the pirating of sound recordings).

Thus, while the Court's analogy to copyright fit the specific claim at issue in *Zacchini*, its reasoning has no relevance to the vast majority of right of publicity cases, which rarely involve the alleged reproduction of an actual, entire performance in a manner that substitutes for the original. *See, e.g.*, Thomas F. Cotter & I. Dmitrieva, *Integrating the Right of Publicity with First Amendment and Copyright Preemption Analysis*, 33 Colum. J. L. & Arts 165, 202-04 (Winter 2010); Dogan & Lemley, 58 Stan. L. Rev. at 1186-87. These cases are no exception. EA has not created digital versions of the actual college football games in which Hart played, thus potentially discouraging fans from watching his actual performances. Rather, hearkening again to the facts of *Zacchini*, there is an obvious difference between airing Zacchini's actual entire performance on television and creating a video game in which members of the public can choose to control any of thousands of avatar cannonballers to compete in their own highly creative, mock human cannonball contest. Accordingly, extending *Zacchini* to

treat all assertions of a right of publicity as quasi-copyright actions is wholly
unwarranted.

**B.    Any Right to Publicize One's Name and Likeness Does Not
Resemble the Right to Copyright Expression**

Outside the almost *sui generis* facts of *Zacchini*, a right to publicize one's
name and likeness is not analogous to copyrights.  Copyright law exists because it
has been well-settled for centuries that the creation of certain categories of original
expression has especially important social value and requires specific incentives to
flourish.  *See 20th Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).  These
principles are embodied in Article I, Section 8 of the Constitution itself, so
restrictions on the use of copyrighted expression inherently do not trigger the First
Amendment scrutiny applied to other statutory and common-law causes of action.
*See Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d
1184, 1187 (5th Cir. 1979).  Moreover, because copyright law exists to facilitate
new expression, copyright disputes inherently involve speech-protective interests
on both sides of the scales.  *See Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539, 556 (1985).  As a result, the balance copyright law strikes between
the rights of copyright holders and others who use their materials often favors
copyright holders, with some  exceptions.  *See Fisher v. Dees*, 794 F.2d 432, 435
(9th Cir. 1986).

By contrast, the right of publicity was first recognized in 1953, *see Haelan Labs, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953), and does not protect expression *at all*. Rather, it exists primarily to maximize the economic rewards of celebrity, fame and achievement. *Comedy III*, 25 Cal. 4th at 400; *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 403 (2001). While those interests may have value, they are surely not as compelling or time-tested as those underlying copyright law. *See C.B.C. Distrib. & Mktg., Inc.*, 505 F.3d at 825; *Cardtoons*, 95 F.3d at 976. Most importantly, they are not interests protected by the Constitution and, because they do not incentivize *expression*, there is far less justification for permitting those interests to restrict other people's speech.

Moreover, as many courts and commentators have pointed out, there is scant evidence to suggest that broadly defined rights of publicity are even necessary to incentivize people, including athletes, to undertake those activities that produced their fame. *See Cardtoons*, 95 F.3d at 973 ("the analogy to the incentive effect of other intellectual property protections is strained"); *C.B.C. Distrib. & Mktg. Inc.*, 505 F.3d at 824; *ETW Corp.*, 332 F.3d 915; *Restatement* § 46, cmt. c.; Zimmerman, 50 B.C. L. Rev. at 1521-22; Dogan & Lemley, 58 Stan. L. Rev. at 1186-90. And in many right of publicity cases, substantial incentives are already provided by copyright law. For example, the Court in *Comedy III* emphasized the effort expended by the Three Stooges to create their own comedic brand, *see* 25

Cal. 4th at 399-400, but the fruits of those efforts are already heavily rewarded by the protection copyright law affords to the films and television programs they created.

In short, the right of publicity and copyrights are not materially equivalent, and applying similar tests and a virtually identical level of First Amendment scrutiny to both is a fundamentally flawed exercise. Indeed, this conclusion is already implicit in the application of both doctrines. For example, there would appear to be little disagreement here that the news reports many of these *amici* disseminate are virtually absolutely exempt from right of publicity claims in New Jersey, *e.g.*, *Castro v. NYT Television*, 851 A.2d 88 (N.J. Super. 2004), but news stories can sometimes infringe on the rights of copyright holders. *See, e.g., Harper & Row Publishers Inc.*, 471 U.S. at 569; *Murphy v. Millennium Radio Group LLC*, 650 F.3d 295, 307 (3d Cir. 2011).

Because the two doctrines are not materially equivalent, borrowing copyright concepts such as a "transformative use" also creates the kind of practical enigmas evident in this case. Copyright law deters physical copying of tangible expression, so the "transformative use" concept, along with many of the other fair use factors, is simply a quantitative and/or qualitative measure of copying forms of expression like a stanza of music or an excerpt of a novel. However, a person's name or likeness is not "expression" that can reasonably be equated to music or

16

literature, so attempting to apply a test designed to measure whether someone gave

new meaning to a song will necessarily produce the kind of conceptual

conundrums that permeate this case – such as what does it mean to "transform" an

athlete's name, weight, or jersey number.

At most, the "transformative use" test might be more relevant if it were

limited to the facts of *Comedy III* and other so-called "merchandising" cases,

where the issue is whether a stand-alone "copy" of a celebrity's name or likeness

can be placed on an ancillary physical product, like a t-shirt or coffee mug.  It has

far less relevance where the only "product" is itself an expressive work, be it a

book, film, newspaper, or video game.  In fact, it is notable that shortly before

*Comedy III* reached the California Supreme Court, the California legislature had

already recognized this distinction and had substantially narrowed the right of

publicity statute at issue, so that the case's particular holding was effectively

limited to its facts.  *Comedy III*, 21 P.3d at 391 n.1.  Thus, with respect to claims

involving the rights of deceased celebrities such as the Three Stooges, California

law now distinguishes between true merchandising cases and all others involving

expressive works (including video games).  For the latter it has adopted a statutory

test that focuses on whether a likeness is used as a disguised advertisement, much

like the *Restatement* test.[1]

---

[1] Cal. Civ. Code 3344.1, adopted in 1999, now provides that any "audiovisual

### C.    "Realism" Is Not a Negative Word in the Lexicon of the First Amendment

The mistaken premise that using a name or likeness is analogous to mimicking copyrighted expression, and so must be "transformed" rather than literally "copied", results in yet another flawed contention that pervades the briefs of Hart and his *amici* – that any "realistic" elements of EA's video games (*i.e.*, those that look more like copies) should somehow weigh against their constitutional protection.  The contention that striving for realism is a disfavored form of expression is highly troubling to these *amici*, who routinely strive to portray individuals and settings as realistically as possible within the context of larger creative or factual works.

In fact, neither Hart nor his *amici* ever explain how their arguments that physically un-transformed likenesses are presumptively actionable can be reconciled with the existence of non-fiction itself, including genres of speech produced by many of these *amici* such as news, movies, books, biographies, etc. Indeed, the California Supreme Court has likewise never explained how the "transformative use" test applies to more traditional genres of speech, but it has expressly confirmed the virtually absolute constitutional protection accorded to the

---

work" that is "fictional or non-fictional entertainment," shall not be considered a "product, article of merchandise, [or] good" subject to the statute, *id.* at 3344.1(a)(2), unless "the claimant proves that this use is so directly connected with a product, article of merchandise, good, or service as to constitute an act of advertising, selling, or soliciting purchases of that product, article of merchandise, good or service." *Id.* at 3344.1(a)(3).

use of names and likenesses in fictional and non-fictional works, such as movies, previously recognized by that Court in *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 3d 860 (1979) (Bird, C.J. concurring). *See Comedy III*, 25 Cal. 4th at 398-99. *See also Ruffin-Steinback v. dePasse*, 267 F.3d 457 (6th Cir. 2001); *Valentine v. C.B.S, Inc.*, 698 F.2d 430, 432 (11th Cir. 1983); *Seale*, 949 F. Supp. at 337; *Tyne*, 901 So. 2d at 810.

Because the approached urged by Hart cannot be reconciled with the protection of most genres of speech and expression, his arguments really imply that video games, along with comic books and perhaps other unspecified genres of speech, should be treated like coffee mugs, while newspapers and books should not. That premise is more explicit in the recent *Davis* opinion, which refers to EA's *Madden NFL* video games as "the digital equivalent of . . . a t-shirt." EA Br. Add. at 9. This logic is wholly inconsistent with *Brown v. Entertainment Merchants Association*, 131 S. Ct. 2729 (2010), which unambiguously held that the First Amendment protects video games to the same extent that it does more traditional forms of expression. In fact, what *Brown* said about the California statute at issue there could equally be said about the principles Hart urges here – "Here, California has singled out the purveyors of video games for disfavored treatment—at least when compared to booksellers, cartoonists, and movie producers—and has given no persuasive reason why." *Id.* at 2740.

Hart at one point appears to recognize the inconsistency with *Brown*, and briefly suggests that, unlike the fictionalized games at issue in that case, what they label "hyper-realistic" video games serve no greater speech-related interests than does playing gin rummy – because both are just "games." *See, e.g.*, Hart Br. at 25 n.6. This assertion has no more merit than would an argument that wholly imagined novels are more worthy of protection than more factually-based nonfiction. Both have independent value and, as is the case with other genres of speech, the realistic elements of video games serve informational, educational, and entertainment purposes that wholly fictionalized games do not (and vice-versa).

For example, there may well be consumers who learn more about the history of college football and even the geography of American universities from these games than from books or magazines. In fact, the realistic elements of these games are quite similar to other reality-based, digital simulation games concerning political matters ranging from Presidential elections to Middle East war and diplomacy.[2] To suggest, as Hart's *amici* do, that it would make no educational or informational difference if, instead of incorporating realistic elements, this entire genre of games featured twenty-two geese on a virtual football field or eight

---

[2] Examples include *Political Machines 2008* and *President Forever 2008* (*see* http://270soft.com/us-election-games/president-election-game/ (last visited May 18, 2012). These computer-based games incorporate elements similar to EA's games in that they enable player "campaign managers" to assume the persona of an actual candidate, alter characteristics of that candidate, or create fictional candidates.

antelopes competing in a simulated presidential primary cannot be seriously

sustained. In short, the notion that "realistic" elements of a work are somehow

disfavored must be rejected.

## IV. THE *ROGERS/RESTATEMENT* TEST IS THE MOST APPROPRIATE PROPOSED TEST TO APPLY HERE

### A. The *Rogers/Restatement* Test More Accurately Reflects the Relationship Between the Right of Publicity and the First Amendment

Rather than the copyright-based tests that Hart urges, the one the district

court considered that strikes the more appropriate balance of the competing

interests at stake here is the *Rogers/Restatement* test, which embodies a single

principle that has been widely applied. The test as formulated in *Rogers* asks

whether a likeness is (1) "wholly unrelated" to the content of the work or (2)

"simply a disguised commercial advertisement for the sale of goods or services."

875 F.2d at 994. The *Restatement* similarly frames the analysis as starting with the

presumption that "use in entertainment and other creative works" is permitted,

unless "the name or likeness is used solely to attract attention to a work that is not

related to the identified person." *Restatement* § 47, cmt. c. *See also Seale*, 949 F.

Supp. at 336. New York courts have also long employed a similar test,

recognizing that news, entertainment, and creative works are not a "trade use"

under its misappropriation statute except in the rare case where the plaintiff's name

or likeness has "no real relationship" to the underlying content or the content itself

21

is really an "advertisement in disguise." *Finger v. Omni Publ'ns*, 566 N.E.2d 141, 143 (N.Y. 1990).

These tests are all just slight re-formulations of the same principle: that expressive works should be actionable only where a plaintiff's name or likeness is genuinely just a ploy to market some other unrelated content or product. That principle appropriately balances the competing interests presented by these cases, which – as noted – are quite different from those presented by copyright disputes.

Hart criticizes the test because (1) *Rogers* itself involved a dispute over a movie title and (2) the *Rogers* constitutional test was aimed at the Lanham Act, while its related right of publicity test arose under state law. This critique misses the point. It is not surprising that *Rogers* itself arose in the context of titles, because titles (or analogous devices such as the CD cover at issue in *Seale*) are more likely to be the most commercially-conscious aspect of an expressive work. But the underlying principles embodied in the test are not inherently limited to titles, and have been applied beyond that context. However, the focus on titles does reflect the recognition that if a plaintiff's likeness is used *within* an expressive work – for example, if the movie at issue in *Rogers* had actually been about Fred Astaire and Ginger Rogers – it would be a very rare case in which any serious claim could even arise. Yet that scenario is what is presented here.

As to whether *Rogers* was technically applying a state-law or constitutional test, not only has it since been applied by multiple courts as the latter, the argument is circular because the purpose of the test is to avoid conflict with the First Amendment. *See, e.g., Beverley v. Choices Women's Med. Ctr.*, 587 N.E.2d 275, 278 (N.Y. 1991) ("no real relationship" test exists because otherwise the "literal application of Civil Rights Law § 51 could conflict with First Amendment protection"); *Seale*, 949 F.Supp. at 337 (applying *Restatement* test and finding that defendants' docudrama was protected "First Amendment expression").

Finally, that *Rogers* applied a similar test to trademark claims is also not surprising, because trademark law also concerns the misuse of names and brands and therefore is at least a closer cousin to the right of publicity than is copyright law. *See ETW Corp.*, 332 F.3d at 924; *see* Dogan & Lemley, *supra* at 13. Indeed, as between the two, trademark law reflects more significant governmental interests since protecting consumers from confusion is more important than providing marginally greater rewards to individual celebrities. *See, e.g., Restatement* § 46 ("The rationales underlying recognition of a right of publicity are generally less compelling than those that justify rights in trademarks or trade secrets"); *Rogers*, 875 F.2d at 1004. As a result, this Court could well conclude that the better rule would be to exempt all expressive works from the scope of the right of publicity.

CRITICAL

At a minimum, balancing the respective interests presented here suggests that any

First Amendment test applied must be at least as protective of speech as *Rogers*.

**B.    The Rogers Test Recognizes that the Right Of Publicity Is a Content-Based Restriction On Speech and Provides Better Clarity**

The district court correctly noted that courts have not invoked the distinction

between strict and intermediate scrutiny when analyzing right of publicity cases.  It

is nonetheless relevant that, at bottom, the right of publicity is a content-based

restriction on speech. *See Cardtoons*, 95 F.3d at 972 ("Restrictions on the words

or images that may be used by a speaker, therefore, are quite different than

restrictions on the time, place, or manner of speech."); *see also* Cotter &

Dmitrieva, 33 Colum. J. L. & Arts at 190-95.  Its purpose is to give people control

over how their names or likeness are represented to the public, and therefore it

cannot be "justified without reference to the content of the regulated speech."

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (Burger, C.J.,

concurring).  These cases are no exception.  Appellees' claim is defined by

reference to specific content in EA's video games, and they contend that EA could

only have avoided liability either by obtaining a license or changing that content.

The *Rogers* test better  calibrates the level of scrutiny appropriate in this context.

Finally, the *Rogers* test less readily invites subjective judgments about the

aesthetic value of expression and has proved to be much less complicated to apply,

thus reducing the enormous amount of unpredictability that plagues this area of the

law. This both avoids troubling First Amendment issues and reduces the

unpredictability inherent in any ad hoc exercise.

## V.    FIRST AMENDMENT CONSIDERATIONS GENERALLY WEIGH IN FAVOR OF AFFIRMING THE DISTRICT COURT

Finally, Hart and his *amici* repeatedly assert that, broadly speaking, no socially-

redeeming purpose could be served by denying them the relief they seek here. As

proof, they point to agreements EA has entered into with some professional players'

associations. To the contrary, the broader balance falls in the other direction.

Recognizing a right of publicity here would likely inhibit significant amounts of

speech and would likely make it difficult, if not impossible, to produce a broad array

of historically-based works.

### A.    The Existence of Other Specific Licensing Agreements is Not a Basis to Apply a Right of Publicity Generally

Turning first to the licensing issue, the proposition that the existence of some

licensing-like agreements is a basis to require them generally is not sound. There

are many reasons that content producers, including some of these *amici*, enter into

licensing arrangements with subjects of their works that have nothing to do with

whether a right of publicity exists.

For example, documentarians and biographers sometimes enter into what are

colloquially referred to as "life rights" agreements with the subjects whose life

stories are depicted in their works. Such agreements provide numerous benefits

ranging from exclusive access to the subjects, documents and memorabilia in their

exclusive possession, their participation in promotional activity, and a guarantee

that the substantial economic costs of even meritless potential litigation will be

avoided. However, the fact that an author might choose to enter into an agreement

to write an authorized biography does not imply that the right of publicity

precludes unauthorized biographies, or that people actually own their life stories.

*Restatement* § 47, cmt. c ("[T]he right of publicity is not infringed by the

dissemination of an unauthorized print or broadcast biography.").

Here again, Hart's licensing arguments are based on a fundamental

misreading of *Zacchini*. They ground their contention on a phrase quoted from

*Zacchini*, to the effect that "the defendant would normally pay". *See* Hart Br. at

12, 19, 52, 56, 59; Screen Actors' Guild Br. at 12, 29 (all citing *Zacchini*, 433 U.S.

at 576). However, the context of those words in *Zacchini* had nothing to do with

whether the defendant news station had previously licensed the likenesses of

human cannonball artists, or indeed of anyone else. Rather, it referenced the fact

that the *public* normally paid to view Zacchini's live *performance*, but might not if

they saw it on the news for free. The analogous question here would be whether

fans will stop paying to watch live college football games because EA uses player

likenesses – and there is no plausible suggestion they would.

**B.      Works Involving Mass Participants in Historical Events Merit Constitutional Protection**

Finally, the vast majority of the case law cited by both parties to this litigation involves balancing considerations that are far afield from the facts here.  Almost all the case law discussed involved a single person (or very small group) depicted in an expressive work that specifically highlighted that person's persona and accomplishments, like the greeting card featuring Paris Hilton or the distinctive voice of Frank Facenda in an infomercial.  *See Hilton*, *supra* at 8; *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008).  Here, however, the work at issue is not *Ryan Hart Football* –it is *NCAA Football*.  Hart is allegedly included in EA's games solely because as a matter of historical fact he was one of thousands of athletes who played college football in a given year, all of whom are depicted in the same way for the same reason.  Pretending that this case is about him or his right of publicity, as if his relationship to these games is like Hilton and Facenda's was to the works at issue in their cases, ignores reality.

Hart and his *amici*'s substantive arguments are entirely premised on the procedural, legal fictions of class-action litigation, which obscure the real interests at play here.  The mechanism of class-action litigation permits Hart to be put forth as a representative of an entire putative class of former college athletes, who present themselves as merely seeking *en masse* payment for games that EA has already created.  But going forward, the "right of publicity" that Hart ask this Court to

recognize would not be a class right to *ex post* payment. Rather, it would be an *ex ante* personal right of permission, which would in effect allow each athlete to individually censor these games in advance of their ever being created.

The difference between the two is profound. In the future, before EA or anyone else could create any games or similar works, it would have to locate and approach every one of the roughly 7500 athletes who play NCAA Division 1 football annually and ask each one of them for a license – assuming it could navigate the dozens of different state laws that might apply to each athlete and/or his heirs. Moreover, each athlete would have the right to refuse to be included in the games at all, or to condition his participation on EA's willingness to distort historical reality. For example, any player could condition his approval on a demand that he be faster or stronger, or that a rival's abilities be diminished. This would be true not only for works involving team sports, but for any expressive work that involved historical events with large numbers of people – such as elections, a model United Nations exercise, simulations of a legislative body, etc.

As a practical matter, it would likely be impossible to obtain individual licenses from every person and/or their heirs who was involved in mass historical events, and at a minimum it would impose an extraordinary burden on content producers to require that they do so. Indeed, these realities further illustrate why arguments regarding licenses with a few professional players' associations are beside the point.

Most participants in historical events are not members of mass unions, so the assumption that such a model could be easily replicated in every instance is likely wrong. And even if that obstacle could be overcome, as a policy matter there is no legitimate state interest in granting every participant in such events the personal right to censor the accurate depiction of history for everyone else.

For all these reasons, the case that is the most analogous to this one is *C.B.C. Distribution & Marketing, Inc.* That case likewise involved historical events involving mass numbers of people, all of whom were included in fantasy sports games solely by virtue of historical fact. Similarly, the existence of prior licensing agreements, even between the parties there, was properly deemed to be irrelevant. The same result should be reached here.

## CONCLUSION

For the foregoing reasons, the decision below should be affirmed.

Dated:  May 23, 2012              Respectfully submitted,

                                s/ Nathan E. Siegel
                                Nathan E. Siegel
                                Lee Levine
                                LEVINE SULLIVAN KOCH & SCHULZ, LLP
                                1899 L Street, NW, Suite 200
                                Washington, DC  20036
                                202-508-1100

                                *Attorneys for Amici*

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

Pursuant to Local Appellate Rule 46.1(e), the undersigned hereby certifies

that he is a member in good standing of the bar of the United States Court of

Appeals for the Third Circuit.


Dated:   May 23, 2012                    By: <u>/s/ Nathan E. Siegel</u>
                                             Nathan E. Siegel

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Fed. R. App. P. (28)(a)(11), I hereby certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B), because this brief contains 6,934 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 3d Cir. R. 29.1(b).

Dated:  May 23, 2012                    By: <u>/s/ Nathan E. Siegel</u>
                                        Nathan E. Siegel

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2012, I caused the foregoing to be

electronically filed with the Clerk of the Court for the United States Court of

Appeals for the Third Circuit and served on the following counsel of record using

the appellate CM/ECF system:

Timothy J. McIlwain, Esq.
Attorney at Law, LLC
5 Marine View Plaza, Suite 300
Hoboken, New Jersey 07030
*Attorney for Plaintiff-Appellant Ryan Hart*

Elizabeth A. McNamara, Esq.
Bruce S. Rosen, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, NY 10019
*Attorney for Defendant-Appellee Electronic Arts, Inc.*

P. Casey Pitts, Esq.
Michael Rubin, Esq.
Altshuler, Berzon, Nussbaum
Berzon & Rubin
177 Post Street, Suite 300
San Francisco, CA 94108-0000
*Attorneys for Amici Appellants Major League Baseball Players Assn., NFL Players Assn. and National Basketball Players Assn.*

Duncan W. Crabtree-Ireland, Esq.
Screen Actors Guild
5757 Wilshire Boulevard, 7th Fl.
Los Angeles, CA 90036
*Attorneys for Proposed Amici Appellants Screen Actors Guild Inc., AFL-CIO and Luminary Group LLC*

Also on this day, I caused to be sent ten (10) hard copies of the foregoing to the Office of the Clerk of the Court.

Dated:   May 23, 2012                    By: /s/ Nathan E. Siegel
                                               Nathan E. Siegel

## <u>CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS</u>

I hereby certify that the text of the electronic brief is identical to the text in the paper copies of the brief.

Dated:  May 23, 2012                    By: <u>/s/ Nathan E. Siegel</u>
                                                     Nathan E. Siegel

## <u>CERTIFICATE OF VIRUS CHECK</u>

I hereby certify that a virus check was performed on the electronic brief

using McAfee VirusScan Enterprise 8.5i and that no viruses were detected.

Dated:  May 23, 2012                    By: <u>/s/ Nathan E. Siegel</u>
                                             Nathan E. Siegel