No. 11-3750

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

**RYAN HART,**

*Plaintiff/Appellant,*

v.

**ELECTRONIC ARTS, INC.,**

*Defendant/Appellee.*

---

On Appeal from the United States District Court
for the District of New Jersey
No. 3:09-CV-05990-FLW-LHG
The Honorable Freda Wolfson, District Judge

---

*AMICUS CURIAE* **BRIEF OF THE MOTION PICTURE ASSOCIATION OF
AMERICA, INC. IN SUPPORT OF DEFENDANT AND APPELLEE
ELECTRONIC ARTS, INC.**

---

LOEB & LOEB LLP
Douglas E. Mirell (SBN 094169)
Eric B. Schwartz (SBN 266554)
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
(310) 282-2000

Attorneys for *Amicus Curiae*
MOTION PICTURE ASSOCIATION OF AMERICA, INC.

---

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), *amicus curiae* Motion Picture Association of America, Inc. ("MPAA") discloses the following:

1.       MPAA is a non-profit trade association;

2.       MPAA does not have any parent companies; and

3.       There are no publicly held companies that own 10 percent or more of the MPAA.

RESPECTFULLY SUBMITTED this 23rd day of May, 2012.

LOEB & LOEB LLP
DOUGLAS E. MIRELL
ERIC B. SCHWARTZ

By: /s/ Douglas E. Mirell
     DOUGLAS E. MIRELL
     Attorneys for *Amicus Curiae*
     MOTION PICTURE ASSOCIATION
     OF AMERICA, INC.

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ..................................................................................... 4

II.   THIS COURT SHOULD ADOPT A BRIGHT-LINE RULE
      CATEGORICALLY EXEMPTING PROTECTED EXPRESSIVE
      WORKS FROM PUBLICITY RIGHTS LIABILITY. ................................. 4

      A.   Videogames Are Protected By The First Amendment. ....................... 4

      B.   Publicity Rights Laws Are Content-Based And Should Be
           Subject To Strict Scrutiny When Applied To Expressive Works. ....... 5

      C.   The Inconsistent Application Of "Balancing Tests" Further
           Demonstrates The Need For A Bright-Line Rule Exempting
           Protected Expressive Works From Publicity Rights Liability. .......... 10

III.  ABSENT A CATEGORICAL EXEMPTION FOR EXPRESSIVE
      WORKS, THIS COURT SHOULD ADOPT THE ROGERS
      DEFENSE TO RIGHT OF PUBLICITY CLAIMS. ................................. 15

IV.   THE "TRANSFORMATIVE USE" TEST IS FOCUSED ON THE
      EXPRESSIVE WORK AS A WHOLE AND DOES NOT REQUIRE
      TRANSFORMATION OF THE NAME OR LIKENESS
      ALLEGEDLY USED THEREIN ...................................................... 21

      A.   If This Court Were To Adopt The "Transformative Use" Test,
           It Should Do So Only If It Also Adopts The Rogers Test. ............... 21

      B.   The Transformative Use Test Does Not Require Transformation
           Of The Name Or Likeness Used Therein. ................................... 22

CONCLUSION ................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Aligo v. Time-Life Books, Inc.*,
  No. C94-20707, 1994 U.S. Dist. LEXIS 21559
  (N.D. Cal. Dec. 19, 1994)......................................................................... 20

*Ann-Margret v. High Soc'y Magazine, Inc.*,
  498 F.Supp. 401 (S.D.N.Y. 1980) ........................................................ 7

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ....................................................................... 6, 9

*Brown v. Electronic Arts, Inc.*,
  722 F.Supp.2d 1148 (C.D. Cal. 2010)................................................ 10, 13

*Brown v. Entertainment Merchants Ass'n*,
  131 S.Ct. 2729 (2011) ............................................................. 2, 4, 13

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
  95 F.3d 959 (10th Cir. 1996) ..................................................... 3, 4, 5

*City of Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986) ......................................................................... 8, 9

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
  886 F.2d 490 (2d Cir. 1989) ............................................................ 18

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
  25 Cal.4th 387 (2001)................................................................... passim

*Daly v. Viacom, Inc.*,
  238 F.Supp.2d 1118 (N.D. Cal. 2002)................................................ 7

*Davis v. Electronic Arts, Inc.*,
  No. 10-CV-03328, slip op. (N.D. Cal. Mar. 29, 2012)......................... 10, 12, 13

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
  547 F.3d 1095 (9th Cir. 2008)...................................................... 18, 19

*ETW Corp. v. Jireh Publ'g, Inc.*,
  332 F.3d 915 (6th Cir. 2003) ....................................................... passim

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Frazier v. Boomsma*,
  No. CV07-08040, 2007 WL 2808559
  (D. Ariz. Sept. 27, 2007) .......................................................................... 9

*Galena v. Leone*,
  638 F.3d 186 (3d Cir. 2011) ................................................................... 8

*Guglielmi v. Spelling-Goldberg Prods.*,
  25 Cal.3d 860 (1979) ................................................................ 7, 16, 25

*Hart v. Electronic Arts, Inc.*,
  808 F.Supp.2d 757 (D.N.J. 2011) .................................................. passim

*Hicks v. Casablanca Records*,
  464 F.Supp. 426 (S.D.N.Y. 1978) ............................................... 7, 25

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010) .............................................................. 14

*Hoffman v. Capital Cities/ABC Inc.*,
  255 F.3d 1180 (9th Cir. 2001) .................................................. 5, 6, 24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ........................................................................... 12

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988) ............................................................................. 12

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ............................................................................. 1

*Keller v. Electronic Arts, Inc.*,
  No. C 09-1967, 2010 WL 530108 (N.D. Cal. Feb. 6, 2010) ...................... passim

*Kirby v. Sega of Am., Inc.*,
  144 Cal.App.4th 47 (2006) ............................................................. passim

*Man v. Warner Bros. Inc.*,
  317 F.Supp. 50 (S.D.N.Y. 1970) ........................................................ 20

*Mattel, Inc. v. MCA Records, Inc.*,
  296 F.3d 894 (9th Cir. 2002) .................................................... 18, 19

## TABLE OF AUTHORITIES (CONT'D)

<u>Page(s)</u>

*Matthews v. Wozencraft*,
  15 F.3d 432 (5th Cir. 1994) ............................................................. 7

*Miller v. California*,
  413 U.S. 15 (1973) ......................................................................... 24

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ....................................................................... 24

*No Doubt v. Activision Publ'g, Inc.*,
  192 Cal.App.4th 1018 (2011).................................................... 21, 22

*Parks v. LaFace Records*,
  329 F.3d 437 (6th Cir. 2003) ...................................................... 5, 18

*Polydoros v. Twentieth Century Fox Film Corp.*,
  67 Cal.App.4th 318 (1997)................................................ 1, 2, 7, 14

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ......................................................................... 6

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ..................................................... passim

*Rosemont Enters., Inc. v. Random House, Inc.*,
  294 N.Y.S.2d 122 (1968) ................................................................. 7

*Ruffin-Steinback v. de Passe*,
  82 F.Supp.2d 723 (E.D. Mich. 2000) ............................................... 7

*Sable Commc'ns v. FCC*,
  492 U.S. 115 (1989) ......................................................................... 6

*Seale v. Gramercy Pictures*,
  949 F.Supp. 331 (E.D. Pa. 1996)................................................. 7, 15

*Stewart v. Rolling Stone LLC*,
  181 Cal.App.4th 664 (2010)............................................................. 7

*Taylor v. NBC*,
  No. BC110922, 1994 WL 780690
  (Los Angeles Cnty. Super. Ct. Sept. 12, 1994) ............................. 26

## TABLE OF AUTHORITIES (CONT'D)

<u>**Page(s)**</u>

*The Romantics v. Activision Publ'g, Inc.*,
    574 F.Supp.2d 758 (E.D. Mich. 2008) ............................................................ 18

*Thoroughbred Legends, LLC v. The Walt Disney Co.*,
    No. 07-CV1275, 2008 WL 616253
    (N.D. Ga. Feb. 12, 2008) .................................................................................. 15

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) ........................................................................................... 6

*Tyne v. Time Warner Entm't Co., L.P.*,
    901 So.2d 802 (Fla. 2005) ..................................................................... 6, 14, 26

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000) ......................................................................................... 13

*Winter v. DC Comics*,
    30 Cal.4th 881 (2003) .................................................................................. 5, 25

*Zacchini v. Scripps-Howard Broadcasting Co.*,
    433 U.S. 562 (1977) ........................................................................................... 9

## OTHER AUTHORITIES

Restatement (Third), *Unfair Competition* § 47 (1995) .................................... passim

Thomas F. Cotter, et al., *Integrating the Right of Publicity with First
    Amendment & Copyright Preemption Analysis*, 33 Colum. J. L. & Arts
    165, 167-69 (Winter 2010) .............................................................................. 10

## <u>SUMMARY OF ARGUMENT</u>

"[M]otion pictures are a significant medium for the communication of ideas." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).  In furtherance of this expressive purpose, filmmakers regularly use the lives and likenesses of public persons for creative comment and artistic effect.  Over time, this use has taken many forms.

Sometimes it is *literal*, as in *Forrest Gump* (Paramount 1994), where newsreel footage of public figures creates the backdrop for the title character's fictionalized encounters with those persons.  Sometimes it is *representational*, as in *Frost/Nixon* (Universal 2008), where actors dramatized journalist David Frost's famous televised interviews of Richard Nixon.  And sometimes it is *allusive*, as in *Citizen Kane* (RKO Pictures 1941), where the fictional character Charles Foster Kane appears to have been modeled in part on newspaper magnate William Randolph Hearst.

Under the First Amendment, each of these uses is entirely expressive and fully protected.  *See*, *e.g.*, *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal.App.4th 318, 325 (1997) (rejecting publicity rights claim in the motion picture *The Sandlot* on First Amendment grounds).

Despite full protection under the First Amendment, creators of expressive works may nevertheless seek authorization to depict a name or likeness in an

expressive work.  There are many reasons why such authorizations are or are not sought.  Sometimes they are obtained because of a perceived creative benefit in procuring the cooperation of the subject as was done in the movie *Ray* (Universal 2004) and the musical stage play *Jersey Boys*.  Other times, authorizations may be obtained to avoid meritless litigation.  *See, e.g., Polydoros*, 67 Cal.App.4th at 326 ("The industry custom of obtaining 'clearance' establishes nothing, other than the unfortunate reality that many filmmakers may deem it wise to pay a small sum up front for a written consent to avoid later having to spend a small fortune to defend unmeritorious lawsuits").  However, since there is no legal need to obtain such authorizations, publicity rights jurisprudence should not be permitted to constrain the production of *unauthorized* works, such as the Academy Award®-winning films *The King's Speech* (The Weinstein Company 2010) and *The Social Network* (Columbia Pictures 2010).

These rules should not differ for videogames, especially after the U.S. Supreme Court's decision in *Brown v. Entertainment Merchants Ass'n,* 131 S.Ct. 2729, 2733 (2011), recognizing that "[l]ike the protected books, plays, and movies that preceded them, video games" are entitled to First Amendment protection. Because videogames are protected First Amendment speech, and because such speech (regardless of its medium or message) is entitled to the same constitutional protection,  any erroneous application of publicity rights jurisprudence in

videogame cases creates a serious risk that such an error will adversely affect more traditional works of expression, such as motion pictures.

The MPAA does not seek to reiterate the arguments asserted by EA in its answering brief. Rather, the MPAA urges the following:

*First*, this Court should affirm that, under the First Amendment, all expressive works[1] must be categorically exempt from publicity rights liability.

*Second*, absent categorical constitutional protection for expressive works, the MPAA believes that the test articulated in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), should be recognized as a complete defense when a right of publicity claim targets an expressive work.

*Third*, this Court should clarify that the "transformative use" inquiry is *not* focused on whether the specific name or likeness at issue has been, or can be, in some way "transmogrified" or even "transformed." Rather, even literal depictions of a likeness may be "transformative" when analyzed *in context* to discern the expressive effect that the filmmaker, author or artist sought to achieve *in the work*

---

[1] The MPAA uses the phrase "expressive works" to refer to all works such as news reports, books, plays, television, motion pictures and videogames – as well as to advertising that is incidental to the promotion of such works. Restatement (Third), *Unfair Competition* § 47 (1995). Expressive works are "not transformed into commercial speech merely because they are sold for profit." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996). By contrast, "commercial speech is best understood as speech that merely advertises a product or service for business purposes." *Id.* Such "commercial speech" falls outside the scope of the "expressive works" exception advocated herein.

*as a whole*.  Moreover, given the uneven application of the "transformative use"

test in cases across the country, particularly where non-traditional works such as

videogames are at issue, this Court should only apply this test along with the

*Rogers* test, as the District Court did below.

## **ARGUMENT**

## **II.    THIS COURT SHOULD ADOPT A BRIGHT-LINE RULE CATEGORICALLY EXEMPTING PROTECTED EXPRESSIVE WORKS FROM PUBLICITY RIGHTS LIABILITY.**

### **A.    Videogames Are Protected By The First Amendment.**

Like motion pictures, videogames are constitutionally protected expressive

works.  *Brown*, 131 S.Ct. at 2729.  As Justice Scalia explains:

> Like the protected books, plays, and movies that preceded them, video
> games communicate ideas – and even social messages – through many
> familiar literary devices (such as characters, dialogue, plot, and music)
> and through features distinctive to the medium (such as the player's
> interaction with the virtual world). That suffices to confer First
> Amendment protection.

*Id.* at 2733.  Accordingly, courts must not make aesthetic or moral judgments

about the value of videogames.  *Id.*  For instance, the constitutional protections

shielding the videogame "Mortal Kombat" are identical to those protecting Dante

Alighieri's "The Divine Comedy," however different their perceived intellectual

worth.  *Id.* at 2737 n.4.  To further the "high purposes" of the First Amendment, all

speech – regardless of its medium or message – is entitled to broad constitutional

protection.  *See, e.g.*, *Cardtoons*, 95 F.3d at 969 ("[s]peech that entertains, like

speech that informs, is protected by the First Amendment . . ."); *Comedy III*

*Prods., Inc. v. Gary Saderup, Inc.,* 25 Cal.4th 387, 399 (2001) (the First

Amendment "does not disfavor nontraditional media of expression" and expressive

works are protected even if they convey "no discernible message"); Restatement

(Third), *Unfair Competition* § 47 cmt. c (1995) ("freedom of expression also

extends to use in entertainment and other creative works, including both fiction and

nonfiction").  The respect that must be accorded to all expressive works cannot be

altered by the medium in which those works appear.

### B.    Publicity Rights Laws Are Content-Based And Should Be Subject To Strict Scrutiny When Applied To Expressive Works.

The right of publicity is a *commercial* right that protects the *commercial*

value of a person's identity, and prevents the unauthorized exploitation of a

persona "for purposes of trade." [2]   Restatement (Third), *Unfair Competition* § 47

---

[2] By contrast, expressive works are plainly not "products, merchandise, or goods" created "for purposes of trade."  *See Hoffman v. Capital Cities/ABC Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001) (commercial speech does nothing more than propose a commercial transaction).  However, some courts have unfortunately applied principles of commercial publicity rights jurisprudence to expressive works.  While some of these cases have properly rejected plaintiffs' publicity rights claims, they have done so without drawing a clear distinction between expressive works and commercial speech.  *See, e.g., Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) (song); *Cardtoons*, 95 F.3d at 959 (satirical cards); *Comedy III Prods.*, 25 Cal.4th at 406 (lithographed charcoal drawing); *Winter v. DC Comics*, 30 Cal.4th 881 (2003) (series of comic books); *Kirby v. Sega of Am., Inc.*, 144 Cal.App.4th 47, 58 (2006) (videogames).  *But cf.* Restatement (Third), *Unfair Competition* § 47 cmt. c (1995) ("The use of a person's identity primarily for the purpose of communicating information or expressing ideas is not generally actionable as a violation of the person's right of publicity . . . . Use of another's identity in a novel,

(1995). As such, the right of publicity cannot be allowed to trample upon the

expressive freedom accorded by the First Amendment. *Id.*, cmt. c ("The right of

publicity . . . is fundamentally constrained by the public and constitutional interest

in freedom of expression"). Right of publicity claims are particularly odious to the

First Amendment as they constitute content-based restrictions on expressive works.

*Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) (a speech regulation is content-

based when it cannot be "justified without reference to the content of the regulated

speech"). Hart's claim is thus subordinate to the First Amendment.

Under the First Amendment, content-based restrictions on expressive speech

are subjected to strict scrutiny. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382

(1992) (content-based speech regulation subject to the highest level of scrutiny);

*Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989) (content-based speech

restrictions must be narrowly drawn to serve a compelling government interest).[3]

Consistent with this stringent standard of review, numerous courts have

concluded that expressive works are insulated from publicity rights liability. *See,

e.g.*, *Hoffman*, 255 F.3d at 1185-86 (the First Amendment permits magazines to

---

play, or motion picture is also not ordinarily an infringement"); *Tyne v. Time
Warner Entm't Co., L.P.*, 901 So.2d 802 (Fla. 2005) (because motion pictures and
other expressive works do not promote a product or service, they are categorically
exempt from Florida's publicity rights statute).

[3] Even content-neutral speech restrictions must meet intermediate scrutiny: the
restriction must be narrowly tailored to further a substantial government interest.
*Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994).

use celebrity names and likenesses in feature articles); *Stewart v. Rolling Stone LLC*, 181 Cal.App.4th 664, 692 (2010) (same); *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994) (First Amendment protects use of persona in a literary work, motion picture, news or entertainment story); *Daly v. Viacom, Inc.*, 238 F.Supp.2d 1118, 1123 (N.D. Cal. 2002) (dismissing publicity rights claim because television program was expressive work under the First Amendment); *Ruffin-Steinback v. de Passe*, 82 F.Supp.2d 723, 730 (E.D. Mich. 2000) (right of publicity does not prohibit unauthorized depictions of a life story); *Seale v. Gramercy Pictures*, 949 F.Supp. 331, 337 (E.D. Pa. 1996) (use of persona in documentary is protected First Amendment expression); *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal.3d 860, 866 (1979) (permitting unauthorized use of Rudolph Valentino's name and likeness in semi-fictional television program); *Hicks v. Casablanca Records*, 464 F.Supp. 426, 430 (S.D.N.Y. 1978) (right of publicity does not prohibit the fictionalized account of an event in the life of a public figure); *Polydoros*, 67 Cal.App.4th at 325 (rejecting publicity rights claim because fictionalized film is constitutionally protected); *Ann-Margret v. High Soc'y Magazine, Inc.*, 498 F.Supp. 401, 404-05 (S.D.N.Y. 1980) (the First Amendment protects a magazine's reprinting of a photograph taken from a fleeting scene in a movie); *Rosemont Enters., Inc. v. Random House, Inc.*, 294 N.Y.S.2d 122, 129 (1968) (publication of a biography is "clearly outside the ambit of" the right of publicity).

The District Court below erroneously held that New Jersey's right of publicity law is not a content-based restriction.  The Court made two points:

1. To be content-based, a restriction must regulate "speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Hart v. Electronic Arts, Inc.*, 808 F.Supp.2d 757, 769 (D.N.J. 2011) (quoting *Galena v. Leone*, 638 F.3d 186, 199 (3d Cir. 2011)).

2. "[M]ost courts have not adopted the argument . . . that the 'exercise of state publicity rights is a content-based regulation of speech'" requiring strict or intermediate scrutiny.  *Hart*, 808 F.Supp.2d at 769 (citations omitted).  Rather, "courts apply one of several tests, referred to in the legal discourse as 'balancing tests.'"  *Id.*

First, *Galena* does not stand for the proposition that, to be content-based, a restriction must regulate a speaker's viewpoint.  Rather, the *Galena* Court drew a distinction between viewpoint-based regulations and time, place and manner regulations.  The proper test is much simpler.  "[C]ontent-neutral speech regulations [are] those that are justified without reference to the content of the regulated speech."  *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (internal citations and emphasis omitted).  Thus, if the speech restriction cannot be

enforced without looking to the content of the protected speech, it must be content-based. *Bartnicki*, 532 U.S. at 521. This clearly occurs in all publicity rights cases.

Second, the fact that many courts have chosen to forgo well-established First Amendment scrutiny and instead applied some form of "balancing test" in publicity rights cases does not derogate from copious Supreme Court precedent requiring strict scrutiny of content-based restrictions on expressive works. *See cases cited in City of Renton*, 475 U.S. at 48; *see also Frazier v. Boomsma*, No. CV07-08040, 2007 WL 2808559 at *15 (D. Ariz. Sept. 27, 2007) (right of publicity is a content-based restriction on protected speech, subject to strict scrutiny). Indeed, the body of conflicting case law applying various balancing tests in publicity rights cases demonstrates the need to abandon this paradigm in favor of a categorical exemption protecting expressive works from publicity rights liability.[4]

---

[4] Hart and his supporting *amici* have suggested that the U.S. Supreme Court's ruling in *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 573 (1977), mandates a "balancing" of competing First Amendment and right-of-publicity interests, thereby precluding a bright-line rule. Hart is wrong. *Zacchini* has been routinely limited to its unique facts. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 956 (6th Cir. 2003). Accordingly, *Zacchini* is relevant only when a party has appropriated, without authorization, the entirety of a live performance. That is clearly not true in the instant appeal.

**C.    The Inconsistent Application Of "Balancing Tests" Further Demonstrates The Need For A Bright-Line Rule Exempting Protected Expressive Works From Publicity Rights Liability.**

As the District Court notes, "[c]ourts throughout the United States have utilized up to eight 'balancing' tests that attempt to weigh the First Amendment rights of an author/creator against the right of publicity." *Hart*, 808 F.Supp.2d at 775 (citation omitted). Consequently, "no judicial consensus has been reached on the contours of the First Amendment vis-a-vis the right of publicity" and this body of law has become "disordered and incoherent." *Id*. at 774 (citation omitted); *see also* Thomas F. Cotter, et al., *Integrating the Right of Publicity with First Amendment & Copyright Preemption Analysis*, 33 Colum. J. L. & Arts 165, 167-69 (Winter 2010) ("judicial and scholarly opinion over the viability of publicity claims is all over the map").

The District Courts' contradictory decisions in *Hart*, *Keller v. Electronic Arts, Inc.*, No. C 09-1967, 2010 WL 530108 (N.D. Cal. Feb. 6, 2010), *Brown v. Electronic Arts, Inc.*, 722 F.Supp.2d 1148 (C.D. Cal. 2010) and *Davis v. Electronic Arts, Inc.*, No. 10-CV-03328, slip op. (N.D. Cal. Mar. 29, 2012) exemplify the problem – a problem that originated with *Comedy III*, 25 Cal.4th 387.

In *Comedy III*, the defendant, Gary Saderup, sold lithographs and t-shirts bearing a likeness of the Three Stooges, which he had reproduced from one of his

own charcoal drawings.  The plaintiff rights holder sued under California's right of

publicity statute; Saderup defended on First Amendment grounds.

Rather than draw a dispositive distinction between commercial

"merchandise" (like t-shirts) and expressive works (like Saderup's original

charcoal drawing),[5] the California Supreme Court conceived and applied a

"transformative use" test without regard to the context of the usage.  Under this

test, derived from the fair use doctrine in copyright law, the question is whether

"the *work* in question adds significant creative elements so as to be *transformed*

into something more than a mere celebrity likeness or imitation."  25 Cal.4th at

391 (emphasis added).

In fashioning this balancing test, the *Comedy III* Court improperly ignored

the First Amendment's traditional content-based standard of review, which broadly

applies to all expressive works, without regard to the perceived quality of those

works or to the reputations of their creators.  Instead, the Court upended the First

Amendment's objective neutrality by investing judges and juries with

responsibility for making judgments regarding aesthetic merit, creative value,

artistic purpose and/or "transformativeness."  Constitutional protection cannot turn

---

[5] Such a distinction is made in the Restatement: "The sale of merchandise bearing a
person's name or likeness ordinarily constitutes a use of the identity for purposes
of trade under the rule stated in § 46.  An unauthorized appropriation of another's
name or likeness for use on posters, buttons, or other memorabilia is thus
ordinarily actionable as an infringement of the right of publicity."  Restatement
(Third), *Unfair Competition* § 47 cmt. b (1995).

on such distinctions.  *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)

(noting impossibility of drawing a principled distinction between a *Hustler* parody

and other satire, and concluding that *Hustler* parody was protected by First

Amendment, even if it was low-brow and offensive); *Hurley v. Irish-Am. Gay,*

*Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) ("a narrow,

succinctly articulable message is not a condition of constitutional protection").

Consequently, courts have had difficulty applying balancing tests in a

consistent fashion, particularly in cases involving new forms of media such as

videogames.  Here, the District Court correctly found that EA's use of players'

personas was transformative and dismissed plaintiff Hart's case.  However, in

*Keller*, the District Court applied the "transformative use" test to the same EA

Games at issue here, but allowed plaintiff to maintain his publicity rights claims.

The District Court below properly distinguished *Keller* by noting two of that

Court's analytical failings.  First, *Keller* failed to "address that the virtual image [of

plaintiff] may be altered and that the EA artists created the various formulations of

each player."  *Hart*, 808 F.Supp.2d at 787.  Second, the Court correctly criticized

"*Keller's* approach of focusing solely on the challenged image, as opposed to the

work as a whole."  *Id.*  Recently, the District Court in *Davis* made the same

mistake as *Keller* by upholding a publicity rights claim based upon an erroneous

formulation of the transformative use test that "focuses on the reproduction of

plaintiff's likenesses, rather than on a canvassing of the larger work." *Davis*, No. 10-CV-03328, slip op. at 8.  The *Davis* Court also failed to give any weight to the fact that the avatars in the game at issue, *Madden NFL*, were capable of manipulation by gamers, despite the fact that such interactivity was a basis for the U.S. Supreme Court's ruling in *Brown v. Entertainment Merchants Ass'n*.  *Id*; *Brown v. Entm't Merchants Ass'n*, 131 S.Ct. at 2733.  Notably, the *Davis* Court failed to cite *Brown v. Entertainment Merchants Ass'n* or *Hart*.  This improper focus on the individual likeness may, perhaps, explain some of the inconsistent case law on transformative use.[6]

While the balancing tests crafted by the courts are no doubt well-intended, they undermine the broad protection historically accorded to expressive works. Consequently, they chill speech by increasing the cost of defending publicity rights litigation, however meritless.  As the U.S. Supreme Court noted in another context, speech is not only chilled by successful litigation; it is likewise chilled by the mere threat of litigation.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 214 (2000) ("Competition is deterred . . . not merely by successful suit but by the plausible threat of successful suit").

---

[6] The holding in *Davis* cannot be reconciled with *Brown v. Electronic Arts, supra,* involving the very same *Madden NFL* game.  Like *Keller*, *Brown v. Electronic Arts* is now also awaiting re-argument before the Ninth Circuit on July 13, 2012.

This Circuit should adopt a categorical exemption protecting expressive works, as other courts have done in fact, if not always in name. *See, e.g., Tyne*, 901 So.2d at 808 ("we find that defining the term 'commercial purpose' in section 540.08 [Florida's publicity rights statute] to apply to motion pictures or similar works raises a fundamental constitutional concern"); *Polydoros*, 67 Cal.App.4th at 325 (rejecting publicity rights claim because fictionalized film is constitutionally protected). The Ninth Circuit recently asked, but did not answer, the question of "whether the First Amendment furnishes a defense to misappropriation of publicity that is *broader than the transformative use or public interest defenses*." *Hilton v. Hallmark Cards*, 599 F.3d 894, 909 n.11 (9th Cir. 2010) (emphasis added). To promote continued creativity, as well as a free and open exchange of ideas, this Court should affirm that the *constitutional* freedom of speech trumps the *commercial* right of publicity in all cases involving an expressive work.[7] It should also affirm that all expressive works *are categorically exempt from publicity rights liability*. This will re-align publicity rights law with bedrock constitutional

---

[7] Importantly, a categorical exemption for expressive works will not leave public personalities without recourse for the misuse of their identity. Other causes of action – including defamation, false light invasion of privacy and public disclosure of private facts – would remain available in appropriate cases.

principles, and restore the First Amendment to its rightful predominance and

historic breadth.[8]

## III.  ABSENT A CATEGORICAL EXEMPTION FOR EXPRESSIVE WORKS, THIS COURT SHOULD ADOPT THE *ROGERS* DEFENSE TO RIGHT OF PUBLICITY CLAIMS.

Absent categorical constitutional protection for expressive works, this Court

should recognize the test articulated in *Rogers*, *supra*, as a complete defense to

right of publicity claims.

In *Rogers*, Ginger Rogers claimed that a movie entitled "Ginger and Fred"

created a false impression that it depicted her famous collaboration with dancer

Fred Astaire, when in fact it portrayed two fictional cabaret performers who

imitated, and were thus nicknamed, Ginger and Fred.  Alleging a misappropriation

of her identity, Rogers asserted both Lanham Act and right of publicity claims.

As a threshold matter, the Second Circuit noted that "[m]ovies, plays,

books, and songs are all indisputably works of artistic expression and deserve

---

[8] Adoption of such a categorical exemption accords with section 47 of the Restatement (Third) of Unfair Competition, which is functionally similar and has been applied by several courts to publicity rights claims.  *See, e.g.*, *ETW Corp.*, 332 F.3d at 937 (under section 47, comment d of the Restatement, no right of publicity claim exists for use of persona in a painting commemorating a golf tournament); *Seale*, 949 F.Supp. 331 (under sections 46 and 47 of the Restatement, no claim for the use of Seale's persona in the film *Panther*); *Thoroughbred Legends, LLC v. The Walt Disney Co.*, No. 07-CV1275, 2008 WL 616253, at *12 (N.D. Ga. Feb. 12, 2008) (relying on section 47, comment c of the Restatement in holding that the First Amendment protected the defendants' use of the characters in the film *Ruffian*).

protection." *Rogers*, 875 F.2d at 997.  It then rejected Rogers' contention that the First Amendment applies only where an author has no alternative means of expression, before resolving to construe the Lanham Act narrowly to avoid any undue infringement upon First Amendment freedoms.

To reconcile Rogers' commercial rights with the filmmakers' freedom of speech, the Second Circuit articulated the "artistic relevance" test:

> We believe that in general the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.  In the context of allegedly misleading titles using a celebrity's name, *that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.*

*Id.* at 999.[9]

Applying the "artistic relevance" test to Rogers' Lanham Act claims, the Second Circuit determined that the film's title bore an "ironic meaning that is relevant to the film's content," *id.* at 1001, and concluded that whatever source of confusion the film's title might generate was outweighed by competing First

---

[9] The Second Circuit found support for its "artistic relevance" test in *Guglielmi*, 25 Cal.3d at 865 n.6 (finding that television broadcast entitled "Legend of Valentino: A Romantic Fiction" did not amount to a use which was "wholly unrelated to the individual," and noting that "[a] different result may follow if, for example, respondents had published Rudolph Valentino's Cookbook and neither the recipes nor the menus described in the book were in any fashion related to Rudolph Valentino").  *Rogers*, 875 F.2d at 1004.

Amendment interests.  Based on these findings, the Second Circuit summarily adjudicated Rogers' Lanham Act claims in favor of the defendant filmmakers.

The Second Circuit then analyzed Rogers' publicity rights claim under a very similar test: "the right of publicity [shall not] bar the use of a celebrity's name in a movie title unless the title was 'wholly unrelated' to the movie or was 'simply a disguised commercial advertisement for the sale of goods or services.'" *Id.* at 1004.  Although articulated in a slightly different manner than its Lanham Act "artistic relevance" test, the *Rogers* publicity rights test is functionally similar. Under the first prong of both formulations, the fact-finder must determine if the use of plaintiff's persona is at all "relevant" or "related to" the complained-of work.  Second, the fact-finder must determine if use of the persona is so explicitly misleading that it is nothing more than a disguised commercial advertisement for the sale of goods.  Indeed, the Second Circuit did not conduct a separate analysis of Rogers' publicity rights claim.  Rather, the Court analyzed plaintiff's publicity rights claim by reference to its analysis of the Lanham Act claim, stating "[h]ere, *as explained above*, the title 'Ginger and Fred' is clearly related to the content of the movie and is not a disguised advertisement for the sale of goods or services or a collateral commercial product."  *Id.* at 1004-05 (emphasis added).

Following the Second Circuit's ruling, *Rogers* has been applied to the use of names, likenesses and other indicia of persona in the body, as well as the title, of

expressive works. *See*, *e.g.*, *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (applying "artistic relevance" test to a videogame entitled "Grand Theft Auto"); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (applying "artistic relevance" test to a song entitled "Barbie Girl"); *ETW Corp.*, 332 F.3d at 928 (applying "artistic relevance" test to a sports painting commemorating golfer Tiger Woods' victory at the Masters golf tournament); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 495 (2d Cir. 1989) (applying "artistic relevance" test to a study guide entitled "Spy Notes"); *The Romantics v. Activision Publ'g, Inc.*, 574 F.Supp.2d 758 (E.D. Mich. 2008) (applying "artistic relevance" test to a videogame entitled "Guitar Hero Encore: Rocks the 80s").

Although the *Rogers* test has most often been applied in the Lanham Act context, several courts, including the Second and Sixth Circuits, have applied it to publicity rights claims as well. *See, e.g., Rogers*, 875 F.2d at 1004-05 (applying "wholly unrelated" test to right of publicity claim); *Parks*, 329 F.3d at 460 (same); *The Romantics,* 574 F. Supp. 2d 758 (same).

The MPAA believes that both formulations of the *Rogers* test present a useful defense in publicity right cases, particularly those involving the name or the "realistic" depiction of a public person in an expressive work. First, the *Rogers* test is more appropriate than other tests because it accounts for the fact that

publicity rights claims are akin to Lanham Act claims. *See, e.g., Kirby*, 144

Cal.App.4th at 57 (noting that the Lanham Act is the "federal equivalent" of a right

of publicity claim).  Second, as the District Court in *Hart* ably demonstrated, both

formulations are easy to apply and are well suited to reconciling free speech and

publicity rights.

The "artistic relevance" inquiry is relatively straightforward.  It does not

require any judgments about whether the depiction at issue was *absolutely*

*necessary* to the goals of the artist.  *See E.S.S. Entm't 2000*, 547 F.3d at 1100; *see*

*also Rogers*, 875 F.2d at 999 (finding that the "'no alternative avenues'" test does

not sufficiently accommodate the public's interest in free expression").  A court

need only determine whether that depiction bears *some minimal* artistic relevance –

*i.e.*, greater than "no relevance whatsoever" – to the underlying work.  "In other

words, the level of relevance merely must be above zero."  *E.S.S. Entm't 2000*, 547

F.3d at 1100.  With respect to the second prong of the "artistic relevance" inquiry,

the key question is whether the work at issue "explicitly misleads" the public as to

the source, sponsorship, or endorsement of the work.  Importantly, the mere use of

a name or likeness, *standing alone*, is insufficient to make that use "explicitly

misleading."  *Id.* ("mere use" of a trademark alone cannot suffice to make that use

explicitly misleading).  Indeed, the Ninth Circuit has averred that if "mere use"

were enough, *Rogers* would become a nullity.  *Mattel*, 296 F.3d at 902.

The "wholly unrelated" inquiry is likewise simple.  First, as long as the use of the complaining party's persona is somehow related to the content of the protected expression at issue, then no liability will lie.  *Rogers*, 875 F.2d at 1004. Next, the fact-finder need only determine whether the use of the plaintiff's persona is so misleading that it is "a disguised advertisement for the sale of goods or services or a collateral commercial product."  *Id.* at 1004-05.

Under *Rogers*, expressive works should be protected from publicity rights liability unless the name or likeness at issue bears zero relevance to the content of the work, or is so explicitly misleading that it is nothing more than a disguised commercial advertisement for the sale of goods.[10]  By focusing on these limited inquiries, *Rogers* gives clear, reliable and objective definition to the scope of the

---

[10] The MPAA is not suggesting that the *Rogers* test should supplant the separate, well-established "incidental use" exception.  Although it is not an issue in the instant case, the "incidental use" exception to the right of publicity recognizes that, as a threshold matter, a *de minimis* use of one's persona is insufficient to support a publicity rights claim.  *See*, *e.g.*, *Aligo v. Time-Life Books, Inc.*, No. C94-20707, 1994 U.S. Dist. LEXIS 21559, at *8 (N.D. Cal. Dec. 19, 1994) ("Defendants' use of Plaintiff's picture in the infomercial is incidental and, therefore, does not state either a common law [or statutory publicity rights] claim . . . .  The photograph appears in the 29-minute program once, and for only four seconds. It is one of dozens of Rolling Stone covers used in the program and is insignificant to the commercial purpose of selling the music anthology. It is inconceivable that commercial profits could inure to Defendants as a result of this fleeting and inconsequential use"); *Man v. Warner Bros. Inc.*, 317 F.Supp. 50, 53 (S.D.N.Y. 1970) ("incidental use of plaintiff's forty-five second performance in defendants' motion picture . . . is surely *de minimis*" and is not actionable).  Accordingly, for example, a wall poster containing the image of a celebrity that appears as part of a movie scene's background set dressing is a non-actionable "incidental use."

right of publicity, which reconciles the *constitutional* right of free speech with the

*commercial* right of publicity.

## IV.    THE "TRANSFORMATIVE USE" TEST IS FOCUSED ON THE EXPRESSIVE WORK AS A WHOLE AND DOES NOT REQUIRE TRANSFORMATION OF THE NAME OR LIKENESS ALLEGEDLY USED THEREIN.

If this Court decides to adopt the "transformative use" test, it should: (A) do

so only if it also employs the *Rogers* test; and (B) clarify the analysis to avoid the

pitfalls properly exposed by the District Court's opinion.

### A.    If This Court Were To Adopt The "Transformative Use" Test, It Should Do So Only If It Also Adopts The *Rogers* Test.

As this case demonstrates, application of the "transformative use" test has

led to inconsistent results, particularly where non-traditional media are at issue.

Although this case and *Keller* involve the same EA Games and similarly situated

plaintiffs, application of the "transformative use" test has led to diametrically

opposed results.  Other cases are no better.[11]  As a result, legal scholars have

---

[11] For instance, it is difficult to reconcile the holding in *No Doubt v. Activision Publ'g, Inc.,* 192 Cal.App.4th 1018 (2011), with *Kirby*, 144 Cal.App.4th 47.  In *No Doubt*, the California Court of Appeal applied the transformative use test to the videogame "Band Hero."  Within the game were recreations of the members of the band No Doubt.  In "Band Hero," players are able to choose No Doubt as their avatar and perform as that band in various fantastical arenas, including outer space.  *No Doubt*, 192 Cal.App.4th at 1023.  Instead of looking at the work as a whole, as it was required to do, the court held that the game was not transformative because the avatars were immutable, not fanciful or creative.  *Id.* at 1033.  This is an absurd result that, perhaps, can only be adequately explained by understanding

opined that the "transformative use" test is "unpredictable in outcome." J. Thomas

McCarthy, The Rights of Publicity & Privacy § 8:72 at 269 (2012).

In light of the inconsistent application of the "transformative use" test by the

courts, the MPAA urges this Court to use that test only if it also uses the easy-to-

apply *Rogers* test, as the District Court did below.

### B. The Transformative Use Test Does Not Require Transformation Of The Name Or Likeness Used Therein.

The District Court below applied the "transformative use" test to correctly

determine that EA's constitutional freedom of speech should trump Hart's

commercial right of publicity. It also exposed the flawed "transformative use"

analysis employed by the *Keller* Court. However, the District Court's decision

could be misinterpreted to require that expressive works must alter the image of

publicity rights holders in order to avoid liability under the "transformative use"

test. Accordingly, the MPAA asks this Court to clarify that the EA Games, *when*

---

it as essentially a breach of contract action. *Id.* at 1041 (Epstein, P.J., concurring). By contrast, in *Kirby*, a different California Court of Appeal applied the transformative use test to Sega's creation of a videogame featuring an avatar that was evocative of pop star Kirby and lived in outer space. *Kirby*, 144 Cal.App.4th at 59-62. The court properly refused to impose liability since Kirby's persona was but one of the materials from which the avatar and videogame were synthesized. *Id.* at 61. Thus, the *Kirby* Court properly rejected the "false assumption that the game could not contain a character resembling Kirby without her imprimatur." *Id.*

*viewed as a whole*, are transformative and immune from liability even absent the mechanism by which the virtual players may be altered.

In applying the "transformative use" test, the District Court properly held that "*[v]iewed as a whole*, there are sufficient elements of EA's own expression found in the game that justify the conclusion that its use of Hart's image is transformative and, therefore, entitled to First Amendment protection." *Hart*, 808 F.Supp.2d at 784 (emphasis added). The Court noted that the EA Games had several creative elements apart from Hart's image, including virtual stadiums, players, coaches, referees, mascots, cheerleaders, fans, sound effects, music and commentary – all of which were designed and rendered by EA's team of artists. *Id.* The District Court also took into account "the distinctive interactive nature of video games" as "one of the means by which video games communicate ideas and social messages." *Id.* at 785.

These elements should have provided sufficient evidence of transformativeness to avoid liability since Hart's persona was but a very minor piece of the raw materials from which the EA Games were synthesized and not the "very sum and substance" of the work in question. *Comedy III*, 25 Cal.4th at 406. However, because of the inherent interactivity of the EA Games, the District Court also gave substantial weight to the fact that users are permitted to alter Hart's physical characteristics – including his height, weight, hairstyle, face, body,

musculature and complexion. *Hart*, 808 F.Supp.2d at 785. Although these interactive features further support the District Court's transformative use holding, the absence of the ability to make such alterations in other types of expressive works cannot derogate from the transformativeness of those works "as a whole."

As conceived by the California Supreme Court, the proper inquiry is "whether the celebrity likeness is *one of the 'raw materials' from which an original work is synthesized*, or whether the *depiction or imitation of the celebrity is the very sum and substance of the work in question*." *Comedy III*, 25 Cal.4th at 406 (emphasis added).[12] Stated differently, the dispositive question is whether *the work as a whole*, and not simply the alleged likeness contained therein, *is in some way transformative, such that the creative elements predominate over the literal ones*.[13] *Id.* at 407; *see also Kirby*, 144 Cal.App.4th at 61 (court must "discern if the **defendant's work** contributes significantly distinctive and expressive content") (emphasis added).

---

[12] This is consistent with the "incidental use" doctrine. *See* discussion at n.13, *supra*.

[13] First Amendment jurisprudence has long instructed courts to consider the entire publication for purposes of determining constitutional protection. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 265-66 (1964) (paid editorial advertisements in newspaper are entitled to First Amendment protection); *Hoffman*, 255 F.3d at 1187 (noting that "[w]e must go beyond the altered photograph itself and examine the 'totality of [defendant's] presentation'") (citation omitted)); *see also Miller v. California*, 413 U.S. 15, 24 (1973) (requiring, in the context of assessing obscenity, a determination of "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value").

Thus, even the most literal depictions of a celebrity likeness can be "transformative" where those depictions are analyzed in context to discern the expressive effect the artist sought to achieve in the work as a whole. *See Comedy III*, 25 Cal.4th at 405 ("when a ***work*** contains significant transformative elements, it is . . . especially worthy of First Amendment protection"); *id.* at 407 ("The inquiry is in a sense more quantitative than qualitative, asking whether the literal and imitative or the creative elements predominate in the ***work***") (emphases added).[14]

Were it otherwise, the "transformative use" test would lead to absurd results. For example, an unauthorized biography of Hart, which included photographs of him wearing his college football uniform or playing college football, would be prohibited. So too would a motion picture about a fictional college football player that incorporated historical stock footage of actual college football games and named actual college football players. The First Amendment cannot permit such speech-limiting results. *See*, *e.g.*, *Guglielmi*, 25 Cal.3d at 862 (Bird, C.J. concurring) (allowing semi-fictionalized television biography of actor Rudolph Valentino); *Hicks*, 464 F.Supp. 426 (permitting semi-fictionalized book and movie

---

[14] *See also Winter*, 30 Cal.4th at 890 (finding the characters are but part of a "larger story, which is itself quite expressive"), *id.* at 891 ("What matters is whether ***the work*** is transformative, not whether it is parody or satire or caricature or serious social commentary or any other specific form of expression"), and *id.* ("Here, as we have explained, ***the comic books*** are transformative and entitled to First Amendment protection") (emphases added).

about mystery writer Agatha Christie); *Taylor v. NBC*, No. BC110922, 1994 WL 780690 (Los Angeles Cnty. Super. Ct. Sept. 12, 1994) (rejecting challenge to unauthorized biography and television docudrama about actress Elizabeth Taylor); Restatement (Third), *Unfair Competition* § 47 cmt. c (1995) ("[T]he right of publicity is not infringed by the dissemination of an unauthorized print or broadcast biography.  Use of another's identity in a novel, play or motion picture is also not ordinarily an infringement"); *see also Tyne*, 901 So.2d 802 (rejecting right of publicity claim on behalf of heirs of persons depicted in motion picture *The Perfect Storm* (Warner Bros. 2000), and construing Florida right of publicity statute narrowly to avoid encroaching on the First Amendment).

*ETW Corp.*, *supra*, provides a useful analysis.  In that case, artist Rick Rush created a painting featuring the photorealistic image of Tiger Woods and several other professional golfers to commemorate Woods' victory at the 1997 Masters Tournament.  Applying the "transformative use" test, the Sixth Circuit concluded that, *viewed as an expressive whole*, Rush's painting was much more than a mere literal likeness of Woods:

> It is a panorama of Woods's victory at the 1997 Masters Tournament, with all of the trappings of that tournament in full view, including the Augusta clubhouse, the leader board, images of Woods's caddy, and his final round partner's caddy.  *These elements in themselves are sufficient to bring Rush's work within the protection of the First Amendment*.  The Masters Tournament is probably the world's most famous golf tournament and Woods's victory in the 1997 tournament was a historic event in the world of sports.  *A piece of art that portrays a historic sporting event communicates and celebrates*

> *the value our culture attaches to such events. It would be ironic indeed if the presence of the image of the victorious athlete would deny the work First Amendment protection.*

332 F.3d at 936 (emphasis added).

Based on this analysis, the Sixth Circuit distinguished Saderup's drawing in *Comedy III,* and held that Rush's painting, *when viewed as an expressive whole*, contained "substantial transformative elements." *Id.* at 938.

From a First Amendment perspective, the EA Games are fundamentally the same as Rick Rush's painting. Aside from its interactive component, a videogame celebrating college football that includes realistic depictions of famous college football players is no different from a painting celebrating golf that includes realistic depictions of famous golfers.

Unfortunately, the District Court's mention of the ways in which plaintiff's likeness was transformed by EA may be misinterpreted to mean that the unauthorized use of a name or likeness in a motion picture may be subject to publicity rights liability – a radical departure from existing First Amendment law. Thus, in upholding the District Court's decision, this Court should affirm that transformation of Hart's likeness is not required for a finding that the EA Games are themselves "transformative."

## <u>CONCLUSION</u>

To promote continued creativity, as well as the free and open exchange of ideas, this Court should affirm that all expressive works, including motion pictures, are fully protected from publicity rights liability under the First Amendment.

RESPECTFULLY SUBMITTED this 23rd day of May, 2012.

LOEB & LOEB LLP
DOUGLAS E. MIRELL
ERIC B. SCHWARTZ

By: /s/ Douglas E. Mirell
DOUGLAS E. MIRELL
Attorneys for *Amicus Curiae*
MOTION PICTURE ASSOCIATION
OF AMERICA, INC.

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Appellate Rule 46.1(e), the undersigned hereby certifies

that he is a member in good standing of the bar of the United States Court of

Appeals for the Third Circuit.

RESPECTFULLY SUBMITTED this 23rd day of May, 2012.

LOEB & LOEB LLP
DOUGLAS E. MIRELL
ERIC B. SCHWARTZ

By: /s/ Douglas E. Mirell
    DOUGLAS E. MIRELL
    Attorneys for *Amicus Curiae*
    MOTION PICTURE ASSOCIATION
    OF AMERICA, INC.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 28(a)(11), I certify that this *Amicus* brief complies with the type-volume limitation of Rule 29(d) and Rule 32(a)(7)(B).  The text of this brief is proportionally spaced, has type face of 14-points, and contains 6,970 words, excluding the motion, table of contents, table of authorities and certificates of bar membership, compliance, virus check, and service.

I further certify that the electronically filed brief and the hard copies of the brief are identical.

RESPECTFULLY SUBMITTED this 23rd day of May, 2012.

> LOEB & LOEB LLP
> DOUGLAS E. MIRELL
> ERIC B. SCHWARTZ
>
> By: /s/ Douglas E. Mirell _____
>     DOUGLAS E. MIRELL
>     Attorneys for *Amicus Curiae*
>     MOTION PICTURE ASSOCIATION
>     OF AMERICA, INC.

## CERTIFICATE OF VIRUS CHECK

I hereby certify that a virus check was performed on the electronically filed

brief using Trend Virus Software, version 10.5 and that no viruses were found.

RESPECTFULLY SUBMITTED this 23rd day of May, 2012.

LOEB & LOEB LLP
DOUGLAS E. MIRELL
ERIC B. SCHWARTZ


By: /s/ Douglas E. Mirell
DOUGLAS E. MIRELL
Attorneys for *Amicus Curiae*
MOTION PICTURE ASSOCIATION
OF AMERICA, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2012, I caused the foregoing *Amicus* brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I also hereby certify that I have cause ten copies of the foregoing *Amicus* brief to be delivered to the Court by Federal Express.

RESPECTFULLY SUBMITTED this 23rd day of May, 2012.

LOEB & LOEB LLP
DOUGLAS E. MIRELL
ERIC B. SCHWARTZ


By: /s/ Douglas E. Mirell
    DOUGLAS E. MIRELL
    Attorneys for *Amicus Curiae*
    MOTION PICTURE ASSOCIATION
    OF AMERICA, INC.