No. 11-3750

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

———————

RYAN HART, individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

*v.*

ELECTRONIC ARTS, INC., a Delaware Corporation; DOES 1-50,

*Defendant-Appellee.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

## BRIEF OF AMICI CURIAE THE ORGANIZATION FOR TRANSFORMATIVE WORKS, INTERNATIONAL DOCUMENTARY ASSOCIATION, DIGITAL MEDIA LAW PROJECT AND LAW PROFESSORS IN SUPPORT OF DEFENDANT-APPELLEE AND URGING AFFIRMANCE

Anthony T. Falzone
Julie A. Ahrens
Daniel K. Nazer
Stanford Law School
Center for Internet & Society
559 Nathan Abbott Way
Stanford, CA 94305
(650) 736-9050

Rebecca Tushnet
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
(202) 662-9935

# TABLE OF CONTENTS

STATEMENT OF INTEREST ..................................................... 1

INTRODUCTION ................................................................ 1

ARGUMENT ...................................................................... 4

I.    Publicity Rights Burden A Wide Array Of Important
      Speech And Expression Interests ............................................ 4

II.   Existing First Amendment Tests Are Inconsistent
      And Out Of Place ..................................................... 7

      A.    Courts Apply A Wide Array Of Inconsistent
            Tests ........................................................... 8

      B.    The "Transformativeness Test" And The
            "*Rogers* Test" Balance Substantially Different
            Interests ....................................................... 11

            1.    The "Transformativeness Test" ........................... 12

            2.    The *Rogers* Test ...................................... 16

III.  An Appropriate First Amendment Test Must Account
      For The Specific Justifications For Publicity Rights And
      The Type Of Speech They Affect ........................................ 18

      A.    The Traditional Justifications For Publicity
            Rights Are Overreaching ............................................ 18

      B.    First Amendment Limits On Publicity Rights
            Must Vary Based On The Nature Of The Speech
            Being Regulated ............................................... 22

      C.    A Proper First Amendment Test Must Avoid
            Uncertainty That Chills Speech .................................... 24

D.    Restatement Section 47 Supplies The Proper
First Amendment Test ................................................... 26

IV.    Whichever Test Is Applied, Hart's Claim Should Fail ........... 28

A.    Hart's Interests In Controlling Factual Information
About Himself Are Weak ............................................. 28

B.    EA And The Public Have A Strong First
Amendment Interest In Being Able To Incorporate
Factual Information Into Speech .................................. 29

C.    Hart's Proposed Rule Would Impose Substantial
Burdens On Speech That Is Based On Historical
Events And Actual Participants .................................... 30

CONCLUSION ............................................................................ 32

# TABLE OF AUTHORITIES

## CASES

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ........................................................ 25

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903) ............... 16

*Bosley v. WildWetT.com*, 310 F. Supp. 2d 914 (N.D. Ohio 2004) ............... 8

*Brown v. Entm't Merchants Ass'n,* 131 S.Ct. 2729 (2011).................... 23, 25

*Browne v. McCain*, 611 F. Supp. 2d 1062 (C.D. Cal. 2009)........................ 5

*C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced
    Media, L.P.*, 443 F. Supp. 2d 1077 (E.D. Mo. 2006)............................. 10

*C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced
    Media, L.P.*, 505 F.3d 818 (8th Cir. 2007)....................................... passim

*Cambridge Univ. Press v. Becker*, 08-CV-1425 (May 11, 2012) ............... 13

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).............. 12, 13, 16

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,*
    95 F.3d 959 (10th Cir. 1996)............................................................ passim

*Central Hudson Gas & Elec. Corp. v. Pub. Service Comm'n of N.Y.,*
    447 U.S. 557 (1980) ................................................................................ 23

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
    25 Cal. 4th 387 (2001)..................................................................... passim

*Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003) ........................... 5, 10

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ............................................. 13, 20

*ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915
    (6th Cir. 2003) ...................................................... 5, 6, 7, 22, 26

*ETW Corp. v. Jireh Publ'g, Inc.*, 99 F. Supp. 2d 829 (N.D. Ohio 2000) .... 26

*Facenda v. NFL Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008) ................ 4, 6, 23

*Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001) ...... 6, 28

*Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860 (1979) .......... 5, 6, 29

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .... 12

*Hart v. Electronic Arts, Inc.*, 808 F. Supp. 2d 757 (D.N.J. 2011) ......... 11, 25

*Hoepker v. Kruger*, 200 F. Supp. 2d 340 (S.D.N.Y. 2002) ........................... 8

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180
    (9th Cir. 2001) ................................................................. 5, 9, 23

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) ...................................... 10

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ................................. 21

*Keller v. Electronic Arts, Inc.*, No. C 09-1967,
    2010 WL 530108 (N.D. Cal 2010) ........................................................ 25

*Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47 (2006) ............................ 10

*Lohan v. Perez (Pitbull)*, Case 2:11-cv-05413
    (E.D.N.Y. Mar. 12, 2012) ........................................................................ 4

*Mattel, Inc. v. MCA Records Inc.*, 296 F.3d 894 (9th Cir. 2002) ............... 17

*Mattell, Inc. v. Walking Mountain Prods.*, 353 F.3d 792
    (9th Cir. 2003) ....................................................................................... 11

*Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) ............................ 9, 17

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) .......................... 20, 25

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) .................. 8, 14, 17

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997) ........................... 23

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ...................... 9, 16, 17, 18

*Rosemont Enters. v. Urban Sys., Inc.*, 340 N.Y.S. 2d 144
　(N.Y. Sup. Ct. 1973) ................................................................... 5

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
　902 F.2d 222 (3d Cir. 1990) ..................................................... 16

*Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996) ............... 5, 6

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417
　(1984) ............................................................................. 12, 13

*Speiser v. Randall*, 357 U.S. 513 (1958) ..................................... 25

*Stephano v. News Group Publ'ns, Inc.*, 474 N.E.2d 580 (N.Y. 1984) ........ 19

*Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664 (2010) ...................... 5

*Toffoloni v. LFP Publ'g Group, LLC*, 572 F.3d 1201 (11th Cir. 2009) ........ 9

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ........................... 18

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) ..................... 16

*Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992) ............................ 14

*White v. Samsung Electronics America, Inc.*,
　971 F.2d 1395 (9th Cir. 1992) .......................................... 4, 9, 14

*White v. Samsung Electronics America, Inc.*,
　989 F.2d 1512 (9th Cir. 1993) ..................................................... 6

*Winter v. DC Comics*, 30 Cal. 4th 881 (Cal. 2003) ....................................... 5

*World Wrestling Fed'n Entm't Inc. v. Big Dog Holdings, Inc.*,
　280 F. Supp. 2d 413 (W.D. Pa. 2003) ..................................... 26

*Yankee Publ'g, Inc. v. News Am. Publ'g, Inc.*, 809 F. Supp. 267
(S.D.N.Y. 1992) ...................................................................................... 11

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977) .......... 7

## STATUTES

15 U.S.C. § 1125 ........................................................................................ 22

17 U.S.C. §§ 107, 108, 110 ........................................................................ 13

U.S. Const. art. I, § 8, cl. 8 ........................................................................ 12

## OTHER AUTHORITIES

Michael A. Carrier, *Cabining Intellectual Property Through a
Property Paradigm*, 54 DUKE L.J. 1 (2004) ....................................... 14, 30

Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity
Can Learn from Trademark Law*, 58 STAN. L. REV. 1161
(2006) ...................................................................................... 14, 19, 21

F. Jay Dougherty, *All the World's Not a Stooge: The
"Transformativeness" Test for Analyzing a First Amendment
Defense to a Right of Publicity Claim Against Distribution of a
Work of Art*, 27 COLUM. J.L. & ARTS 1 (2003) ....................................... 10

Rochelle Cooper Dreyfuss, *We Are Symbols and Inhabit Symbols,
So Should We Be Paying Rent? Deconstructing the Lanham Act and
Rights of Publicity*, 20 COLUM.-VLA J.L. & ARTS 123 (1996) ................. 15

Derrik J. Lang, *Lindsay Lohan mugshot featured in liquor industry
ad attacking ignition interlock laws*, Minn. Star Trib., May 2, 2008 ...... 24

Pierre N. Leval, *Toward a Fair Use Standard*,
103 HARV. L. REV. 1105 (1990) ............................................................. 12

Mark P. McKenna, *The Right of Publicity and Autonomous Self-Definition*, 67 U. PITT. L. REV. 225 (2005) ....................................... 19

Restatement (Third) Of Unfair Competition §§ 46, 47 (1995) ....... 14, 17, 26

Rebecca Tushnet, *Copy This Essay*, 114 YALE L.J. 535 (2004).................. 13

Diane L. Zimmerman, *Fitting Publicity Rights into Intellectual Property and Free Speech Theory: Sam, You Made the Pants Too Long!*, 10 DEPAUL-LCA J. ART. & ENT. L. 283 (2000) ....................................... 15

Diane L. Zimmerman, *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. REV. 1503 (2009) .................................................................. 31

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c) of the Federal Rules of Appellate Procedure, amici provide the following disclosures of corporate identity:

The International Documentary Association states that it is a nonprofit organization that has no parent corporation and issues no stock.

The Organization for Transformative Works states that it is a nonprofit organization that has no parent companies and issues no stock.

Digital Media Law Project ("DMLP") is an unincorporated association based at the Berkman Center for Internet & Society at Harvard University. DMLP is not a publicly held corporation or other publicly held entity. DMLP has no parent corporations, and no publicly held company owns 10% or more of DMLP.

## STATEMENT OF INTEREST

Publicity rights are asserted against a broad array of First Amendment speakers and burden a wide variety of speech and expression interests. Amici consist of the International Documentary Association, The Organization for Transformative Works, The Digital Media Law Project, and ten law professors from around the country. Each has a strong interest in ensuring the First Amendment provides consistent and reliable protection to would-be speakers by placing a clear constitutional limit on the types of speech and expression that are subject to publicity rights claims.[1]

## INTRODUCTION

Courts around the country agree the First Amendment must limit the scope of publicity rights in order to protect free speech and expression interests. Yet there is substantial confusion and inconsistency about the nature of that limit. State and federal courts have applied no fewer than six different tests that lead to widely varying results and substantial uncertainty on behalf of First Amendment speakers. Most of these tests – including the

---

[1] A complete list of amici and descriptions of their work is attached as Exhibit A. All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no party or its counsel contributed money that was intended to fund preparing or submitting this brief. Nor did any other person contribute money that was intended to fund preparing or submitting this brief.

transformative test that the district court applied in this case and the "predominant purpose" test that appellant Ryan Hart urges this Court to adopt – ignore three considerations that are essential to crafting a proper First Amendment test.

First, a proper First Amendment test must be clear and predictable. The transformativeness test and predominant purpose tests are both vague and subject to wide variation in interpretation and application. That presents a familiar problem: If would-be speakers cannot determine in advance whether speech is protected, they will steer far clear of the line, whatever it is. This is the chilling effect the Supreme Court has invoked time and again in striking down vague standards that regulate speech. That same concern demands a clear and reliable First Amendment limit here.

Second, a proper First Amendment test should respect the longstanding distinction between commercial and noncommercial speech. Commercial speech is speech that does no more than propose a transaction. State and federal governments have substantial leeway to regulate it, or even ban it altogether insofar as it is untruthful or misleading. Noncommercial speech receives greater protection. The government may not impose content-based restrictions on it except upon the most stringent showing of a compelling governmental interest and narrow tailoring.

Third, a proper First Amendment test should account for the specific justifications for creating publicity rights. It should recognize that the most commonly-invoked justifications – unjust enrichment and the supposed need to create economic incentives for achieving celebrity – are tenuous in general, and the rest (e.g., preventing dilution of endorsement value or consumer confusion) provide no basis to apply publicity rights to anything beyond commercial speech and advertising.

The test that embraces all three of these critical considerations is the *Rogers* / Restatement test urged by Electronic Arts. As articulated in the Restatement (Third) of Unfair Competition, it limits the application of publicity rights to uses made for "purposes of trade" – that is, uses that appear "in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user." Restatement § 47 (1995). It is clear and predictable because it draws a clean line based on the well-established distinction between commercial speech and noncommercial speech. That is the correct distinction here both as a matter of existing First Amendment doctrine, and because the justifications for creating publicity rights are weak or non-existent outside the context of commercial speech.

In this case, the substantive limit in the Restatement is also the proper Constitutional limit. This Court should adopt the *Rogers* / Restatement test as the First Amendment limit on the scope of publicity rights in this Circuit.

## ARGUMENT

### I.    Publicity Rights Burden A Wide Array Of Important Speech And Expression Interests

Publicity rights are unique and remarkably broad. While copyrights protect original expression and patents protect new inventions, publicity rights extend protection to basic facts and inherent personal attributes, such as a person's name, likeness, voice, or other personal characteristics. *See Facenda v. NFL Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008) (use of plaintiff's voice); *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818 (8th Cir. 2007) (use of ballplayers' names and statistics). Indeed, they may be invoked where a defendant has done nothing more than remind us of a celebrity, or simply mentioned her name. *See White v. Samsung Electronics America, Inc.*, 971 F.2d 1395, 1399 (9th Cir. 1992) (reversing dismissal of publicity rights claim because robot in dress and wig turning letters "evoke[d]" Vanna White's identity); *Lohan v. Perez (Pitbull)*, Case 2:11-cv-05413, Doc 11 (E.D.N.Y. Mar. 12, 2012) (asserting right of publicity claim based on fleeting mention of celebrity's name in a rap lyric).

These remarkably broad rights have been asserted against a wide array of First Amendment speakers, including artists, filmmakers, and politicians, as well as publishers of everything from political biographies to comic books, and even baseball statistics. *See, e.g.*, *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915 (6th Cir. 2003) (painting commemorating the Masters and featuring Tiger Woods); *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001) (drawings on t-shirts); *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860 (1979) (film depicting fictionalized biography of Rudolph Valentino); *Rosemont Enters. v. Urban Sys., Inc.*, 340 N.Y.S. 2d 144 (N.Y. Sup. Ct. 1973) (board game); *Browne v. McCain*, 611 F. Supp. 2d 1062 (C.D. Cal. 2009) (presidential campaign commercial); *Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996) (book and film depicting a founder of the Black Panthers); *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664 (2010) (magazine feature); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) (digitally-altered photograph); *Winter v. DC Comics*, 30 Cal. 4th 881 (Cal. 2003) (comic book characters); *Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003) (comic books); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996) (parody trading cards featuring caricatures of major league baseball players); *C.B.C.*, 505 F.3d at 824 (use of names of and

5

statistical information about major league baseball players in fantasy baseball products); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001) (use of player statistics and depictions of their playing styles in documentaries, game day programs and websites). Some of these plaintiffs have prevailed; others have not. But whether a plaintiff prevails or not, the risk of liability and the cost of defending against a lawsuit are themselves enough to chill expression.

Given the impact publicity rights have on free speech interests, courts around the country agree the First Amendment must limit the scope of publicity rights. *See, e.g.*, *ETW Corp.*, 332 F.3d at 936; *Cardtoons,* 95 F.3d at 962 (holding parody baseball card manufacturer's First Amendment expression interests outweighed players' publicity rights); *Seale*, 949 F. Supp. at 337; *Comedy III*, 25 Cal. 4th at 396 (noting the "tension between the right of publicity and the First Amendment"); *Guglielmi*, 25 Cal. 3d at 867 ("Our courts have often observed that entertainment is entitled to the same constitutional protection as the exposition of ideas."); *Gionfriddo*, 94 Cal. App. 4th at 409-10; *see also White v. Samsung Electronics America, Inc.*, 989 F.2d 1512, 1519 (9th Cir. 1993) (Kozinski, J., dissenting from denial of rehearing) (majority decision represents a "speech restriction unparalleled in First Amendment law"); *cf. Facenda*, 542 F.3d at

6

1032 ("courts must circumscribe the right of publicity so that musicians, actors, and other voice artists do not get a right that extends beyond commercial advertisements to other works of artistic expression").

## II.    Existing First Amendment Tests Are Inconsistent And Out Of Place

While there is broad agreement on the need for a First Amendment limit, there is profound inconsistency about what that limit is. The one Supreme Court case that addresses the question provides almost no guidance. In *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977), the Court held the First Amendment did not bar a publicity rights claim against a television broadcaster that included the plaintiff's entire human cannonball act in a television news program. The Court recognized that broadcasting a performer's entire act imposed unique harm because it posed "substantial threat to the economic value of [the] performance" itself. 433 U.S. at 575. The Court distinguished that situation from the use of somebody's name or picture in the press, *see id.* at 576, and subsequent cases have recognized that *Zacchini* provides little guidance where a defendant uses something other than a plaintiff's entire performance. *See, e.g.*, *Cardtoons*, 95 F.3d at 973; *accord ETW Corp.*, 332 F.3d at 956.

Following *Zacchini*, state and federal courts have applied a grab bag of First Amendment tests to answer the questions *Zacchini* left unresolved.

Most are borrowed from other areas of law that address different interests and are applied without detailed consideration of their suitability to the area of publicity rights.

### A.    Courts Apply A Wide Array Of Inconsistent Tests

Courts around the country have applied no fewer than six different First Amendment tests to right of publicity rights claims, creating a patchwork of incoherent rules that inevitably sow confusion and chill speech.

Some courts have looked to copyright law for guidance. Several have borrowed from the fair use doctrine by applying the "transformativeness test" and assessing the extent to which a defendant's work "adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." *E.g.*, *Comedy III*, 25 Cal. 4th at 391; *Bosley v. WildWetT.com*, 310 F. Supp. 2d 914, 928 (N.D. Ohio 2004); *Hoepker v. Kruger*, 200 F. Supp. 2d 340, 349-50 (S.D.N.Y. 2002).

Other courts have looked to the Lanham Act for guidance. They borrow the so-called "*Rogers* test," which asks whether the defendant's use is "wholly unrelated" to the content of the accused work or was "simply a disguised commercial advertisement for the sale of goods or services." *Parks v. LaFace Records*, 329 F.3d 437, 461 (6th Cir. 2003) (citing *Rogers v.*

*Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989)); *Matthews v. Wozencraft*, 15 F.3d 432, 440 (5th Cir. 1994).

Some courts have looked to other First Amendment doctrines, applying a "newsworthiness" standard or the "actual malice" test to define First Amendment limits on publicity rights. *See Toffoloni v. LFP Publ'g Group, LLC*, 572 F.3d 1201, 1208 (11th Cir. 2009); *Hoffman* 255 F.3d at 1186-88. In one case involving classic commercial advertising, the Ninth Circuit refused to acknowledge *any* First Amendment limit. *See White*, 971 F.2d at 1401 n.3.

Still other courts have rejected these approaches in favor of balancing tests. The Tenth Circuit has employed one that weighs one party's "right to free expression and the consequences of limiting that right" against "the effect of infringing" the other party's publicity rights. *Cardtoons* 95 F.3d at 972; *C.B.C.*, 505 F.3d at 823.

Missouri's "predominant purpose" test – the one favored by Hart – is even more amorphous. It asks whether "a product is being sold that predominantly exploits the commercial value of an individual's identity," in which case "that product should be held to violate the right of publicity and not be protected by the First Amendment, even if there is some 'expressive'

content in it that might qualify as 'speech' in other circumstances." *TCI Cablevision*, 110 S.W. 3d at 374 (internal citations omitted).

In the nine years since *TCI* was decided, no court outside Missouri has applied this test. In fact, every court to consider the standard has rejected it. *See C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 443 F. Supp. 2d 1077, 1096 n.26 (E.D. Mo. 2006), *aff'd*, 505 F.3d 818 (8th Cir. 2007); *Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 61 (2006). This is not surprising. The predominant purpose test is hopelessly vague because it "provides no meaningful guidelines as to what purpose is 'predominate.'" *See* F. Jay Dougherty, *All the World's Not a Stooge: The "Transformativeness" Test for Analyzing a First Amendment Defense to a Right of Publicity Claim Against Distribution of a Work of Art*, 27 COLUM. J.L. & ARTS 1, 14 n.67 (2003). Demonstrating its incoherence, the *TCI* court found a "predominant" purpose in the use of a hockey player's nickname as the nickname of a minor character in a multivolume comic work. The test also improperly, and unworkably, requires the court to examine a speaker's motive. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 53 (1988). Among other things, this test could chill every biography based on the prospect of an expensive battle whose outcome would depend on a jury's assessment of the author's purpose, intentions, and desire. Indeed, it would always be possible

to argue that a publisher would not have produced a biography of a newly popular pop singer, or a magazine cover story on a reality television star, if not for the prospect of financial gain. The alternative to trying to read an author's mind is an equally unworkable inquiry into the audience's perception of the purpose of a work. First Amendment protection should not turn on an audience's reaction to speech, and it should not require a survey. *See Mattell, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 801 (9th Cir. 2003) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed.") (quoting *Yankee Publ'g, Inc. v. News Am. Publ'g, Inc.*, 809 F. Supp. 267, 280 (S.D.N.Y. 1992)).

**B.    The "Transformativeness Test" And The "*Rogers* Test" Balance Substantially Different Interests**

As the District Court recognized, the "transformativeness test" and the "*Rogers* test" have emerged as the most commonly applied tests. *See Hart v. Electronic Arts, Inc.*, 808 F. Supp. 2d 757, 776 (D.N.J. 2011). Yet each was designed to address concerns and balance interests that are quite different from those implicated by the right of publicity. As a result, it makes little sense to simply import one or the other without considering those differences.

11

### 1.    The "Transformativeness Test"

Copyright's ultimate goal is to benefit society by stimulating creativity and assuring wide access to its products. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984); U.S. Const. art. I, § 8, cl. 8 (empowering Congress to grant authors exclusive rights in their works "to promote the Progress of Science"). It advances that goal by granting authors a specific set of exclusive rights in their original works. These exclusive rights provide economic incentives to create new works. This cycle makes copyright an "engine of free expression." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

While exclusive rights provide pro-speech incentives, they also restrict a wide array of speech and expression. Without appropriate limitations, exclusive rights may impede, not advance, creation and dissemination. Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1108-09 (1990). The fair use doctrine is a primary mechanism that balances this tension. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575-76 (1994) (the need to protect authors while allowing others to build on their work is an "inherent tension" as old as copyright itself). Along with the distinction between unprotectable facts and protectable expression, fair use is a "First Amendment safeguard" that helps ensure "copyright's

limited monopolies [remain] compatible with free speech principles," *Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003), by providing "breathing space" for new expression and other uses that incorporates existing works. *See Campbell*, 510 U.S. at 579.

In short, the fair use doctrine is designed to balance *competing* speech interests. Exclusive rights generate incentives to create new expression. Fair use limits the scope of those exclusive rights where permitting a use serves other important speech interests. The transformativeness test was created to help assess the purpose for which a defendant used a copyrighted work, and to examine the extent to which that use tends to promote or impede copyright's speech-enhancing purpose. *See Campbell*, 510 U.S. at 578-79.[2]

---

[2]    Transformativeness is *not* a requirement for fair use where other factors indicate that a use does not interfere with copyright's incentive structure. *See, e.g.*, *Sony*, 464 U.S. at 455 (finding that time-shifting of full copies of over-the-air television broadcasts was fair use); 17 U.S.C. § 107 (listing "multiple copies for classroom use" in the preamble of the fair use provision); *Cambridge Univ. Press v. Becker*, 08-CV-1425, Docket 423 (May 11, 2012) (educational purpose of making copies available to students in electronic reserves supported a finding of fair use). Moreover, copyright has limits other than fair use, such as exceptions for face-to-face teaching and for various standard library practices, that also promote free speech. *See* 17 U.S.C. §§ 108, 110. In short, transformativeness is not forced to bear all the weight of First Amendment interests in limiting copyright. *See* Rebecca Tushnet, *Copy This Essay*, 114 YALE L.J. 535, 553 (2004). Nor should it do so in regard to the right of publicity.

There is no analogous reason to limit First Amendment protection in the context of publicity rights. While copyrights reward the creation of new speech and expression, publicity rights serve no such function. They do not demand the creation of anything new, much less new speech or expression. Often, they protect nothing more than innate characteristics such as one's name, appearance or voice. *Parks*, 329 F.3d at 437 (name); *White*, 971 F.2d at 1395 (appearance); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992) (voice). Here, publicity rights are being asserted to protect basic facts about Hart – his height, weight, jersey number, and the fact he played football for Rutgers from 2002 to 2005. (App. 369-70)

While some may suggest that protecting personal attributes may create incentives to expend the time, effort and resources to develop talents that create public recognition, the marginal effect on the incentive is weak or non-existent because there is already plenty of incentive to pursue fame in sports, entertainment, and other similar endeavors. *See* Restatement (Third) of Unfair Competition § 46, comment c (1995); *Cardtoons*, 95 F.3d at 973-74; Michael A. Carrier, *Cabining Intellectual Property Through a Property Paradigm*, 54 DUKE L.J. 1, 43-44 (2004) (offering multiple reasons why a right of publicity is not necessary to create incentives for celebrity); Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn from*

*Trademark Law*, 58 STAN. L. REV. 1161, 1186-89 (2006); Rochelle Cooper Dreyfuss, *We Are Symbols and Inhabit Symbols, So Should We Be Paying Rent? Deconstructing the Lanham Act and Rights of Publicity*, 20 COLUM.-VLA J.L. & ARTS 123, 144 (1996) (noting empirical weakness of incentive claims); Diane L. Zimmerman, *Fitting Publicity Rights into Intellectual Property and Free Speech Theory: Sam, You Made the Pants Too Long!*, 10 DEPAUL-LCA J. ART. & ENT. L. 283, 306 (2000) ("[n]ot a shred of empirical data exists to show that [celebrities] would . . . invest less energy and talent" in becoming famous without a publicity right). In short, the incentive rationale for the right of publicity lacks any empirical support.

Even if rejecting publicity rights claims like Hart's reduced the economic incentive to play football, it would not burden his speech interests (or anyone else's) nor jeopardize the incentive to create new speech or expression. So while EA has a core speech interest at stake, Hart's interest is purely financial. Applying a test that is designed to help balance competing speech interests to a situation where one side has no speech interest makes very little sense.

If anything, the transformativeness test has the potential to cause substantial First Amendment harm by forcing courts into the role of critic. With no original work to measure against the defendant's work, the only

15

metric of "transformation" comes from what the court thinks is artistic, or not, about the defendant's speech. Thus, the *Comedy III* court treated a realistic *visual* representation of celebrities as nontransformative, while never questioning that a realistic *textual* representation—a biography—was fully protected by the First Amendment; likewise, the court specifically said that Andy Warhol's works were transformative because his own fame showed he was engaging in cultural commentary. *Comedy III*, 25 Cal. 4th at 408-09. These kinds of judgments of worthiness are precisely what courts should avoid. *See Campbell*, 510 U.S. at 582-83; *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251-52 (1903).

### 2.    The *Rogers* Test

The purpose of the Lanham Act is to protect the public, and competitors, against commercial deception. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68 (1992); *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc*., 902 F.2d 222, 230 (3d Cir. 1990).

In *Rogers v. Grimaldi*, Italian film director Federico Fellini made a feature film that tells the story of two fictional cabaret performers who imitated the famous American dancers Fred Astaire and Ginger Rogers. Rogers sued the American distributor of the film, contending its title "Fred and Ginger" suggested a false endorsement, and violated her publicity rights.

The court held the First Amendment barred Rogers's Lanham Act claim because the title was "artistically relevant" to the contents of the film. 875 F.2d at 1000-01. In doing so, the Court explained that the expressive interests in using artistically relevant titles justified a prophylactic rule protecting titles that weren't explicitly misleading, despite a theoretical potential for confusion. Similarly, the Court held that Oregon's right of publicity law did not prohibit the use of a person's name in the title of a film unless it is "'wholly unrelated' to the movie or was 'simply a disguised commercial advertisement for the sale of goods or services.'" *Id.* at 1004.

Other courts have adopted the *Rogers* test to determine whether the use of a name or trademark in a title violates the Lanham Act. *See*, *e.g.¸ Mattel, Inc. v. MCA Records Inc.*, 296 F.3d 894, 902 (9th Cir. 2002). Still other courts have defined the First Amendment limits on publicity rights using the same test *Rogers* articulates and have applied that test to both titles and the underlying content of the work. *See Parks*, 329 F.3d at 461; *Matthews*, 15 F.3d at 440. In addition, the Restatement (Third) of Unfair Competition adopts a test that also focuses on the distinction between advertising and other commercial speech on the one hand, and expressive works on the other. *See* Restatement § 47.

While amici agree the *Rogers* test reaches the right result when applied to publicity rights (Part III. D, below), *Rogers* actually assumed that the defendant is entitled to create the underlying film or song. The question that decision focused on was what title the defendant may use. Here, Hart is challenging the content of the work itself. The question here is whether EA is permitted to make the game in the first place. As explained below, the *Rogers* / Restatement approach also supplies the right test to answer that question because it is the test that best accounts for the speech and expression interests at stake and balances them most sensibly with the underlying justifications for publicity rights.

### III.    An Appropriate First Amendment Test Must Account For The Specific Justifications For Publicity Rights And The Type Of Speech They Affect

#### A.    The Traditional Justifications For Publicity Rights Are Overreaching

Restrictions on non-defamatory, noncommercial speech require substantial justification, not mere speculation about some benefit that might derive from the suppression of speech. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994). The traditional justifications for a right of publicity typically focus on: (1) preventing unjust enrichment; (2) creating incentives to become a celebrity; (3) promoting efficiency by preventing dilution of identity; and (4) preventing consumer confusion. Whether taken

individually or together, none of these rationales supports the broad publicity right Hart alleges here, or any application of publicity rights beyond commercial speech.[3]

The unjust enrichment rationale is based on a moral premise: celebrities are entitled to the fruits of their fame and it would therefore be unjust to allow others to profit from their identities. *See Cardtoons,* 95 F.3d at 976. This rationale fails for at least two reasons. First, it assumes that someone should own the exclusive right to profit from an identity in the first place. "[I]n a market economy it is not reasonable to simply assume that someone must own the right to compete in particular ways. But the unjust enrichment rationale makes just such an assumption. As such, it fails to provide a standalone explanation for the publicity right." Dogan & Lemley, *supra*, at 1182-83 (footnote omitted).

---

[3]    Some courts and commentators have suggested that privacy interests provide an additional rationale for publicity rights. *See, e.g.*, *Stephano v. News Group Publ'ns, Inc.*, 474 N.E.2d 580, 584 (N.Y. 1984). That rationale is frequently misplaced because publicity rights are typically invoked by celebrities and applied to situations that do not implicate privacy interests. *See* Dogan & Lemley, *supra*, at 1163, 1208-11. Indeed, the right of publicity as a cause of action was born out of the mis-fit between privacy claims and the interests alleged to be at stake in celebrity cases. *See* Mark P. McKenna, *The Right of Publicity and Autonomous Self-Definition*, 67 U. Pitt. L. Rev. 225, 240-45 (2005). A privacy rationale is especially misplaced here because EA used only facts about Hart (such as his height and jersey number) that are widely known based on his very public participation and performance in Rutgers football games.

Second, there is an equally powerful moral premise against publicity rights. The unhindered dissemination of public facts is a key value of the First Amendment and a fundamental public right. *See, e.g.*, *Eldred v. Ashcroft*, 537 US 186, 219 (2003) (copyright's refusal to protect facts is a built-in First Amendment accommodation; "every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication"). Biographies, parodies, and other plainly protected uses of celebrity identity wouldn't be valuable or even intelligible were it not for the underlying existence of the celebrity, but that is what makes them important responses to the world around us. Walter Isaacson's biography of Steve Jobs is more valuable because of its subject. But the fact that Isaacson derived *value* from Jobs's identity does not justify giving Jobs any *control* over Isaacson's book. The unjust enrichment rationale fails to account for numerous noncommercial uses of identity—such as news media and biographies—that are generally accepted as falling outside the celebrity's control, and it is especially inapplicable to cases like this one where a defendant uses nothing more than historic facts. [4]

---

[4]    Speech does not become "commercial" simply because it is sold, or made for profit. A lot of core First Amendment speech, including as biographies, newspapers, and movies, is undertaken for profit, yet the Supreme Court has repeatedly held such speech is fully entitled to First Amendment protection. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S.

Incentive-based rationales for publicity rights are also unavailing and provide no justification for limiting noncommercial speech. As explained above, there is no reason to believe there are inadequate incentives for attaining celebrity. (Pp. 14-15, above.) Even if there were a need for additional incentives, publicity rights that cover *commercial* speech such as product endorsement and advertising provide those additional incentives. There is no reason to think the marginal effect of controlling *noncommercial* speech would induce anyone to work even harder to become even more famous. *See Cardtoons,* 95 F.3d at 973-74.

Some have suggested that publicity rights promote efficiency by preventing the dilution or overuse of identity. *See id.* at 974-75. At most, it would support a publicity right that applies to commercial speech where "repeated use of a celebrity's likeness to sell products may eventually diminish its commercial value." *Id.* at 975. But it provides no justification for restricting noncommercial speech. *See id.* Moreover, this argument mistakes free speech for a finite resource. In reality, speech is "nonrivalrous: it simply cannot be 'used up.'" Dogan & Lemley, *supra*, at 1185. This means that "the proliferation of celebrity images—like the distribution of other forms of information—only extends the reach of the images, making

254, 266 (1964); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952).

them more available to those who wish to use and enjoy them." *Id.* Just as the reading audience should be free to choose between as many John F. Kennedy biographies as there are willing biographers, the game-playing audience should be free to choose between as many realistic sports games as there are willing programmers (in the absence of defamation or deception over explicit endorsement).

The final rationale for the right of publicity is the claim that it helps prevent consumer confusion. *See Cardtoons,* 95 F.3d at 975. But the Lanham Act "already provides nationwide protection against false or misleading representations in connection with the sale of products" and specific protection against false endorsement. *Id.*; 15 U.S.C. § 1125(a)(1)(A). In any event, the potential for consumer confusion is highest where a celebrity's image, name or likeness is used in commercial speech to tout a product. When descriptions of people are part of the expressive content offered by a publisher, by contrast, the potential for confusion is at its lowest. *See ETW Corp.*, 332 F.3d at 922. Like dilution, consumer confusion provides no basis to restrict noncommercial speech.

### B.    First Amendment Limits On Publicity Rights Must Vary Based On The Nature Of The Speech Being Regulated

While the case law on the limits of publicity rights is muddy and inconsistent, many cases have recognized the critical difference between

22

commercial and noncommercial speech. *See Facenda*, 542 F.3d at 1018 ("we err on the side of fully protecting speech when confronted with works near the line dividing commercial and noncommercial speech"); *Hoffman* 255 F.3d at 1184-86. Commercial speech does no more than propose a transaction. *See Central Hudson Gas & Elec. Corp. v. Pub. Service Comm'n of N.Y.*, 447 U.S. 557 (1980). Misleading commercial speech may be banned outright, whereas truthful commercial speech may be regulated to further a substantial governmental interest if the regulation directly advances the governmental interest asserted and is not more extensive than is necessary to serve that interest. *See id.* Noncommercial speech receives far greater protection. Content-based regulations of noncommercial speech can only survive if they further a compelling government interest and are narrowly-tailored to advance it. *See Brown v. Entm't Merchants Ass'n*, 131 S.Ct. 2729, 2738 (2011). Even then, the regulation must not be vague or overbroad in order to avoid chilling lawful expression. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871–872 (1997).

A First Amendment rule that turns on the distinction between commercial and noncommercial speech is consistent with both the different protection each category of speech receives under First Amendment law, and the strength of the justifications for publicity rights.

As discussed above, economic and moral justifications for publicity rights have their greatest force when another party is using a celebrity's name or likeness to advertise merchandise or other non-expressive products. That sort of use may materially deceive consumers about a celebrity's endorsement of the product, or may interfere with the celebrity's potential endorsement markets.[5] Those justifications are least compelling where a defendant uses basic facts about a person in creating expressive speech. (Pp. 14-15, above.) As a result, the distinctions the First Amendment typically draws between commercial and noncommercial speech are reinforced by the underlying rationales for publicity rights. A proper First Amendment test should therefore respect, not abandon, the traditional distinction between commercial and noncommercial speech.

### C.    A Proper First Amendment Test Must Avoid Uncertainty That Chills Speech

In addition to providing greater protection for noncommercial speech than advertising and other forms of commercial speech, a proper First Amendment test must avoid speech-suppressing uncertainty. Vague laws,

---

[5]    Not all uses of a celebrity's name or image in conventional advertising would necessarily be misleading. An ad highlighting Lindsay Lohan's impaired driving is unlikely to mislead as to Lohan's endorsement. *See* Derrik J. Lang, *Lindsay Lohan mugshot featured in liquor industry ad attacking ignition interlock laws*, Minn. Star Trib., May 2, 2008, http://www.startribune.com/templates/Print_This_Story?sid=18501409.

even narrowly construed, will force potential speakers to "'steer far wider of the unlawful zone'" than if the boundaries of the forbidden areas were clearly marked. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *see also Brown*, 131 S.Ct. at 2743 (Alito, J., concurring in the judgment). This is why the Supreme Court adopted the actual malice rule and placed First Amendment limits on state law libel claims. *New York Times Co.*, 376 U.S. at 279. In doing so, it recognized a clear boundary was crucial to ensuring that speech about public issues remained "uninhibited, robust, and wide-open." *Id.* at 270.

Tests that turns on subjective notions of "transformativeness" or "predominate use" do not provide the clarity the First Amendment demands because they make it difficult for a speaker to determine in advance whether the speech in question is protected or not. Indeed, the transformativeness test has yielded inconsistent answers about the very question that is before the Court in this case. *Compare Hart*, 808 F. Supp. 2d at 784 (concluding that EA's NCAA Football is transformative) *with Keller v. Electronic Arts, Inc.*, No. C 09-1967, 2010 WL 530108 at *5 (N.D. Cal 2010) (finding that EA's NCAA Football is not transformative). First Amendment speakers should not have to guess about the legality of their speech and expression, or endure

years of expensive litigation to establish it. A proper First Amendment limit must lay down a rule with clear and predictable boundaries.

> ### D.     Restatement Section 47 Supplies The Proper First Amendment Test

The Restatement (Third) of Unfair Competition, Section 47, provides a substantive limit on the right of publicity that is clear and unambiguous. It limits the application of publicity rights to only those uses made for "purposes of trade" – that is, uses that appear "in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user." Restatement (Third) Of Unfair Competition § 47 (1995). It further explains that noncommercial use does *not* include "news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses." *Id.*.

Importantly, although the Restatement allows right of publicity claims to reach some merchandizing, it recognizes that "creative works" require First Amendment protection. Restatement § 47, comment c. Many items sold for profit—be they posters, trading cards or t-shirts—include expressive content and thus are protected as creative works. *See, e.g., ETW Corp. v. Jireh Publ'g, Inc.*, 99 F. Supp. 2d 829, 836 (N.D. Ohio 2000), *aff'd* 332 F.3d 915 (6th Cir. 2003) ("print at issue herein is an artistic creation"); *World Wrestling Fed'n Entm't Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413,

445 (W.D. Pa. 2003) (t-shirts); *see also Comedy III*, 25 Cal. 4th at 408-09 (noting expressive content of Andy Warhol's celebrity-inspired works). In contrast, the right of publicity can legitimately prohibit use of a celebrity's identity that creates a false impression of sponsorship because of the particular way in which that identity was used. Properly understood in light of the First Amendment's protections for non-advertising speech, the Restatement's concept of a celebrity identity "placed on merchandise marketed by the user, or … used in connection with services rendered by the user," Restatement § 47, identifies classic trademark and service mark uses that are distinct from expressive uses.

This substantive limit respects the distinction between commercial speech and noncommercial speech, and strikes a sensible balance. It permits publicity rights claims against commercial speech, where a defendant's speech interests are weaker and the rationale for enforcing publicity rights is stronger. At the same time, it limits publicity rights against noncommercial speech, where a defendant's speech interests are stronger, and the rationale for enforcing publicity rights is weaker. It also presents a boundary that is substantially clearer than the transformativeness test.

## IV.    Whichever Test Is Applied, Hart's Claim Should Fail

Whichever test this Court applies, amici urge the Court to keep in mind the far-reaching implications of this case. Imposing liability on EA for this use would force many First Amendment speakers to obtain permission to use even the most basic facts about people and their activities, and would therefore impose profound burdens on public speech interests with little or no public benefit.

### A.    Hart's Interests In Controlling Factual Information About Himself Are Weak

At its core, Hart's complaint is that EA incorporated factual details about him—such as his height, weight, home state, and the fact that he played for Rutgers and wore a wrist band—into its NCAA Football game. (Br. at 20). To the extent Hart has any legitimate interest in censoring speech that incorporates these basic facts, his interest is very weak. *See Gionfriddo*, 94 Cal. App. 4th at 410 (similar information about baseball players "may fairly be characterized as mere bits of baseball's history"). Furthermore, there is no danger that including factual details about Hart might create a false impression of endorsement. *See C.B.C.*, 505 F.3d at 824 (fantasy baseball games cannot create a false impression of endorsement "because the fantasy baseball games depend on the inclusion of all players"). The details concerning Hart are incorporated into EA's work merely because

Hart was, in fact, one participant (among thousands) in the actual events on which EA's work is based. Hart's participation in the Rutgers football program is as much a part of history as Dwight Eisenhower's participation in World War II and D-Day. Hart's participation in actual events does not give rise to any moral or economic rationale that would bestow upon him the right to decide whether anyone else may depict, reference, acknowledge or fictionalize those events – and at what price.

**B.      EA And The Public Have A Strong First Amendment Interest In Being Able To Incorporate Factual Information Into Speech**

In contrast to Hart's weak interests, there is a very strong public and private interest in being able to incorporate real-world information into speech. *See C.B.C.*, 505 F.3d at 823. Any work based on historical events— be it a movie, a novel, a biography, a website, or a computer game—will incorporate factual information and real people to create its setting or characters. *See Guglielmi*, 25 Cal. 3d at 869 (Bird, C.J., concurring) ("No author should be forced into creating mythological worlds or characters wholly divorced from reality."). These speech interests are not diminished when fiction is added to fact to create biopics like *Bonnie & Clyde*. Nor are those speech interests diminished where the fictional layer is supplied by a video game player rather than a script-writer or film producer.

The public has a strong interest both in the specific kind of information Hart seeks to censor from EA's game (factual information regarding who played college football) and in speech generally that incorporates and comments on factual information and real historical figures.

### C.    Hart's Proposed Rule Would Impose Substantial Burdens On Speech That Is Based On Historical Events And Actual Participants

A ruling for Hart in this case would impose extraordinary burdens on speech that is based on historical events and actual participants, not only for video games but for other expressive works like documentaries, biographies, and docudramas. If Hart were to prevail, creators would need the permission of participants in historical events in order to depict them, factually or fictionally. For major events involving hundreds or thousands of participants, the transaction costs of requesting and obtaining consent would be tremendous. And that is assuming consent can be obtained. Hart's rule would give every participant in an event the power to prevent its depiction, or demand control over how it is depicted. *See* Carrier, *supra,* at 142 (noting that the right of publicity may "give celebrities the power to censor alternative versions of their images"). In practice, this hold-up problem could leave entire subjects off-limits. It would likely have been impossible

to make *The Social Network* (a recent portrayal of the rise of Facebook) if the Winklevoss twins—major characters in the narrative—had been given veto rights over the very negative portrayal of them.

Even if content producers like EA and its counterparts in other industries could overcome these burdens, then it is the public who would ultimately bear the cost of Hart's rule. In some cases the increased costs he would impose would stifle expression altogether. In that case, the public loses the expression itself. *See* Diane L. Zimmerman, *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. REV. 1503, 1507 (2009). But even where these burdens can be overcome, the increased costs will be reflected one way or another in the price of the work itself. If Hart's rule prevails, the cost of NCAA Football (and the many other expressive works affected by Hart's rule) will increase and it is the public who pays that price, directly or indirectly. The result is not simply a transfer of wealth from EA to Hart, it is a transfer from millions of consumers to Hart and others like him.

Ultimately, Hart's rule will either stifle speech, or make it more expensive, without offering the public any benefit in return. The Court should reject Hart's invitation, and adopt Restatement Section 47 as the appropriate First Amendment limit.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's summary judgment in favor of Electronic Arts.

Respectfully Submitted,

May 23, 2012 _____/s/ Julie A. Ahrens_____

Anthony T. Falzone
Julie A. Ahrens
Daniel K. Nazer
Stanford Law School
Center for Internet & Society
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 736-9050
falzone@stanford.edu

Rebecca Tushnet
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
Telephone: (202) 662-9935
rlt26@law.georgetown.edu

*Counsel for Amici Curiae*

# EXHIBIT A

The Organization for Transformative Works is a nonprofit corporation dedicated to protecting and preserving noncommercial fanworks: works created by fans of popular culture and celebrities. Fans have written tens of thousands of stories featuring celebrities, often exploring the nature of celebrity itself. The OTW supports the freedom to make new meaning in this fashion and others. It therefore has an interest in preserving a broad right to use the existing world, including the people in it, as the starting point for new creative works.

The International Documentary Association is a non-profit organization that promotes nonfiction filmmaking and is dedicated to supporting documentary filmmakers everywhere. At IDA, we believe that the power and artistry of the documentary art form are vital to cultures and societies globally, and we exist to serve the needs of those who create this art form. For nearly thirty years we have helped protect and advance the rights of thousands of documentary filmmakers and the craft of documentary filmmaking through advocacy, filmmaker services, education, and public programs and events.

The Digital Media Law Project ("DMLP") (formerly known as the Citizen Media Law Project) provides legal assistance, training, and other resources for online and citizen media. As an advocate for the rights of those who gather and disseminate news and information, the DMLP has a strong interest in ensuring that journalists, media organizations, and others are able to perform these functions effectively. To that end, the DMLP regularly contributes to amicus curiae briefs in cases with important implications for online speech, journalism, and the public good. Because this case raises fundamental questions about protections for speech and the extent to which publicity rights can be used to circumvent such protections, this appeal addresses of particular interest to the DMLP and its constituency of citizen journalists, new media startups, and others who engage in online journalism.

The following law professors also join this brief as amici (titles and institutional affiliations are provided for identification purposes only):

Prof. Irene Calboli
Director, Intellectual Property and Technology Program
Marquette University Law School

Danielle M. Conway
Michael J. Marks Distinguished Professor of Business Law &
Director
University of Hawai`i Procurement Institute

Jon M. Garon
Professor of Law
Chase College of Law, Northern Kentucky University

Deborah R. Gerhardt
Assistant Professor of Law
UNC School of Law

Greg Lastowka
Professor
Rutgers School of Law, Camden

Mark A. Lemley
William H. Neukom Professor
Stanford Law School

Yvette Joy Liebesman
Assistant Professor of Law
Saint Louis University School of Law

Phillip R. Malone
Harvard Law School
Cambridge, MA 02138

Jason M. Schultz
Assistant Clinical Professor of Law
UC Berkeley School of Law

Jessica Silbey
Professor of Law
Suffolk University Law School

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

In accordance with 3rd Circuit LAR 46.1(e) Julie A. Ahrens certifies

that she is a member of the Bar of this Court.

May 23, 2012

_____/s/ Julie A. Ahrens_____
Julie A. Ahrens
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 723-2511
jahrens@law.stanford.edu

*Counsel for Amici Curiae*

## <u>CERTIFICATION OF IDENTICAL COMPLIANCE OF BRIEFS</u>

I certify that the electronically filed PDF and hard copies of the brief are identical.

May 23, 2012                              _____/s/ Julie A. Ahrens_____
                                          Anthony T. Falzone
                                          Julie A. Ahrens
                                          Daniel K. Nazer
                                          Stanford Law School
                                          Center for Internet & Society
                                          559 Nathan Abbott Way
                                          Stanford, CA 94305-8610
                                          Telephone: (650) 736-9050
                                          falzone@stanford.edu

                                          Rebecca Tushnet
                                          Georgetown University Law Center
                                          600 New Jersey Ave., NW
                                          Washington, DC 20001
                                          Telephone: (202) 662-9935
                                          rlt26@law.georgetown.edu

                                          *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,971 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.


May 23, 2012                         _____/s/ Julie A. Ahrens_____
                                     Anthony T. Falzone
                                     Julie A. Ahrens
                                     Daniel K. Nazer
                                     Stanford Law School
                                     Center for Internet & Society
                                     559 Nathan Abbott Way
                                     Stanford, CA 94305-8610
                                     Telephone: (650) 736-9050
                                     falzone@stanford.edu

                                     Rebecca Tushnet
                                     Georgetown University Law Center
                                     600 New Jersey Ave., NW
                                     Washington, DC 20001
                                     Telephone: (202) 662-9935
                                     rlt26@law.georgetown.edu

                                     *Counsel for Amici Curiae*

## <u>CERTIFICATION OF VIRUS CHECK</u>

I hereby certify that a virus check was performed on the electronically filed PDF version of the brief using Sophos v.9.5 and that no viruses were found.

May 23, 2012                    <u>        /s/ Julie A. Ahrens            </u>
                               Anthony T. Falzone
                               Julie A. Ahrens
                               Daniel K. Nazer
                               Stanford Law School
                               Center for Internet & Society
                               559 Nathan Abbott Way
                               Stanford, CA 94305-8610
                               Telephone: (650) 736-9050
                               falzone@stanford.edu

                               Rebecca Tushnet
                               Georgetown University Law Center
                               600 New Jersey Ave., NW
                               Washington, DC 20001
                               Telephone: (202) 662-9935
                               rlt26@law.georgetown.edu

                               *Counsel for Amici Curiae*

## DECLARATION OF SERVICE

I, JULIE A. AHRENS, under penalty of perjury, declare and state that I am over eighteen years of age and not a party to the above-captioned action, and that on the 23rd day of May, 2012, I caused the Brief of Amici Curiae The Organization for Transformative Works, International Documentary Association, Digital Media Law Project and Law Professors to be served on counsel of record and the Clerk's Office via the Court's electronic filing system.

May 23, 2012                              /s/ Julie A. Ahrens
                                          Anthony T. Falzone
                                          Julie A. Ahrens
                                          Daniel K. Nazer
                                          Stanford Law School
                                          Center for Internet & Society
                                          559 Nathan Abbott Way
                                          Stanford, CA 94305-8610
                                          Telephone: (650) 736-9050
                                          falzone@stanford.edu

                                          Rebecca Tushnet
                                          Georgetown University Law Center
                                          600 New Jersey Ave., NW
                                          Washington, DC 20001
                                          Telephone: (202) 662-9935
                                          rlt26@law.georgetown.edu

                                          *Counsel for Amici Curiae*