No. 11-3750

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

**RYAN HART**,

*Plaintiff-Appellant*,

v.

**ELECTRONIC ARTS, INC.,**

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

**APPELLANT'S REPLY BRIEF**

---

Timothy J. McIlwain
Attorney at Law, LLC
5 Marine View Plaza, Suite 300
Hoboken, NJ  07030
Ph:  (201) 420-1911
Fax: (201) 420-8054

*Attorney for Plaintiff-Appellant
Ryan Hart*

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.     This Court Should Adopt a Balancing Test that Protects the Parties' Core Interests by Prohibiting Only Those Right-of-Publicity Suits that Pose a Significant Threat to First Amendment Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     A.     The Predominant Use Test Properly Weighs the Parties' Competing Interests by Asking Whether the Commercially Exploitative Aspects of a Challenged Use Predominate Over Its Expressive Aspects. . . . . . . . . . . . . 9

     B.     Because EA Did Not Transform Hart's Likeness into Its Own Expression, Hart's Claim Should Be Allowed To Proceed Under the Transformative Use Test. . . . . . . . . . . 13

          1.     The Transformative Use Test Asks Whether the Defendant Has Transformed the Plaintiff's Likeness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          2.     EA's Use of the College Athletes' Likenesses Was Not Transformative. . . . . . . . . . . . . . . . . . . . . . . . . 19

     C.     EA's "Relatedness" Test Does Not Adequately Balance the Parties' Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     D.     Hart's Publicity Rights Outweigh EA's First Amendment Rights Under an Ad Hoc Balancing Test. . . . . . 26

          1.     The Right of Publicity Serves Important State Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

2.      Hart's Publicity Rights Can Be Protected Without
        Any Significant Infringement Upon EA's First
        Amendment Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    II.     Additional Factual Development May Be Warranted. . . . . . . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Brown v. Entm't Merchs. Ass'n*,
  131 S. Ct. 2729 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*C.B.C. Distrib. and Mktg., Inc. v. Major League Baseball
  Advanced Media, L.P.*, 505 F.3d 818 (8th Cir. 2007). . . . . . . . . . . . . . 26, 32, 35

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Cardtoons, L.C. v. MLBPA*,
  95 F.3d 959 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 32, 34

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*,
  150 F.3d 132 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dillinger v. Electronic Arts, Inc.*,
  No. 1:09-cv-1236-JMS-DKL, 2011 WL 2457678
  (S.D. Ind. June 16, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Doe v. Abbington Friends Sch.*,
  480 F.3d 252 (3d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Elvis Presley Enters. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
  547 F.3d 1095 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*ETW Corp. v. Jireh Publ'g, Inc.*,
  332 F.3d 915 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 26, 32, 34

*Facenda v. N.F.L. Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 22, 36

*Harte-Hanks Commc'ns v. Connaughton*,
    491 U.S. 657 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hilton v. Hallmark Cards*,
    599 F.3d 894 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

*Int'l News Serv. v. Associated Press*,
    248 U.S. 215 (1918). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Keller v. Electronic Arts, Inc.*,
    No. C 09-1967 CW, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010). . . . . . . . . 4, 15

*Lloyd Corp. v. Tanner*,
    407 U.S. 551 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Matthews v. Wozencraft*,
    15 F.3d 432 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*McFarland v. Miller*,
    14 F.3d 912 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Miller v. California*,
    413 U.S. 15 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*No Doubt v. Activision Publ'g, Inc.*,
    702 F. Supp. 2d 1139 (C.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Parks v. LaFace Records*,
    329 F.3d 437 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22, 24

*Romantics v. Activision Publ'g, Inc.*,
    574 F. Supp. 2d 758 (E.D. Mich. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Ruffin-Steinback v. dePasse*,
    82 F. Supp. 2d 723 (E.D. Mich. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Seale v. Gramercy Pictures*,
    949 F. Supp. 331 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*St. Surin v. Virgin Islands Daily News, Inc.*,
    21 F.3d 1309 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Time, Inc. v. Hill*,
    385 U.S. 374 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 24

*Univ. of Alabama v. New Life Art, Inc.*,
    _ F.3d _, No. 09-16412, 2012 WL 2076691 (11th Cir. June 11, 2012) . . . . . 23

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Waits v. Frito-Lay, Inc.*,
    978 F.2d 1093 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

*Zacchini v. Scripps-Howard Broad. Co.*,
    433 U.S. 562 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**STATE CASES**

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
    21 P.3d 797 (Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Doe v. TCI Cablevision*,
    110 S.W.3d 363 (Mo. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gionfriddo v. Major League Baseball*,
    114 Cal. Rptr. 2d 307 (Cal. Ct. App. 2001) . . . . . . . . . . . . . . . . . . . . . 11, 32, 35

*Guglielmi v. Spelling-Goldberg Prods.*,
    603 P.2d 454 (Cal. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kirby v. Sega of America, Inc.*,
    50 Cal. Rptr. 3d 607 (Cal. Ct. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

*Lugosi v. Universal Pictures*,
    603 P.2d 425 (Cal. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Montgomery v. Montgomery*,
    60 S.W.3d 524 (Ky. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*No Doubt v. Activision Publ'g, Inc.*,
    122 Cal. Rptr. 3d 397 (Cal. Ct. App. 2011). . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Winter v. D.C. Comics*,
    69 P.3d 473 (Cal. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11, 17

## DOCKETED CASES

*Brown v. Electronic Arts, Inc.*,
    No. 2:09-cv-01598-FMC-RZx (C.D. Cal. Sept. 23, 2009). . . . . . . . . . . . . . . . 23

*Davis v. Electronic Arts, Inc.*,
    No. 3:10-cv-03328-RS (N.D. Cal. Mar. 29, 2012). . . . . . . . . . . . . . . . . 4, 15, 16

## FEDERAL RULES

Fed. R. Civ. P. 56(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## MISCELLANEOUS

Mark F. Grady, "A Positive Economic Theory of the Right of Publicity,"
    1 UCLA Ent. L. Rev. 97 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

International Intellectual Property Alliance, *Copyright Protection
    and Enforcement Around the World* (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Russell S. Jones, Jr., "The Flip Side of Privacy: The Right of Publicity, the First Amendment, and Constitutional Line Drawing - A Presumptive Approach," 39 Creighton L. Rev. 939 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Roberta Rosenthal Kwall, "Fame," 73 Ind. L.J. 1 (1997). . . . . . . . . . . . . . . . 28, 30

Stuart Klawans, "Dead Stars, Alive Again," N.Y. Times, Aug. 1, 2004. . . . . . . . . 7

Pierre N. Leval, *Toward a Fair Use Standard,* 103 Harv. L. Rev. 1105 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

J. Thomas McCarthy, *The Rights of Publicity and Privacy* (2d ed. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30, 33

McCormick & McCormick, "The Myth of the Student Athlete: The College Athlete as Employee," 81 Wash. L. Rev. 71 (2006). . . . . . . . 31, 33

Melville B. Nimmer, "The Right of Publicity," 19 Law & Contemp. Probs. 203 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Richard A. Posner, "The Right of Privacy," 12 Ga. L. Rev. 393 (1978). . . . . . . . 29

*Restatement (Third) of Unfair Competition* §47 cmt. c. . . . . . . . . . . . . . . . . . . . . 24

Claire Suddath, "How Tupac Became a Hologram (Is Elvis Next?)," Businessweek.com, Apr. 16, 2012, *available at* http://www.businessweek.com/articles/2012-04-16/ how-tupac-became-a-hologram-plus-is-elvis-next. . . . . . . . . . . . . . . . . . . . . . 26

**INTRODUCTION**

Defendant-appellee Electronic Arts ("EA") does not dispute the principal legal and factual underpinnings of plaintiff-appellant Ryan Hart's appeal from the district court's summary judgment order.

First, concerning the appropriate legal standard, EA agrees as a threshold matter that the Supreme Court's decision in *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977), requires an actual balancing of Hart's right-of-publicity interests and EA's First Amendment interests. EA concedes (as it must) that non-commercial expressive works are *not* categorically exempt from right-of-publicity claims, and that whatever test is applied must attempt to accommodate the public policies underlying both sets of interests. *See* Brief for Defendant-Appellee Electronic Arts Inc. ("EA Br.") at 11 ("Hart's right-of-publicity claim must be balanced against EA's fundamental First Amendment rights."); *id*. at 30 n.49 ("[That] 'First Amendment rights do not automatically trump a plaintiff's publicity rights' [is] something that neither EA nor the district court ever disputed."); *see also Zacchini*, 433 U.S. 562 (allowing claim targeting news broadcast); *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797 (Cal. 2001) (upholding claim targeting artist's lithographs); *No Doubt v. Activision Publ'g, Inc.*, 122 Cal.Rptr.3d 397 (Cal. Ct. App. 2011) (upholding claim targeting video games); *Doe v. TCI*

1

*Cablevision*, 110 S.W.3d 363, 374 (Mo. 2003) (upholding claim targeting comic book).

Second, for purposes of this summary judgment appeal, EA does not dispute several crucial facts, including that: 1) Hart pleaded a valid right-of-publicity claim under New Jersey law, EA Br. 11; 2) the depictions of Ryan Hart and other college athletes in "NCAA Football" realistically replicate those players' likenesses and personal attributes, *id.* 34; 3) EA's decision to use realistic replicas of actual college football players, rather than anonymous stock characters, does not affect its games' functionality or operation or the creative and expressive elements of those games, *id.* 28-29; and 4) the reason EA has chosen to depict actual, well-known athletes is to increase the games' "sense of verisimilitude," *see id.* 35 – thus increasing the games' appeal to potential purchasers and leveraging the athletes' fame for commercial gain, *see* Appellant's Opening Brief ("Opening Br.") at 21-22; Amicus Curiae Brief of the National Football League Players Association *et al.* ("Players Br.") at 11-17.

EA will be entitled to dispute these facts at trial. For purposes of this appeal, though, these concessions must be accepted as true. The question now to be decided is whether EA is entitled to First Amendment protection for its "NCAA Football" video games as a matter of law, even though the games would operate

2

no differently and would be no less expressive if they depicted imaginary players rather than real, easily identifiable individuals like Ryan Hart.

EA urges this Court to balance the parties' respective interests by applying the Lanham Act's "relatedness" test. But that test does not give any weight to the important interests served by New Jersey's century-old right of publicity. As EA acknowledges, the relatedness test only protects the right of publicity in the narrow category of cases involving threats of "consumer confusion" – *i.e.*, cases involving commercial speech or claims of false endorsement. Because the test ignores the significant state law interests served by the right of publicity, it does not actually *balance* anything.

A more appropriate test, which enables the Court to weigh *both* sets of competing interests, asks whether defendant's appropriation furthers an independent expressive purpose or is instead tangential to defendant's First Amendment right of expression. In the words of the California Supreme Court, the question should be whether EA's appropriation of Hart's likeness and identity had the effect of "directly trespassing on [Hart's] right of publicity" (by exploiting the commercial value of that likeness for EA's commercial gain) "without adding significant expression beyond that trespass . . . ." *Comedy III*, 21 P.3d at 808. That inquiry appropriately focuses on how plaintiff's identity is actually used in

3

the context of defendant's work, not just on the threshold issues of *whether* plaintiff's right of publicity was infringed by defendant's work and *whether* defendant's work had other expressive elements.  By analyzing whether the challenged appropriation is central to defendant's protected expression rather than peripheral (or unrelated, as here), this approach accommodates both parties' interests and achieves a true balancing, without sacrificing protected rights.  After all, the First Amendment is not seriously threatened by suits targeting depictions that do not add significant expressive content.

This Court can accomplish this required balancing by adopting either the Missouri Supreme Court's predominant use test, *see TCI Cablevision*, 110 S.W.3d at 374, or the California Supreme Court's transformative use test, *see Comedy III*, 21 P.3d at 808-10 – applied with a proper focus on whether *plaintiff's likeness* has been "transformed" by defendant into its own expression (as in *Winter v. D.C. Comics*, 69 P.3d 473, 479 (Cal. 2003); *Kirby v. Sega of America, Inc.*, 50 Cal.Rptr.3d 607, 615-16 (Cal. Ct. App. 2006); *No Doubt v. Activision, Inc.,* 122 Cal.Rptr.3d at 411; *Hilton v. Hallmark Cards*, 599 F.3d 894, 911 (9th Cir. 2010); *Keller v. Electronic Arts, Inc.*, No. C 09-1967 CW, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010); and *Davis v. Electronic Arts, Inc.*, No. 3:10-cv-03328-RS (N.D. Cal. Mar. 29, 2012)).

4

To be sure, this proposed approach requires case-by-case adjudication, in contrast to EA's one-size-fits-all rule.  Yet EA's rule would eliminate the right of publicity in nearly all cases involving non-commercial expressive works, while Hart's approach has the distinct advantage of accommodating both sets of important rights, including in cases where no true conflict exists, as here.[1]

Hart's proposed approach also would not hamstring future courts as they confront advancing digital technology that will inevitably create new forms of hyper-realistic imagery that now seem inconceivable.  Technology has allowed video game manufacturers to create ever-more-accurate depictions of celebrity likenesses.[2]  Future games will undoubtedly include even more realistic avatars, perhaps represented in three dimensions or holographically, and may enable users to manipulate those avatars in unforeseen (and potentially objectionable) ways.

---

[1]  *See* EA Br. 47 (all right-of-publicity claims should fail unless the appropriated likeness of plaintiff is a disguised endorsement or is "wholly unrelated to the content of the work"); Brief of Amici Curiae the Organization for Transformative Works *et al.* ("OTW Br.") at 26 (no right-of-publicity claims targeting "creative works" should be permitted); Amicus Curiae Brief of the Motion Picture Association of America, Inc. at 3 ("[A]ll expressive works must be categorically exempt from publicity rights liability.").

[2]  The video game in *No Doubt*, for example, included a "Character Manipulation Feature" that allowed users "to manipulate each [band member]'s likeness to engage in unapproved acts with other characters included in the game." 702 F.Supp.2d 1139, 1140 (C.D. Cal. 2010).

These advances will not be limited to video game technology, either.  Life-like

replicas of deceased musical artists are now "performing" live concerts.  *See, e.g.*,

Claire Suddath, "How Tupac Became a Hologram (Is Elvis Next?),"

Businessweek.com, Apr. 16, 2012, *available at* http://www.businessweek.com/

articles/2012-04-16/how-tupac-became-a-hologram-plus-is-elvis-next.  Deceased

stars such as Sir Laurence Olivier are "acting" in new movies.  *See* Stuart

Klawans, "Dead Stars, Alive Again," N.Y. Times, Aug. 1, 2004, at 44.  It is not

far-fetched to imagine a future action movie starring a "young" Tom Cruise, a

future concert appearance by the "reunited" Beatles, or a news broadcast hosted by

Walter Cronkite.  Yet, under EA's interpretation of the First Amendment, all of

these products could be marketed without licenses, consent, or payment to the

individuals whose valuable personas have been appropriated solely to exploit their

commercial value.

     "In considering the application of unchanging constitutional principles to

new and rapidly evolving technology, [courts] should proceed with caution."

*Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2742 (2011) (Alito, J.,

concurring).  The right of publicity provides an important check on the

unauthorized commercial exploitation of a public figure's likeness and identity.

Whatever balancing test this Court applies must accommodate the important

proprietary, dignitary, and autonomy interests underlying this established common

law right, which is increasingly threatened by technological advances in digital

hyper-realism.

## ARGUMENT

### I.    This Court Should Adopt a Balancing Test that Protects the Parties' Core Interests by Prohibiting Only Those Right-of-Publicity Suits that Pose a Significant Threat to First Amendment Rights

In *Zacchini*, 433 U.S. 562, the Supreme Court recognized that the right of

publicity serves important state law interests, and concluded that expressive works

protected by the First Amendment – including, in that case, a news broadcast

(which is the highest level of core protected speech) – are not automatically

shielded from right-of-publicity suits.  Instead, after balancing plaintiff's publicity

rights against defendant's First Amendment rights, *Zacchini* held that plaintiff's

right-of-publicity suit should proceed to trial.  *See* 433 U.S. at 575-77.

EA acknowledges that *Zacchini* requires such a balancing approach, but

asks the Court to view this case solely through a First Amendment lens, with First

Amendment interests always trumping publicity interests outside the narrow

categories of advertising, merchandising, and false endorsements.  The Supreme

Court rejected that approach in *Zacchini*, though, finding "ample reasons" to

conclude that the First Amendment did not "immunize" the news broadcast in that

7

case – which was non-commercial speech and did not involve merchandising or false endorsements.  433 U.S. at 574-75.

Rather than adopting EA's approach, which is inconsistent with *Zacchini* and would prohibit nearly all right-of-publicity suits involving "expressive" works without regard to the functional role of the unauthorized reproductions, this Court should adopt the Missouri Supreme Court's predominant use test, which protects a plaintiff's right to challenge an appropriation that "poses a substantial threat" to the key values protected by the state law right of publicity but that is not integral to defendant's First Amendment rights of speech or expression.  *See Zacchini*, 433 U.S. at 575.  As the Missouri Supreme Court recognized, the principal inquiry should be whether defendant's use of plaintiff's likeness "predominantly exploits the commercial value of an individual's identity" – depriving plaintiff of a core interest protected by the right of publicity without adding independent expressive significance – or whether, conversely, defendant's use of that identity is primarily "an expressive comment on or about [the individual or identity]" that is thus protected by the First Amendment.  *See TCI Cablevision*, 110 S.W.3d at 374.  That same balance can also be achieved through the transformative use test, which, when properly applied, asks whether *plaintiff's likeness* has been "so transformed" by the defendant "that it has become primarily the defendant's own expression

8

rather than the [plaintiff's] likeness." *See Comedy III*, 21 P.3d at 809. Under

either test, the trial court's summary judgment order cannot stand.[3/]

### A.    The Predominant Use Test Properly Weighs the Parties' Competing Interests by Asking Whether the Commercially Exploitative Aspects of a Challenged Use Predominate Over Its Expressive Aspects

Under any appropriate balancing test, this Court must determine whether the

infringement of the athletes' publicity rights in EA's "NCAA Football" games

outweighs the threat to EA's First Amendment rights posed by Hart's suit. The

predominant use test focuses directly on that question. For that reason, it is

preferable to other tests that address that question only indirectly, *e.g.*, by asking

whether the challenged use exhibits "transformation" or "relatedness." *See, e.g.*,

Russell S. Jones, Jr., "The Flip Side of Privacy: The Right of Publicity, the First

Amendment, and Constitutional Line Drawing – A Presumptive Approach," 39

Creighton L. Rev. 939, 959 (2006) ("Focusing on the purpose of using the

celebrity's identity will simplify the analysis and appropriately balance [the

competing interests].").

As Hart and the Players Associations have demonstrated, EA realistically

---

[3/]    There is no basis for EA's amici's contention that right-of-publicity laws constitute "content-based" speech restrictions subject to strict scrutiny, for the reasons explained in the Players Associations' brief. *See* Players Br. 19-23.

depicts actual college athletes not for any identifiable expressive purpose, but solely to increase the sales and marketability of "NCAA Football." *See* Opening Brief at 21-22; Players' Br. 11-17. Like the depictions of the band members in *No Doubt*, EA's depictions of college athletes "encourage[] [the athletes'] sizable fan base to purchase the game so as to perform as, or alongside, the [athletes]." 122 Cal.Rptr.3d at 411. EA's games do not recreate historical events involving the athletes, tell a story about the athletes depicted, or communicate any other message or commentary about the athletes. *See* EA Br. 5-6. "NCAA Football" would contain the same expressive elements whether or not the real players depicted therein were readily identifiable.

EA asks this Court to reject the predominant use test because it "violates longstanding First Amendment precedent that protection is not diminished because of a creator's profit motivation." EA Br. 53. This argument mischaracterizes Hart's position and misstates the test. The predominant use test is not concerned with a defendant's subjective "profit motivation;" many predominantly expressive works are motivated partly by the possibility of profit. Nor does it depend on whether the work is sold for profit (like many predominantly expressive uses). Instead, the test requires an objective evaluation of the challenged use and its function within the work as a whole. The crucial inquiry is whether the

10

challenged appropriation constitutes a significant aspect of defendant's expression rather than a peripheral addition whose function principally increases marketability. *See TCI Cablevision*, 110 S.W.3d at 374 (asking whether a particular appropriation "has very little [expressive] value compared to its commercial value," such that it is "predominantly a ploy to sell [the product] rather than an artistic or literary expression.").

EA cites cases holding that speech that is otherwise protected by the First Amendment is not stripped of that protection simply because of an underlying profit motive.[4] But that non-controversial proposition is irrelevant here. There is no dispute about *whether* EA's games are expressive works. Rather, the question on appeal is how the Court should balance EA's right to engage in expressive activity against Hart's right not to have his identity exploited for commercial purposes. Because the very purpose of the right of publicity is to "prevent[] unjust enrichment by the theft of good will," *Zacchini*, 433 U.S. at 576, the fact that EA's

---

[4] EA Br. 22-24 (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976); *Time, Inc. v. Hill*, 385 U.S. 374, 397 (1967); *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989)); *see also Gionfriddo v. Major League Baseball*, 114 Cal.Rptr.2d 307, 315 (Cal. Ct. App. 2001) (profit motive alone does not make speech "commercial"); *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 460 (Cal. 1979) (Bird, C.J., concurring) (profit motive does not "determine whether an expression is entitled to [First Amendment] protection"); *Winter*, 69 P.3d at 479 ("If the challenged work is transformative, the way it is advertised cannot somehow make it nontransformative.").

11

unauthorized depictions of college athletes function primarily as commercial exploitation rather than as creative expression is central to the required balancing.

EA also contends that the predominant use test is overly subjective and leaves the ultimate determination of liability "to the aesthetic tastes of the judge or jury." EA Br. 54-55. That is not true either. The required inquiry into whether a particular use is predominantly commercial or expressive has nothing to do with subjective motivations. Rather, it is an objective test that focuses on the challenged use in the context of the work as a whole and the manner in which the work is marketed and sold.[5] While the distinction between predominantly commercial and predominantly expressive uses may "sometimes be subtle, it is no more so than other distinctions triers of fact are called on to make in First Amendment jurisprudence." *Comedy III*, 21 P.3d at 811 (citing *Miller v. California*, 413 U.S. 15, 24 (1973)); *cf. Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1016-18 (3d Cir. 2008) (applying three-factor test to determine whether NFL film was "commercial speech").

In this case, application of the predominant use test requires reversal. EA

---

[5] In *TCI Cablevision*, for example, defendant disclaimed nearly every possible expressive purpose for its use of plaintiff's identity, and defendants' marketing efforts capitalized upon the comic book's use of plaintiff's persona. *See* 110 S.W.3d at 366-68, 374.

does not dispute that its depictions of real college athletes in "NCAA Football" exploit the commercial value of the athletes' likenesses.  In addition, EA fails to explain how the expressive content of "NCAA Football" would be any different if those games did not depict real college athletes.[6/]  Given these facts, the district court erred in concluding, as a matter of law, that the First Amendment shields EA from Hart's right-of-publicity suit.

**B.    Because EA Did Not Transform Hart's Likeness into Its Own Expression, Hart's Claim Should Be Allowed To Proceed Under the Transformative Use Test**

Although the predominant use enables this Court to balance the parties' interests in the most straightforward manner, this Court should reverse and remand under the transformative use test as well, which the district court misapplied.

---

[6/]    EA argues that under the First Amendment, this Court cannot consider whether the depictions of real college athletes in "NCAA Football" are peripheral rather than central to the games' expressive content.  EA Br. 28.  The cited authorities do not support that argument, but simply decline to apply the "alternative avenues" approach, which bars a defendant from asserting *any* First Amendment rights if the same message could be communicated through alternative means.  *Compare Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972), *with Rogers v. Grimaldi*, 875 F.2d 994, 998-99 (2d Cir. 1989) (rejecting application of "no alternative means" test to case involving intellectual property), *and Parks v. LaFace Records*, 329 F.3d 437, 449-50 (6th Cir. 2003) (same).  Hart does not ask this Court to ignore EA's First Amendment interests, but to determine how those interests can fairly be reconciled with Hart's right-of-publicity interests.

13

## 1.    The Transformative Use Test Asks Whether the Defendant Has Transformed the Plaintiff's Likeness

The district court concluded that the transformative use test requires dismissal of Hart's right-of-publicity claim as a matter of law because, regardless of the manner in which EA used Hart's image in "NCAA Football," the games themselves, when "[v]iewed as a whole," contain "sufficient elements of EA's own expression" to trump any right-of-publicity interests.  APP0055.  If this argument were accepted, a defendant could appropriate a plaintiff's likeness for any reason, or for no reason at all, without incurring potential liability, as long as its product includes other "creative" or "interactive" elements.  Such a work would be shielded from right-of-publicity claims, according to EA, no matter how tangential to the work's expressive content the appropriated likeness may be, and even if – as in the new action movie featuring a "young" Tom Cruise – the depiction does nothing more than exploit the plaintiff's likeness for the defendant's commercial gain.

As every other court that has applied the transformative use test has recognized, the test makes little sense if limited to whether the work "as a whole" contains sufficient creative or interactive elements, because that interpretation would allow a defendant to "directly trespass[] on [the plaintiff's] right of

14

publicity without adding significant expression beyond that trespass." *Comedy III*, 21 P.3d at 808. Instead, the crucial question must be whether defendant has transformed *plaintiff's likeness* into something more than the mere "appropriation of the celebrity's economic value." *Id.* at 805; *see, e.g., No Doubt*, 122 Cal.Rptr.3d at 411 (citing *Comedy III*, 21 P.3d at 808) (focusing on whether plaintiff's likeness was appropriated for expressive purposes and thus transformed); *Hilton*, 599 F.3d at 911 (finding no transformative use where defendant's greeting card contained numerous creative elements other than plaintiff's likeness); *Davis*, No. 3:10-cv-03328-RS, at *8 (focusing on "the reproduction of plaintiff's likenesses, rather than on a canvassing of the larger work"); *Keller*, 2010 WL 530108, at *5 (focus of the transformative use test "must be on the depiction of Plaintiff in 'NCAA Football'").[7]

---

[7]  EA argues that *No Doubt*, *Keller*, and *Davis* were wrongly decided, and that *Hilton* is distinguishable because it involved "a single individual's celebrity value." EA Br. 41. The strength of the analysis in those cases speaks for itself, and EA's factual distinction of *Hilton* is irrelevant to the Ninth Circuit's conclusion that the existence of *other* creative or expressive elements in a work does not necessarily immunize that work from a right-of-publicity suit. EA also contends that the decision in *No Doubt* was "influenced" by "equitable arguments" involving the parties' contractual relationship, *id.* at 42-43, but the *No Doubt* majority specifically *refused* to base its decision on that contractual relationship. *No Doubt*, 122 Cal.Rptr.3d at 412 n.7.

If the mere presence of "expressive elements within the larger work were somehow [enough] to 'transform' an otherwise conventional use of celebrity's likeness, the right of publicity would effectively be eviscerated." *Davis*, No. 3:10-cv-03328-RS, at *8. Indeed, as EA acknowledges, the only right of publicity claims that could survive under the district court's interpretation of the transformative use test are those targeting "garden variety . . . commercial speech." EA Br. 45 n.65. Properly applied, however, the transformative use test fully satisfies the Supreme Court's requirement of actual balancing, while recognizing that finding defendant's work to be expressive is just the start of the balancing inquiry.

This construction of the transformative use test is also consistent with the test's origin in copyright law's fair use doctrine. *Comedy III*, 21 P.3d at 808. As Judge Leval explained in his seminal article on fair use (which the Supreme Court relied upon in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)), courts "must consider the question of fair use for each challenged passage and not merely for the secondary work overall." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1112 (1990). "Simply to appraise the overall character of the challenged work tells little about whether the various quotations of the original

16

author's writings have a fair use purpose . . . ." *Id.*[8]

Even the cases that EA principally relies upon do not support its proposed construction of the transformative use test. In *Winter* and *Kirby*, the challenged works contained many creative and expressive elements other than the plaintiffs' likenesses, but the courts did not simply ask whether the challenged works contained enough such elements. Rather, they found the uses of plaintiffs' likenesses to be "transformative" precisely because defendants altered those likenesses and placed them in new settings. *See, e.g.*, *Winter*, 69 P.3d at 479; *Kirby*, 50 Cal.Rptr.3d at 616.[9]

---

[8]    In *Elvis Presley Enters. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), for example, the Ninth Circuit considered whether the use of copyrighted material in an "exhaustive" documentary about Elvis Presley constituted non-actionable fair use. *Id.* at 625. Although the work as a whole was creative and expressive, the court found no protected fair use because the copyrighted material had been used in a manner that was "not consistently transformative." *Id.* at 628.

[9]    EA repeatedly cites *Comedy III*'s discussion of "the work in question" in support of its interpretation. *See, e.g.*, EA Br. 33 (citing *Comedy III*, 21 P.3d at 809). *Comedy III*, however, referred to "the work" because, in that case, the celebrity depiction and the work as a whole were one and the same.

EA also relies on *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915 (6th Cir. 2003), but *Comedy III* expressly disavowed *ETW* to the extent it suggested "that any work of art, however much it trespasses on the right of publicity and however much it lacks additional creative elements, is categorically shielded from liability by the First Amendment." 21 P.3d at 809 n.11. Moreover, *ETW* involved a much closer question of "transformation" – namely, whether juxtaposing Tiger Woods

(continued...)

17

Finally, EA is mistaken in asserting that, under Hart's interpretation, the "use of someone's actual name or realistic image within an expressive work" would always be unprotected. EA Br. 40. Hart does not contend that the transformative use test protects only non-realistic or fantasy-like depictions. Nor does Hart dispute the relevance of context. To the contrary, Hart agrees with *No Doubt* that "context may create protected expression in the use of a celebrity's literal likeness." 122 Cal.Rptr.3d at 410; *see* Opening Br. 46. "[E]ven literal reproductions of celebrities can be 'transformed' into expressive works" if the context creates "something new, with a further purpose or different character" by "altering the first likeness with new expression, meaning, or message." *No Doubt*, 122 Cal.Rptr.3d at 410 (alteration and citation omitted). That is why the realistic depiction of Facebook founder Mark Zuckerberg in *The Social Network*, for example, is transformative. Rather than exploiting the commercial value of Zuckerberg's identity, the film uses Zuckerberg's likeness to tell a morality tale about the creation and success of Facebook, so Zuckerberg's likeness "has become primarily the [filmmaker's] own expression." *Comedy III*, 21 P.3d at 809. The depiction indisputably amounts to "more than the appropriation of the . . .

_____

(...continued)
with various former golf greats (depicted in the skies above the fairway) constituted the artist's symbolic expression about Woods.

18

economic value" of Zuckerberg's likeness. *Id.* at 805.

For most biographies, documentaries, historical novels, and comparable works, it will not be difficult to conclude that the realistic depictions they contain are transformative. Still, where a work – be it a film, a painting, a book, or a video game – includes "exact depictions of [the plaintiff] doing exactly what [he or she does] as [a] celebrit[y]," *No Doubt*, 122 Cal.Rptr.3d at 411, with no commentary, message, or other expression *about the plaintiff*, courts must undertake a close analysis to ensure that the plaintiff's likeness is not a "conventional, more or less fungible, image[]" that simply exploits the value of the plaintiff's likeness for defendant's commercial gain, *Comedy III*, 21 P.3d at 808-09; *cf. Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 135 (2d Cir. 1998) (concluding, in fair use context, "the fact that [defendant's work] so minimally alter[ed] [plaintiff's] original expression" was "evidence of the work's lack of transformative purpose").

## 2. EA's Use of the College Athletes' Likenesses Was Not Transformative

The district court acknowledged, for purposes of its summary judgment ruling, that the depictions of college athletes in "NCAA Football" were designed to be realistic representations that "capitalize upon the fame of those players."

19

APP0053.  Although EA's army of digital technicians exercised skill and talent in

creating those depictions, any creative or expressive purpose was "manifestly

subordinated to the overall goal of creating a conventional portrait of [the

athletes]." *Comedy III*, 21 P.3d at 810.  Like the video game avatars found non-

transformative in *No Doubt*, *Keller*, and *Davis*, EA's use of Hart's likeness is

nothing more than "a literal depiction or imitation . . . for commercial gain" that

"directly trespass[es] on [Hart's] right of publicity without adding significant

expression beyond that trespass." *Comedy III*, 21 P.3d at 808.

In arguing that its depiction of Hart was transformative, EA focuses on

aspects of "NCAA Football" other than Hart's likeness, arguing that the games

"contain myriad independently creative elements *beyond* Hart's alleged likeness

and statistics, and . . . rich interactive elements that enable users to create and

experience their own story of college football." EA Br. 33 (emphasis added).

Hart's likeness itself, however, was not transformed into anything other than a

"conventional, more or less fungible, image[]." *Comedy III*, 21 P.3d at 808.  The

games' "original graphics, videos, [and] sound effects," EA Br. 33, do not modify

Hart's likeness in any way.  Nor do the games' "rich interactive elements" (*see* EA

Br. 33-36) require real, rather than imaginary, college athlete avatars.  Indeed, EA

admits that the expressive content of "NCAA Football" would be the same

whether or not the games depicted actual college athletes.  *See supra* text accompanying note 6.[10/]

The district court found it significant that game users can modify certain default features of the player avatars in "NCAA Football." APP0053.  EA rightly does not rely upon that aspect of the court's opinion, however, for as Hart has already demonstrated, the fact that a *user* may customize the games does not make *EA's* realistic virtual depictions of the athletes' likenesses "transformative."  *See* Opening Br. 43-47.  Almost any depiction in any medium can be altered by an end user.  Consequently, permitting a defendant to evade a right-of-publicity claim simply because end users can modify the realistic depictions in defendant's unmodified product would create a massive loophole in the right of publicity.  *See id.* at 45-47.  In any event, even if an end user wanted to modify certain default aspects of the players depicted in "NCAA Football" (which is not likely given the importance of hyper-realism to the game's consumer appeal), none of the basic biographical data of those athletes can be modified in the versions of the game at issue in this case.  *See* APP0057 n.23.

_____

[10/]    EA also suggests that this Court should disregard Hart's claims because the virtual avatar that depicts Hart "is only a single virtual player among thousands."  EA Br. 34.  However, Hart brings this proposed class action on behalf of those other players as well as himself.

When the transformative use test is properly applied, by asking whether *Hart's likeness* was transformed by EA into something "more than the appropriation of the . . . economic value" of that likeness, it is clear that the decision below must be reversed.  On the existing record, it cannot be concluded as a matter of law that "NCAA Football" transforms its depictions of Hart and other college athletes from a conventional commercial exploitation of the athletes' likenesses into EA's own expression.

### C.    EA's "Relatedness" Test Does Not Adequately Balance the Parties' Interests

EA argues that this Court should adopt the "relatedness" test that the Second Circuit used in *Rogers*, 875 F.2d 994, to evaluate federal Lanham Act claims involving the titles of expressive works.  This Court, however, has already recognized that the "relatedness" test should not be applied outside of that narrow context.  *Facenda*, 542 F.3d at 1018.  Applying the "relatedness" test in this case would be particularly inappropriate, because that test is designed only to prevent "consumer confusion," not to balance First Amendment interests against the interests served by the right of publicity.  *See, e.g.*, *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (test permits claims "only where the public interest in avoiding consumer confusion outweighs the

public interest in free expression") (citation and emphasis omitted). As the Supreme Court recognized in *Zacchini*, the right of publicity protects interests that extend well beyond the narrow concerns about consumer confusion underlying the Lanham Act. *See also infra* Part I.D.1. Because of the materially significant differences between the right of publicity and the Lanham Act, applying different balancing tests to right-of-publicity and Lanham Act claims would be anything but "an exercise in formalism." EA Br. 51.[11/]

EA makes no attempt to explain how the "relatedness" test accomplishes an actual balancing of competing First Amendment and publicity interests. While EA insists that the test "is clear and more predictable," EA Br. 46, that would be true of any number of bright-line tests. Yet none accomplish the required task of attempting to reconcile the various competing interests at stake.

---

[11/] EA argues that, in the four years since *Facenda*, the "relatedness" test has been "more widely" applied to Lanham Act cases involving the body of a work, not just its title. EA Br. 49-50 & n.70. However, none of the cited authorities justifies revisiting *Facenda*. In neither *E.S.S.*, 547 F.3d at 1099, nor *Dillinger v. Electronic Arts, Inc.*, No. 1:09-cv-1236-JMS-DKL, 2011 WL 2457678 (S.D. Ind. June 16, 2011), did either party question the appropriateness of applying the "relatedness" test to trademarks used in the body of a work; and the more recent cases of *Brown v. Electronic Arts, Inc.*, No. 2:09-cv-01598-FMC-RZx, at *7 (C.D. Cal. Sept. 23, 2009), and *Univ. of Alabama v. New Life Art, Inc.*, _ F.3d _, No. 09-16412, 2012 WL 2076691, at *23 (11th Cir. June 11, 2012), simply followed *E.S.S.* and the prior out-of-circuit decisions that this Court in *Facenda* found non-persuasive.

EA cites several cases applying the "relatedness" test, but most (including

*Rogers* itself) interpret the elements of a particular state's right of publicity as a

matter of state law.[12/]  *Matthews*, *Montgomery*, and *Romantics* went on to consider

whether the First Amendment *also* barred those plaintiffs' right-of-publicity suits,

but their discussions were seriously flawed.  *Matthews* used an "actual malice"

standard rather than the "relatedness" test to define the boundary between

constitutionally permissible and impermissible right-of-publicity claims, 15 F.3d

at 440 (citing *Time, Inc. v. Hill*, 385 U.S. 374 (1967)) – apparently unaware that

*Zacchini* expressly rejected that approach, *see* 433 U.S. at 570-75.  *Montgomery*

made no effort to balance the parties' interests, did not cite *Zacchini* or consider

other available tests, and erroneously characterized the "relatedness" test as

defining an "exception" to the "general rule" that expressive works are shielded

from right-of-publicity claims.  60 S.W.3d at 529.[13/]  *Romantics* likewise made no

---

[12/]  *See Rogers*, 875 F.2d at 1004-05; *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994); *Romantics v. Activision Publ'g, Inc.*, 574 F.Supp.2d 758, 764-65 (E.D. Mich. 2008); *Seale v. Gramercy Pictures*, 949 F.Supp.331, 336-37 (E.D. Pa. 1996); *Ruffin-Steinback v. dePasse*, 82 F.Supp.2d 723, 730-31 (E.D. Mich. 2000); *Montgomery v. Montgomery*, 60 S.W.3d 524, 527-28 (Ky. 2001).  The *Restatement (Third) of Unfair Competition* §47 cmt. c – which New Jersey has chosen *not* to adopt – likewise uses the "relatedness" test to define the elements of a right-of-publicity claim.  *See* Opening Br. 51 n.14.

[13/]  As Justice Keller's dissent in *Montgomery* points out, defendants in that
(continued...)

24

attempt to balance the parties' interests, and applied the "relatedness" test without meaningful analysis. 574 F.Supp.2d at 765-66.

The only remotely relevant "relatedness" case EA cites is the Sixth Circuit's decision in *Parks*. 329 F.3d at 460. As in *Montgomery*, however, the court in *Parks* did not consider alternative balancing approaches, and relied upon *Rogers* and the Restatement without meaningful analysis. *Id.* at 461. More important, *Parks* did not involve a depiction of the plaintiff within an expressive work, but a challenge to the *title* of a work. As Hart has explained, a title that includes a celebrity's name, is related to the content of the work, and is not misleading to consumers, poses little threat to the proprietary and dignitary interests protected by the right of publicity. Opening Br. 53. By contrast, the commercial exploitation of a celebrity's identity *within* an expressive work often poses a significant threat to those interests. *Id.*

Applying the "relatedness" test to Hart's right-of-publicity claim would significantly undervalue the important interests served by that right, which the

---

[13]/ (...continued)
case never asserted a First Amendment defense. 60 S.W.3d at 532 (Keller, J., dissenting). Justice Keller also rejected the majority's reliance on the "relatedness" test and instead endorsed the transformative use test because "the governmental interest in protecting persons from . . . appropriations [of their publicity rights] demands greater protection than an amorphous 'any relationship' test can accommodate." *Id.* at 535.

25

Supreme Court in *Zacchini* recognized as extending far more broadly than the

Lanham Act's narrow concerns about consumer confusion.  This Court should

therefore reject the "relatedness" test, which inadequately considers the right-of-

publicity interests at stake, and should balance Hart's publicity rights against EA's

First Amendment rights by applying either the predominant use test or the

transformative use test.

### D.    Hart's Publicity Rights Outweigh EA's First Amendment Rights Under an Ad Hoc Balancing Test

Neither party here endorses the overly subjective and unpredictable ad hoc

approach used in cases like *ETW Corp.*, 332 F.3d at 936-38; *C.B.C. Distrib. and

Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 824

(8th Cir. 2007); and *Cardtoons, L.C. v. MLBPA*, 95 F.3d 959, 972-76 (10th Cir.

1996).  *See* Opening Br. 54-55 n.16; EA Br. 56.  Nonetheless, the ad hoc

balancing approach used in those cases, as well as their specific results, provide

further support for Hart's position.

### 1.    The Right of Publicity Serves Important State Interests

Despite conceding that Hart has properly pleaded a right-of-publicity claim,

EA and its amici try to skew this Court's balancing analysis by attacking the

underlying justifications for such rights – including the very justifications

recognized in *Zacchini*.  Although those arguments should be addressed to the

New Jersey Legislature, not this Court, Hart will briefly address their meritless

attacks on the established and important justifications for the right of publicity,

each of which would be sufficient, on its own, to justify New Jersey's decision to

recognize and protect that right.

The first justification for the right of publicity identified in *Zacchini* was the

incentive it provides for individuals to engage in socially valuable activities.  433

U.S. at 573, 576-77.  "While the immediate beneficiaries [of publicity rights] are

those who establish professions or identities which are commercially valuable, the

products of their enterprise are often beneficial to society generally.  Their

performances, inventions and endeavors enrich our society . . . ." *Lugosi v.*

*Universal Pictures*, 603 P.2d 425, 441 (Cal. 1979) (Bird, C.J., dissenting).[14]

Despite *Zacchini*'s clear recognition of these incentives, EA's amici dismiss

this justification because publicity rights purportedly "do not demand the creation

_____

[14]   If anything, the need to protect these incentives has become more
important as technological advances permit more sophisticated intellectual-
property piracy, threatening the traditional means by which creative individuals
are compensated for their work. *See, e.g.*, International Intellectual Property
Alliance, *Copyright Protection and Enforcement Around the World* 10-11 (2010)
(95% of music downloads were unauthorized in 2009, and electronic books were
illegally downloaded over 9 million times in that year's closing months).

of anything new," and sometimes "protect nothing more than innate characteristics such as one's name, appearance or voice." OTW Br. 14. However, the very cases amici cite – one brought by civil rights icon Rosa Parks, *Parks*, 329 F.3d 437 (6th Cir. 2003), another by critically acclaimed musician Tom Waits, *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992) – undercut this assertion. Publicity rights protect the valuable cultural personas that individuals like Parks and Waits create through enormous commitments of time and effort. *See, e.g.*, Roberta Rosenthal Kwall, "Fame," 73 Ind. L.J. 1, 23, 47-56 (1997). To assert that society has no legitimate interest in protecting the unique contributions and identities of such individuals ignores the critical social benefits such public figures bestow in our culture.[15]

*Zacchini* also recognized that individuals must often invest considerable time, money, and labor before their public identity acquires any value, and that

---

[15]    EA and its amici complain that there is inadequate empirical evidence quantifying the strength of the incentives provided by publicity rights. But the same argument would equally apply to other well-established intellectual property regimes. *See* J. Thomas McCarthy, *The Rights of Publicity and Privacy* §2.6 (2d ed. 2011) ("This indeterminacy of incentive is familiar to those who have studied the never-ending dispute as to the incentive effect of the patent and copyright laws."). Courts have repeatedly recognized that copyright and patent law encourage the creation of new works, without requiring unequivocal empirical verification, and *Zacchini* logically concluded that publicity rights likewise encourage activities that society legitimately values. 433 U.S. at 576.

28

such individuals have a right to reap the "reward[] of [their] endeavors." 433 U.S. at 573. The unauthorized commercial appropriation of a person's hard-earned identity represents an unfair "theft" of value from the individual whose labor generated that value in the first place. "The rationale for protecting the right of publicity is the straightforward one of preventing unjust enrichment by the theft of [this] good will." *Id.* at 576.[16]

The misappropriation of an individual's identity not only "depriv[es] that individual of compensation," but also "dilut[es] the value of the name." *McFarland v. Miller*, 14 F.3d 912, 919 (3d Cir. 1994). Compelled association can significantly diminish the commercial value of an individual's identity, and repeated appropriation may result in overexposure, decreasing the public's desire to interact with the individual and reducing the commercial value of that identity. *See* Richard A. Posner, "The Right of Privacy," 12 Ga. L. Rev. 393, 411 (1978).

---

[16] EA's amici assert that this "unjust enrichment" rationale for publicity rights depends on the mere *assumption* that individuals have a right to the commercial value of their identities. *See* OTW Br. 19. The Supreme Court's recognition of that rationale in *Zacchini* was based not upon an "assumption," however, but upon the well-established principle "that he who has fairly paid the price should have the beneficial use of the property." *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 240 (1918); Melville B. Nimmer, "The Right of Publicity," 19 Law & Contemp. Probs. 203, 216 (1954) ("It would seem to be a first principle of Anglo-American jurisprudence, an axiom of the most fundamental nature, that every person is entitled to the fruit of his labors . . . .").

Even if public exposure at times *increases* that value in the short term, "ultimately there is a point of diminishing marginal returns beyond which subsequent displays and performances diminish the value of the asset."  Mark F. Grady, "A Positive Economic Theory of the Right of Publicity," 1 UCLA Ent. L. Rev. 97, 103 (1994).[17]

Finally, by protecting an individual's right to choose the products, groups, and works with which he or she will be associated in the public eye, publicity rights preserve core liberty and autonomy interests such as peace of mind and personal dignity.  *See* McCarthy, *The Rights of Publicity and Privacy* §1.23; Kwall, *supra*, 73 Ind. L.J. at 39.  Privacy is not an on-off switch.  Publicity rights help individuals preserve certain privacy interests even after they have entered the public sphere.  *See Waits*, 978 F.2d at 1103-04 (allowing recovery for economic and non-economic damages in suit against potato chip company by musician

_____

[17]   EA's amici concede this point as to the harms resulting from false endorsements, but argue that this reasoning "provides no justification for restricting noncommercial speech."  OTW Br. 21.  But actors like Daniel Day-Lewis and performers like Bruce Springsteen who are selective about the projects and causes with which they are associated increase the value of each carefully selected association.  The threat of dilution thus exists whether the speech in question is "commercial" or "non-commercial."  *See* Grady, *supra*, 1 UCLA Ent. L. Rev. at 101.  Moreover, whether the unauthorized appropriation of an individual's identity decreases or increases the value of that identity is a fact issue that goes to damages, not liability, and that does not affect the viability of the individual's claim.  *See Zacchini*, 433 U.S. at 575 n.12.

known to eschew commercial endorsements); *see also Parks*, 329 F.3d at 453-55,

459-461 (suit against rap group that used Rosa Parks' name as title for song full of

profanity and egomania); *No Doubt*, 122 Cal.Rptr.3d at 402 (suit against video

game publisher who depicted band's members performing in an objectionable

manner).

### 2. Hart's Publicity Rights Can Be Protected Without Any Significant Infringement Upon EA's First Amendment Interests

EA's efforts to denigrate the significance of college football players' rights

of publicity are no more persuasive than its critique of the justifications for those

rights. As Hart has explained, the fame and publicity value that college football

players acquire through their participation in NCAA athletics constitute a valuable

return on their investment of time and effort. Opening Br. 56-57; *see also* Players'

Br. 7-8; McCormick & McCormick, "The Myth of the Student Athlete: The

College Athlete as Employee," 81 Wash. L. Rev. 71, 75-78 (2006). By

appropriating the valuable likenesses of these student athletes – which remain

economically significant long after the athletes' college careers have ended – and

by diluting the commercial value of those athletes' identities, EA has deprived the

athletes of core publicity rights, and has profited enormously as a result. *See*

Opening Br. 56.

EA nonetheless argues that the athletes' rights are not entitled to significant weight because the athletes depicted in its "NCAA Football" games "are willing to play college football for free" and therefore "have more than sufficient incentives to continue playing the game" regardless of their publicity rights. EA Br. 58-59. This attack on the strength of the athletes' publicity rights, however, addresses only one of the interests served by the right of publicity. *See supra* Part I.D.1. The right of publicity not only provides incentives, but also prevents "unjust enrichment" at a public figure's expense. *Zacchini*, 433 U.S. at 576. As *Zacchini* teaches, the commercial value that Hart and the other athletes depicted in "NCAA Football" have generated through their significant investments of time and energy belongs to the athletes, not to EA.

Moreover, EA's argument depends upon comparing the college athletes depicted in "NCAA Football" to the *professional* athletes whose likenesses were at issue in *ETW*, *Gionfriddo*, *C.B.C.*, and *Cardtoons*. EA's reliance on those decisions, however, is profoundly misplaced. In each of those cases, the courts rested their analysis on the significant financial income that the professional athletes earned from other sources. *See, e.g.*, *ETW*, 332 F.3d at 938; *Gionfriddo*, 114 Cal.Rptr.2d at 318 & n.11; *C.B.C.*, 505 F.3d at 824; *Cardtoons*, 95 F.3d at 973. Although Hart does not agree that highly paid individuals are for that reason

32

entitled to lesser right-of-publicity protection – publicity rights, after all, are a

form of property, and society generally does not deprive individuals of property

rights simply because they have other sources of income – in this case the affected

athletes are not paid at all.  *See* McCarthy, *The Rights of Publicity and Privacy*

§7.27 (criticizing *C.B.C.* as involving "a bizarre form of judicial income

redistribution between professional baseball athletes and those in the business of

running fantasy sports leagues"); McCormick & McCormick, *supra*, 81 Wash. L.

Rev. at 75-76 (college athletics is a $60 billion industry, but NCAA players

receive almost no compensation).  The likelihood that any particular college

football player will be drafted into the NFL – let alone have a "lucrative career in

the [NFL]," as EA asserts, EA Br. 58 – is extremely small.  Players' Br. 7.  The

athletes' state law rights of publicity do not disappear from the balance simply

because they have other, non-financial incentives for playing the game – any more

than artists, academics, and political figures lose their rights of publicity simply

because they have compelling personal reasons for dedicating their lives to their

work.  In any event, for purposes of this appeal, EA concedes that Hart has

pleaded a valid right-of-publicity claim under New Jersey law.

Although EA's appropriation of the college athletes' likenesses poses a

significant threat to those athletes' publicity rights, the expressive use it makes of

33

those likenesses is minimal at best.  As Hart has demonstrated, EA's games

primarily provide a platform for competition, rather than communicating ideas or

social messages.  The expressive content of the games would be exactly the same

if the avatars in "NCAA Football" did not correspond to real players.  Opening Br.

55-56.  EA contends in response that "creators of expressive works have a strong

interest in making use of [celebrities'] names and likenesses in creating new

works."  EA Br. 56.  But such broad generalities are entirely inadequate to

demonstrate why permitting Hart's lawsuit to proceed *in this case* would threaten

*EA's* First Amendment interests.

The depictions of actual college athletes in EA's "NCAA Football" video

games serve none of the First Amendment purposes identified in the decisions on

which EA relies.  Unlike the works at issue in *ETW* and *Cardtoons*, "NCAA

Football" expresses no message about the athletes depicted.  Those athletes are

depicted solely to increase the games' "sense of verisimilitude."  EA Br. 35; *cf.*

*ETW*, 332 F.3d at 938 (explaining that defendant's "collage of images"

"describe[d], in artistic form, a historic event in sports history and . . . convey[ed]

a message about the significance of [Tiger] Woods's achievement [at the Masters

golf tournament]"); *Cardtoons*, 95 F.3d at 972 (finding that defendant's trading

cards "comment[ed] on the state of major league baseball by turning images of our

34

sports heroes into modern-day personifications of avarice" and that plaintiff's suit sought to "restrict[] the communication of [those] ideas"). Unlike in *C.B.C.* and *Gionfriddo*, "NCAA Football" cannot serve any interest in "the 'recitation and discussion of factual data concerning the athletic performance [of those players].'" *C.B.C.*, 505 F.3d at 823 (quoting *Gionfriddo*, 114 Cal.Rptr.2d at 315). EA acknowledges that its games do not recreate or comment upon historical events or figures or report historical facts. EA Br. 6. Indeed, EA does not even include the players' actual names in default mode. Yet without those names, the games cannot possibly promote public knowledge and discussion of the players' historical performances.[18]

Because permitting Hart and the other athletes depicted in "NCAA Football" to enforce their publicity rights would not significantly impact EA's First Amendment rights, while EA's actions strike at the core of the athletes'

_____

[18]    Given EA's concessions, EA's amici err in asserting that this case merely involves EA's use of "factual information regarding who played college football." *See* OTW Br. 30. Amici's predictions about the consequences of remanding this case for further fact-finding are premised on this mistaken assumption. Permitting Hart's suit to proceed would not make it impossible for future content creators to depict "historical events," *id.*, and reality-based works like *The Social Network* would be protected from right-of-publicity suits under Hart's First Amendment analysis, as explained *supra* at 18-19. Conversely, however, the amici's approach would prohibit right-of-publicity suits by actors whose hyper-realistic digital likeness are used solely to increase a film's marketability, as in the Tom Cruise example.

publicity rights, the decision below should be reversed under any test that truly attempts to reconcile the parties' competing interests.

## II.     Additional Factual Development May Be Warranted

The trial court should have undertaken a careful, fact-specific analysis of the strength of the athletes' publicity rights and the threat to EA's First Amendment interests posed by Hart's suit, based on a fully developed factual record.  Instead, the court ruled on the basis of limited facts, before any discovery had occurred.  If this Court cannot determine on the record before it whether Hart's publicity rights outweigh EA's First Amendment interests, it should reverse and remand for additional factual development.

None of EA's contentions preclude this Court from approaching the important issues in this case in that cautious manner.  EA first asserts that the district court properly ruled upon its First Amendment defense because "'the categorization of speech is a question of law' that may be resolved through independent review of the work in question."  EA Br. 59 (citing *Facenda*, 542 F.3d at 1016).  The question presented, though, is not whether EA's video games should be categorized as commercial or non-commercial speech, as in *Facenda*, but whether EA's First Amendment rights outweigh Hart's publicity rights.  That balancing analysis requires a careful consideration of all relevant facts, which

36

relate not only to the expressive components of the challenged work but also to how plaintiff's image is used in that work and the strength of plaintiff's countervailing publicity rights.  *Cf. Parks*, 329 F.3d at 461 (genuine issue of material fact precluded summary judgment on First Amendment defense in right-of-publicity action).

EA also notes that Hart did not adequately identify the specific discovery that he required in order to oppose EA's motion.  To be sure, Hart failed to provide the formal affidavit required by Rule 56(d), but such a failure "is not automatically fatal."  *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994).  In opposing EA's motion for summary judgment, Hart *did* describe the specific discovery that he planned, which related to EA's successful efforts to exploit his likeness for commercial gain and which involved evidence that was almost entirely in EA's possession.  APP00698 n.4.  Although EA asserts that such discovery was immaterial because "First Amendment protection may not permissibly turn on whether an expressive work is created and sold for profit (or the amount of that profit)," EA Br. 62, that evidence was directly relevant to the weight afforded Hart's publicity rights.  *See supra* at 10-12.[19]

---

[19]    Likewise, evidence regarding the extent to which users actually modify the default characteristics of the athletes depicted in "NCAA Football" would have

(continued...)

It goes without saying that "the summary judgment process presupposes the existence of an adequate record." *Doe v. Abbington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007). Such a record is particularly important where, as here, the court must carefully balance the parties' potentially conflicting rights. Given the significant gaps in the record, it may be appropriate for this Court, after determining what standard governs EA's First Amendment defense, to remand for the parties to develop the factual record required to litigate that issue properly.

## CONCLUSION

For the foregoing reasons, the decision below should be REVERSED.

Respectfully submitted,

Dated: July 19, 2012                    s/Timothy J. McIlwain
                                        Timothy J. McIlwain
                                        Attorney at Law, LLC
                                        N.J. Bar No. 010471996

---

[19/] (...continued)
been relevant to the court's balancing analysis. The district court expressly based its decision on that aspect of the games; but, if game users do not actually exercise that option with any frequency, it cannot be the key to determining whether EA's depiction of the athletes was fundamentally expressive or fundamentally commercial. EA's practice of licensing publicity rights from the professional athletes featured in its other sports video games, *see* Players' Br. 15-17, would also have been relevant to the balancing analysis, because the right of publicity is built upon the principle that "[n]o social purpose is served by having the defendant get free some aspect of the plaintiff *that would have market value and for which he would normally pay*." *Zacchini*, 433 U.S. at 576 (citation omitted, emphasis added).

38

5 Marine View Plaza, Suite 300
Hoboken, NJ  07030
Ph:  (201) 420-1911
Fax: (201) 420-8054
*Attorney for Plaintiff-Appellant*
*Ryan Hart*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 28(a)(11), I hereby certify that this brief complies with the type-volume limitation set forth in this Court's July 17, 2012 order granting Plaintiff-Appellant's Motion To File Overlength Reply Brief, because this brief contains 8,941 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I also certify that the text of the electronic brief is identical to the text in the paper copies of the brief, and that the electronic brief was scanned using McAfee Virus Scan, and no virus was detected.

Dated: July 19, 2012                          s/Timothy J. McIlwain
                                              Timothy J. McIlwain

                                              *Attorney for Plaintiff-Appellant*
                                              *Ryan Hart*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2012, I filed and served the foregoing

Appellant's Reply Brief by causing copies to be electronically filed and served via

the appellate CM/ECF system to the following counsel of record:

> Elizabeth A. McNamara
> Davis Wright Tremaine LLP
> 1633 Broadway
> New York, NY 10019

I also hereby certify that I have caused ten copies to be delivered to the

Court, and one copy to the above-listed counsel of record, by United Parcel

Service.

Dated: July 19, 2012                          s/Timothy J. McIlwain
                                              Timothy J. McIlwain

                                              *Attorney for Plaintiff-Appellant*
                                              *Ryan Hart*