PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3750
_____

RYAN HART, individually and on
behalf of all others similarly situated

v.

ELECTRONIC ARTS, INC.,
a Delaware Corporation; DOES 1-50

Ryan Hart,
                    Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. Action Number 3-09-cv-05990)
District Judge: Honorable Freda L. Wolfson
_____

Argued: September 19, 2012
_____

Before: AMBRO, GREENAWAY, JR., and
TASHIMA[*], *Circuit Judges.*

(Opinion Filed: May 21, 2013)
_____

Michael Rubin, Esq. [ARGUED]
Altshuler, Berzon, Nussbaum & Rubin
177 Post Street, Suite 300
San Francisco, CA 94108

Timothy J. McIlwain, Esq.
McIlwain & Mullen
P.O. Box #1538
Hoboken, NJ 07030

Keith A. McKenna, Esq.
96 Park Street
Montclair, NJ 07042
        *Counsel for Appellant Ryan Hart*

Elizabeth A. McNamara, Esq. [ARGUED]
Davis, Wright & Tremaine
1633 Broadway, 27th Floor
New York, NY 10019

_____
[*]Honorable A. Wallace Tashima, Senior United States Circuit
Judge for the Ninth Circuit, sitting by designation.

Bruce S. Rosen, Esq.
McCusker, Anselmi, Rosen & Carvelli
210 Park Avenue, Suite 301
Florham Park, NJ 07932
     *Counsel for Appellee Electronic Arts, Inc.*

P. Casey Pitts, Esq.
Michael Rubin, Esq.
Altshuler, Berzon, Nussbaum & Rubin
177 Post Street, Suite 300
San Francisco, CA 94108
     *Counsel for Major League Baseball Players*
     *Association, Major League Soccer Players Union,*
     *NFL Players Association, NHL Players Association,*
     *and National Basketball Players Association, Amici*
     *Appellant*

Duncan W. Crabtree-Ireland, Esq.
Screen Actors Guild
5757 Wilshire Boulevard, 7th Floor
Los Angeles, CA 90036
     *Counsel for Screen Actors Guild, Inc., American*
     *Federation of Television and Radio Artists, AFL-CIO,*
     *and Luminary Group LLC, Amici Appellant*

Nathan E. Siegel, Esq.
Levine, Sullivan, Koch & Schulz
1899 L Street, N.W., Suite 200
Washington, DC 20036

*Counsel for Advance Publications, Inc., A&E Television Networks, Inc., Activision Blizzard, Inc., Bloomberg News, Capcom U.S.A., Inc., Comic Book Legal Defense Fund, Daily News, L.P., Dow Jones Local Media Group, ESPN, Inc., First Amendment Coalition, Forbes, Inc., Freedom Communications, Inc., Gannett Co., Inc., Gawker Media, Hybrid Films, Inc., The McClatchy Company, National Public Radion, Inc., The New York Times Co., North Jersey Media Group Inc., Pennsylvania Newspaper Association, Press-Enterprise Company, The Radio Television Digital News Association, Reporters Committee for Freedom of the Press, Square-Enix, Inc., Take-Two Interactive Software, Inc., THQ, Inc., The Washington Post Co., and Wenner Media, Amici Appellee*

Douglas E. Mirell, Esq.
Eric B. Schwartz, Esq.
Loeb & Loeb
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, CA 90067

*Counsel for Motion Picture Association of America, Inc., Amicus Appellee*

Julie A. Ahrens, Esq.
Stanford Law School
559 Nathan Abbott Way
Standord, CA 94305
>*Counsel for the Organization for Transformative Works, International Documentary Association, International Documentary Association, Digital Media Law Project, Irene Calboli, Danielle M. Conway, Jon M. Garon, Deborah R. Gerhardt, Greg Lastowka, Mark A. Lemley, Yvette Joy Liebesman, Phillip R. Malone, Jason M. Schultz, Jessica Silbey, Amici Appellee*

————————

## OPINION

————————

GREENAWAY, JR., *Circuit Judge*.

In 2009, Appellant Ryan Hart ("Appellant" or "Hart")[1] brought suit against Appellee Electronic Arts, Inc. ("Appellee" or "EA") for allegedly violating his right of publicity as recognized under New Jersey law. Specifically, Appellant's claims stemmed from Appellee's alleged use of his likeness and biographical information in its *NCAA Football* series of videogames. The District Court granted summary judgment in favor of Appellee on the ground that its

---

[1] Appellant's action purports to be a class action on behalf of similarly situated individuals. Because the putative class members all face the same issues with regard to the First Amendment we will focus our attention and analysis on Appellant in particular.

use of Appellant's likeness was protected by the First Amendment. For the reasons set forth below, we will reverse the grant of summary judgment and remand the case back to the District Court for further proceedings.

## I.    Facts

Hart was a quarterback, player number 13, with the Rutgers University NCAA Men's Division I Football team for the 2002 through 2005 seasons. As a condition of participating in college-level sports, Hart was required to adhere to the National Collegiate Athletic Association's ("NCAA") amateurism rules as set out in Article 12 of the NCAA bylaws. *See, e.g.*, NCAA, *2011-12 NCAA Division I Manual* § 12.01.1 (2011) ("Only an amateur student-athlete is eligible for inter-collegiate athletics participation in a particular sport."). In relevant part, these rules state that a collegiate athlete loses his or her "amateur" status if (1) the athlete "[u]ses his or her athletics skill (directly or indirectly) for pay in any form in that sport," *id.* § 12.1.2, or (2) the athlete "[a]ccepts any remuneration or permits the use of his or her name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind," *id.* § 12.5.2.1.[2] In comporting with these bylaws,

_____

[2] The NCAA Manual also states that where a collegiate athlete's

> name or picture appears on commercial items . . . or is used to promote a commercial product sold by an individual or agency without the student-athlete's knowledge or permission, the student athlete (or the institution acting on behalf of the student-athlete) is required to take

Hart purportedly refrained from seizing on various commercial opportunities.[3]  On the field, Hart excelled.  At 6'2", weighing 197 pounds, and typically wearing a visor and armband on his left wrist, Hart amassed an impressive list of achievements as the Scarlet Knights' starting quarterback.  As of this writing, Hart still holds the Scarlet Knights' records for career attempts, completions, and interceptions.[4]  Hart's skill brought success to the team and during his senior year the Knights were invited to the Insight Bowl, their first Bowl game since 1978.

Hart's participation in college football also ensured his inclusion in EA's successful *NCAA Football* videogame franchise.  EA, founded in 1982, is "one of the world's leading interactive entertainment software companies," and "develops, publishes, and distributes interactive software worldwide" for consoles, cell phones, and PCs.  (App. at 529-30.)  EA's catalogue includes *NCAA Football*, the videogame series at issue in the instant case.  The first edition of the

---

steps to stop such an activity in order to retain his or her eligibility for intercollegiate athletics.

NCAA, *2011-12 NCAA Division I Manual* § 12.5.2.2 (2011).

[3] NCAA bylaws limit college athletes like Hart to receiving only non-athletic financial aid, either through academic scholarships or need-based aid, or athletic scholarships, which cover only tuition and various school-related expenses.  *See* NCAA, *2011-12 NCAA Division I Manual* § 15 (2011).

[4] Until his recent displacement by Mike Teel, Hart also held the team records for career yards and touchdowns.

game was released in 1993 as *Bill Walsh College Football*. EA subsequently changed the name first to *College Football USA* (in 1995), and then to the current *NCAA Football* (in 1997). New editions in the series are released annually, and "allow[] users to experience the excitement and challenge of college football" by interacting with "over 100 virtual teams and thousands of virtual players." (*Id.* at 530.)

A typical play session allows users the choice of two teams. "Once a user chooses two college teams to compete against each other, the video game assigns a stadium for the match-up and populates it with players, coaches, referees, mascots, cheerleaders and fans."[5] (*Id.*) In addition to this "basic single-game format," EA has introduced a number of additional game modes that allow for "multi-game" play. (*Id.* at 530-31.) Thus, with the release of *NCAA Football 98*, EA introduced the "Dynasty Mode," which allows users to "control[] a college program for up to thirty seasons," including "year-round responsibilities of a college coach such as recruiting virtual high school players out of a random-generated pool of athletes." (*Id.* at 531.) Later, in *NCAA Football 2006*, EA introduced the "Race for the Heisman" (later renamed "Campus Legend"), which allows users to "control a single [user-made] virtual player from high school through his collegiate career, making his or her own choices

---

[5] Appellee licenses, from the Collegiate Licensing Company (the NCAA's licensing agent), "the right to use member school names, team names, uniforms, logos, stadium fight songs, and other game elements." (App. at 532.) Unlike certain of its other videogame franchises, EA does not license the likeness and identity rights for intercollegiate players.

regarding practices, academics and social activities." (*Id.* at 531-32.)

In no small part, the *NCAA Football* franchise's success owes to its focus on realism and detail — from realistic sounds, to game mechanics, to team mascots.[6] This focus on realism also ensures that the "over 100 virtual teams" in the game are populated by digital avatars that resemble their real-life counterparts and share their vital and biographical information. Thus, for example, in *NCAA Football 2006*, Rutgers' quarterback, player number 13, is 6'2" tall, weighs 197 pounds and resembles Hart. Moreover, while users can change the digital avatar's appearance and most of the vital statistics (height, weight, throwing distance, etc.), certain details remain immutable: the player's home state, home town, team, and class year.

Appellant filed suit against EA in state court for, among other things, violation of his right of publicity. Appellant's first amended complaint, filed in October 2009, alleged that Appellee violated his right of publicity by appropriating his likeness for use in the *NCAA Football* series of videogames. Appellee subsequently removed the action to federal court, and the District Court subsequently dismissed

---

[6] For example, an article on the EA Sports blog explained that "[e]ach year, *NCAA Football* playbook designer Anthony White strives to make each team's playbook accurately represent their system and play style. . . . [E]ach year, Anthony adds in actual plays run by teams that can only be found in specific playbooks." (App. at 663.)

all but one of the claims.[7]  Thereafter, on October 12, 2010, Appellant filed his second amended complaint, again alleging a claim pursuant to the right of publicity based on Appellee's purported misappropriation of Appellant's identity and likeness to enhance the commercial value of *NCAA Football*. Specifically, Appellant alleges that (1) Appellee replicated his likeness in *NCAA Football 2004*, *2005*, and *2006* (complete with biographical and career statistics)[8] and that (2) Appellee used Appellant's image "in the promotion for [*NCAA Football*] wherein [Appellant] was throwing a pass with actual footage from Rutgers University's Bowl Game against Arizona State University."[9]  (App. at 370.)

On November 12, 2010, Appellee filed a motion to dismiss the claim pursuant to Federal Rule of Civil Procedure

---

[7] The District Court had diversity jurisdiction over the case pursuant to 28 U.S.C. § 1332(a)(1).

[8] Appellant alleges that the physical attributes exhibited by the virtual avatar in *NCAA Football* are his own (i.e., he attended high school in Florida, measures 6'2" tall, weighs 197 pounds, wears number 13, and has the same left wrist band and helmet visor) and that the avatar's speed, agility, and passer rating reflected actual footage of Appellant during his tenure at Rutgers.  (App. at 369-71.)

[9] It is unclear from the complaint what exactly this allegation covers.  However, Appellee concedes that "[a] photograph of [Appellant] is included in a photo montage of actual players within *NCAA Football 09* which is visible only when the game is played on certain game platforms by those users who select Rutgers as their team."  (App. at 475.)

12(b)(6) or, in the alternative, summary judgment pursuant to Federal Rule of Civil Procedure 56(c). While conceding, for purposes of the motion only, that it had violated Appellant's right of publicity, Appellee argued that it was entitled to dismissal or summary judgment on First Amendment grounds. *Hart v. Elec. Arts, Inc.*, 808 F. Supp. 2d 757, 766 (D.N.J. 2011). The motion was accompanied by a Statement of Undisputed Fact and various supporting materials, including declarations. Appellant opposed the motion, arguing that "discovery [was] still in it's [sic] infancy." (App. at 9.) The court below rejected this argument, noting that Appellant had "fail[ed] to identify how discovery would assist the Court in deciding this speech-based tort case." *Hart*, 808 F. Supp. 2d at 764. The District Court then construed the motion as one for summary judgment, citing its intent to "rely on the affidavits and exhibits submitted by the parties," *id.*, and ruled in favor of Appellee, holding that *NCAA Football* was entitled to protection under the First Amendment. Appellant timely appealed, arguing that the District Court erred in granting summary judgment prematurely and, in the alternative, erred in holding that *NCAA Football* was shielded from right of publicity claims by the First Amendment. The matter is now before us for review.

## II.    Jurisdiction and Standard of Review

We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291. Our review of the District Court's order granting summary judgment is plenary. *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). "To that end, we are 'required to apply the same test the district court should have utilized initially.'" *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 181 (3d Cir.

2009) (quoting *Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co. of Md.*, 989 F.2d 635, 637 (3d Cir. 1993)).

Summary judgment is appropriate "where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Azur*, 601 F.3d at 216 (quoting *Nicini v. Morra*, 212 F.3d 798, 805-06 (3d Cir. 2000) (en banc) (citing Fed. R. Civ. P. 56(c))).[10] To be material, a fact must have the potential to alter the outcome of the case. *See Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur*, 601 F.3d at 216. In determining whether summary judgment is warranted "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Chambers ex rel. Chambers*, 587 F.3d at 181. "Further, [w]e may affirm the District Court on any grounds supported by the record." *Kossler v. Cristani*, 564 F.3d 181,

---

[10]   Fed. R. Civ. P. 56 was revised in 2010. The standard previously set forth in subsection (c) is now codified as subsection (a). The language of this subsection is unchanged, except for "one word — genuine 'issue' bec[ame] genuine 'dispute.'" Fed. R. Civ. P. 56 advisory committee's note, 2010 amend.

186 (3d Cir. 2009) (en banc) (internal quotation marks omitted).

In connection with Appellant's request for additional discovery, we review "[w]hether a district court prematurely grant[ed] summary judgment . . . for abuse of discretion." *Radich v. Goode*, 886 F.2d 1391, 1393 (3d Cir. 1989) (citing *Dowling v. City of Phila.*, 855 F.2d 136 (3d Cir. 1988)). "To demonstrate an abuse of discretion, [an appellant] must show that the District Court's decision was arbitrary, fanciful or clearly unreasonable." *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 542 (3d Cir. 2007) (internal quotation marks omitted); *see also Hanover Potato Prods., Inc. v. Shalala*, 989 F.2d 123, 127 (3d Cir. 1993) ("An abuse of discretion arises when 'the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." (internal quotation marks omitted)).

### III.    Discussion

We begin our analysis by noting the self-evident: video games are protected as expressive speech under the First Amendment. *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011). As the Supreme Court has noted, "video games communicate ideas — and even social messages — through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world)." *Id.* As a result, games enjoy the full force of First Amendment protections. As with other types of expressive conduct, the protection afforded to games can be limited in situations where the right of free expression necessarily conflicts with other protected rights.

The instant case presents one such situation. Here, Appellee concedes, for purposes of the motion and appeal, that it violated Appellant's right of publicity; in essence, misappropriating his identity for commercial exploitation. (Appellant's Br. at 8, 34; Tr. at 50:12-:16.)    However, Appellee contends that the First Amendment shields it from liability for this violation because *NCAA Football* is a protected work.  To resolve the tension between the First Amendment and the right of publicity, we must balance the interests underlying the right to free expression against the interests in protecting the right of publicity.  *See Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 574-75 (1977).[11]

Courts have taken varying approaches in attempting to strike a balance between the competing interests in right of publicity cases, some more appealing than others.  In our discussion below, we first consider the nature of the interests we must balance and then analyze the different approaches courts have taken to resolving the tension between the First Amendment and the right of publicity.

## A.    The Relevant Interests at Issue

Before engaging with the different analytical schemes, we first examine the relevant interests underlying the rights of free expression and publicity.

---

[11] While it is true that the right of publicity is a creature of state law and precedent, its intersection with the First Amendment presents a federal issue, and, thus, permits us to engage in the sort of balancing inquiry at issue here.  *See, e.g.*, *Zacchini*, 433 U.S. at 566-68.

### 1.    Freedom of Expression

Freedom of expression is paramount in a democratic society, for "[i]t is the function of speech to free men from the bondage of irrational fears." *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring). As Justice Louis Brandeis wrote nearly a century ago:

> Those who won our independence believed that the final end of the state was to make men free to develop their faculties . . . . They valued liberty both as an end and as a means. They believed liberty to [be] the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.

*Id.* at 375.

In keeping with Justice Brandeis' eloquent analysis, the great legal minds of generations past and present have recognized that free speech benefits both the individual and society. The Supreme Court in *Procunier v. Martinez* noted that the protection of free speech serves the needs "of the

human spirit — a spirit that demands self-expression," adding that "[s]uch expression is an integral part of the development of ideas and a sense of identity." 416 U.S. 396, 427 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). Suppressing such expression, therefore, is tantamount to rejecting "the basic human desire for recognition and [would] affront the individual's worth and dignity." *Id.* Indeed, First Amendment protections have been held applicable to not only political speech, but to "entertainment [including, but certainly not limited to,] motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works." *Tacynec v. City of Phila.*, 687 F.2d 793, 796 (3d Cir. 1982). Thus, "[t]he breadth of this protection evinces recognition that freedom of expression is not only essential to check tyranny and foster self-government but also intrinsic to individual liberty and dignity and instrumental in society's search for truth." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 787 (1985) (Brennan, J., dissenting).

The interest in safeguarding the integrity of these protections therefore weighs heavily in any balancing inquiry. Still, instances can and do arise where First Amendment protections yield in the face of competing interests. *See, e.g.*, *Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003) (discussing the interplay between copyright law and First Amendment protections); *Dun & Bradstreet, Inc.*, 472 U.S. at 757-61 (determining that a state may allow recovery of damages in certain defamation cases after balancing "the State's interest in compensating private individuals for injury to their reputation against the First Amendment interest in protecting this type of expression"). Ultimately, we must determine

whether the interest in safeguarding the right of publicity overpowers the interest in safeguarding free expression.

## 2.    The Right of Publicity[12]

The right of publicity grew out of the right to privacy torts, specifically, from the tort of "invasion of privacy by appropriation."   J. THOMAS MCCARTHY, THE RIGHTS OF PUBLICITY AND PRIVACY §1:23 (2d ed. 2012).  Thus, when New Jersey first recognized the concept in 1907, its analysis looked to the "so-called right of privacy" and the limits on that concept.  *Edison v. Edison Polyform Mfg. Co.*, 67 A. 392, 394 (N.J. Ch. 1907) (enjoining a company from using the name or likeness of Thomas Edison to promote its products). Additionally, we note that, even at this early stage the New Jersey court recognized that an individual enjoyed a property interest in his or her identity.  *Id.* ("[I]t is difficult to understand why the peculiar cast of one's features is not . . . one's property, and why its pecuniary value, if it has one, does not belong to its owner, rather than to the person seeking to make an unauthorized use of it.").

However, this early conceptualization had limitations, particularly when it came to protecting the property interests of celebrities and people already in the public eye.  *See id.* ("It is certain that a man in public life may not claim the same

---

[12] As we have noted, Appellee concedes that *NCAA Football* infringes on the right of publicity as recognized in New Jersey.  Our inquiry, therefore, does not concern the elements of the tort or whether Appellee's actions satisfy this standard. Rather, we are concerned only with whether the right to freedom of expression overpowers the right of publicity.

immunity from publicity that a private citizen may."); *see also* MᴄCᴀʀᴛʜʏ, *supra*, at § 1:25. Faced with this limitation on the legal doctrine, courts began to recognize a "right of publicity," which protected publicly known persons from the misappropriation of their identities. The first case to describe this protection as a "right of publicity" was *Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953) (concerning baseball cards in gum packages). There, the Second Circuit held that "in addition to and independent of that right of privacy . . . , a man has a right in the publicity value of his photograph . . . . This right might be called a 'right of publicity.'" *Id.* at 868. New Jersey courts, which had long recognized a "right of privacy [and] a right of property," were not far behind in voicing their support for this concept. *Ettore v. Philco Television Broad. Corp.*, 229 F.2d 481, 491 (3d Cir. 1956).

In the seminal case of *Palmer v. Schonhorn Enters., Inc.*, the Superior Court of New Jersey noted that

> [p]erhaps the basic and underlying theory is that a person has the right to enjoy the fruits of his own industry free from unjustified interference. It is unfair that one should be permitted to commercialize or exploit or capitalize upon another's name, reputation or accomplishments merely because the owner's accomplishments have been highly publicized.

232 A.2d 458, 462 (N.J. Super. Ct. Ch. Div. 1967) (citations omitted) (finding an infringement of property rights where a golfer's name was used in connection with a golf game); *see also Canessa v. J.I. Kislak, Inc.*, 235 A.2d 62, 76 (N.J. Super. Ct. Law Div. 1967) ("[T]he reality of a case such as we have

here is, in the court's opinion, simply this: plaintiffs' names and likenesses belong to them. As such they are property. They are things of value.").

The current incarnation of the right of publicity in New Jersey is that set forth in the RESTATEMENT (SECOND) OF TORTS (1977). *See, e.g.*, *Bisbee v. John C. Conover Agency, Inc.*, 452 A.2d 689, 690-91 (N.J. Super. Ct. App. Div. 1982) (looking to the Restatement (Second) of Torts for the "four areas of invasion of privacy," including "appropriation of the other's name or likeness"); *see also G.D. v. Kenny*, 15 A.3d 300, 311 (N.J. 2011). According to the Restatement, "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of privacy." RESTATEMENT (SECOND) OF TORTS § 652C. The comments also make clear that "the right created by [the rule in §652C] is in the nature of a property right." *Id.* § 652C cmt a.[13]

New Jersey law therefore recognizes that "[t]he right to exploit the value of [an individual's] notoriety or fame

---

[13] In 1995 the RESTATEMENT (THIRD) OF UNFAIR COMPETITION set forth the elements of a free-standing right of publicity claim, unconnected to the right of privacy torts. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 46-49 (1995). While we discuss this version of the tort further below, we decline to address it here because New Jersey has yet to adopt the Restatement (Third)'s version of the tort and the accompanying comments. *Accord Castro v. NYT Television*, 851 A.2d 88, 96-97 (N.J. Super. Ct. App. Div. 2004) (citing to RESTATEMENT (SECOND) OF TORTS § 652C (1977) in discussing a right of publicity claim).

belongs to the individual with whom it is associated," for an individual's "name, likeness, and endorsement carry value and an unauthorized use harms the person both by diluting the value of the name and depriving that individual of compensation." *McFarland v. Miller*, 14 F.3d 912, 919, 923 (3d Cir. 1994). As such, the goal of maintaining a right of publicity is to protect the property interest that an individual gains and enjoys in his identity through his labor and effort. Additionally, as with protections for intellectual property, the right of publicity is designed to encourage further development of this property interest. *Accord Zacchini*, 433 U.S. at 573 ("[T]he State's interest in permitting a 'right of publicity' . . . is closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors . . . .").

Since neither the New Jersey courts nor our own circuit have set out a definitive methodology for balancing the tension between the First Amendment and the right of publicity, we are presented with a case of first impression. We must therefore consult the approaches of other courts in the first instance.

## B.    How Courts Balance the Interests

We begin our inquiry by looking at *Zacchini v. Scripps-Howard Broadcasting Co.*, the only Supreme Court case addressing the First Amendment in a right of publicity context. In this case, the Court called for a balancing test to weigh the interest underlying the First Amendment against those underpinning the right of publicity. 433 U.S. at 574-75. This decision sets the stage for our analysis of three systematized analytical frameworks that have emerged as

courts struggle with finding a standardized way for performing this balancing inquiry.

### 1.    *Zacchini* and the Need for Balance

In *Zacchini*, an Ohio television news program recorded and subsequently broadcast Mr. Hugo Zacchini's entire "human cannonball" act from a local fair.  The daredevil brought suit alleging a violation of his right of publicity as recognized by Ohio law.  *Id.* at 563-66.  The Ohio courts held that Zacchini's claim was barred on First Amendment grounds, and the case then came before the Supreme Court.

In setting out the interests at issue in the case, the Supreme Court noted (as we did above) that "the State's interest in permitting a 'right of publicity' is in protecting the proprietary interest of the individual in his act in part to encourage such entertainment."  *Id.* at 573.  This aspect of the right, the Court noted, was "analogous to the goals of patent and copyright law," given that they too serve to protect the individual's ability to "reap the reward of his endeavors."  *Id.*  In *Zacchini*, the performance was the "product of [Zacchini's] own talents and energy, the end result of much time, effort and expense."  Id. at 575.  Thus much of its economic value lay "in the right of exclusive control over the publicity given to his performance."  *Id.*  Indeed, while the Court noted that "[a]n entertainer such as petitioner usually has no objection to the widespread publication of his act as long as [he] gets the commercial benefit of such publication," *id.* at 573, the claim at issue in the *Zacchini* concerned "the strongest case for a 'right of publicity,'" because it did not involve the "appropriation of an entertainer's reputation to enhance the attractiveness of a commercial product," but instead involved "the appropriation of the very activity by which the

entertainer acquired his reputation in the first place," *id.* at 576.

Ultimately, the Court ruled in favor of the human cannonball, and held that

> [w]herever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent. The Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television than it would privilege respondent to film and broadcast a copyrighted dramatic work without liability to the copyright owner.

Id. at 574-75. Thus, while the Court did not itself engage in an explicit balancing inquiry, it did suggest that the respective interests in a case should be balanced against each other.

In the wake of *Zacchini*, courts began applying a balancing inquiry to resolve cases where a right of publicity claim collided with First Amendment protections. While early cases approached the analysis from an ad hoc perspective, *see, e.g.*, *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454 (Cal. 1979) (en banc), courts eventually began developing standardized balancing frameworks. Consequently, we now turn our attention to more standardized balancing tests to see whether any of them offer

a particularly compelling methodology for resolving the case
at hand and similar disputes.[14]

---

[14] We reject as inapplicable in this case the suggestion that
those who play organized sports are not significantly
damaged by appropriation of their likeness because "players
are rewarded, and handsomely, too, for their participation in
games and can earn additional large sums from endorsement
and sponsorship arrangements." *C.B.C. Distrib. & Mktg.,
Inc. v. Major League Baseball Advanced Media, L.P.*, 505
F.3d 818, 824 (8th Cir. 2007) (discussing Major League
Baseball players); *see also, e.g.*, *Cardtoons, L.C. v. Major
League Baseball Players Ass'n*, 95 F.3d 959, 974 (10th Cir.
1996) ("[T]he additional inducement for achievement
produced by publicity rights are often inconsequential
because most celebrities with valuable commercial identities
are already handsomely compensated."). If anything, the
policy considerations in this case weigh in *favor* of Appellant.
As we have already noted, intercollegiate athletes are
forbidden from capitalizing on their fame while in school.
Moreover, the NCAA most recently estimated that "[l]ess
than one in 100, or 1.6 percent, of NCAA senior football
players will get drafted by a National Football League (NFL)
team." NCAA, *Estimated Probability of Competing in
Athletics Beyond the High School Interscholastic Level*,
*available at* http://www.ncaa.org/wps/wcm/connect/public/
ncaa/pdfs/2012/estimated+probability+of+competing+in+athl
etics+beyond+the+high+school+interscholastic+level.
Despite all of his achievements, it should be noted that Ryan
Hart was among the roughly ninety-nine percent who were
not drafted after graduation.

## 2.    The Modern Balancing Tests

Following *Zacchini*, courts began developing more systematized balancing tests for resolving conflicts between the right of publicity and the First Amendment. Of these, three tests are of particular note: the commercial-interest-based Predominant Use Test, the trademark-based *Rogers* Test, and the copyright-based Transformative Use Test. The *Rogers* and Transformative Use tests are the most well-established, while the Predominant Use Test is addressed below only because Appellant argues in favor of its adoption. We consider each test in turn, looking at its origins, scope of application, and possible limitations. For the reasons discussed below, we adopt the Transformative Use Test as being the most appropriate balancing test to be applied here.

### a.    Predominant Use Test

Appellant urges us to adopt the Predominant Use Test, which first appeared in *Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003) (en banc), a case that considered a hockey player's right of publicity claim against a comic book publishing company. In *TCI*, Anthony "Tony" Twist, a hockey player, brought suit against a number of individuals and entities involved in producing and publishing the *Spawn* comic book series after the introduction of a villainous character named Anthony "Tony Twist" Twistelli.

In balancing Twist's property interests in his own name and identity against the First Amendment interests of the comic book creators, the *TCI* court rejected both the Transformative Use and *Rogers* tests, noting that they gave "too little consideration to the fact that many uses of a person's name and identity have both expressive and

commercial components." *Id.* at 374.  The Supreme Court of Missouri considered both tests to be too rigid, noting that they operated "to preclude a cause of action whenever the use of the name and identity is in any way expressive, regardless of its commercial exploitation." *Id.*  The court instead applied what it called a "sort of predominant use test":

> If a product is being sold that predominantly exploits the commercial value of an individual's identity, that product should be held to violate the right of publicity and not be protected by the First Amendment, even if there is some 'expressive' content in it that might qualify as 'speech' in other circumstances.  If, on the other hand, the predominant purpose of the product is to make an expressive comment on or about a celebrity, the expressive values could be given greater weight.

*Id.* (quoting Mark S. Lee, *Agents of Chaos: Judicial Confusion in Defining the Right of Publicity-Free Speech Interface*, 23 LOY. L.A. ENT. L. REV. 471, 500 (2003)).  The *TCI* court considered this to be a "more balanced balancing test [particularly for] cases where speech is both expressive and commercial." *Id.*  After applying the test, the court ruled for Twist, holding that "the metaphorical reference to Twist, though a literary device, has very little literary value compared to its commercial value." *Id.*

We decline Appellant's invitation to adopt this test. By our reading, the Predominant Use Test is subjective at best, arbitrary at worst, and in either case calls upon judges to act as both impartial jurists and discerning art critics.  These two roles cannot co-exist.  Indeed, Appellant suggests that

pursuant to this test we must evaluate "what value [Appellee is] adding to the First Amendment expressiveness [of *NCAA Football*] by appropriating the commercially valuable likeness?" (Tr. at 14:15-:18.) Since "[t]he game would have the exact same level of First Amendment expressiveness if [Appellee] didn't appropriate Mr. Hart's likeness," Appellant urges us to find that *NCAA Football* fails the Predominant Use Test and therefore is not shielded by the First Amendment. (Tr. at 7:10-12.) Such reasoning, however, leads down a dangerous and rightly-shunned road: adopting Appellant's suggested analysis would be tantamount to admitting that it is proper for courts to analyze select elements of a work to determine how much they contribute to the entire work's expressiveness. Moreover, as a necessary (and insidious) consequence, the Appellant's approach would suppose that there exists a broad range of seemingly expressive speech that has no First Amendment value.[15]

Appellee rightly argues that the Predominant Use Test is antithetical to our First Amendment precedent, (Tr. at 25:2-:9), and we likewise reject the Test.[16] We instead turn our

---

[15] This concept is almost wholly foreign to free expression save for *highly circumscribed* categories of speech: obscenity, incitement, and fighting words. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011).

[16] We also agree with Chief Justice Bird's rejection of an identical argument: "The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire. Rather, prominence invites creative comment." *Guglielmi*, 603 P.2d at 460.

attention to the *Rogers* Test, which was proposed by Appellee and which draws its inspiration from trademark law.

### b.    The *Rogers* Test

The *Rogers* Test looks to the relationship between the celebrity image and the work as a whole.[17]  As the following discussion demonstrates, however, adopting this test would potentially immunize a broad swath of tortious activity.  We therefore reject the *Rogers* Test as inapposite in the instant case.

### i.    Origins and Scope of the *Rogers* Test

Various commentators have noted that right of publicity claims — at least those that address the use of a person's name or image in an advertisement — are akin to trademark claims because in both instances courts must balance the interests in protecting the relevant property right against the interest in free expression.  *See, e.g.*, *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924 (6th Cir. 2003) (noting that "a Lanham Act false endorsement claim is the federal equivalent of the right of publicity" (citing Bruce P. Keller, *The Right of Publicity: Past, Present, and Future*, 1207 PLI CORP. LAW & PRAC. HANDBOOK 159, 170 (2000))).

---

[17] The various cases and scholarly sources refer to this test in three different ways: the Relatedness Test, the Restatement Test, and the *Rogers* Test.  The "Relatedness" moniker should be self-explanatory even at this early point in our discussion; the propriety of the other two names will become clear shortly.  For our purposes, we will refer to the test as the *Rogers* Test.

It is little wonder, then, that the inquiry championed by Appellee originated in a case that also focused upon alleged violations of the trademark-specific Lanham Act. *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).

In that case, Ginger Rogers brought suit against the producers and distributors of, *Ginger and Fred*, a film that was alleged to infringe on Rogers' right of publicity and confuse consumers in violation of the Act. (Despite its title, the film was not about either Ginger Rogers or Fred Astaire.) In analyzing the right of publicity claim under Oregon law, the Second Circuit noted Oregon's "concern for the protection of free expression," and held that Oregon would not "permit the right of publicity to bar the use of a celebrity's name in a movie title unless the title was wholly unrelated to the movie or was simply a disguised commercial advertisement for the sale of goods or services." *Id.* at 1004 (internal quotation marks omitted).[18]  After applying this test, the *Rogers* court concluded that the right of publicity claim merited dismissal because "the title 'Ginger and Fred' is

_____

[18] For support, the *Rogers* court looked to California and New York case law. *Frosch v. Grosset & Dunlap, Inc.*, 427 N.Y.S.2d 828, 829 (App. Div. 1980) ("It is enough that the book is a literary work and not simply a disguised commercial advertisement for the sale of goods or services."); *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 457 n.6 (Cal. 1979) ("Such statements establish that this is not a case in which the use is wholly unrelated to the individual. . . . [T]his is not a case in which a celebrity's name is used to promote or endorse a collateral commercial product or is otherwise associated with a product or service in an advertisement.").

clearly related to the content of the movie and is not a disguised advertisement for the sale of goods and services or a collateral commercial product." *Id.* at 1004-05.[19]

But while the test, as articulated in *Rogers*, arguably applied only to the use of celebrity identity in a work's title, Appellee suggests that the test can — and should — be applied more broadly. For support, Appellee looks to the Restatement (Third) of Unfair Competition, released in 1995, which characterizes the tort as follows:

> One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability for [appropriate relief].

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 46. In explaining the term "use for purposes of trade," the Restatement notes that it does not "ordinarily include the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses." *Id.* § 47.

---

[19] Still, it bears noting that while the *Rogers* Test was arguably forged in the crucible of trademark law — and the *Rogers* court appeared to consult trademark principles for inspiration — the court also pointed out that "the right of publicity, unlike the Lanham Act, has no likelihood of confusion requirement" and is therefore "potentially more expansive than the Lanham Act." *Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989).

Moreover, the comments to Section 47 of the Restatement also note that:

> [t]he right of publicity as recognized by statute and common law is fundamentally constrained by *the public and constitutional interest in freedom of expression.* The use of a person's identity primarily for purpose of communicating information or expressing ideas is not generally actionable as a violation of the person's right of publicity. . . . Thus the use of a person's name or likeness in news reporting, whether in newspapers, magazines, or broadcast news, does not infringe the right of publicity. The interest in freedom of expression also extends to use in entertainment and other creative works, including both fiction and nonfiction. The use of a celebrity's name or photograph as part of an article published in a fan magazine or in a feature story broadcast on an entertainment program, for example, will not infringe the celebrity's right of publicity. Similarly, the right of publicity is not infringed by the dissemination of an unauthorized print or broadcast biography. Use of another's identity in a novel, play, or motion picture is also not ordinarily an infringement. . . . *However, if the name or likeness is used solely to attract attention to a work that is not related to the identified person, the user may be subject to liability for a use of the other's identity in advertising.*

*Id.* at § 47 cmt. c (emphasis added).  Appellee argues that the above language adopts the *Rogers* Test and applies it to right of publicity claims dealing with any part of a work, not only its title.  Appellee also cites to a number of cases purportedly supporting its position.  *See, e.g., Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003); *Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994).  We do not find any of these cases particularly persuasive.

In *Matthews*, for example, the Fifth Circuit considered whether a fictional novel incorporating events from the life of an undercover narcotics officer violated the officer's right of publicity.  In setting out the legal standard for a right of publicity claim, the court noted that it made no difference "whether [the book] is viewed as an historical or a fictional work, so long as it is not simply a disguised commercial advertisement for the sale of goods or services."  *Matthews*, 15 F.3d at 440 (quotation marks and internal citations omitted).  This single, cryptic quotation notwithstanding, the court ultimately held in favor of the book's author after applying a wholly different — and seemingly inapposite — First Amendment analysis: actual malice.[20]  *See id.* ("[A]bsent a showing of actual malice . . . [the book] is protected by the First Amendment.").

---

[20] In *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), the Supreme Court clarified its holding in *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977), as standing for the proposition that "the 'actual malice' standard does not apply to the tort of appropriation of a right of publicity."  *Hustler*, 485 U.S. at 52.

But where *Matthews* took an ambivalent position, the Sixth Circuit seemed — at least for a short time — to embrace the *Rogers* Test. In *Parks v. LaFace Records*, the Sixth Circuit was asked to determine whether a rap song entitled *Rosa Parks* infringed on the Civil Rights icon's right of publicity. *Parks*, 329 F.3d at 441-42. After noting that *Rogers* was decided in the context of a movie, the Sixth Circuit held that an expansion of the test to "the context of other expressive works [was supported] by comment c of § 47 of the Restatement (Third) of Unfair Competition." *Id.* at 461. Consequently, the Sixth Circuit ruled that there was an issue of material fact as to whether the title of the song ("Rosa Parks") was "wholly unrelated" to the lyrics. *Id.* We find *Parks* to be less than persuasive given that just over a month later another panel of the Sixth Circuit decided *ETW Corp. v. Jireh Publishing, Inc.*, a right of publicity case where the Circuit applied the Transformative Use Test. *See* 332 F.3d 915, 937 (6th Cir. 2003).[21]

Interestingly, this is not the first time that we have considered the proper scope of the *Rogers* Test. Indeed, we expressed doubt (albeit in dicta) over whether the Test could apply beyond the title of a work in *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008), a case centering on a suit

---

[21] To be fair, the *ETW* court did briefly mention the *Rogers* decision before engaging in a lengthy discussion of the RESTATEMENT (THIRD) OF UNFAIR COMPETITION, ultimately concluding that the Restatement stood for the rather mundane principle that a right of publicity implicates a balancing test. *ETW Corp.*, 332 F.3d at 930-36. As we noted above, the balancing utilized by the *ETW* court was the Transformative Use Test.

by the estate of a well-known sports narrator against a sports film production company for Lanham Act violations and breach of the narrator's right of publicity.  In analyzing the trademark claim, we expressed hesitation at extending the *Rogers* Test beyond the title of a work, adding that few other courts had done so at the time of our decision.  *Id.* at 1018.  Nothing in Appellee's argument has swayed us from this position and we thus remain skeptical that the *Rogers* Test applies to the general contents of a work when analyzing right of publicity claims.

### ii.    Analysis of the *Rogers* Test

Ultimately, we find that the *Rogers* Test does not present the proper analytical approach for cases such as the one at bar.  While the Test may have a use in trademark-like right of publicity cases, it is inapposite here.  We are concerned that this test is a blunt instrument, unfit for widespread application in cases that require a carefully calibrated balancing of two fundamental protections: the right of free expression and the right to control, manage, and profit from one's own identity.

The potential problem with applying the *Rogers* Test in this case is demonstrated by the following statement from Appellee's brief:

> Because, as a former college football player, Hart's likeness is not 'wholly unrelated' to *NCAA Football* and the game is not a commercial advertisement for some unrelated product, Hart . . . does not try to meet the . . . test.

(Appellee's Br. at 24.)    Effectively, Appellee argues that Appellant should be unable to assert a claim for appropriating his likeness as a football player precisely because his likeness was used for a game about football.  Adopting this line of reasoning threatens to turn the right of publicity on its head.

Appellant's career as a college football player suggests that the target audience for his merchandise and performances (e.g., his actual matches) would be sports fans.  It is only logical, then, that products appropriating and exploiting his identity would fare best — and thereby would provide ne'er-do-wells with the greatest incentive — when targeted at the sports-fan market segment.  Given that Appellant played intercollegiate football, however, products targeting the sports-fan market would, as a matter of course, relate to him.  Yet under Appellee's approach, all such uses would be protected.  It cannot be that the very activity by which Appellant achieved his renown now prevents him from protecting his hard-won celebrity.  We decline to endorse such a conclusion and therefore reject the *Rogers* test as inapplicable.[22]

On the other hand, we do agree with the *Rogers* court in so far as it noted that the right of publicity does not implicate the potential for consumer confusion and is therefore potentially broader than the protections offered by

---

[22] We recognize that in *Brown v. Elec. Arts*, No. 2:09-cv-01598-FMC-RZ, 2009 WL 8763151 (C.D. Cal. Sept. 23, 2009), the District Court applied the *Rogers* test in analyzing another EA sports game: *Madden NFL*.  Note, however, that the case did not involve a right of publicity claim, but a claim under the Lanham Act.  *Id.* at *1-2.

the Lanham Act. *Rogers*, 875 F.2d at 1004. Indeed, therein lies the weakness of comparing the right of publicity to trademark protections: the right of publicity is broader and, by extension, protects a greater swath of property interests. Thus, it would be unwise for us to adopt a test that hews so closely to traditional trademark principles. Instead, we need a broader, more nuanced test, which helps balance the interests at issue in cases such as the one at bar. The final test — the Transformative Use Test — provides just such an approach.

### c.    The Transformative Use Test

Looking to intellectual property law for guidance on how to balance property interests against the First Amendment has merit. We need only shift our gaze away from trademark, to the broader vista of copyright law. Thus, we come to the case of *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, which imported the concept of "transformative" use from copyright law into the right of publicity context. 21 P.3d 797, 804-08 (Cal. 2001). This concept lies at the core of a test that both Appellant and Appellee agree is applicable to this case: the Transformative Use Test.[23]

---

[23] Unlike in New Jersey, California's right of publicity is a matter of both the state's statutory law and its common law. *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1138 (9th Cir. 2006) (discussing both the statutory and the common law cause of action); *see also* Cal. Civ. Code § 3344; *Eastwood v. Superior Court*, 198 Cal. Rptr. 342, 347 (Cal. Ct. App. 1983). This difference notwithstanding, the laws are strikingly similar — and protect similar interests. Under California law, "any person who knowingly uses another's name . . . or

### i.    Genesis of the Transformative Use Test

The Transformative Use Test was first articulated by the Supreme Court of California in *Comedy III*.  That case concerned an artist's production and sale of t-shirts and prints bearing a charcoal drawing of the Three Stooges.  The California court determined that while "[t]he right of publicity is often invoked in the context of commercial speech," it could also apply in instances where the speech is merely expressive.  *Id.* at 802-803.  The court also noted, however, that when addressing expressive speech, "the very importance of celebrities in society means that the right of publicity has the potential of censoring significant expression by suppressing alternative versions of celebrity images that are iconoclastic, irreverent or otherwise attempt to redefine the celebrity's meaning."  *Id.* at 803.  Thus, while the "the right of publicity cannot, consistent with the First Amendment, be a right to control the celebrity's image by censoring disagreeable portrayals," *id.* at 807, the right, like

---

likeness, in any manner, or in any products, merchandise, or goods, or for the purposes of advertising or selling, or soliciting purchases of . . . shall be liable for any damages sustained by the person or persons injured as a result thereof." Cal. Civ. Code § 3344(a).  In the words of the California Supreme Court, "the right of publicity is essentially an economic right.  What the right of publicity holder possesses is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame . . . ."  *Comedy III*, 21 P.3d at 807.  This is analogous to the conceptualization of the right of publicity in New Jersey, and we consequently see no issue in applying balancing tests developed in California to New Jersey.

copyright, nonetheless offers protection to a form of intellectual property that society deems to have social utility, *id.* at 804.

After briefly considering whether to import the "fair use" analysis from copyright, the *Comedy III* court decided that only the first fair use factor, "the purpose and character of the use," was appropriate. *Id.* at 808. Specifically, the *Comedy III* court found persuasive the Supreme Court's holding in *Campbell v. Acuff-Rose Music, Inc.* that

> the central purpose of the inquiry into this fair use factor 'is to see . . . whether the new work merely "supercede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "*transformative*."

*Id.* (emphasis added) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).

Going further, the court explained that works containing "significant transformative elements" are less likely to interfere with the economic interests implicated by the right of publicity. For example, "works of parody or other distortions of the celebrity figure are not, from the celebrity fan's viewpoint, good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets for celebrity memorabilia that the right of publicity is designed to protect." *Id.* The court was also careful to emphasize that "the transformative elements or creative

contributions" in a work may include — under the right circumstances — factual reporting, fictionalized portrayal, heavy-handed lampooning, and subtle social criticism. *Id.* at 809 ("The inquiry is in a sense more quantitative than qualitative, asking whether the literal and imitative or the creative elements predominate in the work.").[24]

Restating its newly-articulated test, the Supreme Court of California held that the balance between the right of publicity and First Amendment interests turns on

> [w]hether the celebrity likeness is one of the "raw materials" from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question. We ask, in other words, *whether the product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness.* And when we use the word "expression," we mean expression of something other than the likeness of the celebrity.

---

[24] The court in *Comedy III* also added an ancillary question to its inquiry: "does the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted?" *Comedy III*, 21 P.3d at 810. If not, then "there would generally be no actionable right of publicity." *Id.* However, the inverse is not necessarily true: even if the work does derive its value principally from the celebrity's depiction, "it may still be a transformative work." *Id.*

*Id.* (emphasis added).

Applying this test, the court concluded that charcoal portraits of the Three Stooges did violate the Stooges' rights of publicity, holding that the court could "discern no significant transformative or creative contribution" and that "the marketability and economic value of [the work] derives primarily from the fame of the celebrities depicted." *Id.* at 811.

### ii.    Application of the Transformative Use Test

Given its relative recency, few courts have applied the Transformative Use Test, and consequently there is not a significant body of case law related to its application. Nonetheless, a handful of cases bear mention as they help frame our inquiry.

In 2003, the Supreme Court of California revisited the Transformative Use Test when two musicians, Johnny and Edgar Winter, who both possessed long white hair and albino features, brought suit against a comic book company over images of two villainous half-man, half-worm creatures, both with long white hair and albino features, named Johnny and Edgar Autumn. *Winter v. DC Comics*, 69 P.3d 473, 476 (Cal. 2003). As the brothers' right of publicity claims necessarily implicated DC Comics' First Amendment rights, the *Winter* court looked to the Transformative Use Test. In summarizing the test, the court explained that "[a]n artist depicting a celebrity must contribute something more than a 'merely trivial' variation, [but must create] something recognizably 'his own,' in order to qualify for legal protection." *Id.* at 478 (alteration in original) (quoting *Comedy III*, 21 P.3d at 810-11). Thus, in applying the test, the *Winter* court held that

> [a]lthough the fictional characters Johnny and Edgar Autumn are less-than-subtle evocations of Johnny and Edgar Winter, the books do not depict plaintiffs literally.  Instead, plaintiffs are merely part of the raw materials from which the comic books were synthesized.  To the extent the drawings of the Autumn brothers resemble plaintiffs at all, they are distorted for purposes of lampoon, parody, or caricature.  And the Autumn brothers are but cartoon characters — half-human and half-worm — in a larger story, which is itself quite expressive.

Id. at 479.  The court therefore found that "fans who want to purchase pictures of [the Winter brothers] would find the drawing of the Autumn brothers unsatisfactory as a substitute for conventional depictions."  *Id.*[25]  Consequently, the court rejected the brothers' claims for a right of publicity violation.

Also in 2003, the Sixth Circuit decided *ETW*, a case focusing on a photograph of Tiger Woods set among a collage of other, golf-related photographs.  As we previously noted, while *ETW* mentioned both the *Rogers* case and the Restatement (Third) of Unfair Competition, the test it ultimately applied was a combination of an ad-hoc approach

---

[25] The *Winter* court also found unpersuasive arguments that the comic books were marketed by "trading on [the brothers'] likenesses and reputations to generate interest in the comic book series."  *Winter v. DC Comics*, 69 P.3d 473, 479 (Cal. 2003).  The court held that considerations of marketing strategy were "irrelevant" because the "question is whether the work is transformative, not how it is marketed."  *Id.*

and the Transformative Use Test. *See ETW*, 332 F.3d at 937-38. In holding that the collage "contain[ed] significant transformative elements," *id.* at 938, the court compared it to the Three Stooges portraits from *Comedy III*, and noted that the collage "does not capitalize solely on a literal depiction of Woods." *Id.* Instead, the "work consists of a collage of images in addition to Woods's image which are combined to describe, in artistic form, a historic event in sports history and to convey a message about the significance of Woods's achievement in that event." *Id.*; *see also Comedy III*, 21 P.3d at 809 (noting that "transformative elements or creative contributions . . . can take many forms").

*ETW* presents an archetypical example of a case falling somewhere in the middle of Transformative Use Test jurisprudence, given that it focuses on the use of photographs (literal depictions of celebrities), but adds a transformative aspect to the work, thereby altering the meaning behind the use of the celebrity's likeness. Arguably, the *Comedy III* and *Winter* decisions bookend the spectrum of cases applying the Transformative Use Test. Where *Comedy III* presents a clear example of a non-transformative use (i.e., mere literal depictions of celebrities recreated in a different medium), *Winter* offers a use that is highly transformative (i.e., fanciful characters, placed amidst a fanciful setting, that draw inspiration from celebrities). As with *ETW*, however, most of the cases discussed below (along with the instant case), fall somewhere between these two decisions. This same analytical approach — focusing on whether and how the celebrity's likeness is transformed — appears in decisions by courts applying the Transformative Use Test to video games, an area of law which we consider next.

### iii.    The Transformative Use Test and Video Games

In mid-2006, the California Court of Appeal decided *Kirby v. Sega of America, Inc.*, 50 Cal. Rptr. 3d 607 (Cal. Ct. App. 2006), which addressed a musician's right of publicity claim against a video game company.   Specifically, the musician (Kierin Kirby) had claimed that Sega misappropriated her likeness and signature phrases for purposes of creating the character of Ulala, a reporter in the far flung future.  In applying the Transformative Use Test, the court noted that not only did Kirby's signature phrases included "ooh la la" but that both she and the videogame character would often use phrases like "groove," "meow," "dee-lish," and "I won't give up."  *Id.* at 613.  The court also found similarities in appearance between Kirby and Ulala, based on hair style and clothing choice.  *Id.*  At the same time, the court held that differences between the two did exist — both in appearance and movement — and that Ulala was not a mere digital recreation of Kirby.  *Id.*  Thus, the court concluded that Ulala passed the Transformative Use Test, rejecting Kirby's argument that the differences between her and the character added no additional meaning or message to the work.  *Id.* at 616-17 ("A work is transformative if it adds 'new expression.'  That expression alone is sufficient; it need not convey any 'meaning or message.'"); *see also id.* at 617 ("[A]ny imitation of Kirby's likeness or identity in Ulala is not the sum and substance of that character.").

Several years later, in early 2011, the California courts again confronted the right of publicity as it related to video games in *No Doubt v. Activision Publishing, Inc.*, 122 Cal. Rptr. 3d 397 (Cal. Ct. App. 2011).  The case centered on *Band Hero*, a game that allows player to "simulate performing in a rock band in time with popular songs" by

selecting digital avatars to represent them in an in-game band. *Id.* at 401.  Some of the avatars were digital recreations of real-life musicians, including members of the band No Doubt.[26]  After a contract dispute broke off relations between the band and the company, No Doubt sued, claiming a violation of their rights of publicity.  The California Court of Appeal applied the Transformative Use Test.

The *No Doubt* court began by noting that "in stark contrast to the 'fanciful creative characters' in *Winter* and *Kirby*," the No Doubt avatars could not be altered by players and thus remained "at all times immutable images of the real celebrity musicians." *Id.* at 410.  But this fact, by itself, did not end the court's inquiry since "even literal reproductions of celebrities can be 'transformed' into expressive works based on the context into which the celebrity image is placed." *Id.*

---

[26] According to the decision,

> members of No Doubt participated in a full-day motion capture photography session at Activision's studios so that the band members' Band Hero avatars would accurately reflect their appearances, movements, and sounds.  No Doubt then closely reviewed the motion capture photography and the details related to the appearance and features of their avatars to ensure the representations would meet with approval.  The end results are avatars that closely match the appearance of each of the No Doubt band members.

*No Doubt*, 122 Cal. Rptr. 3d at 402.

(citing *Comedy III*, 21 P.3d at 811).  Looking to the context of the *Band Hero* game, the court found that "no matter what else occurs in the game *during the depiction of the No Doubt avatars*, the avatars perform rock songs, the same activity by which the band achieved and maintains its fame."  *Id.* at 410-11 (emphasis added).  The court explained:

> [T]he avatars perform [rock] songs as literal recreations of the band members.  That the avatars can be manipulated to perform at fanciful venues including outer space or to sing songs the real band would object to singing, or that the avatars appear in the context of a videogame *that contains many other creative elements*, does not transform the avatars into anything other than the exact depictions of No Doubt's members doing exactly what they do as celebrities.

*Id.* at 411 (emphasis added).[27]  As a final step in its analysis, the court noted that Activision's use of highly realistic digital

---

[27] For support, the *No Doubt* court relied on the Ninth Circuit's decision in *Hilton v. Hallmark Cards*, where our sister court held that a greeting card depicting Paris Hilton's head on a cartoon waitress accompanied by the line "that's hot" was not transformative and thus infringed on Hilton's right of publicity.  599 F.3d 894, 911 (9th Cir. 2010) ("While a work need not be phantasmagoric as in *Winter* or fanciful as in *Kirby* in order to be transformative, there is enough doubt as to whether Hallmark's card is transformative under our case law that we cannot say Hallmark is entitled to the defense . . . .").

depictions of No Doubt was motivated by a desire to capitalize on the band's fan-base, "because it encourages [fans] to purchase the game so as to *perform as, or alongside, the members of No Doubt.*" *Id.* (emphasis added). Given all this, the court concluded that Activision's use of No Doubt's likenesses did infringe on the band's rights of publicity. *Id.* at 411-12.[28]

### iv.    Analysis of the Transformative Use Test

Like the Predominant Use and *Rogers* tests, the Transformative Use Test aims to balance the interest protected by the right of publicity against those interests preserved by the First Amendment.    In our view, the Transformative Use Test appears to strike the best balance because it provides courts with a flexible — yet uniformly

---

[28] Before moving on, it behooves us to mention a pair of cases decided in the Northern District of California: *Davis v. Elec. Arts Inc.*, No. 10-cv-03328, 2012 WL 3860819 (N.D. Cal. Mar. 29, 2012); *Keller v. Elec. Arts, Inc.*, No. 09-cv-01967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010).    Both cases concern right of publicity claims asserted against EA for use of football players' likenesses in their game franchises. *Davis* related to EA's *Madden NFL* games while *Keller* is simply our own case incarnated in California.    In both disputes the court applied the Transformative Use Test, and in both instances the court decided that EA's use of the players' likenesses failed the Test. *Davis*, 2012 WL 3860819, at *5-6; *Keller*, 2010 WL 530108, at *3-5.    We note these cases in passing only because they are both currently on appeal before the Ninth Circuit and we feel it imprudent to rely too heavily on decisions that our sister court is still considering.

applicable — analytical framework. Specifically, the Transformative Use Test seems to excel precisely where the other two tests falter. Unlike the *Rogers* Test, the Transformative Use Test maintains a singular focus on whether the work sufficiently transforms the celebrity's identity or likeness, thereby allowing courts to account for the fact that misappropriation can occur in any market segment, including those related to the celebrity.

On the other hand, unlike the Predominant Use Test, applying the Transformative Use Test requires a more circumscribed inquiry, focusing on the specific aspects of a work that speak to whether it was merely created to exploit a celebrity's likeness. This test therefore recognizes that if First Amendment protections are to mean anything in right of publicity claims, courts must *begin* by considering the extent to which a work is the creator's own expression.[29]

Additionally, the Transformative Use Test best comports with the cautionary language present in various right of publicity cases. Specifically, we believe that an initial focus on the creative aspects of a work helps address our own concern from *Facenda*, where we noted that "courts must circumscribe the right of publicity." *Facenda*, 542 F.3d

---

[29] While we acknowledge that the test in *Comedy III* included a question as to whether the "marketability and economic value of [the work] derive primarily from the fame of the celebrities depicted," *Comedy III*, 21 P.3d at 810, we note that this is a secondary question. The court in *Comedy III* rightly recognized that the balancing inquiry suggested by the Supreme Court in *Zacchini* cannot start and stop with commercial purpose or value.

at 1032. As our discussion below demonstrates, the Transformative Use Test effectively restricts right of publicity claims to a very narrow universe of expressive works. Moreover, we believe that the Transformative Use Test best exemplifies the methodology suggested by Justice Powell's dissent in *Zacchini*:

> Rather than begin with a quantitative analysis of the performer's behavior — is this or is this not his entire act? — we should direct initial attention to the actions of the news media: what use did the station make of the film footage? When a film is used, as here, for a routine portion of a regular news program, I would hold that the First Amendment protects the station from a "right of publicity" or "appropriation" suit, absent a strong showing by the plaintiff that the news broadcast was a subterfuge or cover for private or commercial exploitation.

*Zacchini*, 433 U.S. at 581 (Powell, J., dissenting). Consistent with Justice Powell's argument, the Transformative Use Test begins by asking "what use did the [defendant] make of the [celebrity identity]?" *Id.*[30]

Finally, we find that of the three tests, the Transformative Use Test is the most consistent with other courts' ad hoc approaches to right of publicity cases. For

---

[30] While the Predominant Use Test may appear to accomplish the same task, we think it does not. In point of fact, it merely looks to the expressive "value" of a celebrity's identity, not its use, vis-à-vis the challenged work.

example, a majority of the Supreme Court of California in *Guglielmi v. Spelling-Goldberg Productions* argued[31] that the "fictionalized version" of a late actor's life, "depicting the actor's name, likeness and personality without obtaining . . . prior consent" was entitled to protection from a right of publicity claim.  603 P.2d at 455, 457-59.[32]  In

---

[31] The Supreme Court of California affirmed the lower court's decision to dismiss the case without engaging with the right of publicity claim beyond noting that the right "expires upon the death of the person so protected." *Guglielmi*, 603 P.2d at 455.  The Chief Justice's concurring opinion, joined by a majority of the court, provided a full analysis of the issue, and in subsequent years has been treated as the Court's majority opinion. *See Comedy III*, 21 P.3d at 803 (citing the *Guglielmi* concurrence while noting that "[a] majority of this court" had agreed to its reasoning); *see also Guglielmi*, 603 P.2d at 464 (Newman, J., concurring) ("I concur in the discussion in the Chief Justice's opinion that sets forth principles for determining whether an action based on the invasion of an individual's right of publicity may be maintained in the face of a claim that the challenged use is an exercise of freedom of expression.").

[32] After noting that the movie was protected despite being a work of fiction that was made for profit, *Guglielmi*, 603 P.2d at 458-59, Chief Justice Bird rejected the contention that defendants "could have expressed themselves without using [the actor's] name and likeness," arguing that "[n]o author should be forced into creating mythological worlds or characters wholly divorced from reality.  The right of publicity derived from public prominence does not confer a

essence, the actor's identity was sufficiently transformed by the fictional elements in the book so as to tip the balance of interests in favor of the First Amendment. *See id.* at 457 (Bird, C.J., concurring). Likewise, in *Estate of Presley v. Russen*, 513 F. Supp. 1339 (D.N.J. 1981), the United States District Court for the District of New Jersey held that an Elvis impersonator's act was subject to right of publicity claims because "entertainment that is merely a copy or imitation, even if skillfully and accurately carried out, does not really have its *own creative component* and does not have a significant value as pure entertainment." *Id.* at 1359 (emphasis added). Seen through the lens of the Transformative Use Test, the *Russen* decision demonstrates that where no additional transformative elements are present — i.e., the work contains "merely a copy or imitation" of the celebrity's identity — then there can be no First Amendment impediment to a right of publicity claim.[33] Additionally, in *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996), which focused on the use of baseball players' identities for parody trading cards, the

shield to ward off caricature, parody and satire. Rather, prominence invites creative comment." *Id.* at 459-60.

[33] The court's "recognition that defendant's production has some [First Amendment] value," did not diminish its conclusion that "the primary purpose of defendant's activity [was] to appropriate the commercial value of the likeness of Elvis Presley." *Russen*, 513 F. Supp. at 1360. In this regard the court analogized the case to *Zacchini*, holding that the Elvis impersonator had "appropriated the 'very activity [live stage show] by which [Presley initially] acquired his reputation." *Id.* at 1361 (alteration in original).

transformative nature of the caricatures on the cards (and the parodic text about the players' "statistics") was sufficient to quash any right of publicity claim. *Id.* at 972-73 ("Because celebrities are an important part of our public vocabulary, a parody of a celebrity does not merely lampoon the celebrity, but exposes the weakness of the idea or value that the celebrity symbolizes in society.").[34]

It is little wonder, then, that the *Comedy III* decision looked to all three of these cases for guidance in defining the Transformative Use Test. *See Comedy III*, 21 P.3d at 806-09.[35] The fact that such prior holdings can be reconciled with the Test not only bolsters our views as to its propriety, but

---

[34] The Tenth Circuit also considered the economic incentives underlying the right of publicity. *See Cardtoons*, 95 F.3d at 973-74. After a close examination, the court recognized only one principal benefit for celebrities from having control over works of parody: "control over the potential effect the parody would have on the market for nonparodic use of one's identity." *Id.* at 974. However, the court quickly added that parody "*rarely acts as a market substitute for the original*." *Id.* As a consequence, the court ruled in favor of the card manufacturer.

[35] We note here that, by our reading, the Transformative Use Test best comports with the language in RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 47 cmt. c. While we acknowledge that other courts have read the Restatement as adopting the *Rogers* Test, we believe that the various examples listed in Comment C all exemplify the sort of transformative uses that would generally pass the analysis set forth in *Comedy III*.

also ensures that adopting the Transformative Use Test does not result in the sort of backward-looking jurisprudential revision that might disturb prior protections for expressive speech.[36]  Quite to the contrary, adopting the Test ensures that already-existing First Amendment protections in right of publicity cases apply to video games with the same force as to "biographies, documentaries, docudramas, and other expressive works depicting real-life figures." (Dissent Op. at 6.)

In light of the above discussion, we find that the Transformative Use Test is the proper analytical framework to apply to cases such as the one at bar.  Consequently, we now apply the test to the facts of the instance case.

## C.    Application

In applying the Transformative Use Test to the instant case, we must determine whether Appellant's identity is sufficiently transformed in *NCAA Football*.  As we mentioned earlier, we use the term "identity" to encompass not only Appellant's likeness, but also his biographical information.  It is the combination of these two parts — which, when

---

[36]    Indeed, in compiling its non-exhaustive list of "transformative elements or creative components," the *Comedy III* court looked for examples from previous decisions — including *Guglielmi*, *Cardtoons*, and even *Parks*. *See Comedy III*, 21 P.3d at 809-10.

combined, identify the digital avatar as an in-game recreation of Appellant — that must be sufficiently transformed.[37]

Having thus cabined our inquiry to the appropriate form of Appellant's identity, we note that — based on the combination of both the digital avatar's appearance and the biographical and identifying information — the digital avatar does closely resemble the genuine article.  Not only does the digital avatar match Appellant in terms of hair color, hair style and skin tone, but the avatar's accessories mimic those worn by Appellant during his time as a Rutgers player.  The information, as has already been noted, also accurately tracks Appellant's vital and biographical details.   And while the inexorable march of technological progress may make some of the graphics in earlier editions of *NCAA Football* look dated or overly-computerized, we do not believe that video game graphics must reach (let alone cross) the uncanny valley to support a right of publicity claim.[38]  If we are to find some

---

[37] This joint focus on both likeness and identifying information avoids a conflict with *C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818 (8th Cir. 2007), which held that use of major league baseball players' records in a fantasy baseball game was protected by the First Amendment even against right of publicity claims because such information was publicly available.  *Id.* at 823-24.  The presence of a digital avatar that recreates Appellant in a digital medium differentiates this matter from *C.B.C.*

[38] It remains an open question, however, whether right of publicity claims can extend into the bygone days of 8-bit graphics and pixilated representations.

transformative element, we must look somewhere other than just the in-game digital recreation of Appellant.[39]  Cases such as *ETW* and *No Doubt*, both of which address realistic digital depictions of celebrities, point to the next step in our analysis: context.

Considering the context within which the digital avatar exists — effectively, looking at how Appellant's identity is "incorporated into and transformed by" NCAA Football, (Dissent Op. at 6) — provides little support for Appellee's arguments.  The digital Ryan Hart does what the actual Ryan Hart did while at Rutgers: he plays college football, in digital recreations of college football stadiums, filled with all the trappings of a college football game.   This is not transformative; the various digitized sights and sounds in the video game do not alter or transform the Appellant's identity in a significant way.  *See No Doubt*, 122 Cal. Rptr. 3d at 410-11 ("[N]o matter what else occurs in the game during the depiction of the No Doubt avatars, the avatars perform rock

---

[39] It is no answer to say that digitizing Appellant's appearance in and of itself works a transformative use.  Recreating a celebrity's likeness or identity in some medium other than photographs or video cannot, without more, satisfy the test; this would turn the inquiry on its head — and would contradict the very basis for the Transformative Use Test. *See, e.g.*, *Comedy III*, 21 P.3d at 809 (applying the Transformative Use Test to charcoal drawings of the Three Stooges); *see also Estate of Presley v. Russen*, 513 F. Supp. 1339, 1359 (D.N.J. 1981) ("[E]ntertainment that is merely a copy or imitation, even if skillfully and accurately carried out, does not really have its own creative component and does not have a significant value as pure entertainment.").

songs, the same activity by which the band achieved and maintains its fame."). Indeed, the lack of transformative context is even more pronounced here than in *No Doubt*, where members of the band could perform and sing in outer space.

Even here, however, our inquiry is not at an end. For as much as the digital representation and context evince no meaningful transformative element in *NCAA Football*, a third avatar-specific element is also present: the users' ability to alter the avatar's appearance. This distinguishing factor ensures that we cannot dispose of this case as simply as the court in *No Doubt*. *See No Doubt*, 122 Cal. Rptr. 3d at 410 (noting that the digital avatars representing No Doubt were "at all times immutable images of the real celebrity musicians"). Indeed, the ability for users to change the avatar accounted, in large part, for the District Court's deciding that *NCAA Football* satisfied the Transformative Use Test. *See Hart*, 808 F. Supp. 2d at 785.[40] We must therefore consider

---

[40] To be clear, the District Court focused specifically on the *ability* to alter the digital avatars, not on the alterations themselves:

> [I]t is not the user's alteration of Hart's image that is critical. What matters for my analysis of EA's First Amendment right is that EA created the mechanism by which the virtual player may be altered, as well as the multiple permutations available for each virtual player image.

*Hart*, 808 F. Supp. 2d at 785. That is, the court below did not look to the users' creations as proxies for Appellee's expression. While we disagree with its final decision, we

to what extent the ability to alter a digital avatar represents a transformative use of Appellant's identity.

At the outset, we note that the mere presence of this feature, without more, cannot satisfy the Transformative Use Test. True, interactivity is the basis upon which First Amendment protection is granted to video games in the first instance.[41] *See Brown*, 131 S. Ct. at 2733. However, the balancing test in right of publicity cases does not look to whether a particular work *loses* First Amendment protection. Rather, the balancing inquiry looks to see whether the interests protected by the right of publicity are sufficient to *surmount* the already-existing First Amendment protections. *See, e.g.*, *Guglielmi*, 603 P.2d at 458 (considering whether right of publicity protections "outweigh[] any protection [the] expression would otherwise enjoy under the [First Amendment]"). As *Zacchini* demonstrated, the right of publicity can triumph even when an essential element for First Amendment protection is present. In that case, the human cannonball act was broadcast *as part of the newscast*. *See Zacchini*, 433 U.S. at 563. To hold, therefore, that a video game should satisfy the Transformative Use Test simply because it includes a particular interactive feature

---

agree with the District Court's careful navigation of this point.

[41] We note, too, that all games are interactive — that is a product of the medium. Identifying an interactive feature that acts upon the celebrity's likeness, therefore, is only the *first step* in the analysis.

would lead to improper results.  Interactivity cannot be an end onto itself.[42]

Moreover, we are wary of converting the ability to alter a digital avatar from mere feature to talisman, thereby opening the door to cynical abuse.  If the mere presence of the feature were enough, video game companies could commit the most blatant acts of misappropriation only to absolve themselves by including a feature that allows users to modify the digital likenesses.  We cannot accept that such an outcome would adequately balance the interests in right of publicity cases.  As one amicus brief noted:

> [U]nder [Appellee's] application of the transformative test [sic], presumably no infringement would be found if individuals such as the Dalai Lama and the Pope were placed within a violent "shoot-em-up" game, so long as the game include[d] a "mechanism" by which the user could manipulate their characteristics.

(Screen Actors Guild, Inc. et al., Amicus Br. at 21.[43])  With this concern in mind, therefore, we consider whether the type

---

[42] The other side of this coin is equally true: interactivity is not the sine qua non of transformative use.  Works involving video games may still be transformative even where no specific interactive features affect the celebrity likeness.  *See, e.g.*, *Kirby v. Sega of Am., Inc.*, 50 Cal. Rptr. 3d 607 (Cal. Ct. App. 2006).

[43] We do not discount the possibility that such a game — given the juxtaposition of spiritual leaders and the hyper

and extent of interactivity permitted is sufficient to transform the Appellant's likeness into the Appellee's own expression. We hold that it does not.

In *NCAA Football*, Appellee seeks to create a realistic depiction of college football for the users. Part of this realism involves generating realistic representations of the various college teams — which includes the realistic representations of the players. Like Activision in *No Doubt*, therefore, Appellee seeks to capitalize on the respective fan bases for the various teams and players. Indeed, as the District Court recognized, "it seems ludicrous to question whether video game consumers enjoy and, as a result, purchase more EA-produced video games as a result of the heightened realism associated with actual players." *Hart*, 808 F. Supp. 2d at 783 (quoting James J.S. Holmes & Kanika D. Corley, *Defining Liability for Likeness of Athlete Avatars in Video Games*, L.A. LAW., May 2011, at 17, 20). Moreover, the realism of the games — including the depictions and recreations of the players — appeals not just to home-team fans, but to bitter rivals as well. Games such as *NCAA Football* permit users to recreate the setting of a bitter defeat and, in effect, achieve some cathartic readjustment of history; realistic depictions of the players are a necessary element to this.[44] That

---

violence of certain modern video games — could still pass the Transformative Use Test on other grounds.

[44] We set aside the "Dynasty" and "Campus Legends" game modes in this inquiry. We see no legally significant difference between these modes and the ability in Band Hero to select alternative avatars to represent the players or to allow members of No Doubt to play with other bands or sing

Appellant's likeness is the *default* position only serves to support our conclusion that realistic depictions of the players are the "sum and substance" of these digital facsimiles.[45]  *See Kirby*, 50 Cal. Rptr. 3d at 617-18.  Given that Appellant's unaltered likeness is central to the core of the game experience, we are disinclined to credit users' ability to alter the digital avatars in our application of the Transformative Use Test to this case.

We are likewise unconvinced that *NCAA Football* satisfies the Transformative Use Test because Appellee created various in-game assets to support the altered avatars (*e.g.*, additional hair styles, faces, accessories, et al.).  In the first instance, the relationship between these assets and the digital avatar is predicated on the users' desire to alter the avatar's appearance, which, as we have already noted, is insufficient to satisfy the Test.  The ability to make minor alterations — which substantially maintain the avatar's resemblance to Appellant (e.g., modifying only the basic biographical information, playing statistics, or uniform accessories) — is likewise insufficient, for "[a]n artist depicting a celebrity must contribute something more than a 'merely trivial' variation."  *Winter*, 69 P.3d at 478-79.  Indeed, the ability to modify the avatar counts for little where

---

other musicians' songs.  *See No Doubt*, 122 Cal. Rptr. 3d at 401.

[45]  Admittedly, just as the presence of a photorealistic depiction of a celebrity cannot be the end of the inquiry, the mere fact that Appellant's likeness is the default appearance of the avatar cannot, without more, end our analysis.  It is merely another factor to consider in the balancing exercise.

the appeal of the game lies in users' ability to play "as, or alongside" their preferred players or team. *See No Doubt*, 122 Cal. Rptr. 3d at 411. Thus, even avatars with superficial modifications to their appearance can count as a suitable proxy or market "substitute" for the original. *See Comedy III*, 21 P.3d at 808; *Winter*, 69 P.3d at 479; *Cardtoons*, 95 F.3d at 974. For larger potential changes, such as a different body type, skin tone, or face, Appellant's likeness is not transformed; it simply ceases to be. Therefore, once a user has made major changes to the avatar, it no longer represents Appellant, and thus it no longer qualifies as a "use" of the Appellant's identity for purposes of our inquiry. Such possibilities therefore fall beyond our inquiry into how *Appellant's likeness* is used in *NCAA Football*. That the game may lend itself to uses wholly divorced from the appropriation of Appellant's identity is insufficient to satisfy the Transformative Use Test. *See No Doubt*, 122 Cal. Rptr. 3d 397 (focusing on the use of the No Doubt avatars, not alternative avatars or custom-made characters).

In an attempt to salvage its argument, Appellee suggests that *other* creative elements of *NCAA Football*, which do not affect Appellant's digital avatar, are so numerous that the videogames should be considered transformative. We believe this to be an improper inquiry. Decisions applying the Transformative Use Test invariably look to how the *celebrity's identity* is used in or is altered by other aspects of a work. Wholly unrelated elements do not bear on this inquiry. Even *Comedy III*, in listing potentially "transformative or creative contributions" focused on elements or techniques that affect the celebrity identity. *See Comedy III*, 21 P.3d at 809 (discussing factual reporting, fictionalized portrayal, heavy-handed lampooning, and subtle

social criticism); *see also Winter*, 69 P.3d at 478-79 (noting that "[a]n artist depicting a celebrity must contribute something more than a 'merely trivial' variation" before proceeding to discuss how the Winter brothers' likenesses were altered directly and through context); *Kirby*, 50 Cal. Rptr. 3d at 616-18.  To the extent that any of these cases considered the broader context of the work (e.g., whether events took place in a "fanciful setting"), this inquiry was aimed at determining whether this context acted upon the celebrity identity in a way that transformed it or imbued it with some added creativity beyond providing a "merely trivial variation."[46]  Thus, while we recognize the creative energies necessary for crafting the various elements of *NCAA Football* that are not tied directly to reality, we hold that they have no legal significance in our instant decision.

To hold otherwise could have deleterious consequences for the state of the law.  Acts of blatant misappropriation would count for nothing so long as the larger work, on balance, contained highly creative elements in great abundance.  This concern is particularly acute in the case of media that lend themselves to easy partition such as video games.  It cannot be that content creators escape liability for a work that uses a celebrity's unaltered identity in one section but that contains a wholly fanciful creation in the other, larger section.

---

[46] As we have already discussed, the broader context of NCAA Football does not transform Appellant's likeness into anything other than a digital representation of Appellant playing the sport for which he is known, while surrounded by the trappings of real-world competition.

For these reasons, we hold that the broad application of the Transformative Use Test represents an inappropriate application of the standard. Consequently, we shall not credit elements of *NCAA Football* that do not, in some way, affect the use or meaning of Appellant's identity.

As a final point, we note that the photograph of Appellant that appears in NCAA Football 2009 does not bear on our analysis above. On that subject, we agree with the District Court that the photograph is "but a fleeting component part of the montage" and therefore does not render the entire work nontransformative. *Hart*, 808 F. Supp. 2d at 786. The reasoning from *ETW* is sufficiently applicable: the context of Appellant's photograph — the montage — imbues the image with additional meaning beyond simply being a representation of the player. *See ETW*, 332 F.3d at 938 (holding that the photographs in a collage were "combined to describe, in artistic form, a historic event in sports history and to convey a message about the significance of [Tiger] Woods's achievement in that event"). Consequently, this particular use of Appellant's likeness *is* shielded by the First Amendment and therefore can contribute nothing to Appellant's claim for violation of his right of publicity.

## IV.    Conclusion

We therefore hold that the *NCAA Football 2004*, *2005* and *2006* games at issue in this case do not sufficiently transform Appellant's identity to escape the right of publicity claim and hold that the District Court erred in granted summary judgment in favor of Appellee.[47] While we do hold

---

[47] There can be no doubt that video games such as *NCAA Football* are the product of great effort, skill, and creative and

that the only apparent use of Appellant's likeness in *NCAA Football 2009* (the photograph) is protected by the First Amendment, Appellant's overall claim for violation of his right of publicity should have survived Appellee's motion for summary judgment.  Consequently, we need not address Appellant's desire for additional discovery.  We shall reverse the District Court's grant of summary judgment and remand this case back to the court below for further proceedings consistent with this opinion.

---

technical prowess.  As the Supreme Court noted in *Brown*, video games convey messages and expressive content in a way that is similar to prior media for expression.  *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011).  At the same time, games open new avenues through which artists and speakers can express their opinions and observations — by playing the game, a user is integrated into the expressive work in a way that has never before been achieved.  Surely, then, the First Amendment protects video games in the first instance, and nothing in our decision today should be read to diminish this fact.  Rather, our inquiry looked to whether other interests may surmount the First Amendment protection — as they can surmount protections for other modes of expression.  In finding that *NCAA Football* failed to satisfy the Transformative Use Test, we do not hold that the game loses First Amendment protection.  We merely hold that the interest protected by the right of publicity in this case outweighs the Constitutional shield.

AMBRO, <u>Circuit Judge</u>, dissenting

My colleagues and I take the same road but read the signs differently. Hence we stop at different places. I wish I was with them; I am not. I recognize that Electronic Arts, Inc. ("EA") has taken for the 2005 version of *NCAA Football* what most good Rutgers fans during Ryan Hart's playing days know—the Rutgers quarterback is Hart—and parlayed that recognition into commercial success.[1] A key to the profitability of *NCAA Football* is consumers' desire to experience a realistic football playing experience with their favorite teams. EA's use of actual college athletes' likenesses motivates buyers to purchase a new edition each year to keep up with their teams' changing rosters. The burn to Hart and other amateur athletes is that, unlike their active professional counterparts, they are not compensated for EA's use of their likenesses in its video games. Were this case viewed strictly on the public's perception of fairness, I have no doubt Hart's position would prevail.[2]

---

[1] That said, most outside Rutgers do not know that quarterback #13 is Ryan Hart. They did not know that in 2005, and even today many, if not most, Rutgers fans no longer connect #13 with Hart. Fame fades so quickly we call it fleeting. Even nostalgic memories nod off. For example, name the BYU quarterback when it was college football's national champion in 1984. (Hint: it wasn't Ty Detmer.)

[2] *See generally* Taylor Branch, *The Shame of College Sports*, The Atlantic, Oct. 2011, at 80–110 (lambasting NCAA "amateurism" and "student-athlete" policies as "legalistic confections propagated by the universities so they can exploit the skills and fame of young athletes," and discussing

Hart claims that he has under New Jersey law a right of publicity to prevent others from unfairly appropriating the value of his likeness for their commercial benefit, and that the First Amendment does not shield EA's infringement of this right.  This claim requires us to balance the competing interests implicated by the right of publicity and the First Amendment.  I agree with my colleagues that the Transformative Use Test is the preferred approach for balancing these interests, but we part ways on its interpretation and application.  The result is that they side with Hart, and I with EA.

The Transformative Use Test gives First Amendment immunity where, in an expressive work, an individual's likeness has been creatively adapted in some way.  Correctly applied, this test strikes an appropriate balance between countervailing rights—the publicity interest in protecting an individual's right to benefit financially when others use his identifiable persona for their own commercial benefit versus the First Amendment interest in insulating from liability a creator's decision to interweave real-life figures into its expressive work.

My colleagues limit effectively their transformative inquiry to Hart's identity alone, disregarding other features of the work.  This approach, I believe, does not find support in the cases on which they rely.  Further, my colleagues penalize EA for the realism and financial success of *NCAA Football*, a

---

lawsuits challenging these policies); *see also* Alexander Wolff, *When Worlds Collide*, Sports Illustrated, Feb. 11, 2013, at 18; Joe Nocera, *Pay Up Now*, N.Y. Times Mag., Jan. 1, 2012, at 30–35 (advocating payment of college athletes to alleviate "[t]he hypocrisy that permeates big-money college sports" arising from amateurism rules).

position I find difficult to reconcile with First Amendment protections traditionally afforded to true-to-life depictions of real figures and works produced for profit.  Because I conclude that the Transformative Use Test protects EA's use of Hart's likeness in *NCAA Football*, I respectfully dissent.

## I.  Formulation of the Transformative Inquiry

To determine whether an individual's identity has been "transformed" for purposes of the Transformative Use Test, I believe it is necessary to review the likeness in the context of the work in its entirety, rather than focusing only on the individual's likeness.  This interpretation is in line with the approach taken in *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 21 P.3d 797 (Cal. 2001), in which the Supreme Court of California first put in play the Transformative Use Test.  Per *Comedy III*, the right of publicity prevails over competing First Amendment interests "[w]hen artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain."  *Id.* at 808 (citing *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 575–76 (1977)).  To determine whether a work qualifies as "transformative" and not simply "literal," the *Comedy III* Court explained that "the inquiry is whether the celebrity likeness is one of the 'raw materials' from which *an original work* is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of *the work in question*."  *Id.* at 809 (emphases added).

Likewise, when applying the Transformative Use Test two years later in *Winter v. DC Comics*, 69 P.3d 473 (Cal. 2003), the California Supreme Court explained that the defendant's use was transformative because it could "readily ascertain that [the portrayals] are not just conventional depictions of plaintiffs but contain *significant expressive content other than plaintiffs' mere likenesses*."  *Id.* at 479

(emphasis added).    The Court also observed that the characters were placed in a "larger story, which is itself quite expressive." *Id.*[3]   The repeated focus on the use of an individual's likeness in the context of the work as a whole leaves me little doubt that we must examine the creative work in the aggregate to determine whether it satisfies the Transformative Use Test and merits First Amendment protection.

My colleagues correctly recite the Transformative Use Test set out in *Comedy III* and *Winter* [Majority Op. at 35–40], but later disregard that recitation.   When addressing Hart's claim, their analysis proceeds by analyzing, on a step-by-step basis, the digital avatar based on Hart, the context in which that avatar is set in *NCAA Football*, and the users' ability to alter the avatar's appearance, concluding at each step that Hart's likeness is not sufficiently changed to qualify as "transformative."   In the last instance, my colleagues reject as immaterial the myriad other creative elements of the video game   on   the   ground   that   "[d]ecisions   applying   the Transformative   Use   Test   invariably   look   to   how   the *celebrity's identity* is used," and that "[w]holly unrelated elements do not bear on this inquiry."   [Majority Op. at 59 (emphasis in original).]   But by cabining their inquest to

---

[3] While the *Winter* decision makes several references to the physical   differences   between   the   plaintiffs   and   their likenesses, these statements were made with respect to the Court's conclusion that "the portrayals do not greatly threaten plaintiffs' right of publicity" insofar as they were unlikely to decrease their commercial value.  69 P.3d at 479.   Similarly, there is no real contention that *NCAA Football* is harming ticket sales of college football games or decreasing Hart's commercial value; if anything, it seems more likely that both have been augmented by the popularity of EA's video games.

Hart's likeness alone, their approach is at odds with California Supreme Court decisions on the Transformative Use Test.[4]

The infirmity of this approach is highlighted by *ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003), in which the Sixth Circuit Court of Appeals concluded that an artist's use of several photographs of Tiger Woods in a commemorative collage was "transformative," and thus shielded from Woods' right-of-publicity suit. My colleagues do not—and, in my view, cannot—explain how the photographic images of Woods were transformed if they limit their analysis to "how the *celebrity's identity* is used." [Majority Op. at 59 (emphasis in original).] Instead, their discussion of *ETW* recognizes that the Sixth Circuit held that the artist's use qualified for First Amendment protection under the Transformative Use Test because "*the collage* 'contain[ed] significant transformative elements,'" and the *combination of images* "'describe[d], in artistic form, a historic event in sports history[—the 1997 Masters golf tournament—]and . . . convey[ed] a message about the significance of Woods' achievement in that event.'"

---

[4] The majority opinion relies heavily on two lower court decisions in California considering the right of publicity in the video game context, *No Doubt v. Activision Publishing, Inc.*, 122 Cal. Rptr. 3d 397 (Ct. App. 2011), and *Kirby v. Sega of America, Inc.*, 50 Cal. Rptr. 3d 607 (Ct. App. 2006). I do not consider these cases particularly instructive, as they were not decided by the architect of the Transformative Use Test, the Supreme Court of California. Thus, I do not attempt to explain or distinguish their holdings except to note that I believe *No Doubt*, which focused on individual depictions rather than the work in its entirety, was wrongly decided in light of the prior precedent in *Comedy III* and *Winter*.

5

[Majority Op. at 41 (first alteration in original) (emphasis added) (quoting *ETW*, 332 F.3d at 938; citing *Comedy III*, 21 P.3d at 809).]    No doubt the use at issue here—creating digital avatars of football teams and placing them in an interactive medium designed for user interaction and manipulation—is significantly more "transformative" than the use in *ETW*, which simply combined several photographs into a photomontage.

To me, a narrow focus on an individual's likeness, rather than how that likeness is incorporated into and transformed by the work as a whole, is a flawed formulation of the transformative inquiry.    The whole—the aggregate of many parts (including, here, many individuals)—is the better baseline for that inquiry.

## II.  Harmonization of the Transformative Use Test with First Amendment Precedent

Transformative use must mesh with existing constitutional protections for works of expression.    The First Amendment extends protection to biographies, documentaries, docudramas, and other expressive works depicting real-life figures, whether the accounts are factual or fictional.    *See, e.g.*, *Matthews v. Wozencraft*, 15 F.3d 432, 439–40 (5th Cir. 1994) (biographical novel); *Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723, 730–31 (E.D. Mich. 2000) (television miniseries), *aff'd*, 267 F.3d 457, 461–62 (6th Cir. 2001); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1996); *Hicks v. Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978) (docudrama and novel); *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 458–59 (Cal. 1979) (docudrama).[5]    "That books, newspapers, and

---

[5] While my colleagues acknowledge the need for uniform First Amendment treatment of different mediums in the

magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). Accordingly, courts have rejected as counter to free expression the claim that constitutional protection is diminished because a celebrity's name or likeness was used to increase a product's value and marketability. *See Guglielmi*, 603 P.2d at 460–62 (Bird, C.J., concurring).[6]

The protection afforded by the First Amendment to those who weave celebrities into their creative works and sell those works for profit applies equally to video games. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011). Thus EA's use of real-life likenesses as "characters" in its *NCAA Football* video game should be as protected as portrayals (fictional or nonfictional) of individuals in movies and books. I do not suggest that all digital portrayals of an individual are entitled to First Amendment protection. Rather, the work should be protected if that likeness, as included in the creative composition, has been transformed into something more or different than what it was before. And in any event the profit that flows from EA's realistic depiction of Hart (and the myriad other college football players portrayed in *NCAA Football*) is not constitutionally

---

abstract [Majority Op. at 51], it is difficult to reconcile their actual application of the Transformative Use Test to the video game here with the above-cited cases.

[6] As recognized by my colleagues, then-Chief Justice Bird's views in *Guglielmi* commanded the support of the majority of the California Supreme Court, and were relied on by the *Comedy III* Court to guide its definition of the Transformative Use Test. [Majority Op. at 48 n.31.]

significant, nor even an appropriate consideration, when applying the Transformative Use Test.[7]

My colleagues' understanding of the Transformative Use Test underplays the creative elements of *NCAA Football* by equating its inclusion of realistic player likenesses to increase profits with the wrongful appropriation of Hart's commercial value. This approach is at odds with the First Amendment protection afforded to expressive works incorporating real-life figures. That protection does not depend on whether the characters are depicted realistically or whether their inclusion increases profits. *See Guglielmi*, 603 P.2d at 460–62 (Bird, C.J., concurring) (concluding that

---

[7] In devising the Transformative Use Test, the California Supreme Court borrowed from "the purpose and character of the use" factor relevant to a copyright fair use defense, *see* 17 U.S.C. § 107(1), yet it rejected "a wholesale importation of the fair use doctrine into right of publicity law," *Comedy III*, 21 P.3d at 807. Nonetheless, it appears my colleagues permit another fair use factor to creep into their transformative analysis. Namely, their focus on the marketability of *NCAA Football* seems colored by the factor considering "the effect of the use upon the potential market for or value of the copyrighted work," *see* 17 U.S.C. § 107(4), notwithstanding that this element was expressly excluded from *Comedy III*'s articulation of the Transformative Use Test, *see* 21 P.3d at 808 n.10. Further, even if consideration of "market effect" were appropriate in a transformative analysis, I do not believe this factor would weigh in favor of finding an infringing use here because, as pointed out *supra* note 3, there is no contention that EA's inclusion of Hart's likeness in *NCAA Football* has caused a decline in the commercial value of his identity or persona.

acceptance of this argument would chill free expression and mean "the creation of historical novels and other works inspired by actual events and people would be off limits to the fictional author").

In sum, applying the Transformative Use Test in the manner done by my colleagues creates a medium-specific metric that provides less protection to video games than other expressive works. Because the Supreme Court's decision in *Brown* forecloses just such a distinction, *see* 131 S. Ct. at 2740, my colleagues' treatment of realism and profitability in their transformative use analysis puts us on a different course.

## III. <u>Application to Hart's Claim</u>

With this understanding of the Transformative Use Test, I conclude EA's use of avatars resembling actual players is entitled to First Amendment protection. *NCAA Football* transforms Hart's mere likeness into an avatar that, along with the rest of a digitally created college football team, users can direct and manipulate in fictional football games. With the many other creative features incorporated throughout the games, sufficient expressive transformation takes place to merit First Amendment protection.

*NCAA Football* involves myriad original graphics, videos, sound effects, and game scenarios. These artistic aspects permit a user to direct the play of a college football team whose players may be based on a current roster, a past roster, or an entirely imaginary roster comprised of made-up players. Users are not reenacting real games, but rather are directing the avatars in invented games and seasons. Further, the "Campus Legend" and "Dynasty Mode" features permit users to control virtual players and teams for multiple seasons, creating the means by which they can generate their own narratives. Such modes of interactive play are, I submit,

imaginative transformations of the games played by real players.

As noted by the District Court, it is not only the user that contributes to the interactivity; EA has created "multiple permutations available for each virtual player image." *Hart v. Elec. Arts, Inc.*, 808 F. Supp. 2d 757, 785 (D.N.J. 2011). This furthers the game's transformative interactivity. In fact, the majority opinion expressly approves the District Court's analysis on this point. [Majority Op. at 54–55 n.40.]

By limiting their inquiry to the realistic rendering of Hart's individual image, my colleagues misapply the Transformative Use Test. Contrary to their assertion that the other creative elements of *NCAA Football* are "[w]holly unrelated" [Majority Op. at 59], those elements are, in fact, related to its use of Hart's likeness. If and when a user decides to select the virtual 2005 Rutgers' football team as a competitor in a game, and to the extent that user does not alter the characteristics of the avatar based on Hart's likeness, the numerous creative elements of the video games discussed above are part of every fictional play a user calls. Any attempt to separate these elements from the use of Hart's likeness disregards *NCAA Football*'s many expressive features beyond an avatar having characteristics similar to Hart. His likeness is transformed by the artistry necessary to create a digitally rendered avatar within the imaginative and interactive world EA has placed that avatar.

I am thus convinced that, as used in *NCAA Football*, Hart's "likeness is one of the 'raw materials' from which [the] original work is synthesized . . . [rather than] the very sum and substance of the work in question." *Comedy III*, 21 P.3d at 809. EA bases its *NCAA Football* characters on countless real-life college football players, and it certainly seeks to depict their physical and biographical characteristics

realistically. Yet these "are not just conventional depictions of [Hart] but contain significant expressive content other than [his] mere likeness[]." *Winter*, 69 P.3d at 479. *NCAA Football* uses creative means to achieve its overall goal of realistically replicating a college football experience in which users may interact, direct, and control the players' avatars, including the one based on Hart's likeness. I find this use transformative.

\* \* \* \* \*

The Transformative Use Test I support would prevent commercial exploitation of an individual's likeness where the work at issue lacks creative contribution that transforms that likeness in a meaningful way. I sympathize with the position of Hart and other similarly situated college football players, and understand why they feel it is fair to share in the significant profits produced by including their avatar likenesses into EA's commercially successful video game franchise. I nonetheless remain convinced that the creative components of *NCAA Football* contain sufficient expressive transformation to merit First Amendment protection. Thus I respectfully dissent, and would affirm the District Court's grant of summary judgment in favor of EA.

11